JIN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | | |
|---|---|---|
| **JACOB PFALLER, ADMINISTRATOR** | ) | |
| **OF THE ESTATE OF** | ) | |
| **DANNY HAROLD PFALLER,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No:  3:19cv728 |
| | ) | |
| **HAROLD CLARKE,** | ) | |
| in his individual capacity, | ) | **JURY TRIAL DEMANDED** |
| **DR. MARK AMONETTE,** | ) | |
| in his individual capacity, | ) | |
| **DR. LAURENCE SHU-CHUNG WANG** | ) | |
| in his individual capacity, | ) | |
| **DR. JALAL TASLIMI,** | ) | |
| in his individual capacity, | ) | |
| **DR. RONALD TONEY,** | ) | |
| in his individual capacity, | ) | |
| **MELVIN DAVIS,** | ) | |
| in his individual capacity, and | ) | |
| **ARMOR CORRECTIONAL HEALTH** | ) | |
| **SERVICES, INC.,** | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## <u>COMPLAINT</u>

COMES NOW Plaintiff, Jacob Pfaller, Administrator of the Estate of Danny Harold

Pfaller and hereby submits this Complaint, pursuant to 42 U.S.C. § 1983 and Virginia law against

the Defendants, to vindicate his rights and to seek an award of damages resulting from the pain

and suffering and wrongful death caused by Defendants in failing to provide medical treatment

that would have saved Danny Pfaller's life and eased his suffering. Plaintiff also seeks an award

of punitive damages for the conscious disregard for Danny Pfaller's rights, dignity, and life.

## INTRODUCTION

1.

Defendants Harold Clarke and Mark Amonette have instituted a state-sanctioned policy and practice of the unconstitutional deprivation of medical care to patients incarcerated in the Virginia Department of Corrections ("VDOC"). This policy, as in effect when it mattered to Danny Pfaller ("Danny") and his family, was to withhold the only medical treatment that was recommended to treat Hepatitis C (also referred to as "HCV")—a cure—and to insufficiently monitor—with methods unsupported by medical science—the Hepatitis C patients that were being denied treatment. Under VDOC's policies and guidelines, the only way patients would get the Hepatitis C cure is if their liver disease advanced to cirrhosis, but this was substantially outside the universally accepted standard of care for Hepatitis C at that time. Even worse, Defendants Clarke and Amonette's policy instructed doctors at VDOC facilities to monitor these patients with lab tests only, which are not a reliable method to monitor patients with Hepatitis C and abnormal liver tests. The standard of care dictates that those patients, in addition to receiving prompt treatment with the Hepatitis C cure—regardless of how advanced their liver disease is—should be given CT scans, ultrasounds or other imaging every one-to-two years to screen for liver cancer. This cancer screening was and is particularly important for patients who have abnormal lab tests for their liver.

2.

While under the care of Dr. Laurence Wang at Green Rock Correctional Center, Danny received lab tests that consistently showed abnormal liver enzymes. Danny was not screened for liver cancer until **2018**, once he was showing severe symptoms. By then it was too late—he had Stage 4b Liver Cancer and quickly died with a 20cm-long tumor on his liver, a tumor that had

been growing for years. When Danny was finally referred to a specialist, he was told that he had

three months to live and that his only option was palliative care (also known as "comfort care")—

care that would treat his severe pain and keep him comfortable as he died. Despite consistently

describing pain as a 7 out of 10 and 8 out of 10, despite his and his family's persistent pleading

for pain relief, and despite the universal standard of care for patients dying of liver cancer, Danny

did not receive any palliative care at Green Rock from Dr. Wang or any other person.

3.

Danny's family and friends desperately sought hospice care for Danny so that he could die in

peace with his family, and they were told that Danny would probably be released to a facility that

would allow him to do that. Instead, Danny was transferred to a gymnasium at Deep Meadow

Correctional Center that had been converted into an overflow infirmary run by Armor

Correctional Health Services. Inc. and their employees, Dr. Jalal Taslimi and Dr. Ronald Toney.

Danny fared no better at Deep Meadow. He received no palliative care despite the

recommendations of multiple treating physicians at VCU, despite specifically requesting that

care, despite his family members pleading with VDOC officials to give Danny palliative care to

control his extreme pain, and despite the basic, universal standard of care for patients dying of

liver cancer. Danny spent his last days in excruciating pain from a cancer that never would have

grown if the officials at the VDOC took Danny's medical care seriously.

4.

Danny Pfaller was sentenced in 1999 for the murder of a man who happened to be a Training

Sergeant at Deep Meadow Correctional Center, the same VDOC prison where Danny was sent to

live out his final days, dying in severe pain. Danny is survived by his three loving sons, four

grandchildren, fiancée, extended family, and many close friends. They remain shocked and

mystified by the way Danny was denied treatment for a curable disease that ultimately killed him—and how he died in agonizing pain for no justifiable reason.

## JURISDICTION AND VENUE

5.

Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1343(a)(4), under 42 U.S.C. § 1983. Venue is proper under 28 U.S.C. § 1391(b) and Local Civ. Rule 3(C) because Defendant Amonette resides in this District and Division.

## PARTIES

**A.  Danny Pfaller,** *the Decedent*

6.

The deceased, Danny Pfaller, was at all times relevant to this action a citizen of the United States of America and the Commonwealth of Virginia and an offender incarcerated by the VDOC. From 1999 to 2018, Danny was housed under the custody of the VDOC at Green Rock Correctional Center until shortly before his death on October 3, 2018 when he was transferred to another VDOC facility, the Powhatan Infirmary Annex at Deep Meadow Correctional Center. Danny was infected with Hepatitis C the entire time he was incarcerated by VDOC, beginning in 1999. Danny is survived by his three sons and four grandchildren.

**B.  Jacob Pfaller, Plaintiff**

7.

Jacob Pfaller is the Administrator of the Estate of Danny Harold Pfaller, the decedent in this action. Jacob is Danny's natural born and eldest son. Jacob is suing on behalf of Danny Pfaller and Danny's estate. At all times relevant to this action Jacob Pfaller was a citizen of the

United States of America and the Commonwealth of Virginia. The facts pertaining to his claims are outlined below in the sections entitled, "Relevant Facts" and "Counts."

**C.  Harold Clarke, Defendant**

8.

At all relevant times, Defendant Harold Clarke was the Director of the VDOC and was responsible for all oversight, operation, and administration of the Commonwealth's correctional system, including providing access to adequate medical treatment and the formulation of policies that ensure the provision of that access to adequate medical treatment to Danny and those similarly situated. During all relevant times, Clarke had a duty to know that inmates such as Danny that were under Clarke's care, custody, and control had chronic Hepatitis C and needed treatment for Hepatitis C (Hepatitis C was and remains a common and known problem within Virginia prisons, during all relevant times).

9.

At all relevant times, Clarke knew about VDOC's Hepatitis C policy and that, in effect, said Hepatitis C policy refused treatment to many inmates who had chronic Hepatitis C. During all relevant times, Clarke had the authority to order modifications to the Hepatitis C policy in a manner that would have at the very least authorized approval for Danny's Hepatitis C treatment.

10.

At all relevant times, Clarke knew chronic Hepatitis C was a deadly disease and knew that ultimately Dr. Amonette made the determination of whether inmates chronically suffering from the deadly Hepatitis C virus needed treatment. In 2015, Clarke deliberately instituted, condoned, and ratified a VDOC policy in which VDOC inmates known to be infected with chronic Hepatitis C were not treated for said Hepatitis C infection. In sum, at all relevant times,

Clarke approved and ratified the policies that were administered by Dr. Amonette and that were used to deny treatment to Danny by Defendants.

11.

Clarke is being sued in his individual capacity. At all relevant times, Defendant Clarke acted under color of state law. At all times relevant, Clarke was responsible for knowing all applicable laws regarding the medical treatment of inmates under the VDOC's care, custody, and control.

**D.  Dr. Mark Amonette, Defendant**

12.

At all relevant times, Defendant Dr. Mark Amonette, M.D. was the Chief Physician and Medical Director of the VDOC and was responsible for overseeing the delivery of medical services to VDOC inmates. During all relevant times, as director of medical services for VDOC, Dr. Amonette had a duty to know that inmates such as Danny had chronic Hepatitis C and thus needed treatment for Hepatitis C. At all relevant times, Dr. Amonette's duty extended to collecting data about inmates who have Hepatitis C.

13.

During all relevant times, Dr. Amonette's duties also included ensuring treatment for all inmates who were known to have chronic Hepatitis C, while under the care and custody of the VDOC—irrespective of what stage said chronic Hepatitis C had reached. (Hepatitis C was and remains a common and known problem within Virginia prisons, at all relevant times.) Indeed, as VDOC's Chief Physician/Medical Director and a high-ranking official under the supervision of Defendant Clarke, Dr. Amonette has reported to Clarke on many occasions that VDOC inmates known to be infected by chronic Hepatitis C are not receiving treatment for their Hepatitis C

infections. Defendant Dr. Amonette has deliberately failed to treat or approve for treatment inmates known to carry the chronic Hepatitis C infection. Upon information and belief, Dr. Amonette knew that Danny Pfaller had untreated Hepatitis C, just as he knew about all of the other inmates with Hepatitis C who were not being treated—pursuant to his policy and guidelines.

14.

Defendant Dr. Amonette is sued in his individual capacity. At all times relevant, Dr. Amonette was responsible overseeing the administration of medical care to Danny Pfaller and for knowing all applicable laws regarding the medical treatment of inmates under the VDOC's care, custody, and control. At all times relevant, he acted under color of state law.

**E.  Dr. Laurence Shu-Chung Wang, Defendant**

15.

At all relevant times, Dr. Wang, M.D. was an employee of the Virginia Department of Corrections providing medical services to VDOC inmates at Green Rock Correctional Center. Beginning in at least 2013, Dr. Wang was Danny's treating physician at VDOC. Upon information and belief, at all relevant times, Dr. Wang reported to Dr. Amonette.

16.

In 2013, 2014, 2015, 2016, 2017, and the first half of 2018, when Dr. Wang was aware that Danny had Hepatitis C and abnormal liver tests from his lab results, Dr. Wang did not perform or order a screening abdominal imaging procedure to rule out liver cancer for Danny. In addition, Wang did not prescribe direct acting antiviral drugs to treat Danny's Hepatitis C. Wang did not refer Danny to another physician to prescribe direct acting antiviral drugs to treat Danny's Hepatitis C. Wang did not base his decision to not treat Danny in 2013, 2014, 2015,

2016, 2017, or 2018 on medical science or the universally accepted AASLD guidelines for the treatment of Hepatitis C. Wang based his decision to not treat or refer Danny for treatment on Danny's liver fibrosis/scarring levels—levels that he assessed with lab-based methods only and did not assess with a reliable method such as a FibroScan when making a decision to defer a patient treatment. When VCU doctors recommended palliative care for Danny's untreatable Stage 4b liver cancer, Dr. Wang took no steps to order or provide palliative care to Danny despite knowing that Danny was in severe pain as recorded by nurses in his medical records.

17.

Dr. Wang is sued in his individual capacity. At all times relevant, Dr. Wang was responsible for administering medical care to Danny. At all times relevant, he acted under color of state law.

**F. Melvin Davis, Defendant**

18.

At all relevant times, Melvin Davis, was the Warden of Green Rock Correctional Center and an employee of the Virginia Department of Corrections.

19.

Davis is sued in his individual capacity. At all times relevant, Davis was responsible overseeing the administration of medical care to Danny Pfaller and for knowing all applicable laws regarding the treatment of inmates under the VDOC's care, custody, and control, including medical treatment. At all times relevant, he acted under color of state law.

**G.  Dr. Jalal Taslimi, Defendant**

20.

At all relevant times, Dr. Taslimi, M.D. was an employee of the Armor Correctional Health Services, Inc. providing medical services to VDOC inmates as the Medical Director of Powhatan Infirmary Annex at Deep Meadow Correctional Center. Beginning on September 25, 2018, Dr. Taslimi was Danny's treating physician at Powhatan Infirmary Annex at Deep Meadow Correctional Center.

21.

In 2018, when VCU doctors recommended palliative care for Danny's untreatable Stage 4b liver cancer, Dr. Taslimi took no steps to order or provide palliative care to Danny, despite knowing that Danny was in severe pain as recorded by nurses in his medical records.

22.

Dr. Taslimi is sued in his individual capacity. At all times relevant, Dr. Taslimi was responsible for administering medical care to Danny. At all times relevant, he acted under color of state law.

**H.  Dr. Ronald Toney, Defendant**

23.

At all relevant times, Dr. Ronald Toney, M.D. was an employee of the Armor Correctional Health Services, Inc. providing medical services to VDOC inmates. Beginning on September 25, 2018, Dr. Toney was Danny's treating physician at Powhatan Infirmary Annex at Deep Meadow Correctional Center.

24.

In 2018, when VCU doctors recommended palliative care for Danny's untreatable Stage 4b liver cancer, Dr. Toney took no steps to order or provide palliative care for Danny's pain despite knowing that Danny was in severe pain as recorded by nurses in his medical records, with the exception of the telephone order on October 3, 2018 at 11:10 a.m., when Dr. Toney ordered a Fentanyl patch for Danny.

25.

Dr. Toney is sued in his individual capacity. At all times relevant, Dr. Toney was responsible for administering medical care to Danny. At all times relevant, he acted under color of state law.

### I.   Armor Correctional Health Services, Defendant

26.

At all relevant times, Armor Correctional Health Services, Inc. ("Armor") was responsible for providing medical services to VDOC inmates, including Danny Pfaller when he was located in the Powhatan Infirmary Annex at Deep Meadow Correctional Center in 2018.

27.

At all relevant times, Armor employed Dr. Jalal Taslimi, who was acting within the scope of his employment during his alleged acts and omissions at all relevant times.

28.

At all relevant times, Armor employed Dr. Ronald Toney, who was acting within the scope of his employment during his alleged acts and omissions at all relevant times.

29.

On information and belief, at all relevant times, Armor had a policy, written or unwritten, of denying palliative care to patients dying of cancer.

## RELEVANT FACTS

A.     **By 2013, Defendant Dr. Wang knows Danny has chronic Hepatitis C and does not treat him**

30.

Danny Pfaller entered the Virginia Department of Corrections in 1999.

31.

Danny was diagnosed with Hepatitis C before he entered VDOC.

32.

By at least 2013, Dr. Wang began treating Danny at VDOC for other ailments and *knew* that Danny had been diagnosed with Hepatitis C because Danny repeatedly told Dr. Wang that he had Hepatitis C.

33.

By at least 2013, Dr. Wang began treating Danny at VDOC for other ailments and *knew* that Danny had been diagnosed with Hepatitis C because Dr. Wang reviewed Danny's medical records, which demonstrated that Danny had been infected with Hepatitis C since at least the time he entered VDOC custody.

34.

In 2013, 2014, 2015, 2016, 2017, and 2018, Dr. Wang ordered general lab tests for Danny, and each of those lab tests demonstrated that Danny was still infected with Hepatitis C and had elevated liver enzymes.

35.

Every liver test, including AST and ALT, performed on Danny from 2014 to 2018 was abnormal.

36.

Throughout his time under the care of Dr. Wang, Danny made verbal requests to Dr. Wang to receive treatment for his Hepatitis C, and these requests were denied.

**B.     The prevailing standard of care required cancer screening for all persons infected with Hepatitis C, as well as approval for treatment and actual treatment of the Hepatitis C virus**

37.

At all relevant times, the following procedures were simple, mandatory tasks that the standard of care demanded Dr. Wang and Dr. Amonette perform which required no appreciable medical discretion:

1.  Reviewing, or referring the patient to a Hepatologist, Gastroenterologist, or Infectious Disease Physician with expertise in Hepatitis C to review the medical records of patients who have a confirmed diagnosis of chronic Hepatitis C and have not been treated.

2.  *If Dr. Amonette or Dr. Wang or his staff are unable to treat the patient with Direct Acting Antiviral Drugs for any reason*, referring the patient to another physician to treat the patient with Direct Acting Antiviral Drugs with the goal of eradicating the Hepatitis C virus from the body and reducing the risk of liver scarring, Hepatocellular Carcinoma (liver cancer), and other painful and dangerous complications from untreated Hepatitis C.

3.  Monitoring the patient by gaining a reliable assessment of the patient's disease progression through the use of imaging such as a FibroScan.

4.  Performing some type of liver imaging such as Ultrasound, CT scan or MRI in a patient with abnormal liver tests and Hepatitis C to evaluate the patient for liver cancer.

38.

The standard of care in the community for Hepatitis C infections is the use of Direct Acting Antiviral Drugs ("DAAs"), a practice now well-established.

39.

From 2016 to present, the standard of care in treatment of chronic Hepatitis C has been the use of DAAs and to treat or approve for treatment *everyone, regardless* of the severity of fibrosis or cirrhosis, with very few exceptions.

40.

The standard of universal treatment for Hepatitis C was based on the emergence of medical data. Guidelines published by the American Association for the Study of Liver Disease (AASLD) were changed in 2016, as data emerged regarding the overall liver and non-liver benefits of Hepatitis C therapy, the excellent tolerability of treatment, and the extraordinarily high rates of Hepatitis C cure and treatment was recommended for everyone with Hepatitis C *regardless* of severity of their liver disease.

41.

Patients who are cured of their Hepatitis C infection experience multiple benefits including a decrease in liver inflammation, improvement in fibrosis, and resolution of cirrhosis in up to fifty percent (50%) of patients; diminished rates of portal hypertension, splenomegaly, and other clinical manifestations of advanced liver disease; a seventy percent (70%) reduction in the risk of liver cancer; and a ninety percent (90%) reduction in the risk of liver-related mortality and requirement for liver transplantation. In addition, cure of Hepatitis C infection also reduces symptoms and mortality from multiple non-liver associated manifestations of viral infection,

including joint pain, rates of lymphoma, fatigue, diabetes, cryoglobulinemic vasculitis, and other non-liver cancers.

42.

Three premises are accepted in the current medical standard for treatment of Hepatitis C – a standard that has been in effect since 2016: (1) having Hepatitis C for *greater than six months* constitutes a chronic illness; (2) the current standard of care is to treat *everyone* with rare exception; and (3) cost *cannot* be a factor for altering the current standard for medical treatment. Inmates with known, chronic Hepatitis C should be immediately approved for treatment of their Hepatitis C.

## C. Reliance on VDOC Hepatitis C Guidelines

43.

To the extent that Dr. Wang or Dr. Amonette relied on clinical guidelines outside of the AASLD HCV Guidelines for the management and treatment of Hepatitis C—guidelines that have been universally accepted by the medical community in the United States for decades—and instead relied on clinical guidelines drafted by Dr. Amonette of the Virginia Department of Corrections, Dr. Amonette had no medical justification for these guidelines and Dr. Wang had no medical justification to rely on these guidelines.

44.

The VDOC's recommendation, from 2015 through 2019, was to treat only HCV infected patients who had advanced liver disease, HIV co-infection, or diabetes, and this severely deviated from accepted standard of care.

45.

Because of the many benefits associated with successful HCV treatment, since 2016, a panel of HCV experts have consistently published guidelines that recommend treatment with antiviral therapy with the goal of achieving clearance of the virus, in almost all patients, **preferably early in the course of chronic HCV infection before the development of severe liver disease and other complications.**

46.

Danny was denied therapy by his treating physician, Dr. Wang, under the instruction of Dr. Amonette through his guidelines, as Danny did not have advanced liver disease based on laboratory testing.

47.

However, as each year that Danny should have been treated (regardless of his level of fibrosis) passed, Danny did not have an adequate assessment of his liver condition. Ongoing assessment of liver disease is **especially important in patients for whom Hepatitis C therapy has been deferred.**

48.

At all relevant times, several factors had to be taken into consideration if HCV treatment deferral was entertained or mandated by lack of medication access:

a.   Fibrosis progression varies markedly between individuals based on host, environmental, and viral factors;

b.   Hepatic fibrosis may not progress linearly. Some individuals may progress slowly for many years followed by an acceleration of fibrosis progression, while others may progress more rapidly;

c. Fibrosis results from chronic hepatic necroinflammation. A higher activity grade on liver biopsy and higher serum transaminase values as displayed by Danny Pfaller are associated with more rapid fibrosis progression and may be associated with a higher risk of liver cancer;

d. Even patients with normal liver tests may develop substantial liver fibrosis over time; and

e. **It was well-known, accepted knowledge in the medical community in the United States that patients with HCV can develop liver cancer irrespective of the degree of fibrosis.**

49.

Techniques to both monitor and estimate liver disease severity are recommended by HCV experts on at least an annual basis. These tests include:

- Liver-directed physical exam
- Routine blood tests (eg, ALT, AST, albumin, bilirubin, international normalized ratio [INR], and CBC with platelet count)
- Serum fibrosis marker panels such as including APRI/Fib-4/fibrosure
- Liver imaging (eg, ultrasound, or CT scan) to assess for liver cancer
- Non-invasive radiologic studies such as Transient elastography (eg fibroscan, ARFI, or MR Elastography).

50.

Danny did not have a FibroScan performed until July 2018—less than three months before he died—and up to that point had not received an adequate assessment of his liver fibrosis or an imaging scan of his liver to screen for cancer.

**D. Dr. Amonette and Dr. Wang's reliance on the VDOC's guidelines was an unjustifiable risk with no basis in medical science**

51.

Dr. Amonette had no medical justification for enforcing VDOC's Hepatitis C guidelines.

52.

Dr. Wang had no medical justification to rely on VDOC's Hepatitis C guidelines.

53.

Neither Dr. Amonette or Dr. Wang had any medical justification to rely on VDOC's Hepatitis C guidelines because no reasonably prudent doctor in 2016 could conceivably endorse or abide by clinical guidelines like the VDOC's Hepatitis C guidelines, which instructed physicians to indefinitely defer patients to receive a referral for Hepatitis C treatment until their liver scarring (potentially irreversible liver damage measured between F0 to F4 with F4 being cirrhosis) gets worse.

54.

The guidelines from the VDOC instructing physicians to defer treatment and defer referral for treatment evaluation until patients demonstrated their liver scarring was F4 or F3 (advanced fibrosis), were substantially outside the standard of care and opposite reasonable medical judgment.

55.

VDOC guidelines instructed physicians to exclusively rely on lab-based testing to determine the level of liver scarring that would "qualify" a patient to receive a more reliable test such as a FibroScan and to repeat these labs every six months while continuing to refuse patients treatment, treatment referrals, or treatment referral requests. This was a highly risky approach that had no medical justification whatsoever, and if Danny's Hepatitis C treatment was to be

deferred for any reason at all, an accurate, reliable assessment should have been made of his liver condition prior to deferring Danny's treatment.

56.

The exclusive use of APRI and FIB-4 to base an assessment of Danny's liver scarring *while using that assessment to justify deferring Danny treatment for his Hepatitis C* was substantially outside the standard of care and opposite reasonable medical judgment.

57.

The effect was a deliberate refusal to assess Danny's medical condition in a reliable way while simultaneously denying Danny access to any medical care to treat his Hepatitis C *based on that unreliable assessment*.

**E. Danny's seemingly impossible struggle to receive medical attention before he is diagnosed with liver cancer**

58.

Dr. Wang reviewed Danny's labs on May 7, 2018, which revealed high liver enzyme levels that Dr. Wang used to calculate a FIB-4 score of 2.18. Based on this score, Dr. Wang requested Danny get a FibroScan, which Danny did not get until July 17, 2018.

59.

Danny Pfaller began complaining of abdominal pain by June 2018 at the latest and indicated that he had been experiencing abdominal pain for three weeks, almost zero bowel movements, severe nausea, dry heaves, and a cough. Dr. Wang indicated in Danny's medical records that he reviewed and understood this information.

60.

On June 24, 2018, **Danny told the nurse that he thought he had a *tumor*,** and this is recorded in his medical record and was reviewed by Dr. Wang in June 2018.

61.

On June 26, 2018, Nurse Tara Cobbs told Danny to "communicate more truthfully with his family" about his medical condition. At this point, Danny had an enormous tumor on his liver and cancer, he knew something was seriously wrong, and Dr. Wang continued to treat Danny's symptoms without any urgent concern for his actual condition.

62.

During the month of June and July 2018, Danny, as well as Danny's family and friends, including his fiancée, Sara Kennedy, sought emergency medical treatment for Danny, who was experiencing a medical emergency—he had barely had a bowel movement in three weeks and experienced regular shortness of breath and a severe cough.

63.

In June and July 2018, Ms. Kennedy sent multiple emails and made dozens of phone calls to Green Rock Correctional Center.

64.

In a single example of Ms. Kennedy's many efforts, on July 2, 2018, Sara Kennedy sent an email to Regional Manager Marcus Elam, stating:

Mr Elam,

I am writing again concerning Danny Pfaller, the inmate at the Green Rock Correctional Facility under the VADOC. He continues to be in a medical emergency. With no emergency care. Still. Please help him.

Danny is in worsening and distressful medical condition since I last emailed you. I saw him two days ago at the facility, the day before I had to return home to California. He was in great physical distress. He is going on 4 weeks now having an abdominal blockage -with very little to no bowel movement. **He has not been diagnosed.** Only given symptom medication-that is not working, after 3 days now. Can you imagine the added pain with the wrong treatment in this blockage? It does not require a doctor even to see he is in serious condition. I saw it sitting across from him 2 days ago. His abdomen has not been looked by film. He cannot go on much longer like this Mr. Elam.

**I left for home fearing that if he does not get adequate and immediate medical care he will die.** Do you understand how horrible that was for me to board a plane fearing this- for him.

During my extended stay in Virginia I called, emailed, begged and pleaded for the facility to send him for a film of his abdomen and emergency care. This has still not been done.

We have pleaded with the facility medical staff, the warden, VADOC, local/state representatives,  and even the Governor of Virginia. All emails and calls refer back to the VADOC.

So we are writing you because we believe you understand that these are people in your facilities and that they have a right, as people, to received adequate and complete medical care. We believe you will not let this man continue to suffer, and possibly die, around this serious medical issue.

A Green Rock staff member by the name of Mr. Winfield has been one of the only people, including the warden, who had ever returned a call from me from the facility. **And let me be clear-the warden has not returned my numerous and ever growing fearful voicemails.** Mr. Winfield is aware and concerned for this inmate. Perhaps someone will take his word in this emergency, if not ours?

Danny Pfaller continues to be undiagnosed, in great agony and discomfort and cannot hold out much longer in this medical condition.

I now have Power of Attorney notarized at the facility, to speak to and for Danny Pfaller.

Please help us. Please.

65.

In another example of Ms. Kennedy's many efforts, on July 5, 2018, Ms. Kennedy wrote

the following email to David Robinson, Marcus Elam, and Warden Melvin Davis:

It is now 7/5/18 and Danny Pfaller is weakening and has still not received adequate medical tests or treatment.  He continues to be in pain and distress. He is struggling to sleep with this horrible abdominal swelling and is also now being kept awake by leg cramping and a severe cough. Still this man suffers. With no action on the part of the facility -or your office.

**Last night Lieutenant Waller found Danny hanging upside down from his bunk trying to move the fluid in his lungs to stop coughing.** This lieutenant filed an immediate and emergency medical request. Danny was taken to medical and examined by a nurse. **This lieutenant stated his concern that Danny needs care beyond what is offered there**

**in the facility.** And showed concern that Danny is clearly in medical distress and pain that requires further testing. His condition is clear and obvious to anyone who sees him. Still he sits in his cell trying to treat himself. Still concerned that his swollen abdomen needs to be diagnosed. With very little waste movement he is still suffering with an intestinal blockage and discomfort.

Still, we are begging you to help him. **This is going to end in an unnecessary and more dangerous medical situation for Danny.** He must be adequately examined after weeks now of swelling and discomfort. He is in danger, in pain and he is exhausted with trying to treat himself.

We do not plan to stop speaking about this inhumane and wrong treatment of this man.

We continue today to beg you to get him adequate medical care. Please.

Still, I have not spoken with a representative with your agency.

Still, an inmate in your care is in medical distress and pain.

I will not stop asking for his right to adequate and quality care. It is his right. To live.

Sara Kennedy

66.

Despite persistent requests for emergency care, Danny did not receive emergency or urgent care from a physician, physician assistant, or nurse practitioner.

67.

Despite persistent requests for emergency care, Danny did not receive a FibroScan on his liver until July 17, 2018 and did not receive further imaging on his abdomen until July 20, 2017.

**F. Danny's FibroScan indicates he has cirrhosis of the liver**

68.

Danny's July 17, 2018 FibroScan result was 75 kPa, indicating that Danny had advanced cirrhosis.

69.

According to the medical records, the day before the FibroScan was conducted, Dr. Wang filled out a referral request for Danny to be seen by a hepatologist at VCU where he could receive treatment for his Hepatitis C.

70.

The fact that Dr. Wang filled out this referral request prior to Danny's FibroScan indicates that ***Dr. Wang knew that Danny should have already been treated for Hepatitis C regardless of what his FibroScan result showed his liver scarring to be, because an absence of liver scarring is not a medically justifiable reason not to treat a patient with Hepatitis C***—based on the AASLD guidelines in 2016 at the latest.

## G. Dr. Wang's delays in getting Danny an MRI, and VDOC Quality Improvement Coordinator Johnnette Cleaton's attempt to cover it up

71.

On July 20, 2018, a CT Scan was performed at the Danville Imaging Center; the findings showed a mass on Danny's liver and ascites in the stomach indicative of a failing liver. Dr. Hector Cooper ***recommended an MRI***. Dr. Wang received these results and Dr. Cooper's recommendation, but ***Dr. Wang did not order an MRI*** or send Danny to get an MRI at this time.

72.

On July 24, an emergency request for a biopsy of the liver was filled out for VCU, but this appointment never occurred, the form was X'd out with the words "Local Appt - Aug 1 2018" written over it.

73.

Instead of going to VCU, on August 1, Dr. Wang sent Danny to Danville

Gastroenterology. On the consult request, Dr. Wang indicated the medical complaint was

"Abdominal Pain / CT done 7/20 shows a Mass / Possible Biopsy."

74.

At Danville Gastro, on August 1, 2018, Danny saw Dr. Mukesh Patel who diagnosed

Danny with "***probable liver cancer***," ***recommended an MRI***, and ***filled out a detailed medical***

***order for an MRI*** to be performed at the Danville Imaging Center.

75.

On August 3, 2018, Dr. Wang received Dr. Patel's diagnosis, recommendation, and MRI

order. Once again, ***Dr. Wang did not order an MRI*** or send Danny to get an MRI.

76.

On August 3, 2018, instead of requesting an MRI, Dr. Wang requested a liver biopsy

from VCU and stated that the diagnosis was "Liver Mass / possible cancer."

77.

On August 10, the VDOC Health Services Quality Improvement Unit Coordinator,

Johnnette Cleaton, wrote and signed a letter to Danny Pfaller. The letter read:

> Health Services received an inquiry from your family member regarding your medical care on August 8, 2018. The following complaints of not receiving recommended MRI and treatment plan have been reviewed.
> **Based on the information provided and upon further investigation we have determined that the medical provider discussed your test results with you and there is no documentation that an MRI was recommended.** You are currently under an active treatment plan for your condition.
> If you have any medical issues, please resubmit a sick call request for further evaluation of your medical needs and treatment plan. You are encouraged to follow the recommendations of the health care staff as well. There is no violation of policy/procedure regarding this issue. No further action is needed from this level.

(emphasis added).

78.

Upon reviewing the complaint from Danny's family member, Ms. Cleaton had a non-discretionary duty to speak to Danny's facility physician, Dr. Wang.

79.

By August 8, the information in Danny's medical records invariably demonstrated *two* outside physicians had recommended an MRI, and Dr. Patel had actually ordered an MRI be performed at Danville Imaging Center.

80.

Despite the clear evidence in Danny's medical record that two independent physicians had recommended an MRI, Cleaton told Danny that no such recommendation existed.

81.

*On information and belief*, Cleaton spoke to Dr. Wang, and Dr. Wang was not truthful with Cleaton about what Danny's outside physicians had recommended.

82.

In 2018, MRIs were considered one of the most expensive health care costs in the United States and one of the most expensive health care costs to the VDOC., approximately twice as expensive as CT scans.

83.

A report from the Kaiser Family Foundation in 2018 found that the average price of an MRI in the United States was $1,119, higher than in any comparable countries.

84.

Between 2014 and 2017, per capita inmate medical costs increased by over 21% for the VDOC, and by 2018, a concerted effort was being made to reduce costs for inmate medical services.

85.

On August 16, Danny was taken to VCU and Dr. Uma Prasad told Dr. Wang by phone that Danny could not receive a biopsy due to ascites; Dr. Prasad and Dr. Scott Wagner both stated that ***Danny needed to receive an MRI***. This was the third and fourth time that a doctor told Dr. Wang that Danny needed an MRI.

86.

Dr. Wang finally ordered an MRI on August 16, and Danny finally received an MRI on August 22.

**H.  Danny's MRI reveals Terminal Stage 4 Liver Cancer, and only palliative care is recommended**

87.

Danny's MRI revealed a tumor nearly 20cm long on his liver, and he was diagnosed with stage 4b liver cancer.

88.

On August 22, 2018 the VCU Tumor Board determined that Danny's liver cancer was terminal and the only treatment that he should receive is palliative care.

89.

On September 4, 2018 VCU Hepatology physicians also determined that Danny's liver cancer was terminal and the only treatment that he should receive is palliative care.

90.

Danny continued complaining of abdominal pain in 2018—to the extent it is recorded in his medical record—on at least June 24, July 11, July 24, August 1, August 16 (Pain = 6/10), August 28 (Pain = 8/10), August 29, September 1 (Pain = 7/10), September 4 (Pain = 8/10), September 27, and September 28 (Pain = 8/10).

**I.    Liability of Dr. Wang for Danny's agonizing pain and suffering in his final days**

91.

The standard of care applicable to Dr. Wang included the following tasks that required no appreciable medical discretion:

1. Reviewing health history/chart for patients with chronic and acute conditions, including patients who have a confirmed diagnosis of terminal liver cancer with a recommendation for palliative care.

2. Treating a patient with terminal liver cancer with pain medications such as a Fentanyl patch with the goal of reducing the severe pain associated with acute organ failure and terminal liver cancer other painful and dangerous complications from terminal liver cancer.

3. Monitoring the patient by gaining a reliable assessment of the patient's pain and specific requests for palliative care (also known as "comfort care").

4. When a patient with untreatable Stage 4b liver cancer has been recommended for palliative care, placing that patient on a pain medication regimen such as a Fentanyl patch, and if the patient is still in pain, placing the patient on IV narcotics.

92.

Dr. Wang did not treat Danny Pfaller, a patient with terminal liver cancer, with pain medications such as a Fentanyl patch with the goal of reducing the severe pain associated with acute organ failure, terminal liver cancer, and other painful and dangerous complications from terminal liver cancer.

93.

Despite the recommendation for pain medications from the VCU Tumor Board on August 22, 2018 and from VCU Hepatology physicians on September 4, 2018, and despite Danny complaining of worsening abdominal pain under Wang's care from June 2018 until his transfer to Deep Meadow Correctional Facility on September 25, 2018, Dr. Wang never prescribed Danny palliative pain medication, never referred Danny to another physician to prescribe Danny palliative pain medication, and Danny never received palliative pain medication under Wang's care.

94.

Dr. Wang did not provide any care for Danny to gain a reliable assessment of the patient's pain and specific requests for palliative care (also known as "comfort care"), or if he did, he ignored Danny's requests for comfort care.

**J.   In a gruesome twist, Danny is sent to die at Deep Meadow—the prison whose officers were trained by the man that Danny killed**

95.

Once Danny was diagnosed with terminal cancer and less than three months to live, an assistant to Green Rock Warden Melvin Davis told Danny's fiancée, Ms. Kennedy, that Danny had two options: transfer to a *hospital* or transfer to a *prison that had hospice care*.

96.

On September 16, 2018, Danny's fiancée, Ms. Kennedy, wrote an email to Green Rock Warden Melvin Davis, stating:

Dear Warden Davis,

I am writing to let you know that Danny is calling in horrible medical distress and pain. He is not able to call as usual, or talk for more than a few minutes. As of this weekend, he

cannot eat. He is reporting that his legs are now swelling with fluid. He cannot take much more of this pain and horrific suffering. He is dying quickly.

Please get him to a hospital for comfort care. Please. He had asked to go to the Deerfield Hospice facility. His counselor decided to not put this request in-as they have been telling him he will likely receive clemency, and won't require hospice in custody. Danny may never make a clemency decision. He needs help now.

Danny Pfaller needs hospice care immediately. He is suffering horribly. Please get him to the hospice facility. He needs medical care beyond Motrin. Stage 4 cancer on Motrin is just cruel. Please transfer him to hospice. Please.

97.

On the evening of September 23, 2018, Danny called his fiancée asking her to call the warden for desperate help to go to a hospital. It took three inmates to get Danny to the phone to make this desperate call. During the call, Danny's fiancée could barely make out his words due to his labored breathing and moaning with pain. He choked out the words, "Call the warden. Tell him I need help. I need hospice. Please send me to hospice. I need help. Help me."

98.

On September 24, 2018, Ms. Kennedy wrote an email to Warden Davis, stating:

Dear Warden,

Danny Pfaller, A dying inmate in your facility was assisted to the phone yesterday to call his family. Danny can barely speak, walk, or eat.

Danny called last night and it was all he could do to say: 'Call the warden. Tell him I need help. I need hospice. Please send me to hospice. I need help. Help me.'

Last Monday, we wrote begging you to get him out of his cell where he lays in complete distress and pain. Last Monday you told one family member that hospice was in the works. NOTHING has been done. This man is dying on the other end of the phone with his family. It is breaking our hearts. We demand that you get him the hospice comfort care the oncologist prescribed weeks ago. This is cruel.

Danny Pfaller asked me to contact you right away this morning. This message is from your inmate. The person who's safety is in your hands. He is dying on your watch. In complete pain and distress. Danny Pfaller is begging you now for help.

99.

Warden Davis did not respond to Ms. Kennedy.

100.

Warden Davis had no legitimate reason to ignore Ms. Kennedy.

101.

Warden Davis knew that Ms. Kennedy had power of attorney for Danny and that he could discuss Danny's medical condition with Ms. Kennedy.

102.

On the morning of September 24, 2018, Ms. Kennedy called Green Rock, starting with Warden Davis, and left a voicemail relaying Danny's message and a long and emotional plea for the Warden to get Danny to hospice before he died in his cell; Warden Davis did not return the call.

103.

On September 24, 2018, Ms. Kennedy called the Assistant Warden's office and spoke with Ms. Stevens, the Secretary to the Assistant Warden, and relayed the same message and plea to help Danny. Ms. Stevens immediately said she was sending someone to do a welfare check and she herself would call Ms. Kennedy afterwards. Ms. Stevens called back a short time later and said someone went to Danny's cell and that the Warden was aware of the seriousness of Danny's condition.

104.

After a short time, Ms. Kennedy called back and Ms. Stevens confirmed that a meeting was taking place with the Warden about what to do with Danny. Ms. Stevens confirmed that

hospice care at Deerfield Correctional Center and the MCV Hospital were options being considered for Danny, not an infirmary.

105.

Ms. Kennedy called back on September 25, 2018, and Ms. Stevens said Danny had been taken to Deep Meadow Correctional Infirmary. Ms. Kennedy expressed confusion at Warden Davis' choice. Ms. Stevens said she did not know why they decided to send Danny to Deep Meadow.

106.

*On information and belief*, Warden Melvin Davis caused Danny to be transferred to the overflow, make-shift infirmary at Deep Meadow Correctional Center run by Armor Correctional Health Services.

107.

*On information and belief*, Warden Melvin Davis caused Danny to be transferred to Deep Meadow because he knew Danny was incarcerated for the murder of the training sergeant at Deep Meadow.

108.

The overflow infirmary at Deep Meadow was an extension of the Powhatan Correctional Center infirmary, also run by Armor, and shared the same medical staff.

109.

Danny Pfaller was transferred by ambulance from Green Rock to Deep Meadow Correctional Center on September 25, 2018.

**K.**     **VDOC refuses to permit Danny's attorney from visiting him when his condition worsens, until finally permitting a visit once Danny has already died**

110.

On October 3, 2018, Plaintiff and Danny's counsel learned from Danny's family that Danny had little time left to live; that same day, after Danny's family had visited with Danny, Plaintiff's counsel scheduled a visit with Danny. The visit was confirmed via voicemail.

111.

Shortly before Plaintiff's counsel was boarding the airplane to visit Danny, the Warden of Deep Meadow Correctional Center, Thomas Meyer, postposed the attorney's visit, asserting that Danny was unresponsive. Plaintiff's counsel boarded the plane regardless with the hope that Warden Meyer would change his mind and do the right thing.

112.

Plaintiff's counsel informed Warden Meyer that Danny was expecting his attorney to visit him and that his family was expecting the same.

113.

After Plaintiff's counsel reminded Warden Meyer in writing that Danny had a right to meet with his attorney, Warden Meyer emailed Plaintiff's counsel at 8:14pm—an hour and fourteen minutes after the scheduled 7pm visit that he would permit the visit.

114.

Plaintiff's counsel received Warden Meyer's email at 8:38pm and immediately drove to Deep Meadow to visit Danny. Upon arrival at approximately 9:30pm, Plaintiff's counsel followed Warden Meyer's instructions, but despite ringing the buzzer and knocking consistently, no one would answer the door for nearly 20 minutes. After finally being taken to the gymnasium that had been converted into an infirmary, Plaintiff's counsel was taken to the corner of the

make-shift infirmary where a patient was partitioned off with hanging sheets next to the nurse's station. The patient was Danny Pfaller.

115.

Plaintiff's counsel was told that the partition was made due to multiple complaints from other inmates in the infirmary that Danny should not be there while he was actively dying. ***The partition was created to make the other inmates feel more comfortable while Danny died in severe pain.***

116.

Plaintiff's counsel was told that he could meet with Danny for one hour. Plaintiff's counsel entered the partitioned area and sat next to Danny, who appeared severely malnourished and with yellow skin. Danny was not hooked up to a heart monitor but was connected to a breathing machine that appeared to be pumping air into his body.

117.

Plaintiff's counsel attempted to communicate with Danny, but Danny's eyes appeared lifeless. Danny had obviously already died. The breathing machine continued to pump air into his lifeless body.

118.

Either the medical staff did not notice that Danny had died, or Plaintiff's counsel was taken by correctional staff to meet with his client, despite the correctional staff knowing that Danny had already died.

119.

*On information and belief*, Warden Meyer denied Danny's right to meet with his attorney because of the deplorable conditions of the facility in which Danny was dying, and Danny's condition as he died.

**L.      Liability of Dr. Taslimi and Ronald Toney for Danny's agonizing pain and suffering in his final days**

120.

The standard of care applicable to Dr. Jalal Taslimi, MD and Dr. Ronald Toney, MD, during the relevant times included the following tasks that required no appreciable medical discretion:

1.  Reviewing health history/chart for patients with chronic and acute conditions, including patients who have a confirmed diagnosis of terminal liver cancer with a recommendation for palliative care.

2.  Treating a patient with terminal liver cancer with pain medications such as a Fentanyl patch with the goal of reducing the severe pain associated with acute organ failure and terminal liver cancer other painful and dangerous complications from terminal liver cancer.

3.  Monitoring the patient by gaining a reliable assessment of the patient's pain and specific requests for palliative care (also known as "comfort care").

4.  When a patient with untreatable Stage 4b liver cancer has been recommended for palliative care, placing that patient on a pain medication regimen such as a Fentanyl patch, and if the patient is still in pain, placing the patient on IV narcotics.

121.

Dr. Taslimi did not treat Danny, a patient with terminal liver cancer, with pain medications such as IV Narcotics or a Fentanyl patch with the goal of reducing the severe pain associated with acute organ failure and terminal liver cancer other painful and dangerous complications from terminal liver cancer.

122.

Despite this recommendation of pain medications from the VCU Tumor Board on August 22, 2018 and from VCU Hepatology physicians on September 4, 2018, and despite Danny complaining of abdominal pain from June 2018, Dr. Taslimi never prescribed Danny palliative pain medication, never referred Danny to another physician to prescribe Danny palliative pain medication, and Danny never received palliative pain medication from Taslimi.

123.

Dr. Taslimi did not provide any care for Danny to gain a reliable assessment of the patient's pain and specific requests for palliative care (comfort care), or if he did, he ignored Danny's requests for comfort care.

124.

Dr. Toney did not treat Danny, a patient with terminal liver cancer, with pain medications such as IV Narcotics or a Fentanyl patch (with the exception of his last day alive) with the goal of reducing the severe pain associated with acute organ failure and terminal liver cancer other painful and dangerous complications from terminal liver cancer.

125.

Despite this recommendation from the VCU Tumor Board on August 22, 2018 and from VCU Hepatology physicians on September 4, 2018, and despite Danny complaining of worsening abdominal pain from June 2018, Dr. Toney never prescribed Danny palliative pain medication, never referred Danny to another physician to prescribe Danny palliative pain medication, and Danny never received palliative pain medication under Toney's care until a Fentanyl patch was ordered for Danny on the day that he died, October 3, 2018—shortly before Danny's family was to arrive for a visit to say goodbye.

126.

Dr. Toney did not provide any care for Danny to gain a reliable assessment of the patient's pain and specific requests for palliative care (comfort care), or if he did, he ignored Danny's requests for comfort care.

127.

On October 3, Danny's medical chart notes that he was moaning and groaning throughout the night, and blood was coming out of his mouth. It was determined that he may die that day. As a result, a visit was arranged for Danny's family to visit him, and prior to Danny's family coming to visit, Danny was administered Ativan (which relieves anxiety) and Fentanyl (a powerful Narcotic with sedative properties).

**M.      Liability of Dr. Wang for Danny's Death Which was Caused by Untreated Hepatitis C While in the VDOC**

128.

Dr. Wang knew about Danny's Hepatitis C by 2013 at the latest and chose to not prescribe direct acting antiviral drugs or to refer Danny to a specialist who could prescribe Danny direct acting antiviral drugs until July 2018.

129.

Any general practitioner knows that it is a physician's job to treat a patient's treatable conditions or to refer the patient to another practitioner who may be capable of treating the patient's treatable conditions. Dr. Wang did neither.

130.

In addition, it is the standard of care to perform liver imaging in any patient with abnormal liver tests to rule out biliary tract disease, gall stones, as well as benign and malignant tumors.

131.

Danny's liver tests were abnormal since at least 2014.

132.

More likely than not, earlier liver imaging would have diagnosed Danny's liver cancer at an earlier stage, where treatment could have been initiated to prevent his death.

**N.      Liability of Dr. Amonette for Danny's Death Which was Caused by Untreated Hepatitis C While in the VDOC**

133.

Dr. Amonette knew that thousands of patients in the Virginia Department of Corrections had untreated chronic Hepatitis C during all relevant times in this case.

134.

Dr. Amonette drafted the VDOC Guidelines in effect at all relevant times in this case.

135.

Dr. Amonette was aware of the AASLD Guidelines when he drafted the VDOC Guidelines in effect at all relevant times in this case (he cited them in his own guidelines).

136.

Dr. Amonette promulgated, ordered, and enforced a policy which directed physicians, including Dr. Wang, to wait until a patient's liver fibrosis is more severe before screening Hepatitis C patients for liver cancer, at all times relevant to this case.

137.

Dr. Amonette promulgated, ordered, and enforced a policy which prohibited Danny from being approved and treated for Hepatitis C, at all times relevant to this case.

138.

*On information and belief*, Dr. Amonette either approved or denied all requests for Hepatitis C treatments made by inmates, to include Danny Pfaller, at all times relevant to this case.

139.

*On information and belief*, Dr. Amonette is aware that over 65 VDOC inmates have died from complications of untreated Hepatitis C since 2013, and Dr. Amonette has been aware of this number as it has grown since 2013 when the cure was made available to the VDOC.

**O. Clarke is liable for Danny's death, which was caused by untreated Hepatitis C while in the VDOC**

140.

At all relevant times, Clarke *knew* VDOC inmates with chronic Hepatitis C were not receiving treatment Hepatitis C because of his ratification of the policy to refuse treatment to inmates with Hepatitis C.

141.

At all relevant times, Clarke's role was to ensure that qualified individuals were in place to ensure the health and safety of VDOC inmates, and upon information and belief, *to ratify by act or omission,* the protocols and policies implemented by the Departments of the VDOC, including the Department of Health Services.

142.

In fact, at all times relevant to this Complaint, Clarke held the authority to order changes to the VDOC Hepatitis C policy yet *refused* to do so.

143.

*On information and belief*, Mr. Clarke is aware that over 65 VDOC inmates have died

from complications of untreated Hepatitis C since 2013, and Clarke has been aware of this

number as it has grown since 2013 when the cure was made available to the VDOC.

144.

On June 27, 2018, Sara Kennedy sent an email to Director Clarke, stating:

On 6/26, I sent an email concerning a medical emergency for inmate Danny Pfaller #1025643. I want to update you on what has occurred.

Today I received a call from Danny Pfaller. He saw a Dr Wang in medical at the Green Rock facility this morning. The doctor diagnosed fluid retention. And is ordering meds for that. Danny asked what about his rock hard stomach and the inability to pass stool for so long. The doctor then added a laxative. There was no mention of ordering an X-ray or other film to look at his intestines. There was no talk of this now having reached an emergency stage; After waiting for weeks to be seen.

Danny Pfaller plans to follow the doctors treatment plan today. Because he is in such distress and discomfort.

For the record, we believe he has still not received complete medical care. We firmly believe that a hospital emergency room visit with X-ray ability is the only way to know what is causing this blockage, pain and abdominal swelling.

We continue to fear for his well being around this medical issue. And if his suffering continues or increases we will hold the VA DOC responsible. We still believe he needs more accurate examination, information and testing. We have asked all along for hospital care and tests, due to the severity of his symptoms.

Our concern over incomplete medical care continues. As yesterday he was reprimanded by the facility nurse for 'lying to his people' about his condition. This man was brought to medical by a nurse yesterday and told this. He has actually tried to downplay the severity to us throughout this.

We would be glad to speak to the press over how this has gone, and that we continue to fear for his well being. This is a bandage on a critical problem. And we, as his family and friends, are not satisfied that he has received full and necessary medical care, following this minimal examination today.

Do what is right and humane here. Get this man an X-ray and or emergency care. Please.

Sincerely, Sara Kennedy

145.

On June 29, 2018, Sara Kennedy sent another email to Director Clarke, stating:

Mr. Clarke,

This is an update on the medical condition of inmate Danny Pfaller at the Green Rock Correctional Center.

He continues to be in abdominal distress. He has not yet received films or emergency medical care for his condition.

We, as his family, continue to be concerned. And as so much time has now passed, with no relief for him, we are even more concerned for his well being.

We are continuing to request that he get emergency and adequate medical care. And quite frankly, we cannot not understand why this has not occurred for him.

Please contact this facility and send this man out for the care he so desperately now needs.

Most sincerely and concerned, Sara Kennedy

146.

Despite making Director Clarke specifically aware that Danny was suffering and not getting adequate medical attention, on Director Clarke's watch, Danny lingered for months without seeing appropriate outside providers, without receiving the recommended tests, and without receiving the recommended palliative care.

147.

On Director Clarke's watch, Danny died in agonizing pain in a gymnasium.

P. **If Danny were treated sooner or monitored appropriately, he would have had an over 90% chance of survival**

148.

According to Plaintiff's expert physician, to a reasonable degree of medical certainty, *if*

*Danny's Hepatitis C had been treated in 2015, or earlier, Danny would have had a greater*

***than 97% chance of being cured of HCV infection*** with a regimen requiring only 8 weeks of therapy, ***with a dramatically decreased risk of developing liver cancer***.

149.

According to Plaintiff's expert physician, if Danny had received cancer screening through imaging such as Ultrasound, MRI, or CT to screen for cancer in 2016 or 2017, to a reasonable degree of medical certainty, more likely than not Danny would have had a small tumor diagnosed. With such a tumor, to a reasonable degree of medical certainty, more likely than not Danny could have undergone resection or loco-regional therapy with chemoembolization or something similar, and then received HCV therapy with a DAA. To a reasonable degree of medical certainty, under this scenario, his 5-year tumor recurrence rate would be less than 25%, ***with a survival rate of greater than 90%***.

## Q.  Liability of Armor based on a policy of denying inmates palliative care

150.

*On information and belief*, at all times relevant to this Complaint, Armor had a policy— written or unwritten, formal or informal—of denying palliative care medications, including IV Narcotics, to inmates dying from cancer, as evidenced by the fact that Dr. Taslimi and Dr. Toney reviewed the medical records where physicians recommended palliative care for Danny's untreatable cancer, the fact that Taslimi wrote in Danny's progress notes that Danny was to be on comfort care, the fact that Dr. Taslimi never ordered palliative care medications for Danny, and the fact that Dr. Toney did not order palliative care medications with the exception of a Fentanyl patch on the day Danny's family came to visit him—the day Danny died.

151.

*On information and belief*, pursuant to its policy of denying Narcotics to patients who were recommended for palliative care, Armor instructed its physicians not to prescribe Narcotics to patients, even patients who were dying of cancer in severe pain.

**R.  Employment of Defendants Taslimi and Toney by Armor**

152.

At all times relevant to this Complaint, Dr. Jalal Taslimi and Dr. Ronald Toney were employees of Armor.

153.

At all times relevant to this Complaint, as employees of Armor, Taslimi and Toney rendered health care services to the inmates of Powhatan Infirmary Annex at Deep Meadow Correctional Center under the direction of Armor management.

154.

At all times relevant to this Complaint, Armor established the work schedule for Taslimi and Toney.

155.

At all times relevant to this Complaint, Armor established the operational procedures that Taslimi and Toney had to follow while working at Powhatan Infirmary Annex at Deep Meadow.

156.

At all times relevant to this Complaint, Armor established standards of conduct—in addition to relevant, prevailing industry standards that applied to Defendants Taslimi and Toney—that Taslimi and Toney had to follow while working at Powhatan Infirmary Annex at Deep Meadow.

157.

At all times relevant to this Complaint, Armor had the authority to discipline Taslimi and Toney whenever they violated any of Armor's rules, polices, and/or regulations that applied to them while they worked at Armor.

158.

At all times relevant to this Complaint, Armor retained the authority to terminate Taslimi and Toney's employment.

159.

At all times relevant to this Complaint, Taslimi and Toney had to submit requests for vacation to Armor, and Armor had to approve said requests in order for Taslimi and Toney to take vacation time from their employment at Armor.

## COUNT I
## DEPRIVATION OF EIGHTH AMENDMENT RIGHT TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT BY RECEIVING ACCESS TO ADEQUATE MEDICAL CARE PURSUANT TO 42 U.S.C § 1983
*(Federal claim against Defendants Dr. Wang, Dr. Taslimi, Dr. Toney, Dr. Amonette, and Warden Melvin Davis)*

160.

Plaintiff incorporates paragraphs 1-139, 148-149, and all paragraphs this Court deems relevant to support this Count.

161.

Based on the incorporated paragraphs to support Count I, Defendants' acts and omissions in failing to provide adequate medical care—including any medical care whatsoever—constitute deliberate indifference to the serious medical needs of Danny, specifically his untreated chronic Hepatitis C, thereby establishing a violation of the Eighth Amendment of the United States Constitution.

162.

Dr. Wang violated Danny's Eighth Amendment rights by the deliberate enforcement of a policy not consistent with medical standards, which in effect, denied Danny screening for liver cancer, treatment for liver cancer, and treatment for Hepatitis C. To a reasonable degree of medical certainty, Dr. Laurence Wang's acts and omissions fell so substantially outside the standard of care and opposite reasonable medical judgment that they constituted a deliberate act of refusing Danny access to any medical care to treat his Hepatitis C—a deadly disease that can and did rapidly advance to a deadly stage.

163.

Dr. Amonette violated Danny's Eighth Amendment rights by the deliberate enforcement of a policy not consistent with medical standards, which in effect, denied Danny screening for liver cancer, treatment for liver cancer, and treatment for Hepatitis C. To a reasonable degree of medical certainty, Dr. Mark Amonette's acts and omissions, including his enforcement of VDOC's Hepatitis C guidelines, fell so substantially outside the standard of care and opposite reasonable medical judgment that they constituted a deliberate act of refusing Danny access to any medical care to treat his Hepatitis C—a deadly disease that can and did rapidly advance to a deadly stage.

164.

To the extent that the direct-acting antiviral treatment was not provided because of financial considerations, such concerns are in violation of the U.S. Constitution, as they deny necessary and adequate medical care to Danny and other similarly situated VDOC inmates in violation of the Eighth Amendment to the United States Constitution.

165.

Dr. Wang's failure to prescribe direct acting antiviral drugs, more likely than not was a proximate cause of Danny developing cirrhosis and liver cancer—the cause of his death. Dr. Wang's failure to prescribe direct acting antiviral drugs, more likely than not was a proximate cause of Danny experiencing severe pain and suffering, mental anguish, and personal indignities up until his death.

166.

Dr. Wang's failure to refer Danny to another physician who could prescribe direct acting antiviral drugs, more likely than not was a proximate cause of Danny developing cirrhosis and liver cancer—the cause of his death. Dr. Wang's failure to refer Danny to another physician who could prescribe direct acting antiviral drugs, more likely than not was a proximate cause of Danny experiencing severe pain and suffering, mental anguish, and personal indignities up until his death.

167.

Dr. Wang's failure to order abdominal imaging for Danny to screen for liver cancer, more likely than not was a proximate cause of Danny developing liver cancer—the cause of his death. Dr. Wang's failure to order abdominal imaging for Danny to screen for liver cancer, more likely than not was a proximate cause of Danny experiencing severe pain and suffering, mental anguish, and personal indignities up until his death.

168.

Dr. Wang's failure to treat Danny Pfaller, a patient with terminal liver cancer, with pain medications such as a Fentanyl patch with the goal of reducing the severe pain associated with acute organ failure and terminal liver cancer other painful and dangerous complications from

terminal liver cancer, more likely than not was a proximate cause of Danny experiencing severe pain and suffering, and mental anguish and personal indignities associated with that pain and suffering, up until his transfer to Deep Meadow Correctional Center on September 25, 2018.

169.

Dr. Laurence Wang's acts and omissions fell so substantially outside the standard of care and opposite reasonable medical judgment that they constituted a deliberate act of refusing Danny access to any medical care to treat his Hepatitis C—a deadly disease that can and did rapidly advance to a deadly stage—and refusing Danny access to any medical care to treat his severe pain as he died.

170.

Dr. Amonette's guidelines instructing physicians that he clinically supervised, including Dr. Wang, *not* to treat patients with direct acting antiviral drugs was more likely than not a proximate cause of Dr. Wang's failure to prescribe direct acting antiviral drugs to Danny Pfaller, and this was more likely than not was a proximate cause of Danny developing cirrhosis and liver cancer—the cause of his death. Dr. Amonette's guidelines instructing physicians that he clinically supervised, including Dr. Wang, *not* to treat patients with direct acting antiviral drugs was more likely than not a proximate cause of Dr. Wang's failure to prescribe direct acting antiviral drugs to Danny Pfaller, and this was more likely than not was a proximate cause of Danny experiencing severe pain and suffering, mental anguish, and personal indignities up until his death.

171.

Dr. Amonette's guidelines instructing physicians that he clinically supervised, including Dr. Wang, *not* to refer patients to another physician who could prescribe direct acting antiviral

drugs was more likely than not a proximate cause of Dr. Wang's failure to refer Danny to another physician who could prescribe direct acting antiviral drugs, and this was more likely than not was a proximate cause of Danny developing cirrhosis and liver cancer—the cause of his death. Dr. Amonette's guidelines instructing physicians that he clinically supervised, including Dr. Wang, *not* to refer patients to another physician who could prescribe direct acting antiviral drugs was more likely than not a proximate cause of Dr. Wang's failure to refer Danny to another physician who could prescribe direct acting antiviral drugs, and this was more likely than not was a proximate cause of Danny experiencing severe pain and suffering, mental anguish, and personal indignities up until his death.

172.

Dr. Amonette's guidelines instructing physicians that he clinically supervised, including Dr. Wang, *not* to order abdominal imaging for patients with abnormal liver tests to screen for liver cancer, more likely than not was a proximate cause of Danny developing liver cancer—the cause of his death. Dr. Amonette's guidelines instructing physicians that he clinically supervised, including Dr. Wang, *not* to order abdominal imaging for patients with abnormal liver tests to screen for liver cancer, more likely than not was a proximate cause of Danny experiencing severe pain and suffering, mental anguish, and personal indignities up until his death.

173.

Dr. Taslimi's failure to treat Danny Pfaller, a patient with terminal liver cancer, with pain medications such as a Fentanyl patch with the goal of reducing the severe pain associated with acute organ failure and terminal liver cancer other painful and dangerous complications from terminal liver cancer, more likely than not was a proximate cause of Danny experiencing severe

pain and suffering, and mental anguish and personal indignities associated with that pain and suffering, from his transfer to Deep Meadow on September 25, 2018 up until his death.

174.

Dr. Taslimi's acts and omissions fell so substantially outside the standard of care and opposite reasonable medical judgment that they constituted a deliberate act of refusing Danny access to any medical care to treat his severe pain as he died and was a proximate cause of the pain and suffering claimed by Danny between the time he was transferred to Deep Meadow and the day he died.

175.

Dr. Toney's failure to treat Danny Pfaller, a patient with terminal liver cancer, with pain medications such as a Fentanyl patch with the goal of reducing the severe pain associated with acute organ failure and terminal liver cancer other painful and dangerous complications from terminal liver cancer, more likely than not was a proximate cause of Danny experiencing severe pain and suffering, and mental anguish and personal indignities associated with that pain and suffering, from his transfer to Deep Meadow on September 25, 2018 up until his death.

176.

Dr. Toney's acts and omissions fell so substantially outside the standard of care and opposite reasonable medical judgment that they constituted a deliberate act of refusing Danny access to any medical care to treat his severe pain as he died and was a proximate cause of the pain and suffering claimed by Danny between the time he was transferred to Deep Meadow and the day he died.

177.

Green Rock Warden Melvin Davis knew that Danny Pfaller was dying of painful liver cancer and despite the medical facts, Davis chose to send Danny to a facility that was not equipped to deal with a patient dying of liver cancer—knowing that he was placing Danny at a substantial risk of serious harm.

178.

*On information and belief*, Davis knew that Danny was incarcerated for the murder of a former Training Sergeant at Deep Meadow and for this reason sent Danny to Deep Meadow where he knew Danny would die in pain in facilities that were not equipped to manage him.

179.

Because Danny was made to die from two ***curable*** diseases that were neglected by these Defendants' lack of care, Danny's heirs suffered severe emotional distress far beyond any they would have suffered had their father died a natural death. Furthermore, because Danny was made to suffer in agonizing pain as he died, Danny's heirs suffered severe emotional distress far beyond any they would have suffered had their father died a natural death or from liver cancer while receiving palliative care.

180.

Consequently, Plaintiff is entitled to relief as set forth in the below titled section, "Prayer For Relief."

**COUNT II**
**SUPERVISORY LIABILITY**
**PURSUANT TO 42 U.S.C § 1983**
(*Federal claim against Defendants Clarke and Dr. Amonette*)

181.

Plaintiff incorporates paragraphs 1 through 149 and all paragraphs this Court deems relevant to support this Count.

182.

Based on the incorporated paragraphs to support Count II, Defendants' acts and omissions in failing to provide adequate medical care in a supervisory capacity—including any medical care whatsoever—*caused and constitute* deliberate indifference to the serious medical needs of inmates infected with Hepatitis C, specifically including Danny, thereby establishing a violation of the Eighth Amendment of the United States Constitution.

183.

Dr. Amonette violated Danny's Eighth Amendment rights by the deliberate enforcement of a policy not consistent with medical standards, which in effect, denied Danny screening for liver cancer, treatment for liver cancer, and treatment for Hepatitis C.

184.

To the extent that the direct-acting antiviral treatment was not provided because of financial considerations, such concerns are in violation of the U.S. Constitution, as they deny necessary and adequate medical care to Danny and other similarly situated VDOC inmates in violation of the Eighth Amendment to the United States Constitution.

185.

*Upon information and belief*, Clarke violated Danny's Eighth Amendment rights by failing to take reasonable steps, through his acts and omissions, to implement a medically and

constitutionally permissible Hepatitis C policy and instead ratified a policy not consistent with medical standards, which in effect, denied Danny screening for liver cancer, treatment for liver cancer, and treatment for Hepatitis C.

186.

Because Danny was made to die from two *curable* diseases that were neglected by these Defendants' lack of care, Danny's heirs suffered severe emotional distress far beyond any they would have suffered had their father died a natural death. Furthermore, because Danny was made to suffer in agonizing pain as he died, Danny's heirs suffered severe emotional distress far beyond any they would have suffered had their father died a natural death or from liver cancer while receiving palliative care.

187.

Consequently, Plaintiff is entitled to relief as set forth in the below titled section, "Prayer For Relief."

## COUNT III
## MEDICAL MALPRACTICE
(*State claim against Defendants Dr. Wang, Dr. Taslimi, Dr. Toney, and Dr. Amonette*)

188.

Plaintiff incorporates paragraphs 1-139, 148-149, and all paragraphs this Court deems relevant to support this Count.

189.

Based on the incorporated paragraphs to support Count III, Defendants' acts and omissions in failing to provide adequate medical care—including any medical care whatsoever—constitute medical malpractice, specifically his untreated chronic Hepatitis C, his not receiving regular screenings for liver cancer, and untreated pain as he died in agony from liver cancer.

190.

Based on the facts incorporated into this Count, Dr. Wang breached the standard of care by his actions that were not consistent with medical standards, which denied Danny treatment for Hepatitis C, screening for liver cancer, treatment for liver cancer, and treatment for his pain as he died.

191.

Based on the facts incorporated into this Count, Dr. Laurence Wang breached the applicable standard of care, and his breaches were a proximate cause of the injuries claimed by Danny. Dr. Wang's monitoring of Danny's Hepatitis C using lab tests as a basis for denying Hepatitis C treatment did not constitute "care" but instead constituted his knowledge that Danny had elevated liver enzymes and his active choice to provide no care, including his choice not to order imaging of Danny's abdomen which would have -- more likely than not -- detected the liver cancer that ultimately killed Danny, and Dr. Wang's absence of care was a proximate cause of the injuries claimed by Danny.

192.

Dr. Amonette breached the standard of care by the deliberate enforcement of a policy not consistent with medical standards, which in effect, denied Danny screening for liver cancer, treatment for liver cancer, and treatment for Hepatitis C.

193.

Based on the facts incorporated into this Count, Dr. Mark Amonette breached the applicable standard of care, and his breaches were a proximate cause of the injuries claimed by Danny. Dr. Amonette's VDOC Guidelines instructing Dr. Wang to monitor Danny's Hepatitis C using lab tests as a basis for denying imaging to screen for liver cancer and as a basis for denying

Hepatitis C treatment did not constitute "care," and Dr. Amonette's absence of care was a proximate cause of the injuries claimed by Danny.

194.

Based on the facts incorporated into this Count, Dr. Jalal Taslimi breached the applicable standard of care, and his breaches were a proximate cause of the pain and suffering claimed by Danny between the time he was transferred to Deep Meadow and the day he died. Dr. Taslimi's monitoring of Danny and provision of non-palliative care medications did not constitute "care," and Dr. Taslimi's absence of care was a proximate cause of the pain and suffering claimed by Danny between the time he was transferred to Deep Meadow and the day he died.

195.

Based on the facts incorporated into this Count, Dr. Ronald Toney breached the applicable standard of care, and his breaches were a proximate cause of the pain and suffering claimed by Danny between the time he was transferred to Deep Meadow and the day he died. Dr. Toney's monitoring of Danny and provision of non-palliative care medications did not constitute "care," and Dr. Toney's absence of care was a proximate cause of the pain and suffering claimed by Danny between the time he was transferred to Deep Meadow and the day he died.

196.

Because Danny was made to die from two curable diseases that were neglected by these Defendants' lack of care, Danny's heirs suffered severe emotional distress far beyond any they would have suffered had their father died a natural death. Furthermore, because Danny was made to suffer in agonizing pain as he died, Danny's heirs suffered severe emotional distress far beyond any they would have suffered had their father died a natural death or from liver cancer while receiving palliative care.

197.

Consequently, Plaintiff is entitled to relief as set forth in the below titled section, "Prayer For Relief."

## COUNT IV
## ORDINARY NEGLIGENCE
(*State claim against Defendant Melvin Davis*)

198.

Plaintiff incorporates paragraphs 1-29, 64-67, 95-109, 110-119, 120-127, and all paragraphs this Court deems relevant to support this Count.

199.

Based on the incorporated paragraphs to support Count IV, Defendant Davis had a non-discretionary duty to transfer Danny Pfaller to a hospital or to another facility that could provide hospice care—following recommendations by specialist treating physicians that the inmate had less than three months to live and only palliative care was recommended. Because Davis refused to transfer Danny to a facility with hospice care, Davis breached this non-discretionary duty, which proximately caused Danny to suffer in pain in a hospital bed in a gymnasium as he died in agonizing pain with no serious pain medication. As a result of Davis's breach of this non-discretionary duty, Davis is liable for ordinary negligence and is not entitled to sovereign immunity.

200.

Because Danny was made to suffer in agonizing pain as he died, Danny's heirs suffered severe emotional distress far beyond any they would have suffered had their father died a natural death or from liver cancer while receiving palliative care.

201.

Consequently, Plaintiff is entitled to relief as set forth in the below titled section, "Prayer For Relief."

## COUNT V
## GROSS NEGLIGENCE
### (*State claim against Defendant Melvin Davis*)

202.

Plaintiff incorporates paragraphs 1-29, 64-67, 95-109, 110-119, 120-127, and all paragraphs this Court deems relevant to support this Count.

203.

Based on the incorporated paragraphs to support Count V, Defendant Davis had a non-discretionary duty to transfer Danny Pfaller to a hospital or to another facility that could provide hospice care—following recommendations by specialist treating physicians that the inmate had less than three months to live and only palliative care was recommended. Because Davis refused to transfer Danny to a facility with hospice care, Davis breached this non-discretionary duty, which proximately caused Danny to suffer in pain in a hospital bed in a gymnasium as he died in agonizing pain with no serious pain medication. Transferring Danny to an overflow infirmary in a gymnasium as he suffered in agonizing pain from terminal cancer did not constitute "care" by any definition of the word, and instead caused Danny greater harm. Because Davis did not demonstrate any care when he transferred Danny to the gymnasium at Deep Meadow, Davis is liable for gross negligence.

204.

Because Danny was made to suffer in agonizing pain as he died, Danny's heirs suffered severe emotional distress far beyond any they would have suffered had their father died a natural death or from liver cancer while receiving palliative care.

205.

Consequently, Plaintiff is entitled to relief as set forth in the below titled section, "Prayer For Relief."

## COUNT VI
## WILLFUL AND WANTON NEGLIGENCE
### (State claim against Defendant Melvin Davis)

206.

Plaintiff incorporates paragraphs 1-29, 64-67, 95-109, 110-119, 120-127, and all paragraphs this Court deems relevant to support this Count.

207.

Based on the incorporated paragraphs to support Count VI, Defendant Davis had a non-discretionary duty to transfer Danny Pfaller to a hospital or to another facility that could provide hospice care—following recommendations by specialist treating physicians that the inmate had less than three months to live and only palliative care was recommended. Because Davis refused to transfer Danny to a facility with hospice care, Davis breached this non-discretionary duty, which proximately caused Danny to suffer in pain in a hospital bed in a gymnasium as he died in agonizing pain with no serious pain medication. Transferring Danny to an overflow infirmary in a gymnasium as he suffered in agonizing pain from terminal cancer did not constitute "care" by any definition of the word, and instead caused Danny greater harm. Because Davis knew that

harm to Danny would probably result from transferring Danny to Deep Meadow, Davis is liable for willful and wanton negligence.

208.

Because Danny was made to suffer in agonizing pain as he died, Danny's heirs suffered severe emotional distress far beyond any they would have suffered had their father died a natural death or from liver cancer while receiving palliative care.

209.

Consequently, Plaintiff is entitled to relief as set forth in the below titled section, "Prayer For Relief."

**COUNT VII**
**RESPONDEAT SUPERIOR**
*(state claim against Armor Correctional Health Services, Inc.)*

210.

Plaintiff incorporates paragraphs 1-29, 87-90, 108-109, 120-127, 152-159, and all paragraphs this Court deems relevant to support this Count.

211.

Based on all the incorporated facts to support this Count VII, as Dr. Taslimi and Dr. Toney's employer, Armor is liable for Dr. Taslimi and Dr. Toney's acts and omissions regarding Danny experiencing severe pain and suffering, and mental anguish and personal indignities associated with that pain and suffering, from his transfer to Deep Meadow on September 25, 2018 up until his death.

212.

Because Danny was made to suffer in agonizing pain as he died, Danny's heirs suffered severe emotional distress far beyond any they would have suffered had their father died a natural death or from liver cancer while receiving palliative care.

213.

Consequently, Plaintiff is entitled to relief as set forth in the below titled section, "Prayer For Relief."

**COUNT VIII**
**MONELL CLAIM**
**DEPRIVATION OF EIGHTH AMENDMENT RIGHT TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT BY RECEIVING ACCESS TO ADEQUATE MEDICAL CARE PURSUANT TO 42 U.S.C. § 1983**
*(Federal claim against Armor Correctional Health Services, Inc.)*

214.

Plaintiff incorporates paragraphs 1-29, 87-90, 108-109, 120-127, 150-159, and all paragraphs this Court deems relevant to support this Count.

215.

Based on all the incorporated facts to support this Count VIII, because Armor had a policy—formal or informal, written or unwritten—of denying palliative care to patients with terminal cancer, including prescribing IV Narcotics to sooth the pain of dying from liver cancer, Armor is liable for violating Danny's right to have access to adequate medical care and be free from cruel and unusual punishment, a right protected under the Eight Amendment to the U.S. Constitution.

216.

Because Danny was made to suffer in agonizing pain as he died, Danny's heirs suffered severe emotional distress far beyond any they would have suffered had their father died from liver cancer while receiving palliative care.

217.

Consequently, Plaintiff is entitled to relief as set forth in the below titled section, "Prayer For Relief."

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff prays for a trial by jury and judgment against Defendants as follows:

(a)     That process, issue, and service be had on each Defendant;

(b)     That Plaintiff recovers all costs of this litigation;

(c)     That Plaintiff receives compensatory damages;

(d)     Award Plaintiff reasonable attorneys' fees under 42 U.S.C § 1988(b);

(e)     That Plaintiff receives Punitive Damages to the extent that Defendants' actions were (1) prompted by ill will or spite or grudge or by a desire to see Danny Pfaller suffer, (2) done in a reckless or callous disregard of, or indifference to, the rights of Danny Pfaller, or (3) done in a way or manner that injured or damaged or otherwise violated the rights of Danny Pfaller with unnecessary harshness or severity, as by misuse or abuse of authority or power or taking advantage of some weakness or disability or misfortune of Danny Pfaller.

(f)     That Plaintiff receives Special Damages in an amount of at least $75,000, to include all medical bills, and

(g)     That Plaintiff receives such other and further relief as the Court deems just and

proper.

Respectfully submitted this 2nd day of October 2019,

/s/ MARIO B. WILLIAMS
Mario B. Williams (VSB #91955)

**NDH LLC**
44 Broad Street, NW, Suite 200
Atlanta, Georgia 30303
404-254-0442/703-935-2453 FAX
mwilliams@ndh-law.com
*Counsel for Plaintiff*