```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE EASTERN DISTRICT OF VIRGINIA

 3                     RICHMOND DIVISION

 4

 5   --------------------------------------
                                         :
 6    JACOB PFALLER                      :    Civil Action No.
                                         :    3:19cv728
 7    vs.                                :
                                         :
 8    DR. MARK AMONETTE, et al.          :    April 6, 2021
                                         :
 9   --------------------------------------

10

11        COMPLETE TRANSCRIPT OF THE MOTIONS HEARING

12          BEFORE THE HONORABLE ROBERT E. PAYNE

13            UNITED STATES DISTRICT JUDGE

14

15   APPEARANCES:

16   Dallas LePierre, Esquire
     John Shoreman, Esquire
17   NDH, LLC
     44 Broad Street Northwest
18   Suite 200
     Atlanta, Georgia  30303
19   Counsel for the plaintiff
                                                  VOLUME 1 OF 2
20   Jeff W. Rosen, Esquire
     Pender & Coward, PC
21   222 Central Park Avenue
     Suite 400
22   Virginia Beach, Virginia  23462

23

24                Peppy Peterson, RPR
                 Official Court Reporter
25              United States District Court
```

```
 1    APPEARANCES:  (cont'g)

 2    Laura Maughan, Esquire
      Office of the Attorney General
 3    202 North Ninth Street
      Richmond, Virginia  23219
 4    Counsel for Dr. Mark Amonette

 5

 6    Lynne Jones Blain, Esquire
      M. Scott Fisher, Jr., Esquire
 7    Harman, Claytor, Corrigan & Wellman
      4951 Lake Brook Drive
 8    Suite 100
      Glen Allen, Virginia  23060
 9    Counsel for Dr. Laurence Shu-Chung Wang

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                          P R O C E E D I N G S

2

3              THE CLERK:  Case number 3:19CV728, Jacob Pfaller

4    versus Dr. Mark Amonette, et al.  Plaintiff is represented by

5    Dallas LePierre and John Shoreman.  The defendant Dr. Mark

6    Amonette is represented by Jeff Rosen and Laura Maughan.  The

7    defendant Dr. Laurence Shu-Chung Wang is represented by M.

8    Scott Fisher, Jr., and Lynne Blain.  Are counsel ready to

9    proceed?

10             MR. ROSEN:  Defendants are ready, Judge.  Good

11   morning.

12             THE COURT:  Good morning.

13             MR. LePIERRE:  Plaintiffs are ready, Your Honor.

14             THE COURT:  All right.  Let's first take stock of

15   where we are.  As I understand it, the claims left in the case

16   at this point are count one, an Eighth Amendment claim alleging

17   a violation of the Eighth Amendment and brought into this court

18   by way of Section 1983 against Dr. Amonette and Dr. Wang; count

19   two, a so-called supervisory liability claim against Dr.

20   Amonette under Section 1983; and count three, a medical

21   malpractice claim against Dr. Wang; is that correct?

22             MR. LePIERRE:  Yes, Your Honor.

23             THE COURT:  Do you all agree?

24             MS. BLAIN:  Yes, sir.

25             THE COURT:  Now, there's a lot of variant language

1    that appears in these papers, and I must say I find it sort of

2    hard to trace through.  Explain to me, Mr. LePierre, the Eighth

3    Amendment claim.  Come to the lectern with your papers.  Do you

4    have your complaint?

5            MR. LePIERRE:  Yes, Your Honor.

6            THE COURT:  The Eighth Amendment claim against

7    Amonette.

8            MR. LePIERRE:  Yes, Your Honor.  The Eighth Amendment

9    claim against defendant Amonette, Your Honor, is based on the

10   fact that defendant Amonette enacted and enforced a policy that

11   excluded from treatment, knowingly excluded from treatment

12   inmates with a known serious medical condition -- that is hep C

13   -- until they reached the sickest level, that is test scores

14   indicative of an F3 or an F4 fibrosis level of the liver

15   without any medical basis.

16           THE COURT:  All right, now, you have expert testimony

17   to support that?

18           MR. LePIERRE:  Yes, Your Honor.

19           THE COURT:  Who supports it?

20           MR. LePIERRE:  Dr. Schamber supports that the policy

21   is violative of the standard of care and that he does exclude

22   people with a serious medical condition from treatment as is

23   required by the AASLD which sets the standard of care, and Dr.

24   Gaglio supports --

25           THE COURT:  Who?  Take that mask off.

1          MR. LePIERRE:  Yes, Your Honor.  Dr. Gaglio, our

2   expert on causation, does testify that the failure to treat to

3   a reasonable degree of medical certainty led to liver cancer

4   and death.

5          THE COURT:  And that's the claim against Amonette.

6          MR. LePIERRE:  Yes, Your Honor.

7          THE COURT:  What's the Eighth Amendment claim against

8   Wang?

9          MR. LePIERRE:  The Eighth Amendment claim against Dr.

10  Wang, Your Honor, is that Dr. Wang, knowing of Mr. Pfaller's

11  serious medical need for treatment, knowing he has hepatitis C,

12  a disease that he knew could cause cirrhosis and death, failed

13  to provide any treatment for Mr. Pfaller as required by the

14  AASLD guidelines.

15         THE COURT:  What treatment was required that he

16  didn't provide?

17         MR. LePIERRE:  The use of or referral for the use of

18  DAA antiviral -- direct-acting antiviral drugs, Your Honor,

19  which operates as an effective cure for hepatitis C.

20         THE COURT:  And that's it?

21         MR. LePIERRE:  He failed to do that for over two

22  years, Your Honor, which --

23         THE COURT:  What two years?

24         MR. LePIERRE:  I'm sorry.  From 2016 at the very late

25  -- earliest, I'm sorry -- or, sorry, the very latest was 2016

1    if not 2015.  He failed to treat Mr. Pfaller despite the

2    availability of DAAs to 2018, October -- I'm sorry, August

3    23rd, 2018, when he was diagnosed with liver cancer, Your

4    Honor.

5              THE COURT:  Did he give him DAA then?

6              MR. LePIERRE:  No, Your Honor.

7              THE COURT:  The reason is that the guidelines say if

8    you've got liver cancer, you don't get DAAs.

9              MR. LePIERRE:  Correct.  When you have stage 4B

10   terminal liver cancer with less than three months to live,

11   there's no use of DAAs at that point.  There's also, Your

12   Honor, after Mr. Pfaller was diagnosed with stage 4B liver

13   cancer, the failure to provide adequate palliative care until

14   he left Dr. Wang's care on September 25th, 2018.

15             THE COURT:  What time period are we talking about

16   there?

17             MR. LePIERRE:  It was August 23rd, 2018, through

18   September 25th, 2018, Your Honor.  I'm fairly confident of the

19   first date.  I know it was two days of that.  The second date I

20   clearly recall, September 25th.

21             THE COURT:  Now, count three is against Dr. Wang for

22   medical malpractice.

23             MR. LePIERRE:  Yes, Your Honor.

24             THE COURT:  And there's no medical malpractice claim

25   left against Dr. Amonette.

```
 1              MR. LePIERRE:  No, Your Honor.  You dismissed that
 2    claim for failure to be a provider.
 3              THE COURT:  And that claim is based on negligence?
 4              MR. LePIERRE:  Yes, Your Honor.
 5              THE COURT:  Is it correct that in Virginia law,
 6    doctors working for the state have, generally have -- enjoy the
 7    sovereign immunity of the state for a suit for damages?
 8              MR. LePIERRE:  Yes, Your Honor, for negligence --
 9              THE COURT:  Why doesn't he enjoy sovereign immunity
10    in your theory?
11              MR. LePIERRE:  Yes, Your Honor.  Under the Jane test
12    established by the Virginia Supreme Court, sovereign immunity
13    has to -- I'm sorry, to receive sovereign immunity, you have to
14    meet four factors.  In this case, they do meet three of them.
15    The fourth factor, as Your Honor found at the motion to dismiss
16    stage, is a determinative factor which is whether or not Dr.
17    Wang was exercising any discretion.  Doctors working for the
18    state get sovereign immunity to the extent of their
19    discretionary treatment of patients.
20              THE COURT:  Was his medical malpractice claim -- the
21    medical malpractice claim, does it involve the failure to give
22    palliative care as well as -- what is -- what did he fail to
23    do?
24              MR. LePIERRE:  Absolutely, Your Honor.  So under the
25    standard of care, our expert testifies that the standard of
```

1   care of a patient with hepatitis C is to provide them a

2   referral for treatment at the very least.  Dr. Wang failed --

3            THE COURT:  Referral for what treatment?

4            MR. LePIERRE:  I'm sorry, Your Honor, for the

5   treatment with DAA, direct-acting antivirals.  From at least

6   2015, that was the standard of care.  Dr. Wang failed to meet

7   that standard of care, and Dr. Wang also noted two instances

8   where Mr. Pfaller required treatment under even the VDOC's

9   policies, and Dr. Wang's credibility issue, but Dr. Wang

10  asserts he misread or misunderstood the policy as requiring

11  higher scores than they did, and he failed to refer Mr. Pfaller

12  for treatment in those instances as well.

13           Our causation expert, Dr. Gaglio, testifies that the

14  failure to refer for treatment with DAAs caused Mr. Pfaller's

15  liver cancer and his death.  Then, Your Honor, for the

16  palliative care, our expert testified, Dr. Schamber, that the

17  standard of care required a palliative -- a set of palliative

18  care that included basal pain control as well as as-needed pain

19  control.

20           Mr. Pfaller was prescribed Mobic while under Dr.

21  Wang's care but was never given adequate palliative care equal

22  to the standard of care as testified to by Dr. Schamber.

23           THE COURT:  Which one of these does he not have

24  sovereign immunity for?  I mean, it seems to me that there's

25  different -- it looks to me like the issue is discretion, and,

1    to me, it looks like Dr. Wang didn't have any discretion under

2    the policy that Dr. Amonette set and that, therefore, he

3    would -- you've got one circumstance, and then he did have

4    discretion under the palliative care.

5              MR. LePIERRE:  Yes, Your Honor.

6              THE COURT:  What about the middle one where he says

7    he misunderstood the policy for referral?

8              MR. LePIERRE:  Your Honor, the misunderstanding of

9    the policy is an indication of negligence.  However, it does

10   not change whether or not he had discretion.  He just made an

11   error.  But the discretion still doesn't exist under the

12   policy.  There's bright line cutoffs that he has to follow.

13             THE COURT:  So the result of following -- having no

14   discretion is that he gets no immunity.

15             MR. LePIERRE:  Yes, Your Honor.

16             THE COURT:  The result of having discretion is that

17   he does have immunity.

18             MR. LePIERRE:  Correct, Your Honor.

19             THE COURT:  If I find that beyond question he has

20   discretion, no reasonable jury --

21             MR. LePIERRE:  Yes, Your Honor, that is correct.

22   And, of course, our argument is that he didn't have discretion

23   on the palliative care either because the standard of care

24   called for it, but we do not have a policy like we do with the

25   hepatitis C treatment, Your Honor.

1        THE COURT:  Why would the fact that the standard of
2   care calls for palliative care mean there's no discretion?
3        MR. LePIERRE:  Yes, Your Honor.  And it's a fine
4   point that we're arguing which is that had he provided some
5   form of palliative or basal pain control, he would have
6   absolute sovereign immunity as to that, but having provided no
7   basal pain control, there is no discretion to provide some
8   palliative care, or, you know, there's no discretion on having
9   to provide some form of treatment.  There's just discretion in
10  what treatment is provided.
11       THE COURT:  You mean there's no discretion to not
12  provide palliative care, but once you provide any, you are
13  protected.
14       MR. LePIERRE:  Yes, Your Honor.
15       THE COURT:  All right.  I think that helps me out
16  there.  All right, you may sit down.
17       MR. LePIERRE:  Thank you, Your Honor.
18       THE COURT:  Now, Dr. Amonette's motion for summary
19  judgment, and that's ECF number 108.
20       MR. ROSEN:  Good morning, Your Honor.  Jeff Rosen on
21  behalf of Dr. Amonette.
22       THE COURT:  Begin with -- I need some clarification
23  about what has been filed here.
24       MR. ROSEN:  I'll do my best to answer your questions,
25  Judge.

1           THE COURT:  I need to know, to begin with, what dates

2    are at issue as to the claim against Dr. Amonette?

3           MR. ROSEN:  Well, Judge, it would be the

4    implementation of --

5           THE COURT:  The date.  I want the date and the

6    documents.

7           MR. ROSEN:  Okay.

8           THE COURT:  That's what I want.

9           MR. ROSEN:  All righty.

10          THE COURT:  You all are all over the place, and then

11   all of a sudden, at the last minute, what do I see?  I get a

12   filing in response to question number 209 that has guidelines

13   from February 2015 all the way through July 2018.

14          I'm not sure which ones we're talking about why,

15   what's going on here.  You all have left the record in such an

16   utter mess that I should deny qualified immunity for failure to

17   address the issue in a way that the Court can understand it.

18          Where, as here, the allegation of the complaint is

19   that there were certain policies that he put into effect, I

20   need to know the date of the policies he put into effect and

21   the date of the guidelines, whatever guidelines they were, and

22   exactly what they were, how they changed over time, and that

23   hasn't been dealt with at all.

24          And the principal argument that you have on qualified

25   immunity is that case out of -- *Riggleman* out of the Western

1    District which cites all of the great difficulty in shifting of

2    time -- of standards over time, and, in fact, there's no

3    definition in that case of anything that shifted over time.

4    Yes, it looks like from the record I have here that things did

5    shift over time, but that's irrelevant to the determination of

6    qualified immunity or liability unless the changes were somehow

7    significant.

8            And I can't find anywhere in here where anybody has

9    explained to me how the changes are significant.  And I am a

10   month from trial, and I've got these summary judgment motions.

11   If you want to get out of the case on that ground, you have to

12   give me some reasoning, and I don't have it.

13           MR. ROSEN:  Well, Judge, I'll do the best --

14           THE COURT:  So tell me, to begin with, what

15   guidelines, what rules did Amonette prepare, what is the

16   exhibit number, what did they say starting with the very first

17   one, Amonette's rules.

18           MR. ROSEN:  All right, Judge.  Exhibit 6 to our

19   motion for summary judgment, we have all the guidelines we

20   presented to the Court that were applicable to this case.

21           THE COURT:  That isn't what I asked you.  I didn't

22   ask that question.  That's exactly what's wrong.  You all

23   shuffle the guidelines like they're a deck of cards and expect

24   me to figure out what's significant about them.  What did he do

25   when?

1            MR. ROSEN:  Okay.

2            THE COURT:  What's the first guideline that Amonette

3    prepared?

4            MR. ROSEN:  February 9th, 2015, Pfaller Bates number

5    2439 through --

6            THE COURT:  Is that a sub thing in Exhibit 67?

7            MR. ROSEN:  Yes, 2453.

8            THE COURT:  You have a set of those here for me?

9            MR. ROSEN:  I can give you -- Judge, I have them.  I

10   don't have an extra set.

11           THE COURT:  You need them to --

12           MR. ROSEN:  We have an extra set, Judge.  I

13   apologize.

14           THE COURT:  Now, this is what Amonette did; right?

15           MR. ROSEN:  Judge, I'm confirming that he signed it.

16   Yes, Judge, Dr. Amonette promulgated these, yes, Judge.

17           THE COURT:  That is marked as Exhibit 2 to something.

18   And on the bottom is Pfaller 2439.  Is that what we're using?

19           MR. ROSEN:  2439, Judge, through 2454.

20           THE COURT:  Now, is it correct that Pfaller -- when

21   did Pfaller come into the Bureau of Prisons?

22           MR. ROSEN:  2012, I believe, Judge.  I'm sorry, 1999,

23   Judge.  Co-counsel corrected me.  1999.

24           THE COURT:  When was he diagnosed with hep C?

25           MR. ROSEN:  He had been diagnosed previous to coming

1    in, I think.  Previously to coming into the Department of

2    Corrections he was diagnosed.

3              THE COURT:  When was the first time he was screened,

4    treated, or anything for hep C?

5              MR. ROSEN:  Judge, I think upon coming in, he was --

6    I think -- on intake, it was noted that he had hepatitis C.

7              THE COURT:  So he was diagnosed with hep C in 1999.

8              MR. ROSEN:  Correct.

9              THE COURT:  When was he treated for hep C?

10             MR. ROSEN:  Well, he was monitored, Judge.  He was

11   not treated when he came in 1999 --

12             THE COURT:  You take the view that monitoring is not

13   treating; is that what you are saying?

14             MR. ROSEN:  Well, there was -- in 1999, the standard

15   of care was that there were no DAAs available.  So there were

16   some treatments that -- some treatments available --

17             THE COURT:  Did the standard of care require

18   monitoring?

19             MR. ROSEN:  Yes.

20             THE COURT:  And was he monitored?

21             MR. ROSEN:  He was monitored.

22             THE COURT:  How often was he monitored?

23             MR. ROSEN:  I believe he had blood tests every six

24   months, Judge, to the best of my recollection.

25             THE COURT:  Any imaging?

1              MR. ROSEN:  No, Judge.

2              THE COURT:  How long did he continue with that

3     treatment of monitoring by having blood tests every six months

4     and that's all?

5              MR. ROSEN:  It continued throughout his

6     incarceration, Judge.

7              THE COURT:  In other words, throughout his

8     incarceration, all that he had was blood testing.

9              MR. ROSEN:  Correct, Judge, until --

10             THE COURT:  No --

11             MR. ROSEN:  Yes, that's correct until --

12             THE COURT:  That's not correct.  The answer is no --

13    I have to have it straight here.

14             MR. ROSEN:  Sure.  I understand.  He was monitored

15    until he had elevated blood test in --

16             THE COURT:  What date?

17             MR. ROSEN:  In 2000 -- October --

18             THE COURT:  Wait a minute.  He was monitored from

19    1999 --

20             MR. ROSEN:  Yes, and in October --

21             THE COURT:  -- until what date?  And that monitoring

22    consisted of six months blood tests.

23             MR. ROSEN:  In October of 2015, he had an elevated

24    blood test which, under the guidelines, would have triggered a

25    referral for a FibroScan.

1           THE COURT:  October what date?

2           MR. ROSEN:  October...

3           MS. BLAIN:  20th.

4           MR. ROSEN:  20th, Judge.  Thank you.  October 20th,

5      2015.

6           THE COURT:  '15 or '16?

7           MR. ROSEN:  '15.

8           THE COURT:  So in October 2015, he had elevated what?

9           MR. ROSEN:  He had elevated FIB-4 score, FIB-4 score.

10          THE COURT:  And that --

11          MR. ROSEN:  I believe it was 1.48.

12          THE COURT:  So what happened as a result of that?

13     Anything?

14          MR. ROSEN:  Well, Dr. Wang made a mistake and did not

15     refer him for a FibroScan score -- FibroScan test which would

16     have been done under the guidelines.  Should have been done

17     under the guidelines.

18          THE COURT:  Should have been referred for a

19     FibroScan.

20          MR. ROSEN:  Correct, Judge.  And I'm relying -- so

21     the record is clear, I'm relying on the guideline dated

22     October 13th, 2015, which is in Exhibit 6, and that's Bates

23     labeled 247 --

24          THE COURT:  October what?

25          MR. ROSEN:  October 13th, 2015.

 1                  THE COURT:  That's the guideline --

 2                  MR. ROSEN:  The guideline --

 3                  THE COURT:  -- promulgated seven days before he had

 4       the elevated score; is that right?

 5                  MR. ROSEN:  Correct, Judge.

 6                  THE COURT:  And whose guideline was that?

 7                  MR. ROSEN:  That was the Virginia Department of

 8       Corrections guidelines implemented by Dr. Amonette.  And so you

 9       can find it, Judge, it's Bates labeled Pfaller 2473 --

10                  THE COURT:  All right, now --

11                  MR. ROSEN:  -- through 2490.

12                  THE COURT:  So then he should have been referred for

13       a FibroScan.

14                  MR. ROSEN:  Correct.

15                  THE COURT:  But he wasn't.

16                  MR. ROSEN:  Correct.

17                  THE COURT:  So that was Wang's error.

18                  MR. ROSEN:  Correct.

19                  THE COURT:  So what does the record show then about

20       when the next time he got -- did he get another -- when did he

21       get his regular blood testing?  He didn't get anything else?

22                  MR. ROSEN:  He was continued to get, to receive

23       regular blood tests, and the subsequent blood tests were normal

24       with a normal range.  There was one subsequent blood test which

25       also showed an elevated FIB-4 score --

1          THE COURT:  Wait a minute.  When were the blood tests
2     that showed normal?

3          MR. ROSEN:  Excuse me?

4          THE COURT:  When were the blood tests that were in
5     the normal range?

6          MR. ROSEN:  They were done periodically, Judge, every
7     six months.

8          THE COURT:  When?  From what date to what date every
9     six months?

10         MR. ROSEN:  From the October --

11         THE COURT:  October 20th, 2015 --

12         MR. ROSEN:  20th, until --

13         THE COURT:  He kept getting blood tests every six
14    months.

15         MR. ROSEN:  Right.

16         THE COURT:  From October 20th to when?

17         MR. ROSEN:  I'm coming up with the date, Judge, where
18    there was a second abnormal blood test.  I'll give you that
19    date, Judge.

20         MS. BLAIN:  Judge, next blood test was August the 4th
21    of '16.

22         THE COURT:  A year later?  Almost a year later?
23    That's supposed to be six months.

24         MS. BLAIN:  Actually it's every six to 12 months.
25    This was ten months later, yes, sir.

1        THE COURT:  He's telling me it's every six months.

2   That's what's being represented to me.  Now you tell me it's

3   six to ten months.  Which is it?  It's either six months or six

4   to 12 months.  Which is it?  It's one or the other.  What does

5   the policy actually say?

6        You can't have the benefit of saying we gave him

7   something every six months when, in fact, you gave him most --

8   as of 2015 you gave him ten months, and then you say, well,

9   that was within the policy because the policy was six to

10  12 months.  You can't do that.

11       MR. ROSEN:  I understand, Judge.

12       THE COURT:  Which is the policy?  Is it every six to

13  12 months, and how often did he get them?

14       MS. MAUGHAN:  Your Honor, if I may, for a time, the

15  policy did call for monitoring every six to 12 months, and it

16  eventually changed to every six months later on in the --

17       THE COURT:  When did all that happen?  What policies

18  were involved?

19       MS. MAUGHAN:  The policies involved are in the record

20  at 110 --

21       THE COURT:  I'm not doing that homework.  Just so you

22  all understand it, that's your homework to do.  I do not do

23  that kind of stuff on my own.  That puts me in the position of

24  ferreting out the facts of the record that the lawyers should

25  put to me straight, and I don't do that.

1          And a consequence of your failure to ferret them out

2   when I discover that there's a conflict is that all inferences

3   then immediately have to be resolved against you who are

4   responsible for putting it out that way.  And that means you

5   can't possibly have qualified immunity, you can't possibly have

6   summary judgment because you don't put out a record upon which

7   a court can decide summary judgment, and it is your burden to

8   do that.

9          So now I have to go back -- I just think we have to

10  start this whole thing over again.  I don't think we're doing

11  this right.  Now we're going back.  He's diagnosed on intake

12  with hep C in 1999, and he was monitoring -- being monitored,

13  and I was told that was every six months.  Now, was it every

14  six months, or was it every six to 12 months beginning in 1999

15  that he was monitored?  Which one was it?

16          MS. BLAIN:  Judge --

17          THE COURT:  You have to take that mask off because I

18  can't hear you.  It's hard enough to hear when you're at the

19  microphone.

20          MS. BLAIN:  I'm happy to take the mask off.  It's

21  giving me a little bit of claustrophobia.  I have in front of

22  me a very detailed medical chronology that has the date of each

23  of the lab tests.

24          THE COURT:  That's fine.  You need to ferret them out

25  and tell me.  The first thing is, what was the policy at the

1    time.  I was told the policy was every six months, he got

2    testing every six months.  Then I was told, well, sometimes the

3    policy was six to 12 months.  Then it changed to six months.

4         So if it was first six to 12 months, he could not

5    have received -- he could have received testing every six

6    months, but did he until it changed?  So what was the policy in

7    effect when he came in, six to 12 months or six months, and how

8    often did he receive the tests during those periods?

9         MS. MAUGHAN:  Your Honor, I do want to clarify for

10   the Court one thing.  The guidelines that we are talking about

11   that are in effect in this case started in February of 2015.

12   These guidelines requiring monitoring and testing were not in

13   effect in 1999 --

14        THE COURT:  I'm not asking about the guidelines.  I'm

15   asking about what his history was and what was going on.  And

16   the guidelines may not be dispositive, but I want to know -- we

17   started out when he came in, I was told something.  I want to

18   get it straight, and it's no answer that the guidelines aren't

19   the ones at issue.  What are the facts, please?

20        MS. BLAIN:  The facts are that he had lab tests

21   March 30th of --

22        THE COURT:  I don't want to write them down

23   individually.  I want you to tell me, study them, tell me were

24   they every six months.  What was the policy in 1999, or was

25   there a policy?

1        MS. BLAIN:  I'm unaware of a policy.  Dr. Wang wasn't
2   even working for the VDOC --
3        THE COURT:  That doesn't make any difference.  Was
4   Amonette working in 1999?
5        MR. ROSEN:  He was not the medical director back
6   then, but he was at -- I think he was at the DOC.  He was not
7   the medical director.
8        THE COURT:  What was the policy in 1999?  You told me
9   that pursuant to the policy, he was monitored --
10       MR. ROSEN:  Judge, I believe from memory that it was
11  six months.  That was my understanding, but I cannot, in good
12  faith, say it was not six to 12 months.  I cannot tell you the
13  answer to that question.
14       THE COURT:  What was the policy?
15       MR. ROSEN:  It provided for periodic blood testing to
16  monitor his levels to determine whether his disease was
17  progressing.
18       THE COURT:  Where in the record is that policy, and
19  what did that policy provide as to the periodic blood testing?
20  Is it not in the record?
21       MS. BLAIN:  Judge, might I borrow my policies back so
22  that I can assist Mr. Rosen?
23       THE COURT:  Did they give us a set of the hard copy
24  exhibits?  What is this, Exhibit 6 to the summary judgment of
25  Wang?  Is that what this is or Amonette?

1        MS. BLAIN:  I'd have to look at top.

2        MR. ROSEN:  That was Amonette, Judge.

3        THE COURT:  Is the policy that was in effect in 1999

4   in Exhibit 6?

5        MS. MAUGHAN:  No, Your Honor, it's not.

6        THE COURT:  Do we know what the policy was in 1999?

7        MS. MAUGHAN:  I believe all that we have is a

8   pre-2004 guideline or policy that was in effect at that time.

9   The treatment was very different, so it was a very different

10  policy, but if the Court would like it, we have a copy of it.

11  I do not believe it's in the record.

12       THE COURT:  So the earliest policy in the record is

13  the one promulgated in 2000-when?

14       MS. MAUGHAN:  It was promulgated February 9th, 2015.

15       THE COURT:  But this man had hep C from 1999 on.

16       MS. MAUGHAN:  Yes, Your Honor.  But one of the

17  reasons the policies changed so drastically in 2015 is that new

18  drugs became available.  Prior to that, the treatment was very,

19  very different.  It was not 100 percent -- it was not a

20  guaranteed rate of cure.

21       THE COURT:  No, it wasn't, but there were treatments,

22  and I want to know if he was treated.

23       MS. MAUGHAN:  He was not treated under the pre-2004

24  guidelines, no, Your Honor.

25       THE COURT:  Ever.  The first treatment he got -- the

first treatment that Pfaller got was what?  When?

MS. MAUGHAN:  I think -- Your Honor, if we could define the term treatment, are we talking about treatment for the cure of hepatitis C, or are we talking about monitoring and referral for evaluation for further testing?  I just want to make --

THE COURT:  What are you all calling it?  I know what I'd call it, but my definition isn't appropriate.  What are you all calling it?  He's telling me it's monitoring.  You're telling me it's monitoring.  Is that what you all are saying?  Is treatment monitoring?

I thought that treatment -- that monitoring -- frankly, when I go to my doctor and they're monitoring me for something, I consider that I'm having treatment.  If I need medicine, I get medicine because the results of my monitoring tell me that.  But I don't know if that's what you all are calling monitoring -- treatment, and I don't know whether that's what these guidelines call treatment.

MS. MAUGHAN:  I think we should clarify and say the treatment can include monitoring as the Court has discussed. Treatment with DAAs or referral for treatment with DAAs indicates treatment with the curative drugs that are at issue in this case.

So if we could distinguish general treatment from treatment with DAAs or referral for treatment with DAAs, I

1    think we can better define what we're all talking about.

2            THE COURT:  You all seem to define it in your papers.

3    You don't define it in the more specific sense.  You define it

4    from the beginning.  He just starts his arguments off with the

5    guy is getting treatment in the form of monitoring since 1999.

6    You all have to tell me.

7            Have you all talked?  Is there an agreement as to

8    what treatment means under the medical terms that apply to this

9    condition?  Do you all have an understanding of what that is

10   that you are in agreement on?  You've been at the case for a

11   year or so.

12           MR. ROSEN:  Judge, I think -- I think that Mr.

13   Pfaller was asymptomatic.  While he had hepatitis C, he was not

14   suffering from any symptoms of hepatitis C.  So that's why he

15   was being monitored, to see if he did develop any symptoms.

16           THE COURT:  Are you including monitoring within the

17   term treatment?

18           MR. ROSEN:  Yes, Judge.  That is how the -- that is

19   how, under the guidelines, the doctors would know if his liver

20   disease -- liver was affected by the hepatitis C and if his

21   liver function was impaired.

22           THE COURT:  Then the question is, the record is

23   devoid of any indication of what the testing, the monitoring

24   requirements were until 2015; is that what you are telling me?

25           MR. ROSEN:  I'm not -- Judge, I'm not sure if the

1  monitoring for hepatitis C were in the hepatitis C policy or in

2  another policy.  I can't answer that -- your question.  I

3  cannot answer the question as to what -- where in the DOC

4  policies hep C patients were monitored regularly.  I can't

5  answer that question.

6          THE COURT:  Given that that is an important part of

7  the arguments being made here, I would think you are obligated

8  to give me an answer.  Why don't you go find it.

9          MR. ROSEN:  I would be able -- Judge, we can

10 certainly --

11         THE COURT:  Failure to do that, if that's important,

12 falls -- requires an inference against you.  When do you say

13 that, Mr. LePierre, that the claim against Dr. Amonette starts?

14         MR. LePIERRE:  Yes, Your Honor.  The claims starts in

15 2014 when Dr. Amonette put a hold on all hepatitis C treatment

16 while he promulgated the 2015 policy.

17         THE COURT:  What date in 2014 did he put a hold on

18 it?

19         MR. LePIERRE:  I believe, Your Honor, Dr. Wang

20 testified that that was in February of 2014.

21         THE COURT:  And so there was no policy -- or no

22 treatment from February 2014 until October 13, 2015, because

23 there was no policy at all.

24         MR. LePIERRE:  Your Honor, that was from

25 February 2014 until the first policy Dr. Amonette promulgated

1    on February 2nd of 2015, for one year.

2              THE COURT:  Is that in the record?

3              MR. LePIERRE:  Yes, Your Honor, if I could have just

4    a moment.

5              THE COURT:  Is that part of Exhibit 6?

6              MR. LePIERRE:  No, Your Honor.  That is actually part

7    of ECF 129-1, Dr. Wang's -- excuse me, Dr. Wang's deposition

8    that we attached to our response.

9              THE COURT:  There was a policy then -- let's go back

10   and get this straight.  We don't have -- we do not know what

11   the policy about monitoring was of Mr. Pfaller from 1999 until

12   some policy was enacted, and, as I understand it, there was

13   some policy enacted -- what was the first policy that we have

14   in the record?  What date was that?

15             MR. ROSEN:  February 9th, 2015, Judge.

16             THE COURT:  February 9 of 2015 --

17             MR. ROSEN:  Yes, correct.

18             THE COURT:  Did you say February 2nd or February 9?

19             MR. LePIERRE:  I believe I said February 2nd, Your

20   Honor.  I misspoke.

21             THE COURT:  Was there a policy between 1999 and

22   February 9th, 2015?

23             MR. ROSEN:  Yes, Judge.  There was a previous policy,

24   previous hepatitis treatment policy which prescribed treatment

25   with other medications, ribavirin and interferon which is the

1    treatment that predated DAAs.

2              THE COURT:  Well, when was that policy in effect?

3    From what date to what date?

4              MR. ROSEN:  It was -- well, the previous policy was

5    in effect, my understanding, until February 2014 when the DAAs

6    were approved by the government for use to treat hepatitis C,

7    and Dr. Amonette believed that he needed to suspend the

8    existing policy so he could develop an appropriate treatment

9    policy in light of the development of this new treatment for

10   hepatitis C.

11             THE COURT:  So when was the previous policy in

12   effect?  What period did it start?

13             MS. MAUGHAN:  February 2004.

14             THE COURT:  What does the record show about why he

15   suspended the policy instead of just continuing what he had in

16   effect where, as you say, the policy included monitoring by way

17   of blood tests?

18             MS. MAUGHAN:  Your Honor, prior to approximately 2014

19   when the DAA drugs became available, the other treatments that

20   were available for hepatitis C were not widely recommended and

21   they were not widely effective.  They had a lot of severe

22   psychological symptoms or side effects that went along with

23   them, and they were not anywhere near a guaranteed rate of cure

24   like the new drugs are.

25             So prior to 2014, that was the only -- those are the

1    only drugs that were available, and I believe plaintiff's

2    counsel and all of us can agree that the standard of care was

3    not to treat everyone with hepatitis C at that time because the

4    drugs were so ineffective and could render people

5    psychologically harmed.

6          So only selected people were treated for hepatitis C

7    at that time, and the 2004 to February 2014 policy that was in

8    effect at the Department of Corrections dealt with those drugs

9    and those symptoms and those side effects and that rate of

10   cure.

11         THE COURT:  Well, if treatment includes monitoring,

12   did the policy from 2004 to 2014 include monitoring

13   requirements?

14         MS. BLAIN:  Judge, I think the issue that perhaps Mr.

15   Rosen is having is this:  Separate and apart --

16         THE COURT:  I think all of you are having it.  It

17   ain't anything that I have, nothing that tells me what's really

18   going on here.  You all assume a level of knowledge.  You all

19   are in these cases all over the place, and you assume that I

20   know what you're talking about, but I don't know what you're

21   talking about.  I have to get it from the record.

22         MS. BLAIN:  Judge, so in Dr. Wang's declaration,

23   which was attached to our motion and memorandum in support,

24   what Dr. Wang said is separate and apart from the policy that

25   we're talking about, there's something called a chronic disease

1   clinic, and patients with hypertension, diabetes, and hepatitis

2   C, among other conditions, are seen by a doctor every six

3   months in the chronic disease clinic.  That's part of the

4   treatment for hepatitis C, and when he was at --

5           THE COURT:  Excuse me.  So it had nothing whatsoever

6   to do with any policy concerning hepatitis C itself.  It had to

7   do with the fact that they recognized that you needed to

8   continue monitoring people and set up a clinic to do that.

9           MS. BLAIN:  Yes, sir.

10          THE COURT:  So the first time -- is it generally the

11  case that from at least -- from the period involved here, 1999

12  to 2015, there really was no policy about the treatment of hep

13  C other than going to the clinic, the chronic disease clinic?

14          MR. ROSEN:  Yes, and as --

15          THE COURT:  Is that right?

16          MS. MAUGHAN:  If the Court is asking whether there

17  was no policy for the treatment of hepatitis C, that is not

18  correct.

19          THE COURT:  Other than going to the chronic disease

20  clinic to get your blood tested every six months.

21          MS. MAUGHAN:  No, Your Honor.  There was a treatment

22  policy in effect in the Department of Corrections prior -- from

23  2004 to 2014 regarding the treatment for hepatitis C using the

24  old drugs that we've discussed.

25          THE COURT:  But I don't understand something.  If

1    nobody was given the medications that were available, why is

2    that a treatment policy?

3              MS. MAUGHAN:  People were getting them, Your Honor,

4    in certain circumstances.

5              THE COURT:  What circumstances?  How did they get

6    them?

7              MS. MAUGHAN:  When the risks associated with

8    treatment outweighed the risks of waiting or not having the

9    treatment based on medical provider's judgment.

10             THE COURT:  So what was the risk that triggered the

11   treatment?

12             MS. MAUGHAN:  I would think progressed disease,

13   comorbid conditions such as HIV or underlying immune disorders

14   could make the treatment worth pursuing for an individual.  If

15   the person met the psychological criteria and did not appear to

16   a medical provider that they would not suffer psychological

17   harm, that was another factor which factored into whether or

18   not someone would be treated with the other drugs.

19             THE COURT:  These are the -- what is it? -- ALLDS

20   standards or policies, or they are the VDOC policies?

21             MS. MAUGHAN:  We're talking about the VDOC

22   guidelines, Your Honor.  And --

23             THE COURT:  Is there any evidence that he was

24   considered to get any of those treatments?

25             MS. BLAIN:  He was not.

1          MS. MAUGHAN:  I don't believe that he was, Your

2    Honor.

3          THE COURT:  So then on -- he's getting these blood

4    tests, and --

5          MS. MAUGHAN:  If I may, Your Honor, I don't want to

6    interrupt, but I do want to clarify for the Court.  What Ms.

7    Blain was explaining about the chronic care clinic, that is

8    somewhat separate and apart from the actual Department of

9    Corrections' hepatitis C guidelines.

10          They have a chronic care clinic for all manner of

11    conditions that need chronic monitoring, diabetes,

12    hypertension, hepatitis C, HIV.  There are a lot of conditions

13    that may not have a cure or may have a cure --

14          THE COURT:  But as I understand it, what he did is

15    that he went to the chronic care clinic to get his blood

16    testing, and that was what happened from 1999 to a point in

17    time when you all disagree.  Is that right?  Either he did or

18    he didn't.  What's going on?  This is like the Katzenjammer

19    Kids here.

20          MS. BLAIN:  He did go every six months to the chronic

21    disease clinic.  He had a full exam by the doctor, and as a

22    part of that, blood work was done.  It wasn't just walk in,

23    take your blood, and do a test.  He had an exam.

24          THE COURT:  So he was okay until -- he had an exam,

25    his blood didn't require that he get any of the preexisting

1    treatments until October 20th, 2015, when he had an elevated

2    FIB-4 score of 1.48.  At that time, he should have been

3    referred for a FibroScan, but Wang didn't think so, and he

4    didn't refer him.  So then what happened?  When did he get

5    another blood test?

6               MR. ROSEN:  He was getting periodic blood tests,

7    Judge, and I think Ms. Blain has the dates of those blood

8    tests, but then there was this -- and the subsequent test

9    within normal elements, but then he subsequently had one other

10   abnormal FIB-4 level.

11              THE COURT:  When was that?

12              MS. MAUGHAN:  May of 2018.

13              MR. ROSEN:  May 2018, Judge.

14              MS. MAUGHAN:  I'm sorry, I'm being corrected.

15              THE COURT:  No, his test --

16              MR. ROSEN:  '17.  What was that?

17              MS. BLAIN:  July 12, 2017.

18              MR. ROSEN:  July 12, 2017, Judge.

19              THE COURT:  That was an elevated FIB-4 score?

20              MR. ROSEN:  Elevated FIB-4 score, Judge, and under

21   the criteria, he should have been referred for a FibroScan test

22   to determine the level of his liver damage.  But, again, Dr.

23   Wang made a mistake under the guidelines, and he did not

24   request a FIB-4 score.

25              THE COURT:  What does that mean, he made a mistake

1  under the guidelines?  He thought the guideline was one

2  thing --

3          MR. ROSEN:  Correct.  That's correct.  He thought --

4  he thought -- he was using -- I think using an old guideline,

5  Judge, and so the cutoff was changed from, I think, 1.5 to

6  1.45, and so he was thinking it was 1.5 when the cutoff should

7  have been -- the one he used should have been 1.45.  He just

8  made a mistake.

9          THE COURT:  Well, the jury can decide whether he made

10  a mistake or --

11          MR. ROSEN:  Right, right.

12          THE COURT:  -- he was closing his eyes.  It's a jury

13  question, isn't it?

14          MR. ROSEN:  Well, I guess, Judge, that's an issue of

15  whether he was negligent or not, and if he has sovereign

16  immunity, I guess -- if he doesn't have sovereign immunity, it

17  would be a jury issue.

18          THE COURT:  If I were to shut my eyes twice to the

19  same condition, there's a reasonable inference that I'm being

20  willfully blind which is deliberate indifference.  A jury can

21  decide that.  It doesn't mean that I am.  It means that a jury

22  decides it; right?  Right or wrong?

23          MR. ROSEN:  I don't -- I think that if you make a

24  mistake on interpretation of a guideline, I believe that's an

25  issue not of deliberate indifference but negligence.

1          THE COURT:  No.  You say you made the mistake.  I

2     don't believe you.  I believe that you just don't give a hoot,

3     and you just turn a blind eye to what's going on and you think

4     that prisoners don't deserve good treatment.  That's what their

5     case is.

6          Your case is -- their case is Wang made a mistake.

7     Well, the jury decides.  If the doctor makes the same mistake

8     twice, is there something more to it than negligence?  Is it

9     really a blind eye when I consider also the other factors such

10    as he doesn't do this, he doesn't do that, he doesn't do other

11    things which is their theory and they have doctors who support

12    it.

13         To me, it looks to me like the jury has to decide

14    whether he made a mistake or he didn't.  It's not up to me to

15    decide it on summary judgment.  I can't decide, oh, it was just

16    a mistake so we let -- we'll take deliberate indifference out

17    of the case when their evidence is that he also didn't do other

18    things.

19         MR. ROSEN:  But he did provide some care, Judge.

20         THE COURT:  You know what?  The notion, and if you

21    believe it's the notion that if you provide some care that's

22    enough, that's dead in this circuit.  There is no case anymore

23    that supports, oh, you can provide some care.

24         MR. ROSEN:  I just had Judge Jackson dismiss a

25    case --

```
 1                    THE COURT:  I don't care.

 2                    MR. ROSEN:  -- on that same -- on the same issue --

 3                    THE COURT:  Fine.

 4                    MR. ROSEN:  Okay.

 5                    THE COURT:  Take it to the Fourth Circuit and let

 6      them decide.

 7                    MR. ROSEN:  All right.  Okay, Judge.  It's okay.  I

 8      respectfully disagree.  That's fine.

 9                    THE COURT:  Go on.

10                    MR. ROSEN:  So, anyway, so I think -- so then the

11      second -- the second elevated score Dr. Wang did not refer for

12      FibroScan, and then until he developed symptoms, he went to see

13      Dr. Wang, and Dr. Wang determined that he was having swelling

14      in his stomach.

15                    THE COURT:  When did that happen?

16                    MS. BLAIN:  That's not right.  What you just said is

17      not right.

18                    THE COURT:  This is over.  All summary judgment

19      motions are dismissed.  All your paper is out the window.  It's

20      going to the recycle.  You sit down and you all get me a

21      combined record that shows what actually happened here that I

22      can rely on.  And then I'll consider it, and you're going to

23      have to do it really fast because you have a trial date coming

24      on May 10th.

25                    I do not believe that it is my responsibility to
```

1    listen to three different lawyers saying different things about

2    a record that essentially deals with the same topic line.

3    That's not something that judges have to do, and I'm through

4    with it.  I'm not going to do that.

5         MR. ROSEN:  We want to make it easy for you, Judge.

6    If you tell us the issues that you are interested --

7         THE COURT:  No.  Your job is to figure out why you

8    get summary judgment and to put together a record.  Ordinarily

9    one puts together a record on matters like this in a

10   chronological sense.  And as a general proposition, I think

11   that there's factual issues on deliberate indifference and

12   on qualified immunity.  They're probably going to keep the case

13   going to the jury anyway, but I now know the reason I'm having

14   such difficulty with these papers is I don't have anything that

15   really makes any sense here.

16        I've studied these things.  I've spent about a week

17   and a half pouring through them trying to figure out, asking

18   you questions.  I get the question responses back, and I'm

19   confused by them.  All of a sudden, for the first time as far

20   as I know, we're talking about a list of somebody's guidelines.

21   I don't know which guidelines they are.  Are they the industry

22   group's guidelines, are they the VDOC guidelines, are they the

23   BOP guidelines?  They go from February 9th, 2015, all the way

24   into 2018.  But does anybody explain to me how they differed?

25   No.  You just pick and choose parts of them.

1          MR. ROSEN:  Are you referring to the AASLD

2    guidelines, Judge?

3          THE COURT:  I'm referring to the fact that I can't

4    tell from defendant Amonette's response to such and such which

5    of these guidelines are the VDOC or the -- I get the acronym

6    backwards every time.

7          MR. ROSEN:  AASLD.

8          THE COURT:  Yes.  I don't know, and I'm not sure I

9    yet know which ones are the important ones from your standpoint

10   or from their standpoint because you all tend to refer to

11   things as guidelines.  This is wearing thin on trying to figure

12   out what's going on in the case, and what's important here is

13   really the details.

14         While you're here, when did he manifest symptoms?  We

15   were at that point.  When did Pfaller manifest symptoms?  Let's

16   see if we can get that straight.

17         MS. BLAIN:  I'm trying to get the exact date, Judge.

18   June 8th.

19         THE COURT:  June 8th of what year?

20         MS. BLAIN:  2018.

21         THE COURT:  So he was tested July 12th, 2017.

22         MS. BLAIN:  Then he was tested again May 7th of '18.

23   At that time, Dr. Amonette calculated the FIB-4 score at

24   2.18 -- sorry, Dr. Wang -- and ordered a FibroScan once he

25   calculated that score.  So the FibroScan was ordered May 14th

1    of '18.

2              THE COURT:  May what?

3              MS. BLAIN:  14.

4              THE COURT:  All right.  Now, is there any medical

5    evidence, any opinion from any doctor in the case that says if

6    you had a FIB-4 score of 1.48 on October 20, 2015, and had

7    gotten a FibroScan, what likely would have been shown based on

8    what medical knowledge is?  Is there anything in the record

9    about that?

10             MR. ROSEN:  No, Your Honor, not that I'm aware of.

11             THE COURT:  Is there anything in the record about

12   what would have been shown if he had an elevated FIB-4 score --

13   what was it on July 12th, '17?

14             MS. BLAIN:  1.46.

15             THE COURT:  What would have been going on in your

16   body had the FibroScan been performed?

17             MR. ROSEN:  No, Your Honor.  I believe the testimony

18   was that in that range, they need additional testing to

19   determine whether you were having liver impairment, liver

20   disease.  That's the evidence.  We don't know -- there's no

21   testimony of what it would have been.  I believe Dr. Alsina,

22   the defense expert, it was his opinion that in 2015, Mr.

23   Pfaller already had liver cancer.  But there's no -- no expert

24   says what the FibroScan --

25             THE COURT:  Defense expert said in 2015 he had liver

1  cancer?

2      MR. ROSEN:  He believed he had liver cancer.

3      THE COURT:  What's that fellow's name?

4      MR. ROSEN:  Alsina.

5      THE COURT:  Did he say how serious he thought it was,

6  whether he thought it might be at the level it might be

7  treatable or what?

8      MR. ROSEN:  I don't believe so, sir.

9      THE COURT:  Liver cancer is not inevitably fatal, is

10 it?  There are cures for liver cancer; right?

11     MS. BLAIN:  True.

12     MR. ROSEN:  There's no evidence of that, Judge.

13 Plaintiff's experts have not put any evidence on of that.

14     MR. LePIERRE:  I apologize, Your Honor.  There was a

15 disagreement between Dr. Alsina and Dr. Gaglio on whether or

16 not in 2015 Mr. Pfaller had treatable liver cancer or not.  Dr.

17 Gaglio testified that had he been treated in 2015, more likely

18 than not he would have had either no liver cancer or treatable

19 liver cancer at that time.  There's a disagreement between the

20 two doctors on the growth rate of hepatitis -- I'm sorry, of

21 hepatocellular carcinoma or liver cancer.

22     THE COURT:  All right.

23     MR. ROSEN:  In answer to your question, no doctor has

24 opined what the FibroScan would have shown if it was done at

25 the time under the guideline.

1          THE COURT:  I'm going to take a 20-minute recess, and

2    you can -- does Exhibit 6 have the documents -- the VDOC

3    guidelines that are relevant in the case?

4          MS. MAUGHAN:  It has the VDOC guidelines that were in

5    effect from 2015 through 2018, and, yes, those are the

6    guidelines that defendants posit are relevant to this case.

7          THE COURT:  Do you agree they're the VDOC guidelines

8    that are relevant in the case?

9          MR. LePIERRE:  Yes, Your Honor, I believe they are

10   relevant in the case.

11         THE COURT:  Then I want you to mark for me, take this

12   copy, and I want to see where the relevant changes were in

13   these guidelines that move from one to the other to the other.

14   Then you can mark them and get a little highlighter, get a

15   little flag.

16         MS. MAUGHAN:  Your Honor, those changes are outlined

17   in Dr. Amonette's memorandum in support of his motion for

18   summary judgment, and that is at docket number 110, page six,

19   footnote one.  It outlines the inclusion criteria and the date

20   of the policy in effect.

21         THE COURT:  What ECF number?

22         MR. ROSEN:  110.

23         THE COURT:  Footnote what?

24         MS. MAUGHAN:  Footnote three, Your Honor.

25         THE COURT:  What page?

1          MS. MAUGHAN:  Page six.

2          THE COURT:  Well, that's your characterization of

3    what they are.  I want to see what they actually are.

4          MS. MAUGHAN:  We can find those in the guidelines,

5    but that information came straight from the exhibit that is

6    attached to the memorandum.

7          THE COURT:  It's hard to understand what that is.  I

8    don't understand what that means.  Did somebody testify what it

9    means?

10         MS. MAUGHAN:  Yes.  Dr. Sterling has testified --

11         THE COURT:  Do you agree that these are the

12   provisions that are at issue and the changes as they went

13   through time, what's in footnote three?

14         MR. LePIERRE:  Yes, Your Honor, the exclusion and

15   inclusion criteria for the treatment of -- hepatitis C

16   treatment is the relevant portion of the policy, Your Honor.

17         THE COURT:  Do you agree that as set out here, this

18   is what they say?

19         MR. LePIERRE:  Yes, Your Honor.

20         THE COURT:  This is what the policy say?

21         MR. LePIERRE:  Yes, Your Honor.

22         THE COURT:  We'll take 20 minutes.

23         (Recess taken.)

24         THE COURT:  Why don't we let Ms. Maughan answer the

25   questions about the facts since she seems to have them in hand.

1    Then if there's going to be any argument about the law or

2    something else, Mr. Rosen, if you want to do it, okay.

3              MR. ROSEN:  That's fine, Judge.

4              MS. MAUGHAN:  Your Honor, I will do my best to answer

5    questions as best I can.  I may refer back to some of the

6    briefs which I have in my computer which contain some more of

7    the specific medical information that the Court has been asking

8    about.

9              THE COURT:  Excuse me a minute.  I need to find some

10   things here.

11             MS. MAUGHAN:  All right.

12             THE COURT:  Okay.  The guidelines referred to on ECF

13   110, footnote three, are they VDOC guidelines?

14             MS. MAUGHAN:  Yes, Your Honor, they are.

15             THE COURT:  All right.  Now, I don't understand what

16   these mean.

17             MS. MAUGHAN:  Okay.

18             THE COURT:  But tell me first, why are all these

19   policies pertinent?

20             MS. MAUGHAN:  Okay.  The policies -- all of these

21   versions of the policies are pertinent because they govern the

22   treatment -- from Dr. Amonette's standpoint, they govern the

23   policies that were in place at the Department of Corrections in

24   regards to the treatment of hepatitis C.

25             THE COURT:  And did he promulgate those policies,

1    each one of them?

2           MS. MAUGHAN:  Yes, he did.

3           THE COURT:  Okay.

4           MS. MAUGHAN:  And there's no dispute, no disagreement

5    among plaintiff's counsel or defense counsel that these are the

6    guidelines that are at issue as far as Dr. Amonette is

7    concerned.

8           THE COURT:  These are the VDOC guidelines that are at

9    issue.

10          MS. MAUGHAN:  Correct, Your Honor.  I'll try to be

11   very specific and say VDOC guidelines when I'm speaking about

12   VDOC guidelines.

13          THE COURT:  All right.  Just to help me, what does it

14   mean when it says inclusion criteria?  Is that a term that's

15   actually in the guideline, or is that a term that you all used

16   to describe what was happening in the guideline?

17          MS. MAUGHAN:  It is listed as inclusion criteria in

18   the guidelines, Your Honor.

19          THE COURT:  And inclusion for what?

20          MS. MAUGHAN:  Inclusion for treatment with

21   direct-acting antiviral drugs.

22          THE COURT:  So inclusion, when it's referred to in

23   these guidelines, refers to for treatment with the drugs.

24          MS. MAUGHAN:  The guidelines themselves outline

25   inclusion criteria which are included at docket number 110,

1    page six, and that's in Dr. Amonette's memorandum in support.

2              THE COURT:  I'm trying to get to what the inclusion

3    is for.  Is it for treatment with DAA drugs?

4              MS. MAUGHAN:  It's for two things, Your Honor.  One

5    part of inclusion criteria is inclusion for treatment --

6              (Court reporter interruption.)

7              MS. MAUGHAN:  There are two categories of things that

8    are included in these criteria.  One is an immediate referral

9    to the VCU hepatitis C telemedicine clinic for treatment with

10   DAAs, the drugs that are at issue in this case.

11             The other set of criteria renders someone eligible or

12   included in a level of need for further testing, and that's

13   what's outlined at the bottom of page six of docket number 110,

14   and, for example, starting in June of 2015, an APRI of greater

15   than 1.5 and a FIB-4 score of greater than 3.25 means --

16   triggers a prioritized referral.  That indicates we send you to

17   VCU --

18             THE COURT:  Wait a minute.  I don't see in

19   February 15th anything about except APRI greater than 1.0.

20             MS. MAUGHAN:  If I said February 15, I apologize,

21   Your Honor.  I was starting at June of 2015, but I can start at

22   February of 2015.

23             THE COURT:  I may have been just looking at

24   February 15th and heard you say it, but a request referral for

25   APR -- if your APRI is greater than one, then it's obligatory

1    on the doctors at the prison to request referral for treatment;

2    is that what you are saying there?  Is that what that first

3    language means?

4            MS. MAUGHAN:  That is in general what it means.  That

5    is Dr. Amonette's guidance to the Department of Corrections

6    physicians at that time, but let me clarify for the Court that

7    in the February 2015 to June 2016 set of guidelines, those are

8    referred to as interim guidelines.  And those guidelines were

9    in effect for four months while Dr. Amonette was finalizing

10   negotiations with the VCU hepatitis C telemedicine clinic.

11           So there was no VCU hepatitis C telemedicine clinic

12   available at that point, so these interim guidelines

13   prioritized certain people for referral for treatment by

14   Department of Corrections physicians not at VCU.  There's a

15   slight difference.

16           THE COURT:  My policy -- the date of the policy

17   begins -- the first one is 2/15, and then there's one --

18   there's one -- there are three of them.  There's 2/15 to 9/15,

19   9/23/15 to 10/13/15, and then 10/13/15 to 6/16.  That's all

20   more than four months.  I don't understand -- from February to

21   October of '15 is more than four months.

22           MS. MAUGHAN:  Your Honor, I think we are

23   misunderstanding each other.  Is the Court looking at page six

24   of docket number 110, the chart at the bottom?

25           THE COURT:  Yeah, the chart at the bottom, and the

1  very first entry says 2/15-6/15.  To me, that means from

2  February 15th to June of '15, then the policy was as indicated

3  to the right.  From June 15 to September 15, the policy was

4  indicated in the right box.

5         MS. MAUGHAN:  Yes, Your Honor.

6         THE COURT:  From September 23 of 2015 to October 13,

7  2015, the policy was as shown in the box.  And then there's

8  another one -- the next one is from October 13, '15, to June of

9  '16 -- it doesn't have a specific date -- and then June '16,

10  meaning the year, to June '17, meaning the year, there's

11  another policy, and June '17 to 5/18 there's a policy, and then

12  there's another one from 5/18 to July '18.  Each one of them

13  has some kind of criteria listed.  Is that the way to read the

14  chart?

15        MS. MAUGHAN:  That is in general the way to read the

16  chart.  The very first entry from February 2015 to June of 2015

17  requires additional explanation because the standards are

18  slightly different and the circumstances are different.

19        THE COURT:  Which ones are different?

20        MS. MAUGHAN:  So the very first policy, the dates

21  that are listed, February 2015 to June 2015, are an interim

22  guidelines that Dr. Amonette wrote for the Department of

23  Corrections, and the reason he wrote those interim guidelines

24  was because the negotiations with the VCU hepatitis C

25  telemedicine clinic for treating DOC inmates who had hepatitis

1   C were not finished.

2          So in those four months, he created his own interim

3   guidelines that applied to providers at the Department of

4   Corrections --

5          THE COURT:  It says APRI greater than 1.0, request

6   referral for treatment.  Treatment by whom, where, when,

7   etcetera?  Who would they get treated by?

8          MS. MAUGHAN:  In those four months, they would have

9   been treated at the Department of Corrections by Department of

10  Corrections physicians.

11         THE COURT:  An APRI greater than .7-1.0, so that

12  basically means with an APR between .7 and 1.0 with other

13  findings to suggest advanced liver disease.  Then what happens?

14         MS. MAUGHAN:  Exactly.  Under the interim policy, if

15  a person's APRI was greater than 1.0, that triggered

16  eligibility for treatment with the DAAs.  If their APRI was

17  greater than .7 but less than 1.0 and they had other findings

18  to suggest advanced liver disease, they would be referred for

19  treatment with the DAAs at the Department of Corrections.

20         THE COURT:  So both of them are referral to treatment

21  for DAAs?

22         MS. MAUGHAN:  Yes.

23         THE COURT:  At VDOC.

24         MS. MAUGHAN:  Initially, yes.

25         THE COURT:  All right.

1      MS. MAUGHAN:  The second version of the guidelines

2  that went into effect in June of 2015 -- this is the second

3  version of the DOC guidelines -- was promulgated by

4  Dr. Amonette once the VCU hepatitis C telemedicine clinic was

5  operational.

6      So starting in June of 2015, the policy of the

7  Department of Corrections was to refer inmates who met these

8  criteria to the VCU telemedicine clinic for treatment with DAAs

9  if they were going to be treated with DAAs, and those criteria

10  are listed in the right column, and if an inmate had an APRI of

11  greater than 1.5 and a FIB-4 score of greater than 3.25, that

12  was a prioritization -- a prioritized referral to VCU.

13      If an inmate had an APRI of greater than .5 and less

14  than 1.5 or a FIB-4 score greater than 1.45 and 3.25, the

15  patient was to be referred to VCU for a FibroScan or a

16  FibroSure depending on the distance from the location of the

17  patient.

18      THE COURT:  But not treatment with DAA?

19      MS. MAUGHAN:  Correct.  Starting in the 2015

20  guidelines, Dr. Amonette categorized everybody into three

21  categories.  One was you were prioritized for referral for

22  treatment with DAAs to the VCU clinic.  The second category was

23  what the parties sometimes refer to as an indeterminant

24  category.

25      If your scores fell in that range that I've just

1    listed there that indicates a referral to VCU for FibroScan,

2    those scores are less indicative of liver disease.  When your

3    score falls in those ranges, we can't be as sure how advanced

4    or not advanced your disease is.  So extra testing is what's

5    called for in the guidelines.

6              THE COURT:  Why did it go from 1.0 in the interim

7    guidelines to get DAAs to greater than 1.5?

8              MS. MAUGHAN:  I don't know that that is a question

9    that I can answer, Your Honor.

10             THE COURT:  All right.  If you can't, you can't.  Why

11   were these guidelines changing in here?

12             MS. MAUGHAN:  So they were changing because the

13   circumstances were changing that Dr. Amonette was facing in

14   dealing with treatment of hepatitis C for DOC inmates.

15   Mainly --

16             THE COURT:  Like what circumstance?

17             MS. MAUGHAN:  So some of the things that changed were

18   the availability of treatment at VCU's telemedicine clinic.

19   VCU's telemedicine clinic was opened -- this portion of the

20   clinic was opened specifically to treat Department of

21   Corrections inmates.  That's the reason for its existence, this

22   portion of the clinic, and they had a limited number of slots

23   of people that they could treat.

24             As the treatment evolved, as certain people were

25   treated and we realized it didn't take as long or they could

1   treat more people or the clinic expanded, the guidelines

2   likewise expanded to allow more people to go be treated.

3           THE COURT:  But the guidelines increased in quantity.

4   I mean, it went from 1.0 to 1.5 APRI, greater than 1.0 and

5   greater than 1.5.

6           MS. MAUGHAN:  I am sorry, Your Honor.  I don't have

7   an answer for why that specific criteria changed.  I do know

8   that Dr. Amonette consulted with Dr. Sterling who is a

9   hepatologist at VCU, and I don't want to speculate.

10          I do know they consulted on what the criteria should

11  be.  I can't answer why, from February to June, that one

12  particular level changed.  I don't know the answer to that.

13          THE COURT:  Okay.

14          MS. MAUGHAN:  Your Honor, before the break, the Court

15  had asked us to go through the record and find the monitoring

16  criteria, and Mr. Fisher communicated with us over Zoom to

17  indicate the specific places in the record where those criteria

18  exist, and I have marked the Court's copy of the DOC guidelines

19  with Post-it notes to indicate where that criteria is listed,

20  and I can return that to the Court.

21          THE COURT:  What are you marking?

22          MS. MAUGHAN:  It is the Court's copy of document

23  number 110-6, and it has been tabbed with yellow Post-it notes

24  to indicate the monitoring criteria and the frequency of

25  monitoring about which the Court had previously inquired.

1          THE COURT:  May I see it, please?  Thank you for

2     doing that, whoever did it.

3          MS. MAUGHAN:  That was Mr. Fisher, Your Honor.

4          THE COURT:  Has Mr. Fisher left us?  He's not on the

5     television.

6          MR. FISHER:  I'm here, Your Honor.  Trying not to be

7     a distraction.

8          THE COURT:  What?

9          MR. FISHER:  I was just trying not to be a

10    distraction like a floating head.  I'm not clear what the setup

11    is.

12         THE COURT:  Well, don't be a cat.

13         MR. FISHER:  I certainly don't want to be a cat.

14         THE COURT:  The Post-it notes at the top are what I

15    look at for the monitoring criteria?

16         MS. MAUGHAN:  Correct, Your Honor.  The information

17    written on the Post-it notes is the date range of the

18    guidelines that was in effect at that time.  The Post-it notes

19    are placed at the specific page where the testing criteria

20    appears or starts.  The monitoring criteria, I'm sorry.

21         THE COURT:  So in the very first one, 2/19/15 to

22    6/8/15, most offenders who are not eligible for treatment can

23    be monitored once per year.  The next one, offenders with HIV

24    or other immunocompromised condition or with genotype 3 disease

25    should be monitored every six months.  So which one of those

1    includes hep C?

2              MS. MAUGHAN:  The guidelines that the Court is

3    looking at -- they're at docket 110-6 -- are the Department of

4    Corrections hepatitis C treatment guidelines.  Those guidelines

5    only govern the treatment of hepatitis C.

6              THE COURT:  What does it mean when it says most

7    offenders who are not eligible for treatment can be monitored

8    once a year?  Who is not eligible for treatment, and how do you

9    determine that?

10             MS. MAUGHAN:  So that goes back to the guideline

11   criteria that we were discussing at the bottom of page six at

12   docket number 110, and that would be the three levels that I

13   had discussed previously with the Court.  If you fall into that

14   third level where your scores do not render you eligible for

15   extra evaluation or referral to the VCU telemedicine clinic,

16   you are to be monitored.

17             THE COURT:  All right.

18             MS. MAUGHAN:  Per the guideline.

19             THE COURT:  All right, thank you.

20             MS. MAUGHAN:  I will note for the Court as well at

21   docket 111 -- that is Dr. Wang's memorandum in support of

22   summary judgment -- from pages four through approximately

23   eight, it outlines Mr. Pfaller's specific blood test results

24   and the corresponding policy in effect at that time.

25             THE COURT:  Okay.  Are you going to continue now, or

1    is Mr. Rosen going to pick up?

2          MS. MAUGHAN:  If I may, Your Honor, if I could give

3    the Court a little bit more background information, and some of

4    this is in the record and some of it is not, so I apologize,

5    but I can explain why it is or isn't.

6          THE COURT:  Wait a minute.  Don't give me stuff

7    that's not in the record.  I have enough trouble keeping track

8    of things in the record, and if they're not in the record, I

9    can't use them anyway.

10         MS. MAUGHAN:  Understood, Your Honor.  I just want to

11   address the Court's questions about the pre-2014 guidelines to

12   the extent that they are relevant in this case, and I think all

13   of the parties agree that pre-2014 treatment -- hepatitis C

14   treatment in the Department of Corrections prior to 2014 was

15   not at issue.  I know plaintiff disagrees a little bit on the

16   date and says --

17         THE COURT:  Excuse me a minute.  I'm looking at their

18   questions I got from them, and I think they say 2012.

19         MS. MAUGHAN:  They say the time period in question is

20   from October 15, 2012, through August of 2018, and that's at

21   docket number 231.  I don't know why plaintiff believes that

22   the hepatitis C treatment guidelines from October 2012 are at

23   issue.  That would be a question for plaintiff.

24         THE COURT:  All right.

25         MS. MAUGHAN:  But the guidelines we do agree, the

1    next sentence in that same submission from the plaintiff is

2    that the guidelines in question are the February 9th, 2015,

3    guidelines and the others that follow through the June 2017

4    VDOC guidelines.

5            THE COURT:  From looking at the guidelines on

6    footnote three in ECF 110, page six, it really doesn't look

7    like the guidelines changed a great deal between June 15th --

8    June of 2015 and May of -- May to July 2018.  The criteria

9    doesn't look like they changed much.

10           MS. MAUGHAN:  So the three criteria that we

11   discussed, either immediate referral for treatment to the VCU

12   clinic for hepatitis C treatment, that did not change.  What

13   did change was the second criteria which was the method by

14   which people were getting additional testing with the FibroScan

15   or FibroSure.

16           THE COURT:  But the basic criteria didn't change.  It

17   was the method; right?  I haven't flyspecked it, but a quick

18   look -- if you look at the bottom line, the APRI of less than

19   .5 -- I mean greater than .5 and less than 1.5 or FIB-4 greater

20   than 1.45 and less than 3.25, those criteria do not appear to

21   have changed at any point in time.  It's what happens once you

22   have those things; right?

23           MS. MAUGHAN:  Yes, Your Honor.

24           THE COURT:  And so the difference is, as I see it, is

25   where and when you refer for scans; is that right?

1          MS. MAUGHAN:  Yes.

2          THE COURT:  And the purpose of the scan is to

3   determine the degree of scarring on the liver, and the degree

4   of scarring, therefore, indicates what?

5          MS. MAUGHAN:  The degree of scarring indicates the

6   scarring of the liver, so how far advanced is someone's

7   fibrosis which is what is -- that is the definition of liver

8   scarring, is fibrosis.  Once you have that scan, you have a

9   better indicator for those middle-range people of what their

10   liver is actually up to at that point in time.

11          THE COURT:  So then they get the drugs or don't get

12   the drugs.

13          MS. MAUGHAN:  They may or may not.

14          THE COURT:  Depending upon what?

15          MS. MAUGHAN:  Depending upon the results of their

16   FibroScan, and I believe those criteria are addressed in the

17   DOC hepatitis C guidelines that the Court has as well.  If you

18   get a certain score on the FibroScan, then you are referred for

19   treatment.  If you have a certain score on the FibroScan, you

20   go back into the monitoring group.

21          THE COURT:  Where is that break point in the record?

22          MS. MAUGHAN:  It is in the guidelines that the Court

23   has at ECF 110-6, and --

24          THE COURT:  Is it broken down anywhere that I can see

25   it without flyspecking everything and running the risk of

1    making a mistake and not understanding the technical language

2    that's in some of these documents?  Has anybody broken it down

3    tabularly like this?

4              MS. MAUGHAN:  I don't think so, Your Honor, because

5    in this case, Mr. Pfaller did not receive a FibroScan until, I

6    want to say July of 2018, and once he had that FibroScan, he

7    was at the same time being diagnosed with terminal liver

8    cancer.  So his FibroScan score would not -- at that time would

9    not have triggered under the guidelines because of his comorbid

10   condition of liver cancer.

11             THE COURT:  Well, if he had been diagnosed with liver

12   cancer in 2015 as Dr. Gaglio says he should have been if he'd

13   had the scan, would he have gotten the DAA?

14             MS. MAUGHAN:  I believe the medicine --

15             THE COURT:  Or would he have gotten some other

16   treatment for cancer?

17             MS. MAUGHAN:  I believe that the medical testimony is

18   that if you have liver cancer, you need to take care of the

19   cancer first before you take the DAAs.

20             THE COURT:  That makes sense to me, but -- well,

21   then, what kind of treatment -- according to the record, what

22   kind of treatment would he have gotten for cancer beginning in

23   2015?

24             MS. MAUGHAN:  I don't know that there is evidence in

25   the record of exactly what type of treatment he would have had

1   for cancer.  I will tell the Court, and I know the testimony

2   would be that the Department of Corrections did and does treat

3   liver cancer, and at that time what specifically Mr. Pfaller

4   would have had to undergo, I cannot answer that question.

5           THE COURT:  No doctor opined in their expert reports

6   on that topic?

7           MS. MAUGHAN:  Not to my recollection, Your Honor.

8           THE COURT:  Okay.  Hold on, please, before you go

9   further.  What AASLD guidelines are in effect at the time that

10  the guidelines, VDOC guidelines are in effect as on this chart?

11          MS. MAUGHAN:  That is not in the chart, Your Honor.

12          THE COURT:  I know.  Do you know the answer?

13          MS. MAUGHAN:  So I believe that the AASLD first

14  issued their guidelines about DAA use in 2015.  I don't know

15  the month.  And I believe they issued amended guidelines in, I

16  think, 2016 and in November of 2019.

17          THE COURT:  Okay.

18          MS. MAUGHAN:  And in the record at document number

19  110-2 are excerpts of the relevant portions of the guidance

20  from the AASLD.

21          THE COURT:  That's page two.

22          MS. MAUGHAN:  That is page two of docket number

23  110-2, and it's been highlighted for the Court in the record.

24          THE COURT:  Yes.

25          MS. MAUGHAN:  I hesitate to get into argument, but

1    I'll ask the Court to indulge me for just a moment.  I will

2    point out to the Court for purposes of argument that in that

3    document, page two of 110-2, the highlighted portion does

4    indicate that evidence supports treatment for all HCV-infected

5    persons with some limit exceptions.

6            It does say although treatment is best administered

7    in -- early in the course of the disease before fibrosis

8    progression and the development of complications, the most

9    immediate benefit of treatment will be realized by populations

10   at highest risk for liver-related complications.  Thus, where

11   resources limit the ability to treat all infected patients

12   immediately as recommended, it is most appropriate to treat

13   those at greatest risks of liver complications and those at

14   risk of transmitting HCV or in whom treatment may reduce

15   transmission risk.

16           Where such limitations exist, prioritization of

17   immediate treatment for those listed in tables three and four

18   is recommended including patients with progressive liver

19   disease, METAVIR stage F3 or F4, transplant recipients, or

20   those with severe extrahepatic manifestations.

21           THE COURT:  Where are you reading from?

22           MS. MAUGHAN:  That is document number 110-2, page

23   two, of the Court's record.  While the AASLD guidelines and

24   this document do not have specific criteria like the Department

25   of Corrections guidelines do, what the AASLD guidelines do do

1    is indicate that if there are limitations on treatment,

2    resources and access to treatment, the best thing to do is to

3    prioritize those who are in most severe need of treatment.

4    That would be people with F3 or F4 fibrosis level.

5              THE COURT:  You have to have a scan in order to know

6    that.

7              MS. MAUGHAN:  You do not.  Not necessarily.

8              THE COURT:  How do you know what the fibrosis level

9    is if you don't have a scan?

10             MS. MAUGHAN:  As Dr. Amonette responded to the

11   Court's questions about -- I'm trying to find it in the record,

12   Your Honor.

13             THE COURT:  This is the question between number

14   four -- I mean of number four?

15             MS. MAUGHAN:  I believe it is question number four,

16   Your Honor.  The Court had inquired about the significance of

17   the APRI and FIB-4 and how that corresponded, and I'm trying to

18   find our response.  It is -- it's at docket number 226, page

19   three, in response to question four, and the Court can read,

20   obviously --

21             THE COURT:  I can read it, but I don't understand

22   what it says.

23             MS. MAUGHAN:  Okay.  So essentially what it's saying,

24   the APRI score and the FIB-4 scores are biochemical tests.  So

25   we take blood work, and a physician calculates the results --

1   physician calculates the APRI or the FIB-4 based on the

2   information in the blood work.  There are formulas that are in

3   place that indicate what numbers are supposed to be plugged in.

4   I can't tell you what those are at the moment.

5           THE COURT:  Okay.  Well, what did his blood work show

6   at the time it was taken as to the predictive level of his

7   fibrosis?

8           MS. MAUGHAN:  So that is in the record at ECF 111

9   from pages four to eight, indicates the results of

10   Mr. Pfaller's specific blood tests and his levels that were

11   calculated.

12           THE COURT:  That indicates the blood levels, but does

13   it show the level of fibrosis?  In other words, it says here --

14   just to know the blood work level doesn't do anything.

15           MS. MAUGHAN:  It does, Your Honor.

16           THE COURT:  Doesn't tell me anything.  What I want to

17   know is, what does the record show about what his blood work

18   showed as to his level of -- predictive level of fibrosis which

19   is what's referred to in the first sentence of paragraph four

20   of ECF 226.

21           MS. MAUGHAN:  That information is in ECF 111 from

22   page four to eight in Dr. Wang's memorandum, the specific

23   results for Mr. Pfaller.

24           THE COURT:  What does it say?

25           MS. MAUGHAN:  So what it generally says, and I'll ask

1    Ms. Blain to correct me if I'm incorrect here, but generally

2    Mr. Pfaller's scores fell in the range under the DOC guidelines

3    that indicated that he was in the category of people who would

4    be monitored.

5           THE COURT:  If you just measured the level of

6    fibrosis predictively by using the blood test.

7           MS. MAUGHAN:  Yes.  I'll interject here for the

8    Court, there are several ways to evaluate fibrosis.  The number

9    one gold standard is a liver biopsy.  That's invasive, painful,

10   and doesn't necessarily give significantly better results than

11   the biochemical markers such that you would undergo that

12   voluntarily unless there's a specific need.  So we have a liver

13   biopsy.  That's one option.

14          Another operation is these biochemical markers, and

15   when they're in the very low ranges, which is the ranges from

16   the Department of Corrections guidelines that indicate you are

17   in the monitoring category, those are very predictive, they're

18   highly predictive of a low level of fibrosis.

19          On the other hand, if those numbers indicate that

20   your ranges are elevated which corresponds to the Department of

21   Corrections guidelines indicating you will be immediately

22   referred for treatment with DAAs, those numbers are very

23   indicative of a correlation with advanced liver disease.  If

24   you fall in the middle, the numbers are less certain.

25          THE COURT:  What about the FibroScan?

1          MS. MAUGHAN:  That's why the FibroScan is required

2     for people who fall in the middle range.  The FibroScan is

3     another way that fibrosis can be determined.  It's an

4     ultrasonic method that takes an ultrasound of the liver using

5     elastography and spits out a number indicating what that

6     machine believes your fibrosis level to be.

7          THE COURT:  I thought that the plaintiffs took the

8     view that the scores that Dr. Wang misread called for scans.

9          MS. MAUGHAN:  There were two --

10          THE COURT:  I'm having trouble reconciling that with

11     the comment that the scores that he had on the blood tests only

12     called for monitoring.

13          MS. MAUGHAN:  That's not the only time that it called

14     for monitoring.

15          THE COURT:  I'm talking about your comment that at

16     pages four through eight, Wang's scores called only for

17     monitoring, not for a FibroScan.  And I'm trying to harmonize

18     that with the fact that as I understand the plaintiff's

19     evidence and even Dr. Wang's own testimony, that on the two

20     occasions when he mistakenly reached the wrong conclusion, the

21     scores were such that they would have called for FibroScan, not

22     just monitoring.

23          MS. MAUGHAN:  If I indicated otherwise, Your Honor, I

24     apologize.  That was not my intent.  There were two times where

25     Mr. Pfaller's scores indicated that he was in that middle

1   range, and he should have been referred for additional testing.

2           THE COURT:  Wait a minute then.  So then the correct

3   statement is -- what were they?  July 12th, 2017, and what were

4   the dates -- it should be -- Wang's scores, as we're talking

5   about on ECF 11, 111, pages four through eight, called for

6   monitoring only and not for a FibroScan except for the tests on

7   what dates?

8           MS. BLAIN:  Collected on October 16th, 2015.

9           THE COURT:  And?

10          MS. BLAIN:  And July 12th of 2017.

11          THE COURT:  And those did call for FibroScan?

12          MS. MAUGHAN:  Under the DOC guidelines, they did,

13   Your Honor.

14          THE COURT:  So what about a comparison between the

15   AASLD guidelines and the VDOC guidelines as to when a score

16   would call for monitoring only as opposed to the fiber scan?

17          MS. MAUGHAN:  The AASLD guidelines do not, and, to

18   the best of my knowledge, never have listed those specific

19   criteria.  What the AASLD guidelines do, which is -- or did is

20   at 110-2, page two.  The AASLD issued general guidance and said

21   if there is a situation where resources are limited and you

22   cannot treat everyone at the same time, what you should do is

23   prioritize the sickest people.

24          THE COURT:  What does the record show about whether

25   resources were limited and why they were limited here?  It's

1    not sufficient, in my judgment, for the defense to come in and

2    say resources were limited.  That's the same thing as saying we

3    can't produce documents because it will be expensive for us to

4    do so.  You have to quantify what the resource is that's

5    limited and why it's limited in order to understand what that

6    means.

7            MS. MAUGHAN:  And I will have to summarize

8    Dr. Amonette's testimony from his deposition in this case and

9    his deposition in prior cases which we have all agreed is --

10   can be used in this case.  What Dr. Amonette was facing back in

11   2014/2015 when these new drugs, the DAAs, became available was

12   a very large population of inmates in the Department of

13   Corrections who had chronic hepatitis C and a very limited

14   number of doctors and medical providers qualified to administer

15   that treatment.

16           THE COURT:  What is the treatment?  What is the DAA

17   treatment?

18           MS. MAUGHAN:  The DAAs are a newer line of drugs that

19   I believe first became available in 2013 but more widely

20   available in 2014, and it's a new type of drug.  When they

21   first came out, they were limited in several respects.

22           THE COURT:  How do you administer them?

23           MS. MAUGHAN:  It's an oral medication.  You take it

24   every day.

25           THE COURT:  You prescribed a -- the doctor says take

1    a pill.

2              MS. MAUGHAN:  Yes.

3              THE COURT:  And then in the prison setting, the nurse

4    administers the pill.

5              MS. MAUGHAN:  Right.  It's under direct observational

6    therapy where the nurse monitors someone ingest the pill and

7    swallow it, yes.

8              THE COURT:  So what's so hard about administering the

9    pill?  I don't understand that.

10             MS. MAUGHAN:  So the administration of the pill is

11   not the problem, and the Department of Corrections has always

12   undertaken the administration of the pills.  So even when

13   inmates were referred to the VCU clinic, they ultimately took

14   the pills that VCU prescribed at their facilities.  That's

15   never been an issue.  The administration of the medication is

16   not the problem.

17             Where the limited resources come into play,

18   especially in the early days of DAAs, is the limitation in the

19   number of medical providers qualified to administer and monitor

20   the treatment.  It was fairly new, it needed to be monitored.

21   Blood work needed to be done while the person was taking the

22   medication to make sure he or she was not having a reaction or

23   adverse effect, and the people who were qualified to do that

24   were limited in number.

25             THE COURT:  There isn't any difficulty in

1   administering the treatment.  It's the monitoring the treatment
2   that is the problem then.
3            MS. MAUGHAN:  It's the monitoring, and it's also the
4   decision of which pills to prescribe.  It's not a
5   one-size-fits-all, and it particularly was not in the early
6   days of the treatment.  There are multiple --
7            THE COURT:  Then it's not administering it, it's
8   prescribing.
9            MS. MAUGHAN:  Prescribing and monitoring are the
10  limitation --
11           THE COURT:  Excuse me.  Prescribing the medication
12  and monitoring the treatment.
13           MS. MAUGHAN:  Correct.  Especially in the early days.
14           THE COURT:  The monitoring consisted in the early
15  days of what?
16           MS. MAUGHAN:  I believe it was routine blood work
17  through the course of treatment.  So once you are prescribed
18  the medication, it could be an 8- to 12-week course of
19  administration of the medicine.
20           THE COURT:  What's the problem?  They draw blood work
21  for all kinds of things all the time, and anybody who has
22  training in the medical area at the prison, if they're nurse
23  practitioners or physician assistants or doctors or nurses,
24  know how to draw the blood.  So there isn't any problem drawing
25  the blood, is there?

 1              MS. MAUGHAN:  Again, that would be what I would

 2     consider an administration issue.  There's not a problem

 3     drawing the blood.  Certainly any nurse practitioner or nursing

 4     assistant would not have trouble drawing the blood.  It's

 5     interpreting the results of that blood work that people,

 6     nurses, doctors, medical providers at the Department of

 7     Corrections were not qualified or comfortable to do in

 8     Dr. Amonette's medical opinion.

 9              And that's why the Department of Corrections used the

10     providers at VCU who had that specialized knowledge and

11     training.  The blood was drawn at the prison, the blood work or

12     the results were sent to VCU, the providers at VCU decided --

13              THE COURT:  We haven't gotten there yet.

14              MS. MAUGHAN:  Okay.

15              THE COURT:  In 2014 and '15 when these drugs became

16     available, you said they had a large hep C prisoner population.

17     How large was it?

18              MS. MAUGHAN:  The exact number in 2014 is not known.

19     What was known, I believe in 2017 or '18, was that it was

20     approximately 2,500 people in the Department of Corrections had

21     been affirmatively identified as having chronic hepatitis C.

22              THE COURT:  So they didn't know what the population

23     was in 2014 and '15 when he was doing the regulations.  Is that

24     what you're saying?

25              MS. MAUGHAN:  What they did know was that based on

1    research that has been done nationally is that the prison

2    population is at an extremely high prevalence --

3              THE COURT:  What did they know?  What document did he

4    look at to say I have looked at this research, and I think we

5    have the same problem as everybody else has got?

6              MS. MAUGHAN:  I don't know that there is a document,

7    Your Honor, but what there is is Dr. Amonette's testimony that

8    he consulted with Dr. Sterling at the VCU clinic, and Dr.

9    Sterling and Dr. Amonette discussed the prevalence of hepatitis

10   C in inmates and how to best administer treatment.

11             THE COURT:  That's interesting, but it's not

12   responsive because the issue is -- you're saying I've got a

13   resource limitation because I've got a large population of

14   people who need the drug.  Then I need to know what is the

15   large population of the people who either need or might need

16   the drug.  And what I'm hearing is that at the time these

17   guidelines were prepared, Dr. Amonette did not know that

18   figure.

19             MS. MAUGHAN:  That is true.

20             THE COURT:  And they didn't know the figure until

21   2017 or '18.  That's -- you jumped ahead to point to that, so I

22   have jumped ahead in my reasoning to get there, and if I'm

23   wrong, disapprise me of it.  But I hear you say that they did

24   not know what the prison population was that needed or might

25   need the medication, DAAs, until 2017 to '18; is that correct

1    or incorrect?

2         MS. MAUGHAN:  That's incorrect.  So there's two parts

3    of that that are incorrect.  My statement about what

4    Dr. Amonette knew and when he knew it comes from his deposition

5    testimony that was taken in, I believe, 2017 or 2018.  So at

6    that point, he had data from the Department of Corrections

7    indicating how many people had hepatitis C.

8         THE COURT:  How many was that?

9         MS. MAUGHAN:  That was in the range of 2,500.

10        THE COURT:  What's the prison population?

11        MS. MAUGHAN:  I think at the time it was around

12   30,000.  National estimates put the prevalence of hepatitis C

13   in inmate populations from anywhere, I think -- I'm estimating,

14   ten to 30 percent of the inmate population was probably

15   infected with hepatitis C.

16        THE COURT:  So now, then, from 2014 to 2017 whenever

17   he got that information, they did not know the quantity of

18   people, prisoners, who were -- needed the drug or might need

19   the drug.

20        MS. MAUGHAN:  Again, Your Honor, my understanding of

21   Dr. Amonette's testimony is from what he said in a deposition

22   in 2017 or 2018.  I don't know when he personally became aware

23   of that number.

24        THE COURT:  Let me put it this way:  There is nothing

25   in the record, then, to tell me what the prisoner population

1    was that he thought needed the drug or might need the drug when

2    he was forming his policies.

3          MS. MAUGHAN:  Specific to the Department of

4    Corrections numbers, no, there is not that information in the

5    record.

6          THE COURT:  And what did he know as to general

7    figures about prison population from 2014 to 2017 when he got

8    that information?

9          MS. MAUGHAN:  My recollection is that he was aware of

10   national research indicating that the population who had

11   hepatitis C could be anywhere from ten to 30 percent of the

12   inmate population.

13         THE COURT:  When did he have that knowledge?

14         MS. MAUGHAN:  I don't know that, Your Honor.

15         THE COURT:  All right.  So then the resource

16   limitation was the ability to -- limited number of doctors in

17   VDOC to prescribe the medication and to monitor the treatment

18   and, in particular, to interpret the blood work results.

19         MS. MAUGHAN:  I will clarify what the Court just

20   said.  The Court said the limitations of providers in the

21   Department of Corrections to prescribe the treatment.  What the

22   DOC guidelines did was sent inmates who were eligible for

23   treatment to VCU, so the VCU providers decided to prescribe the

24   drugs or not or which drugs to prescribe.

25         THE COURT:  No, that's not what I'm asking.  I'm

1    asking before they ever entered into anything with VCU.  I

2    asked you at the beginning what was the limitation you're

3    talking about, and it was the hep C prisoner population --

4    we've got that -- and then the limited number of doctors within

5    VDOC to prescribe the medication, i.e., to know what to

6    prescribe, and to monitor the blood treatment and the blood

7    work.  That's before they ever went to VCU.

8              MS. MAUGHAN:  Yes.  I will clarify a little bit.  I

9    don't want to misstate anything to the Court.  There were -- in

10   Dr. Amonette's opinion when he was formulating the guidelines,

11   the medical providers in the Department of Corrections were not

12   equipped to handle this type of treatment from a knowledge

13   standpoint and from a logistics standpoint at the time.  That's

14   why he went to the Department -- that's why he went to VCU --

15             THE COURT:  Think that through for a minute when you

16   tell me that the policy from 2015 -- I mean from February '15

17   to June of '15 was that the treatment was done at VDOC by VDOC

18   doctors.  So he's letting incompetents do it?

19             MS. MAUGHAN:  No, I'm not saying that he thought that

20   they were incompetent, but for those four months, Dr. Amonette

21   wanted to get people treated, but he couldn't get to the VCU

22   clinic.  The next best thing was for the people who met those

23   criteria, just the APRI score indicating that they really

24   needed it, he wanted them to get it no matter what in the

25   interim.

1           THE COURT:  So now we have to go -- he's decided to

2    go to VCU.  Do you need some water?

3           MS. MAUGHAN:  I do, yes, Your Honor.

4           THE COURT:  All right, so he decided he was going to

5    VCU and try to work something out with VCU.  So tell me about

6    how that all evolved and what the situation was there and why

7    that's a resource limitation.

8           MS. MAUGHAN:  So I believe -- I want to say in late

9    2014, early 2015, Dr. Amonette was engaged in discussions with

10   Dr. Richard Sterling of VCU.  Dr. Richard Sterling is a

11   world-renowned hepatologist.  This is what he does.  He treats

12   liver disorders and specifically hepatitis C.

13           So Dr. Amonette and Dr. Sterling consulted about

14   whether the Department of Corrections could send their

15   hepatitis C inmates to VCU to get treatment with Dr. Sterling

16   and his team, and Dr. Sterling worked with Dr. Amonette to come

17   up with the guidelines that the Court has seen at ECF 110, page

18   six.

19           THE COURT:  So when did the deal -- as I understand

20   it -- I may be wrong, but as I understand it, there are more --

21   there are more than one doctor -- there is more than one doctor

22   at VCU who is knowledgeable about treating hep C, and there was

23   then.

24           MS. MAUGHAN:  I would say that that may be true.  The

25   clinic that was available for the Department of Corrections, I

1    believe, had Dr. Sterling and, at the beginning of the clinic,

2    two nurse practitioners.  An additional nurse practitioner was

3    added at a later time as those people became available and had

4    the training to prescribe the drugs.

5          THE COURT:  They're the only people at VCU that could

6    have been made available if -- assuming the Department of

7    Corrections was willing to pay the money to have those doctors

8    and nurses available to treat these people?

9          MS. MAUGHAN:  I believe Dr. Sterling's testimony was

10   that he gave as much of his resources that he had to the

11   Department of Corrections that he could.  Dr. Sterling and his

12   team, I believe, treat other people who are not Department of

13   Corrections inmates as well.  So they're treating the general

14   public.  So that is a limitation on the resource that is Dr.

15   Sterling, because he's treating other people who are not just

16   DOC inmates.

17         THE COURT:  What does the record show about other

18   people who were capable of treating and why they weren't

19   included and why limit it just to Sterling and his people?

20   After all, what you're talking about is looking at some blood

21   tests, blood work with knowledge and assessing what needs to be

22   done and effectuating a treatment that consists of doing some

23   scanning, imaging, and making decisions and reading and

24   administering medication.  So my question is, why did it have

25   to be limited to Dr. Sterling?

1          MS. MAUGHAN:  I believe the testimony from

2    Dr. Amonette in this case and others where his deposition

3    testimony is going -- is relevant to this case is that he tried

4    to find other people to help treat the inmates in the

5    Department of Corrections with hepatitis C, and he was unable

6    to find them.

7          THE COURT:  He tried to find them at VCU?

8          MS. MAUGHAN:  He tried to find them throughout the

9    state, Your Honor, and VCU was the only place where he could

10   find a place that would administer the treatment in a way that

11   was going to be -- get through as many hepatitis C positive

12   inmates as possible.

13         THE COURT:  That still doesn't answer -- VCU is a

14   vast organization, and I don't know how many doctors it has,

15   but it's been my experience, having been treated at MCV for a

16   number of different conditions, that there are usually more

17   than one doctor available to treat you.

18         And what does the record show about the number of

19   doctors that were available at VCU that knew about how to treat

20   people with hep C with these drugs and read these blood

21   results?  Or does it show anything?

22         MS. MAUGHAN:  I'm looking, Your Honor.  I ask for the

23   Court's indulgence.

24         THE COURT:  That's all right.  I'm asking you

25   questions.  I know you're not going to have it all at the top

1   of your head, but you're helping me out by finding the answers.

2          MS. MAUGHAN:  What I'm looking for, Your Honor, is

3   Dr. Sterling's deposition testimony, and I'm having a little

4   bit of trouble finding that.

5          THE COURT:  You can look at that during the lunch

6   hour.  You say that he said that he wasn't able to strike any

7   deals with others throughout the state.  What does the record

8   show about how many others he was talking to and what it was

9   that kept them from having the deal?  Was it -- from being able

10  to strike a deal to treat the prisoners or look at the blood

11  work, etcetera.

12         MS. MAUGHAN:  Dr. Amonette testified that he did

13  attempt to come to a similar arrangement with UVa, and I don't

14  know the reason UVa was not interested at the time.  They

15  turned the Department of Corrections down for whatever reason.

16         THE COURT:  Is there any evidence in the record about

17  what the cost is to the Department of Corrections for its deal

18  with VCU?

19         MS. MAUGHAN:  Yes.

20         THE COURT:  What is it?

21         MS. MAUGHAN:  So the Department of Corrections has a

22  memorandum of understanding with VCU, and the amount of money

23  that they pay per month has changed over several years.  I

24  believe originally it was around $13,000 a month to have the

25  clinic available, basically paying for the clinic's overhead,

1   the doctor, the nurses, for it to exist for the treatment of

2   Department of Corrections inmates.  That's an estimate.  I know

3   that it changed over time.

4               THE COURT:  How high did it get?  How far did it get?

5               MS. MAUGHAN:  How far, I'm sorry?

6               THE COURT:  How much further up the pay scale did it

7   go?

8               MS. MAUGHAN:  I believe it's in the record, but I'm

9   not recalling where it was.  It was -- in general, I believe,

10  and I'll let the plaintiff's counsel if plaintiff's counsel

11  knows, I think it was in the realm of $14,000 a month.

12              THE COURT:  You mean it stayed at -- it was

13  originally 13- per month, and it stayed there.

14              MS. MAUGHAN:  I believe it increased as more

15  providers were brought on.  Dr. Amonette spoke to Dr. Sterling

16  at times about expanding the clinic, and when that was

17  something that Dr. Sterling could do, I believe the Department

18  of Corrections then had to pay more money on top of their

19  monthly fee for those providers --

20              THE COURT:  Maybe you all can tell me that.  What was

21  the offer that he -- what does the record show about what the

22  offer was that he made to UVa to get them to do the same thing?

23              MS. MAUGHAN:  Dr. Amonette is not involved in the

24  monetary discussions, so I don't believe that it was a we'll

25  pay you $10,000 and UVa said no, that's not enough.  I don't

1   think that's what occurred.

2        THE COURT:  Is there anything in the record about

3   what the offer was, what the money was?

4        MS. MAUGHAN:  I don't think that we got to the point

5   of a money discussion because VCU -- or, I'm sorry.  We did not

6   get to the point of a money discussion because UVa's answer was

7   no, we're not doing that.  It wasn't a matter of money.

8        THE COURT:  You're saying that, but I want to know

9   what the record was.  It's hard, as a practical matter, to

10  believe that you approach somebody with a request, this is what

11  I want done, and suppose I had been willing to say instead of

12  13,000 I'm willing to pay you a million dollars a year to do

13  this.  My experience, money has something to do with the

14  willingness of people to allocate their resources.

15       Did somebody in the record actually say money didn't

16  have anything to do with it?

17       MS. MAUGHAN:  Dr. Amonette has repeatedly said that

18  money was not the issue in limited resources to treatment.

19       THE COURT:  That isn't what I asked you, though.  Did

20  he say it wasn't the issue with Virginia?

21       MS. MAUGHAN:  I don't believe that's in the record,

22  Your Honor.

23       THE COURT:  All right.  So did he try to do deals

24  with any other hospitals in Virginia to do similar things to

25  that which VCU was going to undertake?

1          MS. MAUGHAN:  I don't believe he reached out to other

2     major hospitals, but I do believe he attempted to hire

3     individuals to come and work for the Department of Corrections

4     for the purpose of treating hepatitis C inmates, and that was

5     not successful.  He was unable to find qualified providers.

6          THE COURT:  Doctors or nurses or physician

7     assistants, or what does the record show?

8          MS. MAUGHAN:  I don't think the record shows that,

9     Your Honor.  What I will inform the Court of, outside of

10     specific negotiations, Dr. Amonette and others in this case

11     have testified that the limitation on access to treatment were

12     not specific to inmates or people who were incarcerated.  It

13     was a system-wide issue when the drugs first came out.

14          A lot of people had been living with hepatitis C for

15     a very long time in the community, in prisons, the same.  So

16     people in the community also had issues with accessing care.

17     At the beginning, at least, this was not a drug that you could

18     go to your general practice provider and say, hey, can I get

19     this, and he or she would say, sure, here you go.  That's not

20     how it worked.  Those general practice providers typically

21     would refer you to a specialist, and those specialists were in

22     limited supply.

23          Another limitation on access to care in the community

24     was Medicaid and insurance companies' requirements that a

25     specialist be utilized.  So even if your doctor, for instance,

1    said, yes, I will give you this medication, your insurance

2    company might say, no, not without a specialist you won't.  So

3    you would be left with either paying --

4              THE COURT:  That's not unusual.

5              MS. MAUGHAN:  It's not.  Especially when drugs are

6    new.  But this is what was facing Dr. Amonette in 2014 and

7    2015.  This is the circumstances he found himself in.

8              THE COURT:  So that's the sum and substance of the

9    resource issue.

10             MS. MAUGHAN:  It is, and I'll add that the clinic

11   slots available at VCU, what was available for the Department

12   of Corrections to use, they did not go unfilled if they could

13   help it.  They were constantly seeing new patients and

14   referring new people as quickly as the clinic could see them.

15             THE COURT:  What does the record show about the total

16   cost year by year that was paid by the Department of

17   Corrections to VCU for the services provided by the VCU clinic?

18             MS. MAUGHAN:  Again, Your Honor, I ask the Court's

19   patience.  I'm trying to find that.

20             THE COURT:  Given your ability to find the answer,

21   I'll be as patient as you want me to be because you tend to

22   find the answers.  I realize this is an unusual way to address

23   summary judgment, but, in this case, it's become necessary.

24             MS. MAUGHAN:  There is information in the record that

25   is recited in Director Clarke's memorandum in support of his

1  motion for summary judgment that is at docket number 116, and I

2  go there first because I know it's there because I wrote it.

3  It may be elsewhere, but this is where it appears in the

4  record.

5            THE COURT:  What page?

6            MS. MAUGHAN:  It is page five.

7            THE COURT:  Since I don't have that here since he's

8  out of the case, tell me what it says.

9            MS. MAUGHAN:  What it says is that in 2015, the

10  Department of Corrections spent $5,046,964 on hepatitis C

11  treatment.

12            THE COURT:  How much?

13            MS. MAUGHAN:  $5,046,964.

14            THE COURT:  Okay.

15            MS. MAUGHAN:  In 2016, that amount was $5,544,997.

16  In 2017, it was $6,450,812, and in 2018, it was $7,018,451.

17            THE COURT:  18,000?

18            MS. MAUGHAN:  Yes, sir.  And I have other numbers as

19  well.  We didn't stop treating people in 2018.

20            THE COURT:  But I don't need to get into them.

21            MS. MAUGHAN:  Understood.

22            THE COURT:  I think at this juncture we'll take a

23  lunch recess, and I'll hear you later this afternoon.

24            MS. MAUGHAN:  Thank you, Your Honor.

25            THE COURT:  You want 45 minutes or an hour?  I don't

1    know what's available around here to eat except down in the

2    basement there's sort of a cafeteria, like Horn & Hardart, kind

3    of sandwiches and snacks and stuff.  I don't know whether the

4    Hilton is open.

5         MS. MAUGHAN:  There's not much that's open.  We'll

6    take an hour, Your Honor.

7         THE COURT:  I think under the circumstances, you

8    better take an hour.

9         MS. MAUGHAN:  Thank you, Your Honor.

10        (Luncheon recess.)

11        THE COURT:  All right, we're resuming with the two

12   proceedings in Pfaller against Clarke, 3:19CV728.  I think I've

13   gotten the questions I was going to ask sort of straightened

14   out, so if you want to get your structure about who is arguing

15   or going the way you wanted to on whatever issues you want to

16   argue it, you may do that.

17        MS. MAUGHAN:  If I may, Your Honor, I did have a

18   chance to research another question that the Court had

19   regarding the availability of clinic slots at VCU and whether

20   or not more slots could have been made available to the

21   Department of Corrections, and I've reviewed the deposition of

22   Dr. Richard Sterling who was the 30(b)(6) designee for VCU.

23        I don't believe this part of his testimony is in the

24   record, but he was deposed in this case, or VCU was deposed in

25   this case, and he did testify --

1    THE COURT:  If it's not record, I can't consider it.

2    MS. MAUGHAN:  I understand, Your Honor.

3    THE COURT:  I have enough to say grace over with

4    what's in the record.

5    MS. MAUGHAN:  If the Court has no other factual

6    questions for me, I will confer with Mr. Rosen about what we're

7    going to do next.

8    THE COURT:  If you want to go ahead with arguments or

9    whatever other points, just let me know.  Otherwise, I'll hear

10   from the defendant about it -- from the plaintiff about

11   Dr. Amonette's argument.  I just had a number of questions that

12   I needed answers to.

13   MS. MAUGHAN:  If you'll bear with me one moment while

14   I switch over to argument mode, I would appreciate it.

15   THE COURT:  All right.

16   MS. MAUGHAN:  All right, good afternoon, Your Honor.

17   Laura Maughan on behalf of Dr. Amonette in this case, and I am

18   here to argue on behalf of Dr. Amonette in favor of his motion

19   for summary judgment in this case.

20   The Court has read the briefs, and I don't want to

21   repeat a lot of what's in the briefs.  I will summarize our

22   argument, and if the Court has questions about the legal

23   aspects, I welcome those questions, and I will answer them to

24   the best of my ability.

25   Dr. Amonette's basic premise is that he is entitled

1    to summary judgment both on the merits of the case and to the

2    extent the Court is willing to consider the qualified immunity.

3    As to the merits of the case against Dr. Amonette, as the Court

4    pointed out, there are two claims against Dr. Amonette.  One is

5    a direct liability claim that Dr. Amonette violated the Eighth

6    Amendment by promulgating the VDOC guidelines regarding

7    hepatitis C treatment and that his promulgation of those

8    guidelines was deliberately indifferent to the serious medical

9    needs of inmates with chronic hepatitis C.

10           The other claim against Dr. Amonette is premised on a

11   theory of supervisory liability for the same reasons.  If the

12   Court reads -- and I'll go into the supervisory liability issue

13   first.  If the Court looks back at the complaint in the case,

14   the section that outlines the grounds for supervisory liability

15   against Dr. Amonette does not mention Dr. Wang.

16           So there's no direct allegation in the complaint, and

17   there's been no development in the record of any information

18   that Dr. Amonette somehow failed to adequately supervise Dr.

19   Wang.

20           THE COURT:  What paragraphs are you referring me to

21   in the complaint?

22           MS. MAUGHAN:  It is the section of the complaint,

23   Your Honor, that outlines the cause of action.  So towards the

24   end.  It would be starting at paragraph 181 of the complaint.

25           THE COURT:  That's count two, 181, he incorporates

1  everything before.

2          MS. MAUGHAN:  That's right, Your Honor.

3          THE COURT:  What part of what was incorporated

4  pertains to the supervisory liability claim?

5          MS. MAUGHAN:  If the Court will bear with me, I do

6  not want to misstate, so I'm double-checking myself.  So the

7  complaint does mention Dr. Amonette in reference to Dr. Wang

8  and alleges in paragraph 15 that Dr. Wang reported to

9  Dr. Amonette.

10         But I don't believe that the complaint alleges that

11  Dr. Amonette knew that Dr. Wang was misbehaving or behaving

12  badly contemporaneously with any sort of unlawful behavior to

13  the point where Dr. Amonette should have or could have

14  corrected Dr. Wang's behavior, and that's the premise of the

15  supervisory liability claim.  That's the entire purpose of the

16  claim.

17         And while there may be independent claims against Dr.

18  Wang, which there are, Dr. Wang's action should not be imputed

19  to Dr. Amonette under the theory of supervisory liability.

20         THE COURT:  That's your theory on count two.

21         MS. MAUGHAN:  That is my theory on count two, and to

22  the extent the plaintiff alleges that Dr. Amonette should be

23  liable under a supervisory liability theory based on the fact

24  that he promulgated a policy, I think that's duplicative of

25  count one, and it's essentially a direct liability claim.

1        THE COURT:  All right, Mr. LePierre, what do you say

2   about her summary judgment motion on count two?  Come on and

3   let him have the lectern.  You can push your stuff to the side

4   if you want to.

5        MR. LePIERRE:  Your Honor, count two, we understand

6   that you are not going to be able to find Dr. Amonette liable

7   for both direct liability and the supervisory liability.  The

8   reason we're looking to keep the supervisory liability claim in

9   is it's actually sort of an alternative argument.

10       To the extent that the jury finds that Dr. Amonette

11  would not be responsible for the content of the policy for some

12  reason -- I'm not sure how they would do that, but if a jury

13  says that content of that policy was actually the

14  responsibility or result of somebody else's actions,

15  Dr. Amonette enforced that policy to the extent where he

16  explicitly stated that he would not expect Dr. Wang to request

17  any referral for any individual who did not meet the standards

18  in that policy and, in fact, specifically stated that any

19  referral that came to him that did not meet that policy he

20  would deny.

21       So, at that point, he is directly supervising and

22  expecting, by his actions, that Dr. Wang would comply with the

23  policy, or he's going to deny it, and that -- even if he is

24  somehow found --

25       THE COURT:  Why is that supervisory liability?  Why

1    isn't it the same thing as implementing the policy which Wang

2    applied?

3              MR. LePIERRE:  Your Honor --

4              THE COURT:  Sounds to me like it's the same thing.

5              MR. LePIERRE:  They do kind of -- they meld together.

6    You're either getting one or the other, and there is some

7    overlap, but, yes, Your Honor, that's our position, is that to

8    the extent they say Dr. Amonette would not be responsible for

9    the content of the policy would be the enforcement of the

10   policy that would lead to supervisory liability.

11             THE COURT:  Supervisory liability, basically the

12   elements are generally that A had responsibility for B; B did

13   something wrong which B shouldn't have done and which A would

14   not have approved of, and that A either ratified it or approved

15   it or let it go on or permitted a pattern and practice of some

16   sort to obtain, and none of the allegations of the complaint go

17   to that.

18             Show me where -- I know you -- Ms. Maughan is correct

19   that in count two, paragraphs 181 through 187 doesn't mention

20   Dr. Wang.  Now, you have incorporated paragraphs one through

21   149, so I suppose it's fair for me to ask you, show me the

22   incorporated paragraphs that bring in to play the supervisory

23   liability claim.  Do you want to get your copy of the complaint

24   and go through it with me?

25             MR. LePIERRE:  I apologize, Your Honor.  I do not

1    have a copy of the complaint with me today.  I misplaced it

2    when I was coming in.  That being said, I do know, Your Honor,

3    there is no paragraph in the complaint that would state that

4    Dr. Wang and Dr. Amonette ever interacted with relation to

5    Mr. Pfaller's care or any individual's care other than through

6    the referral process which would just be enforcement of the

7    policy under direct liability.

8              THE COURT:  All right.  So that's your response to

9    what she said?

10             MR. LePIERRE:  Yes, sir.

11             THE COURT:  All right, I understand where we are on

12   supervisory liability.  Do you want to deal with the other one,

13   Ms. Maughan?

14             MS. MAUGHAN:  Yes, Your Honor.

15             THE COURT:  Count one.

16             MS. MAUGHAN:  As far as count one is concerned, Your

17   Honor, it is Dr. Amonette's position that he is entitled to

18   summary judgment both on the merits and that he would be

19   entitled to a finding that he was entitled to qualified

20   immunity as well.  I'll discuss the merits first and foremost.

21             So as we've talked about this morning, Dr. Amonette

22   was faced in 2014/2015 with a dilemma.  There were new drugs

23   that were going to cure hepatitis C.  There were a limited

24   number of providers who could provide those drugs to those

25   inmates, and Dr. Amonette did not have at his disposal

1   unlimited resources to find people who could treat those

2   inmates.

3          So what he did was promulgate a policy that in the

4   early phases prioritized the sickest inmates first, and the

5   reason he did that was he went to the AASLD -- he went to Dr.

6   Sterling at VCU, consulted with him, reviewed the AASLD

7   guidelines, and prioritized treatment for the sickest people

8   first.

9          And that's why he reached out to VCU and started the

10  clinic with VCU and set up the DOC guidelines that this Court

11  has reviewed so far.  And effectively what those guidelines did

12  was put people into three categories based on your liver blood

13  work.

14         One category was an immediate referral for treatment

15  at VCU.  The second category was an indeterminant category

16  which indicated you needed a FibroScan or additional testing,

17  and depending on that testing, if your testing indicated you

18  needed a referral, you were referred to VCU for treatment, or

19  you were placed into the third group which was a group where

20  monitoring was prescribed.

21         And the reason he did that was that he wanted to

22  treat the people with the most severe disease first, and he did

23  not have the ability or the resources to treat everyone all at

24  the same time.  And there's no --

25         THE COURT:  Let me ask something about that.  If he

1    doesn't know how many people he needs to treat, how can he say

2    he doesn't know -- he doesn't have the resources to treat the

3    number of people he needs to treat?

4            MS. MAUGHAN:  He may not have known a definite number

5    at the time that he put the policy together specific to the

6    Virginia Department of Corrections, but he was aware of

7    research that existed that said that hepatitis C, chronic

8    hepatitis C was very prevalent in corrections populations, more

9    so than in the public population.

10           THE COURT:  Where does he say that, that he knew

11   about it when he was promulgating that policy?

12           MS. MAUGHAN:  At paragraph 17 of his affidavit, which

13   is found at docket number 110-1, Dr. Amonette says, and I

14   quote, VDOC cannot refer all inmates who have been diagnosed

15   with hepatitis C for immediate evaluation and treatment because

16   the VCU telemedicine clinic does not have the capacity to see

17   that many inmates at once.

18           Based on initial staffing levels in 2015, VCU only

19   had the capacity to see 250 patients during that first year of

20   the agreement.  VDOC tried unsuccessfully to enter into

21   arrangements with other specialty groups including the

22   University of Virginia so that VDOC could refer more inmates

23   for treatment.

24           And that does not -- I have to agree with the Court,

25   that does not indicate that Dr. Amonette knew exactly how many

1    inmates at that time in 2015 in the Virginia Department of

2    Corrections had chronic hepatitis C, but what he knew was that

3    VCU could only see 250 patients a year.

4            So knowing that and with the research that is

5    indisputably out there at that time, I think it would be a

6    worse decision on Dr. Amonette's part to say, let's refer

7    everyone knowing that there's no way that that's going to

8    happen.  So he put into place a guideline, a system by which

9    this could appropriately happen to make sure that the sickest

10   people got the treatment first.  And Dr. Amonette has testified

11   that it was always the Department of Corrections' goal to treat

12   everyone.

13           THE COURT:  Don't you have to find out who is the

14   sickest first?  If you have a policy that's going to treat the

15   sickest, you have to find out who is the sickest.

16           MS. MAUGHAN:  And I think the guidelines did that,

17   Your Honor, because --

18           THE COURT:  How did it do that?

19           MS. MAUGHAN:  It called for the chronic monitoring of

20   people depending on your genotype, whether that was every six

21   months or every 12 months.

22           THE COURT:  Pull that mic down a little closer to

23   you.

24           MS. MAUGHAN:  Is that better?

25           THE COURT:  Yes.

1          MS. MAUGHAN:  All right.  The guidelines themselves,

2     the DOC guidelines indicated when people should be monitored

3     for purposes of referral for treatment under the policy.  So

4     that was the purpose of putting in -- separate and apart from

5     the chronic care clinic that providers were providing at the

6     Department of Corrections facilities, he put into the policy a

7     requirement that people be screened based on their hepatitis C

8     specific blood work with a certain frequency to make sure that

9     we knew how many people there were and how sick they were and

10     whether they needed to be referred for treatment.

11          THE COURT:  What evidence is there in the record as

12     to what the results of this screening showed at any given time?

13     For example, they screened people in 2015 and '16.  What

14     evidence is there in the record that there were 100 people who

15     were -- ought to be referred, there were 1,300 people who ought

16     to be monitored, and the rest ought to be -- I mean ought to go

17     for additional testing, imaging, etcetera, and the rest, 1,200

18     or so, ought to be -- whatever it was -- ought to be -- go

19     to -- continued blood work monitoring?  What evidence is there

20     in the record about that?

21          MS. MAUGHAN:  The evidence in the record can answer

22     the first part of the Court's question which is how many people

23     needed to be referred, and the way we get to that information

24     is we look at how many people were referred in 2015 and 2016

25     and how many inmates VCU treated who came from the Department

1    of Corrections.  That information, I believe, is in the record.

2    I know it's in the deposition testimony.

3              THE COURT:  It has to be in the record for me to

4    consider it.  I didn't see it.  There's so much in this record,

5    I won't claim the knowledge of it that you have.

6              MS. MAUGHAN:  All right.  In the record at docket

7    number 116 -- docket number 116 is Director Clarke's memorandum

8    in support of his motion for summary judgment.  There is

9    information summarized in docket 116 which cites the

10   information that is in the record, and it indicates that in

11   2015, the VCU clinic treated 115 inmates with hepatitis C, and

12   that cites to an excerpt from the deposition of VCU.

13             In 2015, that same time period, 78 percent of the

14   inmates treated at the VCU clinic had a fibrosis score of four.

15   So on the scale of zero to four, 78 percent of those people who

16   were treated had a fibrosis score of four.  So that indicates

17   that 78 percent of the people who were referred to be treated

18   had the most advanced disease in 2015.

19             THE COURT:  That doesn't tell us how many.

20             MS. MAUGHAN:  It was 115 inmates with hepatitis C

21   were treated at the clinic in 2015.

22             THE COURT:  I thought you were talking about 2016.

23             MS. MAUGHAN:  That was 2015, Your Honor.  I'll get to

24   2016 as well.

25             THE COURT:  What score did they have?

1          MS. MAUGHAN:   78 percent of those 115 had a fibrosis

2   score of four.   In 2016, the VCU clinic treated 174 Department

3   of Corrections inmates.   In 2017, the VCU clinic treated 209

4   Department of Corrections inmates.   In 2018, the VCU clinic

5   treated 203 Department of Corrections inmates.

6          THE COURT:   Do you have percentages of FIB for them?

7   '16, '17, and '18.

8          MS. MAUGHAN:   Let me see if that appears in the

9   record, Your Honor.   One moment while I pull that up.   The

10  excerpt from Dr. Sterling's deposition transcript appears at

11  docket number 116-9, and I'm trying to confirm whether those

12  percentages for the other years also appear in that transcript.

13         They do.   They appear at page nine, or they start at

14  page nine, and they continue at page ten, and Dr. Sterling

15  testified that in 2016, of the 175 DOC inmates with chronic

16  hepatitis C that were treated, 76 percent had a fibrosis score

17  of four.

18         THE COURT:   You told me earlier it was 174 people,

19  and he said 175.   So it was one or the other.

20         MS. MAUGHAN:   The transcript certainly says 175.   If

21  I misquoted it in my memorandum, I apologize.   It appears that

22  I did.   I said that it was 174.

23         THE COURT:   It's not but one off, so we'll take his

24  testimony, 175.   All right, in 2017 it was 209.   What percent

25  were fibrosis score of four?

1          MS. MAUGHAN:  Of the 209 who received treatment in

2     2017, 74 percent had a fibrosis score of four, and that's at

3     page 12 of docket number 116-9.  And I do believe that for the

4     same time periods, I have the percentages of those people who

5     were treated who had a fibrosis score of three and two as well.

6          THE COURT:  The difference would be that the people

7     who are not in the 78 percent would be either three or two.

8          MS. MAUGHAN:  Presumably.  I believe there was -- for

9     example, in 2017, of the 209 people who were treated, two

10    percent of them had a fibrosis score of one, but that does not

11    indicate that they did not have other conditions that could

12    have made their treatment more urgent or that they needed

13    treatment for more serious reasons.

14         It obviously indicates they were not at the level of

15    fibrosis that the majority of the people were, but if they had

16    another condition such as HIV, something else that was

17    complicating their immune system, it might have been within the

18    guidelines to refer them regardless of their fibrosis score.

19    We do not have information about the specifics for those

20    individuals.

21         THE COURT:  So the remaining for 2015, 22 percent

22    would have had lower fibrosis scores but other problems; is

23    that a fair statement in general?

24         MS. MAUGHAN:  I think it's fair to infer that from

25    the policy.  It's not necessarily in the record that it's

1   100 percent clear.

2          THE COURT:  Okay.  That's all right.  All right, what

3   else?

4          MS. MAUGHAN:  So faced with these limited resources,

5   this is the policy that Dr. Amonette came up with.  And he

6   didn't just write this -- he didn't just sit down one day and

7   decide I'm going to write this policy, it sounds good to me.

8   Dr. Amonette is not a hepatologist.  He conferred with Dr.

9   Sterling at VCU who is a world-renowned hepatologist, and the

10  two of them together came up with the criteria that would be

11  included in the DOC guidelines for purposes of referring

12  inmates to treatment at the VCU clinic.

13         And Dr. Sterling, in his deposition testimony, the

14  same document I'm looking at right now, 116-9, testified, and

15  it's really not in dispute, that the AASLD recommended

16  prioritization when resources were limited for treatment

17  options, and what they recommended was that you start with the

18  people who had F3 and F4 fibrosis, and that's what the

19  guidelines were designed to do and catch anybody who might have

20  had another comorbid condition that indicated they needed

21  treatment more urgently.

22         THE COURT:  All right.

23         MS. MAUGHAN:  I'm looking at one more thing, sir.

24  I'm sorry.  So Dr. Amonette consulted with Dr. Sterling.  They

25  both reviewed the AASLD guidelines which said -- which

1    recommended that you do exactly what they did, and so they put

2    the policy into effect back in 2015, and they started the VCU

3    clinic, and inmates started getting referred.

4         There's no information in the record to contradict

5    that there was a limited amount of resources.  I know plaintiff

6    makes much of the fact that DOC could have just paid more money

7    and we would have expanded the clinic at VCU, but I don't think

8    that information is supported in the record.

9         Dr. Sterling testified -- let me make sure I'm citing

10   to the record, Your Honor -- that treating hepatitis C requires

11   specialty training, and that's at 116-9, page four, and that

12   VCU's prioritization criteria that they used for their non-DOC

13   clinic participants was also based on their capacity to treat

14   patients.

15        So it's not just the Department of Corrections

16   inmates who have to be prioritized and who are subjected to the

17   guidelines that say the sickest people get treatment first.

18   Dr. Sterling's other patients were also prioritized.  And, in

19   the interim, they were monitored, and many of them have now

20   been treated for the time that they've been in their practice,

21   and that's at -- Dr. Sterling's testimony at docket 116-9, page

22   six.

23        So Dr. Amonette did the same thing that Dr. Sterling

24   was doing in his own clinic.  He promulgated guidelines, he

25   decided on objective criteria by which people would be referred

1    for treatment, and they started the process in 2015.  There's

2    nothing in the record to indicate that Dr. Amonette did this to

3    save money or that Dr. Amonette simply didn't want to pay more

4    money.

5              The undisputed testimony is that the resources,

6    clinic spots, providers, access to the medications, getting

7    prescriptions was limited, and it was limited for everyone.

8              THE COURT:  Where in the record does it say that

9    Amonette tried to hire medical providers to prescribe and

10   monitor treatment with AASLD --

11             MS. MAUGHAN:  So at his --

12             THE COURT:  You said he went to the University of

13   Virginia, and they turned him down.  You said also that he

14   tried to hire people but he couldn't find qualified people.

15   Where does it say that?

16             MS. MAUGHAN:  So the statements about UVa are in his

17   affidavit.

18             THE COURT:  UVa, I know where that is.  I'm talking

19   about something else.  I'm talking about where it is that he

20   tried to hire medical providers and wasn't able to do that.

21             MS. MAUGHAN:  One moment.

22             THE COURT:  After all, you don't have to be a rocket

23   scientist to do this.  You just have to have some training.

24             MS. MAUGHAN:  The plaintiff's expert, Your Honor,

25   indicated that -- Dr. Schamber indicated that he personally

1   does not treat hepatitis C.  He refers people to a specialist.

2   So it's not uncommon, especially in the early days, that this

3   would have occurred, and Dr. Schamber acknowledges that.

4              THE COURT:  He didn't say he was trying to provide

5   specialists.  He said he was trying to provide providers.

6              MS. MAUGHAN:  And these providers are specialists in

7   the treatment of hepatitis C.  That's why it couldn't just be

8   anybody with an M.D. degree who can dispense medication.

9              THE COURT:  Where does it say he tried to hire

10  specialists?

11             MS. MAUGHAN:  That's what I'm trying to find, Your

12  Honor.  I'm not seeing it in the record before the Court except

13  for the reference to UVa.

14             THE COURT:  Okay.

15             MS. MAUGHAN:  So getting back to the merits of

16  Dr. Amonette's actions, to find deliberate indifference, the

17  Court has to find that Dr. Amonette recognized that there was a

18  serious risk of harm and disregarded it or acted

19  inappropriately.

20             THE COURT:  There isn't any dispute that hep C

21  presents a serious risk of harm and that he recognized it.

22             MS. MAUGHAN:  No, there's not.  There's no dispute.

23             THE COURT:  He knew that, or he wouldn't be doing all

24  the things you say he was doing.

25             MS. MAUGHAN:  Exactly.  The second part of finding

1    deliberate indifference is that his response was so inadequate

2    to shock the conscience or to be contrary to the contemporary

3    standards of decency, and there's no dispute in the record that

4    Dr. Amonette's response was reasonable under the circumstances.

5            He used the resources that he had, he followed the

6    AASLD guidelines, he consulted with a specialist, and he came

7    up with this policy.  And there is case law that -- specific

8    cite is slipping my mind at the moment, but under the Eighth

9    Amendment, if a prison official's response fails to prevent an

10   ultimate harm but ultimately was reasonable, they're not liable

11   under the Eighth Amendment.  So if his response was reasonable

12   but, unfortunately, nevertheless Mr. Pfaller did not get

13   treatment, if the overall response is reasonable, that

14   indicates that he is not liable for an Eighth Amendment

15   violation based on the policy.

16           THE COURT:  So it's reasonable because he used

17   resources that he had, he consulted VCU, and what other two

18   points did you make?

19           MS. MAUGHAN:  He consulted with VCU, he consulted the

20   AASLD guidelines, and he implemented the DOC guidelines that

21   are at issue in this case with the goal of first treating

22   everyone who was at the most severe risk of harm and eventually

23   moving to treat everyone regardless of their fibrosis level.

24           And I know that the plaintiff has argued that the

25   guidelines themselves don't indicate a lack of resources, and

1    the guidelines themselves do not indicate that everyone was

2    eventually going to be treated.  I acknowledge that.  I read

3    the guidelines several times.  Nothing in there says we want to

4    treat everyone, and nothing in there says we have a lack of

5    resources.

6             But you can't read the guidelines in a vacuum.  You

7    have to read them in context of Dr. Amonette's testimony in

8    this case, and he has said that it was at the beginning, has

9    always been, and still is his goal to treat everyone in the

10   Department of Corrections who has chronic hepatitis C.

11            And that leads tangentially to another issue that the

12   Court has raised about Department of Corrections policies after

13   2018.  And I would argue to the Court that those policies are

14   relevant because they show a continuum.  It goes to

15   Dr. Amonette's entire point that his entire goal this whole

16   time has been to treat everyone.  So what happened after 2018,

17   while that may not go specifically to the facts of

18   Mr. Pfaller's treatment, goes to Dr. Amonette's intent.  It

19   goes to his subjective state of mind when he was trying to

20   treat everyone.

21            THE COURT:  How does that do that?  How does that

22   information go to his state of mind?

23            MS. MAUGHAN:  Because he can testify all he wants I

24   wanted to treat everyone, I wanted to treat everyone, but if

25   the objective evidence supports that, what he actually did

1    supports that, I think --

2              THE COURT:  I'm asking you how does it support that.

3              MS. MAUGHAN:  It shows --

4              THE COURT:  What is the evidence?

5              MS. MAUGHAN:  The evidence -- the guidelines that

6    were in effect -- or I won't say the guidelines but the steps

7    that the Department of Corrections has taken after October of

8    2018 indicate a continued desire to treat everyone and the

9    continued behavior that the Department of Corrections --

10   continued actions Department of Corrections has undertaken in

11   order to do that which were substantial, and I'll proffer to

12   the Court that some of the things that have been done since

13   2018 --

14             THE COURT:  No, just what's in the record about it.

15   What is the record?  That's all I can consider.

16             MS. MAUGHAN:  In Dr. Amonette's affidavit at docket

17   number 110-1, paragraph 24, he states that since 2015, 1,094

18   inmates have completed treatment at VCU, and an additional 50

19   are currently under treatment.

20             In December 2019, DOC hired a Pharm.D., or doctor of

21   pharmacy, Dr. Jamie Smith, with training in the use of DAAs to

22   treat patients in the mid-range of liver disease progression

23   without complicating comorbid conditions.  So Dr. Smith was

24   able to treat her own patients, and as of the time Dr. Amonette

25   submitted his affidavit in September of 2020 --

1                THE COURT:  Who hired Dr. Smith?

2                MS. MAUGHAN:  The Department of Corrections.  I don't

3     know the individual.  I can't tell the Court an individual

4     person made the hiring decision.

5                THE COURT:  That doesn't tell me anything.  If the

6     evidence is probative, as you say, of our desire to treat

7     everybody and we're trying to show a continuum, then you have

8     to show me how many people have the disease for each year and

9     how many people were treated each year and show me a

10    continued -- a continuum of increased treatment.  And that

11    statistic that is cited there doesn't show that.  Therefore, it

12    doesn't tend to prove what it is -- the point that you say you

13    want to prove.

14               MS. MAUGHAN:  One moment, Your Honor.  So the

15    additional information that is in the record here -- I'm

16    getting -- so while we don't have necessarily in the record

17    numbers of how many people were referred in 2018 and 2019, what

18    we do have is that as of April 2019, the Department of

19    Corrections continued to prioritize treatment based on disease

20    severity and -- I'm sorry, Your Honor.

21               At docket number 116-9, page -- ECF page 13, Dr.

22    Sterling testifies that in July of 2020, they increased the

23    capacity at the clinic, and they had done that again previously

24    in 2018.  So these are other steps that the Department of

25    Corrections is taking in conjunction with VCU to try to treat

1   more people.  Do we have the exact numbers for what happened in

2   2018, 2019, and 2020 in the record before the Court?  No.  Do

3   we have evidence that Dr. Amonette and others took steps to

4   treat more people?  Absolutely, yes.

5           THE COURT:  All right.  What about qualified

6   immunity?

7           MS. MAUGHAN:  Well, on qualified immunity, I think

8   one of the issues that comes up --

9           THE COURT:  Maybe it would be a good idea to hear Mr.

10  LePierre on the direct liability aspect of count one at this

11  point.  One of the things that you all haven't been doing is

12  cleaning.  So if you wouldn't mind, remember to go over there

13  and grab that thing and wipe off the lectern.  Give her a

14  chance to do it, Mr. LePierre.

15          All right, Mr. LePierre.  What she says is that the

16  record shows that they used their resources, that they

17  consulted with VCU, they consulted with AASLD guidelines in

18  implementing the DOC guidelines, and they may not be perfect,

19  but the goal is to treat the sickest people with what resources

20  you've got, and then they get first priority to go to VCU and

21  then image the rest of the people, and then you monitor the

22  rest of the people.

23          While that may not be -- sadly did not create -- help

24  Mr. Pfaller, it's not deliberate indifference to a condition

25  that he acknowledges right off the bat is serious and can cause

1   serious problems.  There's no dispute about that.  That's why

2   he did all he did.  He did that to try to do that.  You say,

3   well, he fouled up, but does fowling up mean deliberate

4   indifference?

5           MR. LePIERRE:  In this case, yes, Your Honor, because

6   what happened is, Dr. Amonette asserts that he has created a

7   prioritization system.  However, the record shows no evidence

8   that there was any connection between who qualified for

9   treatment and the available resources that they had.

10          It did not matter, and, in fact, they presented no

11  evidence of the number of people that needed treatment or the

12  number of slots that were available.  They provided us

13  information about -- in the record of how many people were

14  treated, but they never addressed in the record how many slots

15  were available, and, under the policy, if they referred over

16  174 people and they had 250 slots, it does not matter.  Until

17  more people reach inclusion criteria within the policies, they

18  are categorically excluded from treatment.  And that's

19  unconnected to any medical basis or any resource limitation.

20          That being said, Your Honor, Dr. Schamber, in his

21  report, which is at 128 --

22          THE COURT:  What's that?

23          MR. LePIERRE:  ECF 128, it's Exhibit 2 to that

24  document.  Dr. Schamber opines a general practitioner can

25  prescribe and monitor the treatment with DAAs since it is a

1    pill that is taken once a day over eight to 12 weeks.

2            He did testify that in the jail where he -- or the

3    jails that he monitored, they referred out, and that is most

4    likely related to the fact that they are jails not having

5    long-term care.

6            That being said, it is possible that providers can --

7    general practitioners with an M.D. license can and are free to

8    prescribe these medications and oversee it, or you can refer

9    them to a specialist.  That being said, they're asserting that

10   there was a limitation on resources and a limitation on VCU's

11   ability to treat or provide treatment.  The issue there is that

12   Dr. Sterling, in his deposition, cited that VCU's capacity is

13   based on the number of providers available to treat and that

14   the amount billed to the VDOC for treatment at the VCU is based

15   on the monthly cost of their overhead including provider time,

16   and when asked if the VDOC asked VCU to increase capacity, Dr.

17   Sterling said the cost would go up indicating that had they

18   been paid more, they had the ability to provide more providers

19   to treat VDOC inmates, and that, Your Honor, is at Exhibit 7 to

20   ECF 128, pages 41, paragraph 18, to 42, paragraph two, and on

21   31 -- page 31 of that document, paragraph 17 to 32, paragraph

22   eight discussing the fact that had they been -- had they

23   increased capacity, the cost would have gone up, and that

24   wasn't provided for within the MOU.

25           Defendant Amonette admits that the VDOC could have

1   increased or requested that VCU increase their capacity but

2   they did not do so, and that quote, Your Honor, is on Exhibit 5

3   to ECF 128.  That's Amonette's deposition at page 61,

4   paragraphs 12 through 21.

5           THE COURT:  So he admitted what?

6           MR. LePIERRE:  That they did not ask VCU to increase

7   their capacity.  The defendants have asserted in the face of

8   these facts that -- or defendant Amonette has asserted in the

9   face of these facts that he has reached out to UVa and was

10  denied, but other than his statement, which is a question of

11  credibility, he has provided no evidence of why, whether or not

12  he may have made a low offer, we can't do it profitably for

13  that amount, or whether they said we're just not going to treat

14  VCU.

15          They provided no basis that indicates it was some

16  kind of limitation on resources at UVa.  They provided no

17  information about anybody else in the record that they may have

18  consulted, any other hospitals, any other providers.  They

19  provided no information about any attempts to hire in their own

20  providers that could provide for this case.  They provided no

21  information about attempts to provide training for their

22  currently existing M.D.s to provide this care.

23          And, in fact, they can't show that Dr. Amonette even

24  knew the amount of people prior to 2017 that needed treatment

25  other than to vaguely say there were studies out there that he

1    was aware of.

2            THE COURT:  What's the significance -- I think the

3    record is clear that 2015, 2016, 2017, they did not know how

4    many people they had who needed treatment.  What's the

5    significance of that fact in the analysis of deliberate

6    indifference?

7            MR. LePIERRE:  Yes, Your Honor.  It shows, one, that

8    they did not care to know who needed to be treated and to try

9    to find or appropriately craft their resources and their

10   policies to reflect that need, and, in fact, it shows that they

11   crafted this policy with no idea of exactly what connection

12   there needed to be or what the need was.

13           So they're not obviously crafting it in light of

14   limited resources.  They're crafting a policy that says we're

15   paying this amount to VCU, that gives us this amount of

16   providers, and we're going to make sure our policy doesn't

17   exceed that.  And they're just deliberately indifferent as to

18   the other inmates that they're leaving out of that treatment

19   program, Your Honor.

20           And that goes into -- which is something that has

21   been repeatedly held in the Fourth Circuit that a policy maker

22   cannot deliberately stick their head in the sand as to the

23   consequences of their policies and as to the people they're

24   going to hurt and then escape liability afterwards.

25           Your Honor did ask --

1          THE COURT:  So the fact that they didn't know 2014 to

2     2017, you said, shows that they didn't care to find out and

3     that they were engaged generally in willful blindness.  That's

4     what you are saying.

5          MR. LePIERRE:  Yes, Your Honor.

6          THE COURT:  And so that's probative -- a jury could

7     find from that that they were deliberately indifferent, but

8     what did that have to do with Mr. Pfaller?

9          MR. LePIERRE:  I'm not sure I understand your

10    question, Your Honor.

11         THE COURT:  They have to be deliberately indifferent,

12    and then there has to be causation.  Let's assume they're

13    deliberately indifferent.  What did that have to do with

14    Mr. Pfaller?

15         MR. LePIERRE:  Yes, Your Honor.  In 2014, when the

16    policy was -- first started to be promulgated and Dr. Amonette

17    stopped all treatment of hepatitis C patients in the VDOC such

18    that they had no opportunity no matter what their condition was

19    of receiving any treatment, Danny Pfaller was a known hepatitis

20    C patient, and throughout the time he had reliable tests, Your

21    Honor, he was at F-2, or he had tests that indicated he was an

22    F-2 although he was probably more progressed than that.

23         So the policy where they are denying and excluding

24    the class of people that includes Mr. Pfaller from treatment

25    categorically until they get sicker is affecting Mr. Pfaller

1   because he doesn't meet the criteria in 2015 when there is a

2   policy that permits it and had no opportunity for treatment

3   when there was a complete hold on all treatment for hepatitis C

4   in 2014, Your Honor.

5           THE COURT:  How long did that hold last?

6           MR. LePIERRE:  One year, Your Honor.  And I can --

7           THE COURT:  So he was not treated from -- he didn't

8   get the benefit -- the DAA drugs came in in 2014.

9           MR. LePIERRE:  Yes, Your Honor.

10          THE COURT:  And you told me this morning that the

11  point in time that's really at issue here is 2014 forward;

12  right?

13          MR. LePIERRE:  Yes, Your Honor.

14          THE COURT:  The time when he stopped the treatment.

15          MR. LePIERRE:  Yes, Your Honor.

16          THE COURT:  So the statement in your filing in

17  response to my order earlier where you said 2012 was the

18  beginning point is not something I should pay attention to

19  anymore.

20          MR. LePIERRE:  Your Honor, October of 2012 would be

21  relevant for Dr. Wang because that's when he first took over

22  his care, and if I put that in the Amonette response, that was

23  an error.

24          THE COURT:  Okay.  So for Amonette, it's when he

25  stopped all treatment.

1          MR. LePIERRE:  Correct, Your Honor.

2          THE COURT:  But when I asked you what the offense was

3    under count one, what the claim was, you said that it was

4    enacting and enforcing an exclusive treatment until he got to

5    the sickest level.  Well, why is suspending the treatment for a

6    year a part of that theory?

7          MR. LePIERRE:  Yes, Your Honor.  And a part of that

8    is, Your Honor, that once the AASLD issued their guidelines

9    that the DAAs were approved, the first step of that policy

10   being promulgated by Dr. Amonette was Dr. Amonette said nobody

11   can get treatment anymore.  They are all excluded until we

12   design our new policy.

13         They went through the process of designing the policy

14   and implementing it, and that was all a continuous action.

15   Your Honor, my submission is that the hold that prevented all

16   treatment was part of that process, the promulgation and

17   enforcement of the exclusionary policy at issue.

18         Once the policy came in in February of 2015, it was

19   an interim policy.  It came into effect as a complete policy in

20   June of 2015 and didn't materially change as to the relevant

21   exclusionary conditions throughout the rest of Mr. Pfaller's

22   life.

23         Your Honor did ask what was the relevance of the

24   changes that occurred in 2019.  I don't believe there's any

25   evidence, Your Honor, that they -- in the record that show

1    those are a continuation of any kind of increase in care, and,

2    in fact, throughout Mr. Pfaller's life, the numbers stayed

3    fairly consistent that the VCU was treating low 200s.

4           It does, however, demonstrate in Dr. Amonette's

5    affidavit at 110 that Dr. Amonette went out and hired somebody

6    in the VDOC that could prescribe this medication to VDOC

7    members in 2019.  There's no evidence he couldn't have done

8    that before, but there is evidence that when he tried to do it,

9    he was successful

10          THE COURT:  Is that Smith?

11          MR. LePIERRE:  Yes, Your Honor, that's the Pharm.D.,

12   Dr. Smith.

13          THE COURT:  What is a Pharm.D.?  What do you mean by

14   that?

15          MR. LePIERRE:  A Pharm.D., Your Honor, is an

16   individual who has a doctorate in pharmacy.  He's a pharmacist

17   who prescribed medication.  So he's not an M.D., he's a

18   Pharm.D.  It's one of those kind of offshoot degrees.

19          THE COURT:  So you don't need any specialty training

20   except in pharmaceuticals.

21          MR. LePIERRE:  In fact, Your Honor, you don't need

22   medical training beyond basic -- the basic ability to prescribe

23   medications as demonstrated by the fact that a pharmacist who

24   does have the ability to prescribe medication is currently

25   treating the lower-risk individuals, the F-2s, in the VCU --

1          THE COURT:  Was there any indication that he tried to

2     hire a Pharm.D. before Mr. Pfaller died?

3          MR. LePIERRE:  Your Honor, I'm aware of none in the

4     record.  I'm more than happy to let defense counsel see if they

5     have some, but I'm aware of no evidence within the record that

6     shows Dr. Amonette made any effort to hire anybody else.

7     Dr. Amonette did take the position that the funding he received

8     is completely outside of his control, and he had made no

9     efforts to increase that funding, again showing that if funding

10    or resources was an issue, he was not making any effort to

11    increase his available funds and to increase the capacity that

12    was available to him or to hire individuals who could increase

13    the ability of VDOC itself to treat these individuals.

14         THE COURT:  What is the viability on this record of

15    the conclusion from the *Reid* case wherein the judge held that

16    plaintiff is categorically excluded from treatment by VDOC's

17    policy, and it looks to me like the policy they're talking

18    about is the policy we're talking about in this case.  Is that

19    correct in the *Reid* case?

20         MR. LePIERRE:  If I remember the *Reid* case correctly,

21    Your Honor, that's the one in which Judge Moon stated there was

22    a difference between a policy that says we're going to treat

23    everyone, the sickest first, and a policy that says we're going

24    to treat the sickest and everybody else has to get sicker

25    first.  And that position, Your Honor, really highlights

1    exactly what we're saying is the case here.

2              THE COURT:  That is the case, but my question was,

3    are the VDOC guidelines that were at issue in the *Reid* case the

4    same ones that are at issue in this case?  Why don't you

5    reflect on that while we have a 20-minute recess.

6              MR. LePIERRE:  Yes, Your Honor.

7              (Recess taken.)

8              THE COURT:  All right, Mr. LePierre.

9              MR. LePIERRE:  Your Honor, I cannot say that every

10   policy at issue in this case was at issue in *Reid*.  I'm not

11   sure if it was just the 2015 and 2016 policies.  That being

12   said, I do not believe the policies in *Reid* and the policies

13   here materially differ particularly as to the exclusionary

14   criteria within those policies.

15             THE COURT:  All right.

16             MR. LePIERRE:  And, Your Honor, in addition, on the

17   record, the evidence is that VCU provided one doctor, two

18   nurses, and eventually a third nurse to the VCU telemedicine

19   clinic.  As you know, the VCU is a billion-dollar-a-year health

20   corporation with a multitude of doctors, and from that

21   information a reasonable juror could conclude, combined with

22   everything else, that Dr. Amonette was not facing a shortage

23   that was linked to the policy and that he, instead, created an

24   exclusionary policy without any justification which is simply

25   not a reasonable response.

1          THE COURT:  You can infer that from the fact that VCU

2     is a billion dollar company?  I mean -- I think VCU is so far

3     beyond a billion dollars you wouldn't believe it, but what

4     difference does it make?  Let's assume it's a billion.

5          MR. LePIERRE:  Yes, Your Honor.  The fact --

6          THE COURT:  Why does that show deliberate

7     indifference?

8          MR. LePIERRE:  Yes, Your Honor.  The fact that they

9     have in their employ currently a multitude of doctors that can

10    treat, according to our evidence --

11         THE COURT:  What evidence is there about how many

12    doctors VCU has that can treat these conditions?  Is there

13    any -- I mean is there anything that shows they have more than

14    one?

15         MR. LePIERRE:  No, Your Honor, there's nothing on the

16    record that shows they have more than one doctor at VCU.  The

17    only way --

18         THE COURT:  I mean more than one doctor who is

19    capable of treating this condition.

20         MR. LePIERRE:  Yes, Your Honor.  That evidence is

21    that our expert has testified that any certified or qualified

22    doctor, trained doctor who has an M.D. can provide this

23    treatment, and, in fact, as Your Honor notes, a pharmacist with

24    the ability to prescribe medications can do so, and, in fact,

25    it is LPNs that are overseeing the majority of this.

1          Judicial notice, I guess, would be the only way to

2     get that, that VCU has more than one doctor and two nurses.  So

3     based on that, Your Honor, that any doctor with an MD, licensed

4     doctor can provide this treatment who has the ability to

5     prescribe medication.

6          Again, just judicial notice that VCU has more than

7     one doctor in the case, that there was the ability to get more

8     had the VCU -- or had Dr. Amonette -- I'm sorry -- been trying

9     to do so.

10          So based on these facts, Your Honor, I believe

11     there's a genuine issue of material fact in dispute as to

12     whether or not there was an actual resource shortage, whether

13     or not the policy was related to such a resource shortage, or

14     whether or not a reasonable juror could confer that

15     Dr. Amonette, instead, simply wrote an exclusionary policy and

16     made no further efforts to ensure, beyond some kind of a

17     conversation with UVa, to ensure that patients like Mr. Pfaller

18     who had a serious medical condition that is life-threatening

19     received an available treatment.

20          THE COURT:  The question comes up, then, doesn't it,

21     why would any doctor do that, and why did this guy do it?

22          MR. LePIERRE:  Your Honor, the evidence is he went,

23     at the same time as he came up with the MOU, the agreement

24     between VCU and VDOC that created the telemedicine clinic, came

25     up with what they were going to pay them, came up with the

1    entire arrangement.

2          THE COURT:  I lost what you were saying.  Came up

3    with what?

4          MR. LePIERRE:  Came up with the entire arrangement of

5    what they were going to pay VCU and what they were going to get

6    in return for treatment of inmates with hepatitis C and then

7    created a policy that was designed to ensure at no time would

8    more individual inmates be sent to VCU than the current

9    arranged agreement would permit to be treated.  That's the only

10   reason I can think of, Your Honor, is cost containment.

11         THE COURT:  I mean in the record is -- not what you

12   can envision but what's in the record.  Are you saying that the

13   jury could infer from the fact that he made these minimal

14   arrangements with one doctor and two nurses and paid $13,000 --

15   we don't really know what it went to later, but over the years

16   it was an average of about $5 million, wasn't it? -- that

17   somehow that shows that he was taking costs into consideration

18   and that's why he limited the access of treatment to people as

19   he did?

20         MR. LePIERRE:  Yes, Your Honor.

21         THE COURT:  How do you deal with the fact -- if

22   that's your theory, how do you deal with the fact that in 2015,

23   they spent $5,046,000 on inmate treatment; 2016, 5,500,000;

24   2017, 6.5 million; 2018, 7,000,000.  That's a lot of money.  Do

25   we have anything in the record about how much each inmate's

1   treatment is?

2         MR. LePIERRE:  Your Honor, we know that the treatment

3   at VCU was a block -- just a group billing.  It was a flat

4   rate.

5         THE COURT:  Wait a minute.

6         MS. MAUGHAN:  It's not in the record, Your Honor, but

7   that's not correct.

8         THE COURT:  You'll get a chance.  Wait just a minute.

9   Say what now?  I lost you.  Is there anything in the record

10  about how much -- she told me that in Exhibit Number 116, page

11  five of Clarke, Clark's motion, that the amount of money was 5,

12  5.5, 6.4, and 7.0 for 2015 through 2018 respectively.  Is there

13  anything in the record that shows us how many inmates were

14  treated -- I mean how much the cost was for each inmate that

15  was treated?

16        MR. LePIERRE:  No, Your Honor.

17        THE COURT:  Could I divide the -- I mean, I have

18  figures for 2015 through '18 of 115, 175, 209, and 203, but

19  that's just the people with FIB-4.  Now, if -- no.  78 percent

20  of those people had FIB-4.  So that's 115 -- if I divide 115

21  into 5,046,964, do I get the cost of treatment per inmate?

22        MR. LePIERRE:  My understanding of that figure, Your

23  Honor, was that it was the total cost spent on health care for

24  inmates, not for hepatitis C treatment, and if I'm incorrect,

25  I'll look --

1          THE COURT:  I thought Ms. Maughan told me that's what

2    they spent for this particular VCU program.

3          MR. LePIERRE:  That was not the read I had taken from

4    reviewing the documents in preparation for this, Your Honor,

5    and if I'm wrong, I'm wrong on that.  Taking a look at the

6    document would correct me.  That being said, Dr. Sterling

7    testified that there was a bill given to the VDOC based on

8    their overhead and provider cost.  It's not per -- that bill is

9    not per inmate treated.  The only --

10         THE COURT:  When was the deal with VCU started?

11         MR. LePIERRE:  2015, Your Honor.

12         THE COURT:  So how did a deal that was 13,000 to

13   start with in 2015 get to a little over $5 million in 2015?

14   Anything in the record that teaches me that?

15         MR. LePIERRE:  No, Your Honor.  I do know that -- I

16   don't know if it's in the record or not, specifically that the

17   MOU provided that the VDOC would have to separately pay for the

18   drugs prescribed to each individual.  That's not included in

19   that $13,000 number.

20         THE COURT:  So the extra costs could be the cost of

21   the drugs?

22         MR. LePIERRE:  The costs of those drugs were not

23   cheap per inmate, Your Honor, but I do not believe they're

24   sufficient to reach that number.  I think there's something

25   along the lines of Dr. Sterling testified $36,000 or $64,000 an

1  inmate.

2          THE COURT:  The way -- if I have 115 inmates in 2005,

3  and they paid $5,046,964, if this machine is right and I know

4  how to work it right, which is a problem, the cost per inmate

5  is $43,886.64.  Now, that probably sounds about right to me.

6          MR. LePIERRE:  Yes, Your Honor, that does -- that is

7  in line with what the cost of the DAAs would be, Your Honor.

8          THE COURT:  Cost of what?

9          MR. LePIERRE:  I'm sorry, Your Honor.  The DAA drugs

10  themselves.

11          THE COURT:  Okay.  Anything else?

12          MR. LePIERRE:  No, Your Honor.  If I could have just

13  a moment, Your Honor, I'll clean this.

14          THE COURT:  The math on this whole thing doesn't make

15  much sense to me.

16          MS. MAUGHAN:  It does not, Your Honor, and it won't,

17  and there's a couple reasons for that.  It's not as simple as

18  what the Court might think it is in dividing the total number

19  spent over the total number of inmates treated, and the reason

20  it's not quite that simple is that the cost of the DAAs varied

21  over time.  It varied depending on what particular medication

22  was appropriate for a specific inmate, and it varied on how

23  long that inmate needed to be on that treatment.

24          So while you could, if you had some more numbers,

25  potentially extrapolate out an average, you're not going to be

1  able to understand -- it's not a true average, Your Honor.  The

2  math won't work.  I hope I'm explaining that well.

3           THE COURT:  It's not going to vary much.

4           MS. MAUGHAN:  It does, actually.

5           THE COURT:  What is the evidence as to what it -- how

6  you deal with all that?  My problem is you have a program you

7  all told me was $13,000 to start with, and within the year it

8  was 5,000,000.  How does that work?

9           MS. MAUGHAN:  When I interrupted Mr. LePierre -- I

10  apologize for that.  I got excited.  So the Department of

11  Corrections does pay a monthly stipend to VCU, and I believe,

12  though I don't think it's in the record, that amount was

13  approximately $13,000.

14           That covers the overhead for the clinic.  That does

15  not cover the individual treatment per inmate.  When inmates go

16  to VCU and they are treated, it's billed through Anthem, and

17  that cost is passed back to the Department of Corrections who

18  then pays Anthem.  Anthem manages the billing, but it's not an

19  insurance policy per se.  I know Anthem is a provider of

20  insurance, but that's not what they're doing for the Department

21  of Corrections.

22           So they deal with the billing, they send Department

23  of Corrections a bill based on how many people were treated and

24  how many people were seen, and Department of Corrections pays

25  that money back.

1            So that's one variable that depends -- that comes

2     into play because the number of inmates who are seen at the

3     clinic in a given time may not be 209 that are treated through

4     that whole year.  There are follow-up appointments, there are

5     other times that the inmates might go to have treatment for

6     which the Department of Corrections has to pay.

7            There's also a pretty wide variation in the cost of

8     the drugs that were available, and that has changed

9     significantly over the past five to six years.  Just to give

10    the Court an example, at docket number 110-1, there is an

11    outline of what the costs were in 2015.  One of the drugs costs

12    $27,000, and in 2015 another drug costs $30,000 -- I'm

13    approximating.  By 2020, there's still quite a variation.  One

14    drug is as cheap as $7,700.  Another drug is as much as

15    $20,000.  So there's still a lot of variation, and that depends

16    on what you specifically or I specifically might need that

17    governs what drug we would get.

18            THE COURT:  Were you requested to provide and did you

19    provide discovery, cost information, what you actually paid,

20    what you were billed, what the bills were, so that they could

21    be analyzed and figure out what the cost was, anything like

22    that?

23            MS. MAUGHAN:  I do not believe there was a document

24    request for that type of information.  Some of it was covered

25    in a 30(b)(6) deposition, but the specific documents, the

1    bills, I do not believe that those were requested.

2         THE COURT:  Okay.  Now we're going to talk about

3    qualified immunity.

4         MS. MAUGHAN:  I was wondering if the Court might let

5    me respond to some of Mr. LePierre's arguments if that would be

6    acceptable, and I can be brief.  I'll be as brief as I can.

7    One of the things that Mr. LePierre and the plaintiff in this

8    case want Dr. Amonette to have done back in 2015 is to scour

9    the Earth for something that he had no reason to believe was

10   going to exist, that he was going to find, that he should have

11   gone to other providers, that he should have tried to hire

12   people who were not on the market for a job.

13        THE COURT:  How do we know that?

14        MS. MAUGHAN:  Well, what Mr. LePierre argued was that

15   Dr. Amonette -- there's no evidence that Dr. Amonette tried to

16   hire individual Pharm.D.s to work at the Department of

17   Corrections in 2015, or there's no evidence that he went -- how

18   many other hospitals he went to.  The response to that is,

19   that, frankly, would have been a waste of time.  Having known

20   what Dr. Amonette knew about the limitations --

21        THE COURT:  How do we know that?  What's in the

22   record that would say it was a waste of time?

23        MS. MAUGHAN:  The information from Dr. Sterling about

24   the limitations on resources that is in the record from Dr.

25   Sterling's deposition testimony and that people in the

1    community were having trouble getting access to care as well.

2            THE COURT:  He has a doctor that says that anybody

3    with an M.D. can prescribe this and follow this if you want to.

4    All you have to do is go hire people that have M.D.'s, or you

5    can go to other hospitals, and no explanation about why you

6    didn't, no explanation about why UVa turned you down.  Could

7    have been because they didn't like Dr. Amonette.  It could have

8    been because they didn't like the price he was willing to pay.

9            Who knows?  I can't guess at that.  I think that he's

10   got a point that the record is pretty sparse on what Amonette

11   did.  I'm not sure how that cuts, but I think it's pretty

12   sparse.

13           MS. MAUGHAN:  I would counter that it's pretty sparse

14   on the options that he would have had available had he tried

15   something else.  There's no information to show that had

16   Dr. Amonette called Johnson Memorial Hospital in Bristol that

17   they would have accepted it.  That's not in the record either.

18   So I don't think plaintiff can overcome the defendant's

19   undisputed facts that there was a problem --

20           THE COURT:  In all the places where VDOC has prisons,

21   in all those towns, there are hospitals nearby.  They're

22   further away from Red Onion and places like that than they are

23   places like Richmond where Sussex and all of those facilities

24   are located, but there are hospitals all around.  And that he

25   went to UVa shows evidence that he went to UVa, but is that

1   what he should have been doing?  There's no evidence about

2   that.

3           MS. MAUGHAN:  There's no evidence in the record that

4   going to a local hospital would have been any more beneficial

5   or that that would have been a doorway through which

6   Dr. Amonette could have treated the number of people that he

7   believed needed to be treated.  So to the extent --

8           THE COURT:  He didn't know how many people needed to

9   be treated.

10          MS. MAUGHAN:  He didn't know an exact number.  He

11  knew that there were going to be a lot.  But to the extent that

12  there's a dispute -- there's an attempt to create a dispute of

13  fact here for purposes of summary judgment, what else would

14  have been available to Dr. Amonette had he gone to look for it,

15  that's not in the record either.

16          THE COURT:  Your point is there's not a disputed

17  fact.  There is a dispute created by the absence of fact; is

18  that right?

19          MS. MAUGHAN:  I would argue that there cannot be a

20  dispute if there is an absence of facts by which the plaintiff

21  could rebut defendant's facts.

22          THE COURT:  There could be a dispute.  I think the

23  issue is is it a genuine dispute.

24          MS. MAUGHAN:  That's fair.  I would argue, though,

25  that without specific facts to counter Dr. Amonette's

1  statements, there's not enough to create a material dispute of

2  fact.  The other --

3         THE COURT:  How many cases has this particular

4  problem spawned?

5         MS. MAUGHAN:  How many lawsuits?

6         THE COURT:  How many lawsuits in which Dr. Amonette

7  has been named a defendant, and how many of them has it been

8  held that he's entitled to summary judgment or that there's an

9  issue of fact on the basis -- on the question of deliberate

10 indifference?

11        MS. MAUGHAN:  There is the case that was recently

12 pending in this court.  I believe the plaintiff's name was

13 Hinton or Hilton.  That was the case that Dr. Amonette moved to

14 ask this Court to consider, and, in that case, I believe it was

15 Judge Gibney found that the policy was reasonable and on the

16 merits granted summary judgment to Dr. Amonette.

17        There was the *Riggleman* case which, at one point,

18 seemed like it was going to conclude because Judge Moon had

19 granted summary judgment on qualified immunity to Dr. Amonette.

20 There is --

21        THE COURT:  That case is what?  What happened to it?

22        MS. MAUGHAN:  Judge Moon has indicated that he is

23 reconsidering his decision.

24        THE COURT:  On the qualified immunity?

25        MS. MAUGHAN:  Yes, sir.  And that's currently been --

1    it's been briefed, but there's been no decision from Judge

2    Moon.

3                THE COURT:  So his decision to reconsider vacates the

4    decision in *Riggleman*, does it?

5                MS. MAUGHAN:  The *Riggleman* decision has not been

6    vacated.  The Court has indicated that it is considering

7    vacating it, but the decision and the opinion have not been

8    vacated yet.

9                THE COURT:  What was the reason for reconsideration

10   of the opinion, or what was urged as the basis for it?

11               MS. MAUGHAN:  I believe Judge Moon's thought process

12   was that the Fourth Circuit had decided the *Riggleman* -- I'm

13   sorry, not *Riggleman*.  The Fourth Circuit had decided *Gordan v.*

14   *Schilling*.

15               THE COURT:  Decided what?

16               MS. MAUGHAN:  *Gordon v. Schilling*.

17               THE COURT:  And why did that change it?

18               MS. MAUGHAN:  In my opinion, Your Honor, it should

19   not have changed the outcome in the *Riggleman* case because the

20   Fourth Circuit did not deal with qualified immunity in the

21   *Gordon* case, but the Court was concerned that to the extent

22   there were, I guess -- I suppose disputes of fact, that

23   qualified immunity was not appropriate.

24               And that has been briefed.  I'm not articulating it

25   very well, and I did not write those briefs, but it is on the

1   record in *Riggleman* if the Court is interested in reviewing

2   that.

3         THE COURT:  All right.  And *Reid*, did that case

4   settle?

5         MS. MAUGHAN:  That case did settle.  Mr. Reid was

6   treated, and then the case was settled after that.

7         THE COURT:  *Hinton*?  You say summary judgment for

8   Dr. Amonette?

9         MS. MAUGHAN:  Summary judgment for Dr. Amonette.

10         THE COURT:  Any others?

11         MS. MAUGHAN:  There is one currently pending in

12   Norfolk that involves a person named Mr. Lovelace.

13         THE COURT:  There was a decision in *Lovelace*.  What

14   was it on?

15         MS. MAUGHAN:  That was on a motion to dismiss.

16         THE COURT:  12(b)(6)?

17         MS. MAUGHAN:  12(b)(6), Your Honor, yes, sir.

18         THE COURT:  And it was denied.

19         MS. MAUGHAN:  That case, as far as I know, has not

20   come to any dispositive conclusion as of yet.

21         MR. ROSEN:  It's been resolved.

22         MS. MAUGHAN:  It has?  Okay.

23         THE COURT:  Settled?

24         MR. ROSEN:  *Lovelace*, I misspoke, no.

25         MS. MAUGHAN:  *Lovelace* is still pending, Your Honor,

1    I'm sorry.

2         THE COURT:  Pending.  Is there summary judgment

3    pending in it?

4         MR. ROSEN:  Not yet.

5         MS. MAUGHAN:  I believe it's still in discovery

6    currently, or it was recently.

7         THE COURT:  Any others?

8         MS. MAUGHAN:  I am fairly certain there are at least

9    two more, but I cannot think of the names of those currently.

10   There's another.  There's one called *Coward* pending in the

11   Western District currently.  It's 7:20CV702.

12        THE COURT:  What's the status of that case?

13        MS. MAUGHAN:  I believe the Court is awaiting

14   responsive pleadings from most of the defendants.  One of the

15   defendants is a medical doctor who does not work for Department

16   of Corrections.  That defendant recently filed a motion for

17   summary judgment, but it has not been responded to or ruled

18   upon.

19        THE COURT:  All right.

20        MS. MAUGHAN:  There is one more in the Western

21   District involving -- I can't recall the name or the case

22   number, but I know there is one in the Western District, and

23   I'm involved in that one as well, but I can't think of the name

24   currently.

25        THE COURT:  What's the status of it?

1          MS. MAUGHAN:  It is pending, and no responsive

2    pleadings have been filed yet.  Plaintiff is pro se and

3    indicated he will be amending his complaint, so we're awaiting

4    an amended complaint.

5          THE COURT:  So why doesn't *Hinton* dispose of the case

6    on deliberate indifference?

7          MS. MAUGHAN:  Dispose of this case?

8          THE COURT:  Yes.

9          MS. MAUGHAN:  I would argue that it's persuasive

10   authority.  It's clearly not binding.  It's from this Court --

11         THE COURT:  I know, but I'm saying -- I'm not saying

12   it right.  I lead you down the wrong path.  What's the

13   difference between this case and *Hinton* analytically?

14         MS. MAUGHAN:  There's not any in my opinion.  I did

15   not write the brief in *Hinton*, one of my colleagues did, but

16   much of the information that's relied upon in that brief is the

17   exact same information that has been relied upon in this case.

18   Factually I do not believe that they are different.

19         THE COURT:  Presents the same question?

20         MS. MAUGHAN:  It does.

21         THE COURT:  As to deliberate indifference?

22         MS. MAUGHAN:  Deliberate indifference on behalf of

23   Dr. Amonette as to the DOC hepatitis C treatment guidelines,

24   yes.

25         THE COURT:  How about the -- then there was no need

1    to get to the qualified immunity issue in *Hinton*.

2          MS. MAUGHAN:  If I recall correctly, the Court did

3    not address qualified immunity at all in the *Hinton* case

4    because the Court granted summary judgment on the merits.

5          THE COURT:  Okay.  Excuse me.  I interrupted.

6          MS. MAUGHAN:  You're all right.  One other thing I

7    wanted to respond to that plaintiff raised while he was arguing

8    is the allegation that all treatment was stopped between 2014

9    and 2015.  That allegation is not in the complaint, and it's

10   not something that has been explored in discovery in this case.

11   To the extent that is part of what -- part of the facts upon

12   which plaintiff brings his case, that seems like it would be

13   barred by the statute of limitations.  We have a discrete

14   period of time where there was no treatment for hepatitis C,

15   and everyone agrees that was from 2014 to 2015.  This case was

16   filed in 2019.  That's not an issue that's been briefed because

17   it was not raised in the complaint or the motions for summary

18   judgment.

19         THE COURT:  All right.

20         MS. MAUGHAN:  The *Reid* case that the Court inquired

21   about, I would distinguish the *Reid* case because the *Reid* case,

22   while it is based on the same set of documents at 110-6 that

23   this Court has referred to and we've all referred to as the DOC

24   hepatitis C guidelines, the provision at issue in *Reid* is

25   completely different than the provision at issue in this case.

1          In *Reid*, the inmate plaintiff wanted to be treated

2     for hepatitis C, but the policy in place at that time, back in

3     2015, excluded him because he had a possibility of parole or

4     release coming soon.  And that particular provision which was

5     applied to Mr. Reid was what triggered Mr. Reid's lawsuit, and

6     that provision is not at issue in this case at all.

7          So the same documents govern, yes.  Different

8     provisions of the document applied to Reid than apply to this

9     case.  So I do not think *Reid* is controlling or even persuasive

10    to the Court in this case.

11         THE COURT:  Qualified immunity now?

12         MS. MAUGHAN:  We can do that now, Your Honor.  Unless

13    the Court specifically asks me to, I'm not going to get into

14    the case law that is specific in defining general rules about

15    qualified immunity.  I don't think there's a dispute about

16    that.  It's a two-step inquiry whether the plaintiff's

17    allegations state that a defendant's conduct violated a

18    statutory or constitutional right and, if so, whether that

19    right was clearly established at the time.

20         This case has been a little complicated by the fact

21    that plaintiff has redefined the right at issue several times

22    going from very broad to very narrow.

23         THE COURT:  But if you synthesize what the argument

24    is, is it really that the right is to be defined at the same

25    level of specificity that Judge Davis defined it in *Reid*?

1          MS. MAUGHAN:  *Reid* was the Judge Moon case, Your

2     Honor, and --

3          THE COURT:  No, you're right.  I don't mean *Reid*.

4     Judge Davis defined it in --

5          MS. MAUGHAN:  *Lovelace*?  Judge Davis is the judge in

6     *Lovelace*, Your Honor.

7          THE COURT:  I think it's *Lovelace*.  He rejected the

8     specific formulation and said that -- that you are talking

9     about and said that -- if it's the case I'm thinking about, and

10    said that it was to be defined because of the *Scinto* case at

11    the level that the issue is presented is whether there's a

12    deprivation -- whether there's serious medical condition

13    treatment for which has been denied.

14         MS. MAUGHAN:  All right, Your Honor, I am reading the

15    *Lovelace* opinion where the Court does quote to *Scinto*, and

16    *Scinto* is dealing with the diabetic inmate who had a need for

17    insulin, and the allegation was that the medical provider did

18    not provide that insulin appropriately.

19         So I don't think that the right can be defined that

20    broadly in this particular case because in a case where you're

21    dealing with a doctor who has an inmate who has diabetes and

22    it's a clear issue of whether he needs insulin, then the right

23    to adequate medical treatment might be the way to define that

24    right and the right to timely medical treatment.

25         But in a case such as this one where Dr. Amonette is

1  dealing with limited resources and the ability to get that

2  treatment to people in a timely and appropriate fashion, I

3  think we have to define the right a little bit more

4  specifically, and we have to do that because the Supreme Court

5  says that we have to do that.

6         THE COURT:  It said where you're dealing with

7  resources and time, you have to define the right to include the

8  resources and time.

9         MS. MAUGHAN:  No, it doesn't say that, Your Honor.

10  It does say that the right at issue has to be defined based on

11  the circumstances of the case.  I'm paraphrasing.  But --

12         THE COURT:  I don't think there's any serious

13  proposition about that.

14         MS. MAUGHAN:  The circumstances in this case present

15  an issue of whether there was a limitation of resources, and so

16  the right has to be defined within -- based on the facts and

17  circumstances here.  This is from *Mullenix v. Luna*, a Supreme

18  Court case from 2015, that says the dispositive question is

19  whether the violative nature of the particular conduct is

20  clearly established, and this inquiry must be undertaken in the

21  light of the specific context of the case, not as a broad

22  general proposition.

23         And so if the right is defined too broadly, the Court

24  goes on -- actually the Fourth Circuit goes on to say, it will

25  always have been found to be clearly established.  And that's

1    not -- that is what the Supreme Court has said we cannot do.

2              THE COURT:  And if it's defined too narrowly,

3    according to what Judge Davis wrote, it will never be found to

4    have been clearly established because -- in the issue of

5    medicine because you'll have to wait until every medical

6    condition with every variation thereof comes before a court,

7    and then there has to be a decision, and that's what Judge

8    Davis held in *Lovelace*, I think.

9              And he was persuaded to define it at a slightly more

10   general level than that.  And I think that there are -- that

11   valid considerations are presented on both sides of the issue.

12   You don't want to have a definitional issue eliminate

13   substantive issues just out of hand.  That, then, just leads to

14   a lot of wordsmithing decisions, and that's not what we ought

15   to be doing.

16             MS. MAUGHAN:  No, and I agree with the Court, but we

17   do have to define the right at issue at the proper level of

18   specificity, because that's what gives prison officials

19   information about whether or not what they're doing is lawful.

20   If we just say that it's the right to timely care, what's care?

21   What's timely?  And under the circumstances of this case, those

22   two questions matter a lot.

23             What's timely?  What's timely for you might be

24   different than what's timely for me depending on our

25   circumstances and our hepatitis C diagnoses.  So we have to ask

1   those questions in this case, and I think we have to define the

2   right in this case to acknowledge that those questions have to

3   be asked and answered.

4            THE COURT:  Suppose if I define it this way, the way

5   you want it.  Reasonable is the right to devise a system of

6   medical care that allows an inmate twice to be subjected to an

7   asserted mistake in a diagnosis of a threshold which, if

8   correctly diagnosed, would have saved his life.  Can I find it

9   that specifically?

10           MS. MAUGHAN:  I lost the Court there.  I'm sorry.  I

11  didn't understand the question.

12           THE COURT:  We include Dr. Wang's handling of the

13  case in the definition of Dr. Amonette's case.

14           MS. MAUGHAN:  No, I don't think we can do that

15  because the allegation against Dr. Amonette and the clear facts

16  established in this case is that Dr. Amonette promulgated the

17  policy.  He was not involved in the treatment of Mr. Pfaller

18  individually, and he was not aware of what treatment was or was

19  not being provided by Dr. Wang.

20           So I don't think in this case we can do that.  And

21  here's one of the reasons why simply defining the right to

22  timely medical care will not work in this case, and it doesn't

23  work in other cases, because there's ample case law out there

24  that says triage of more serious medical conditions and triage

25  in prison treatment situations is constitutional.  And that

1    makes sense.

2          If someone with a more serious condition needs to be

3    seen first because they have a more serious and urgent need for

4    treatment, the person with the broken finger might have to

5    wait, and there might be a risk to that person having to wait,

6    but that matters in this context in defining qualified immunity

7    because courts throughout the country have decided that triage

8    is appropriate.

9          So this is, in effect, a form of triage.  So we have

10   case law out there that says triage is okay and that we also

11   have -- to give timely medical care, we have to define the

12   right a little bit more specifically in this case.  And what

13   other courts have discussed as well that have dealt with

14   similar issues in the District of South Carolina is the rapidly

15   evolving legal and medical developments in this area of

16   medicine and the absence of controlling Fourth Circuit or

17   Supreme Court authority.

18         So, again, we have a period of about five years where

19   the availability of treatment changed rapidly.  The standard of

20   treatment, the available drugs changed rapidly, and so I think

21   that has to be acknowledged as well under the specific

22   circumstances of this case.

23         THE COURT:  How do you see *Lovelace* -- I mean *Gordon*

24   *v. Schilling* as dealing with the level of -- definitional

25   level?  What part of *Schilling* do you think deals with that?

1        MS. MAUGHAN:  I don't think *Schilling* does deal with

2 qualified immunity, Your Honor.  I think the Court, in

3 *Schilling*, said that it was not -- it was not discussing

4 qualified immunity, and that's at 362 and 363 of the *Schilling*

5 opinion.  The Fourth Circuit writes the Court did not determine

6 whether the defendants are entitled to qualified immunity on

7 the deliberate indifference claims.

8        THE COURT:  What does deciding *Gordon v. Schilling*

9 have to do with Judge Moon's decision to redefine *Riggleman*

10 where he granted the motion on qualified immunity?  That's what

11 I was -- you said the reason he said he was revisiting was

12 because the Court had decided *Gordon against Schilling*.

13        MS. MAUGHAN:  And if I were representing the

14 defendants in that case, Your Honor, that would be my

15 rhetorical question to the Court, and I believe the briefing --

16 again, I did not write the briefing so I'm going from memory.

17 I believe the briefing addressed that on behalf of the

18 defendants, that Gordon does not require a different outcome in

19 the --

20        THE COURT:  Are you all getting tired because your

21 voices are fading off.  You're going too fast.

22        MS. MAUGHAN:  I know, I'm so sorry.  I'm trying.

23        THE COURT:  Okay.  I understand.  I'm inclined to

24 believe I believe Judge Davis is right in *Lovelace*, but I

25 understand your argument.  So let's go on.  Let's deal with the

1    substance of the issue of qualified immunity.

2              MS. MAUGHAN:  Okay.

3              THE COURT:  Please.  There was a violation of the

4    right or not?  That's a factual issue that the jury has to

5    decide once we define it; right?  In this case, there's a

6    factual dispute created by the record that you cite and the

7    record that he cites and the opinions of experts on both sides.

8              MS. MAUGHAN:  I don't think that there is --

9              THE COURT:  Doesn't a jury have to decide whether

10   there was a violation of a right?

11             MS. MAUGHAN:  I don't think there's a material

12   dispute of fact that gets this case to the jury, Your Honor.

13   That's one of the reasons that I think defendant Amonette is

14   entitled to summary judgment on the merits as well.

15             THE COURT:  I'm not talking about the merits.  I'm

16   talking about the issue of -- was the right defined at the

17   level that *Lovelace* says it's to be defined violated -- and

18   that's the first part of the analysis.  And so the question

19   then becomes is there a factual dispute that has to be resolved

20   by a jury as to whether or not there was such a violation.

21             MS. MAUGHAN:  No, I don't think that there is in this

22   case, Your Honor.

23             THE COURT:  Why not?  Let's get that on the table.

24             MS. MAUGHAN:  So I don't want to rehash all of the

25   facts again.  We've been through them a lot.  But I believe the

1    reason there's not a dispute of fact as far as Dr. Amonette is

2    concerned is Dr. Amonette -- the circumstances that faced

3    Dr. Amonette, the policy, how the guidelines have changed over

4    the years, none of that is in dispute in this case.

5             THE COURT:  They didn't change, as I see.  You

6    pointed me out to footnote three in Exhibit 110 as the best

7    example of how the guidelines were, and I don't see how they

8    changed except from the very first ones, the interims, to the

9    other -- all of the other five that you point to or whatever in

10   any material way.

11            MS. MAUGHAN:  They did change, and the way that they

12   changed expanded the number of inmates who were eligible to be

13   treated at VCU, but the place where they changed in the

14   guidelines is not outlined in ECF 110-6 -- I'm sorry, is not

15   outlined in that footnote.  It's outlined in the guidelines.

16   And the reason it's not included in the footnote is because it

17   has to do with FibroScan.

18            I can't remember the date, but at some point, in the

19   guidelines, Dr. Amonette, for the people who were referred to

20   have a FibroScan, those people in indeterminant range, he

21   changed the number on the result of the FibroScan that would

22   trigger someone to be referred for treatment and made it more

23   open to more people.

24            So I believe at one point the reading on the

25   FibroScan that would have come back to trigger a referral was

1    -- I think it was nine kilopascals.  That number was reduced to

2    seven kilopascals meaning that people with less advanced

3    fibrosis were referred to the VCU clinic for treatment

4    immediately which opened the door to more people being treated.

5              THE COURT:  That doesn't make a difference here, does

6    it, as to Mr. Pfaller?  The reason he didn't get it is he

7    didn't fit those criteria that are laid out in footnote three.

8              MS. MAUGHAN:  He fit the criteria laid out in

9    footnote three on at least two occasions when his blood work

10   came back in the indeterminant range meaning he should have

11   been referred for a FibroScan.  What we don't know is what that

12   FibroScan would have shown and when it would have shown it.

13             So at some point in the continuum, had he come back

14   with a nine kilopascals, he would have been referred for

15   treatment, and at some point later if he had come back with a

16   reading of seven kilopascals, he would have been referred for

17   treatment, but we can't answer that question in this case.

18             But that change goes to Dr. Amonette's lack of

19   deliberate indifference in his goal of treating everyone and

20   opening up the clinic spaces as they became available.  Not

21   necessarily specific to qualified immunity, but...

22             So even -- I would go so far as to argue that in *the*

23   *Lovelace* case, even if we stick with Judge Davis's definition

24   of what the right at issue should be, which is the right of

25   prisoners to receive adequate medical care and to be free from

1    officials' deliberate indifference to their known medical

2    needs, even if we adopt that standard in this case, I would

3    submit that Dr. Amonette's behavior is not evidence of

4    deliberate indifference.

5         If we define it that broadly and we say the right of

6    prisoners to receive adequate medical care -- that's the first

7    part -- we have to think about all the prisoners who need this

8    adequate medical care which is the treatment with the DAAs.  So

9    we have people who are obviously much sicker than Mr. Pfaller

10   objectively was who needed that treatment, who got that

11   treatment before he did.

12        So those people are being -- are receiving that

13   adequate medical care, and then that begs the question what is

14   adequate in this situation.  So, in this situation, adequate

15   care can mean people who are more advanced disease need to be

16   treated more quickly.  People who are not as advanced can be

17   monitored to see what happens with their disease progression.

18        So adequate medical care, as this Court has noted,

19   includes the monitoring, the testing, and the treatment.  So

20   they're receiving that treatment.  They're receiving the

21   monitoring, they're receiving the blood work, and they're

22   receiving it timely.  And the second part of what the Court

23   writes in *Lovelace* is that those inmates are to be free from

24   officials' deliberate indifference to their known medical

25   needs.  So if we think about what Dr. Amonette did, he's not --

1              (Court reporter interruption.)

2              THE COURT:  He's not been deliberately indifferent.

3              MS. MAUGHAN:  To the known medical needs of the

4    inmates that are in the Department of Corrections because he

5    has promulgated a policy that is getting that care to those

6    inmates.

7              THE COURT:  All right.  Thank you.  Mr. LePierre,

8    what do you have to say about qualified immunity?

9              MR. LePIERRE:  Your Honor, as an initial matter, it

10   is plaintiff's position that the judge in *Scinto* was correct,

11   the level of specificity that is required for the definition of

12   the right at issue in this case.  And so we do believe it

13   should be defined as the right of an inmate to be free from

14   officials' deliberate indifference to a serious medical need.

15             That being said, we have provided, obviously, an

16   alternative, more specific definition of right of an individual

17   with a diagnosed serious medical need, hepatitis C, to

18   treatments that is readily available where there is no medical

19   basis for the denial of that treatment.

20             Both of those standards, Your Honor, whichever one

21   you adopt, does raise the issue that you pointed out related to

22   the special problem of qualified immunity and deliberate

23   indifference because there is, quite frankly, a disputed issue

24   of material fact as to whether or not there was any medical

25   basis for the decision to exclude Mr. Pfaller categorically

1   from receiving treatment until he got sicker.

2            I believe, Your Honor, the qualified immunity

3   analysis simply cannot be done until that decision has been --

4   or, I'm sorry, a jury's decision on that disputed --

5            THE COURT:  Say it again.  Genuine dispute of fact as

6   to whether there was a medical basis.

7            MR. LePIERRE:  For excluding Mr. Pfaller from

8   receiving -- eligibility for receiving the treatment with DAAs

9   until his illness progressed to being an F3 or an F4 liver

10  damage.

11           THE COURT:  What is the evidence on each side that

12  creates that fact dispute, that genuine dispute of material

13  fact?

14           MR. LePIERRE:  Yes, Your Honor.  That is as --

15           THE COURT:  Give me your side.

16           MR. LePIERRE:  My side is that Dr. Amonette has

17  asserted that there was a scarcity of resources and that he

18  went and asked UVa if they would treat inmates with hepatitis C

19  and, for reasons unknown, was denied.

20           However, we have on record Dr. Schamber's statement

21  that any M.D., any primary provider can provide the treatment

22  to inmates with hepatitis C, the DAAs treatment.  It is his

23  position and opinion that is supported by the fact that they

24  currently have a Pharm.D. providing that prescription

25  medication having only training in pharmacology and is

1  sufficient to have --

2          THE COURT:  All right.  Excuse me.  I don't

3  understand -- on the one hand, you say you have -- what's your

4  expert?

5          MR. LePIERRE:  Dr. Schamber.

6          THE COURT:  He says any M.D. can provide this

7  treatment.

8          MR. LePIERRE:  Correct.

9          THE COURT:  And monitor.  And what's his name,

10  Amonette, says you need a specialist to treat it.  That's a

11  fact dispute that's resolved by medical expert testimony.  Is

12  that what you are saying?

13          MR. LePIERRE:  Yes, Your Honor.

14          THE COURT:  What does the resource scarcity going to

15  UVa comment have to do with that?

16          MR. LePIERRE:  Yes, Your Honor.  Essentially, my

17  point was that that's the only other evidence of scarcity that

18  they were discussing, is that they had asked UVa to provide

19  that treatment, and UVa had denied it.  My point was there was

20  no evidence as to why that denial occurred.

21          THE COURT:  What evidence do you have that it is --

22  that there wasn't scarcity?  The same evidence that your doctor

23  says any M.D. can provide the treatment; is that right?

24          MR. LePIERRE:  That as well as Dr. Sterling's

25  testimony referenced earlier in which he says had they EDCU --

1    I'm sorry, had VDOC requested VCU to --

2              THE COURT:  You need to speak up and slow down.

3              MR. LePIERRE:  Let me see if I can get that -- I'll

4    speak into the microphone.  I apologize, Your Honor.  The other

5    evidence is Dr. Sterling's testimony that we referenced earlier

6    in which he said had the VDOC requested VCU to increase their

7    capacity, the costs of the MOU would have increased.  And it is

8    a reasonable inference therefrom that clearly they could

9    increase that capacity.

10             THE COURT:  All right.  What else?

11             MR. LePIERRE:  There is also the fact, Your Honor,

12   that Dr. Amonette admitted he did not ask VCU to increase their

13   capacity.

14             THE COURT:  What?

15             MR. LePIERRE:  I'm sorry, what was that?

16             THE COURT:  What did you say?

17             MR. LePIERRE:  The fact that Dr. Amonette admitted in

18   his deposition he had not asked VCU to increase their capacity

19   prior to 2018.

20             THE COURT:  All right.  What else?

21             MR. LePIERRE:  I apologize, Your Honor, I know there

22   was one more thing, and I'm blanking on it.

23             THE COURT:  The question is --

24             MR. LePIERRE:  I think --

25             THE COURT:  -- what is the genuine dispute of

1    material fact on the issue whether there was medical basis, a

2    medical basis, for excluding Pfaller from receiving treatment

3    with DAAs until his illness progressed to F3 or F4 fibrosis.

4    What other evidence is there for the medical --

5              MR. LePIERRE:  That, Your Honor, is the evidence we

6    have at this time.

7              THE COURT:  Well, did Schamber -- are you telling

8    me -- did Schamber opine that, in his view, there wasn't any

9    medical basis for doing that?

10             MR. LePIERRE:  Yes, Your Honor.

11             THE COURT:  Well, you didn't cite that as a reason.

12             MR. LePIERRE:  I apologize.

13             THE COURT:  You cite it as a reason that Schamber had

14   said any doctor could provide it, but did he also say there is

15   no medical basis for excluding Pfaller from receiving treatment

16   with DAAs until his illness progressed to the F3 or F4

17   fibrosis?

18             MR. LePIERRE:  Yes, Your Honor.  The medical basis

19   cited is the scarcity of providers, scarcity of the ability to

20   find people to provide the treatment, and Dr. Schamber's

21   opinion is that there is no such scarcity, specifically because

22   any M.D. can do it.  That's the medical basis that the

23   defendant Amonette has cited and that Dr. Schamber has

24   contested.

25             And he did say there may be a wait time, but you have

1    to -- you have the ability to have anybody provide that

2    treatment, so there is no scarcity at issue, Your Honor.

3    That's the issue of material fact in dispute.

4              THE COURT:  All right, anything else?

5              MR. LePIERRE:  Your Honor, that being said, even if

6    you do proceed with the qualified immunity analysis, I think

7    with that issue in dispute, the inference has to be in our

8    favor that there was no scarcity, that the policy was unrelated

9    to any scarcity and simply excluded Mr. Pfaller from treatment

10   without medical -- without any medical basis, and I think under

11   qualified immunity, that right of an individual to be free from

12   unreasonable delay, that is delay without any connection to

13   medical reasons, is clearly established at this time, Your

14   Honor.

15             THE COURT:  All right.  Ms. Maughan.

16             MS. MAUGHAN:  Your Honor, I'd like to direct the

17   Court's attention to docket number 110-3, and that is excerpts

18   from Dr. Schamber's deposition testimony that Mr. LePIERRE has

19   just stated to this Court that Dr. Schamber testified that any

20   M.D. could treat hepatitis C and, you know, that he would be

21   fine.

22             What Dr. Schamber actually testified about, he was

23   shown the provision from the AASLD guidelines that we have

24   discussed talking about prioritization.

25             THE COURT:  Talking about what?

1          MS. MAUGHAN:  Prioritization, Your Honor, where the

2     AASLD said if you have a limited resource in treatment, you

3     should treat people who are F3s and F4s first.  He was shown

4     that exhibit, and he was asked, "Do you agree with that

5     highlighted statement," and he said, "If there are limited

6     resources, I think that prioritization is a reasonable approach

7     based on the highlighted statement."

8          Then he was asked, "Do you know as you sit here today

9     whether or not the resources in the Commonwealth of Virginia at

10    the Department of Corrections were limited insofar as the

11    provision of hepatitis C treatment?"  His answer, "I am not

12    aware of limits in that area."

13         He was then asked, and this is at docket 110-3, page

14    six, "Okay.  And if you have a population of patients with

15    hepatitis C and you have limited resources, wouldn't you agree

16    that the appropriate approach would be to prioritize those

17    patients based on some metric?"  Answer, "I believe

18    prioritization could be one way to solve that dilemma."

19         THE COURT:  Where does he say that any M.D. could do

20    it?

21         MS. MAUGHAN:  Your Honor, it's not in the excerpt

22    that I am reviewing, so I would have to review plaintiff's

23    submission to the Court, but what is --

24         THE COURT:  What's your citation to that proposition?

25         MR. LePIERRE:  I specifically cited Your Honor to

1   128 -- Exhibit 2, Dr. Schamber's report where he states that a

2   general practitioner --

3           THE COURT:  What page?

4           MR. LePIERRE:  I'm sorry, page three, I believe it

5   was.

6           THE COURT:  So it's 128-2, page three.

7           MR. LePIERRE:  Yes, Your Honor.  That's where he

8   states that a general practitioner or a specialist may

9   provide --

10          MS. MAUGHAN:  What Dr. Schamber also testified was

11  that he does not actually administer hepatitis C treatment for

12  the inmates in his care.  He refers them to a specialist.

13          And I note that this is relevant on a couple of

14  fronts.  If Dr. Schamber has to treat one inmate for hepatitis

15  C, maybe he can do that as an M.D. without any special

16  training.  Maybe he feels like he's competent to do that.  If

17  he has to treat 2,000, it might be a little bit different.

18          Nonetheless, he still testified that he thought that

19  if there were limited resources, that prioritization is a

20  reasonable approach based on the highlighted statement from the

21  AASLD, and he was not aware of any limits on resources in

22  Virginia.

23          THE COURT:  What is the consequence in a summary

24  judgment motion of this sort where the record does not contain,

25  for the relevant period of time, the total number of people

1    needing treatment and the categories in which they fall when

2    the policy at issue specifies that there are categories that

3    people fall into, and the first -- one of the categories is

4    monitoring, and monitoring provides blood levels which indicate

5    whether you go to the next level?

6              What's the -- the bottom line is, what's the

7    consequence of the failure to have that evidence in the record

8    on a motion for summary judgment?  Does it fall -- does the

9    consequence bear against the defendant who has moved for

10   summary judgment or against the plaintiff who is defending

11   summary judgment.

12             MS. MAUGHAN:  Ultimately, I don't think it's

13   dispositive, and I don't think it's necessarily relevant.

14   Would it be wonderful if Dr. Amonette could give that

15   information to the Court?  Yes, absolutely, and if he had it, I

16   would ask the Court to supplement the record and provide it,

17   but we don't have that information.

18             THE COURT:  I'm getting to this point:  Cannot the

19   jury conclude that the absence, the utter absence from -- proof

20   of any statistical record basis that the VDOC kept put the lie

21   to the fact that there was this policy at all that was based on

22   the information they say it was based on?  Do you understand

23   what I'm asking?

24             MS. MAUGHAN:  I think I do, Your Honor.

25             THE COURT:  It seems to me that if I'm saying I'm

1   making a decision based on scarce resources, that I would first

2   assess what my resources were, and part of the assessment of

3   the resources then becomes what am I going to apply the

4   resources to and then how did I do it over the years.

5          And there is nothing in this record that suggests to

6   me that VDOC did anything to implement this policy at all other

7   than to send some people to VCU --

8          MS. MAUGHAN:  I don't know that --

9          THE COURT:  -- for treatment.

10          MS. MAUGHAN:  -- that's an accurate assessment of the

11   facts that are before the Court.

12          THE COURT:  Forget whether it is or not.  Is there

13   any evidence in the record from which I can find that in any

14   given year, VDOC knew how many patients, inmates had hepatitis

15   C, how many of them fit each of the three categories in the

16   policy?  Is there any record that I can find that?

17          MS. MAUGHAN:  As to the first question about whether

18   any -- at any point anyone at the Department of Corrections

19   knew how many inmates had hepatitis C, there is information

20   about that.  I would have to find the record cite for that.

21          The second part of the Court's question whether or

22   not --

23          THE COURT:  Year by year.  Year by year.

24          MS. MAUGHAN:  I don't know that it's year by year,

25   Your Honor.  I know --

1    THE COURT:  The issue is not whether there is some

2    isolated citation somebody came up with 2,500 in 2017.  The

3    issue is that in 2015, 2016, 2017, 2018, is there any

4    information that VDOC knew how many people in its inmate

5    population had hepatitis C?  That's the first thing.

6        Is there any information that they had that they knew

7    how many people they were referring to MCV for treatment?  The

8    answer is yes, you've got that.

9        MS. MAUGHAN:  Yes, Your Honor.

10       THE COURT:  Is there any information about who fit

11   each of the categories that are in this policy?

12       MS. MAUGHAN:  No, Your Honor.

13       THE COURT:  No.  So could not a jury believe

14   reasonably that this whole policy that you are relying on is

15   just arbitrary and a charade?

16       MS. MAUGHAN:  No, Your Honor, I don't think that

17   that's a reasonable conclusion at all.  When you look at

18   Dr. Amonette's testimony and you look at the resources that

19   were marshalled to get the people treated, I don't think it's

20   fair -- it's not reasonable for a jury to say, well, it was

21   entirely a sham.  There's no facts in the record to indicate

22   that it was a sham.  These people were treated.  The Department

23   of Corrections did refer them for treatment.

24       THE COURT:  But we don't know why they were treated.

25       MS. MAUGHAN:  We know that they were treated because

1    they had more severe disease than other people who we knew

2    about who had the same disease, and that is clear.  The

3    people -- the policy was designed to pick out the people who

4    were the sickest and refer them to treatment, and that's what

5    the policy was supposed to do, and it did that, and we know

6    that it did that because we have statistics from VCU about the

7    number of people who were treated and the percentages of them

8    who were F3s and/or F4s.

9            THE COURT:  We don't know about how sick the other

10   people were.  We don't know how many people were sick.  We

11   don't know how sick the other people were.  We know that for

12   some reason, X number got treated at VCU.  It looks like that X

13   reason has to do with capacity at VCU.  The capacity at VCU,

14   they say, never was asked to be increased because we found we

15   have more people in our population who need treatment.  They

16   never went to VCU and asked that, but they never had -- nothing

17   in the record that shows that they even had the wherewithal to

18   ask that.

19           MS. MAUGHAN:  They did that, Your Honor.  They asked

20   it in 2016 and 2018, and the clinic was expanded twice.  And

21   the idea that the Department of Corrections, if only they had

22   asked and paid more money they would have gotten more slots is

23   belied by the testimony of Dr. Sterling from VCU who testified

24   that the resources, the space, the providers, the resources

25   that VCU had were limited not just for Department of

1    Corrections inmates but also for the other patients in the

2    community that Dr. Sterling was treating.

3           He did not have the capacity in his clinic to treat

4    everyone all at the same time who needed treatment.  He had to

5    prioritize his own patients outside of the Department of

6    Corrections as well.  So it goes to the limitation of the

7    resources in this situation.

8           THE COURT:  All right, I understand.  Anything else?

9           MS. MAUGHAN:  I will note also for the Court that

10   Schamber reviewed only one of the Department of Corrections --

11   the Department of Corrections hepatitis C guidelines, and that

12   was the guidelines that were in effect for the four months in

13   2015, from February to June, before the VCU clinic was

14   operational.  He did not review and cannot opine on any of the

15   further guidelines or how they were revised or how they were

16   implemented.

17          THE COURT:  All right.  Okay.  We have another motion

18   for summary judgment left to go.  That's Dr. Wang's; right?

19          MS. BLAIN:  Yes.

20          THE COURT:  Help me with the issue that we're going

21   to be wrestling with there.

22          MS. BLAIN:  There are a number of issues, and I'm

23   happy to stay and deal with it.  I am solo this week, and I

24   have to make a call to get some things taken care of.  I didn't

25   know we would be here this late which is okay, but I just have

1   to get my dogs taken care of, frankly.  So sorry.

2           So I'm home by myself this week, and my dogs are

3   there, and I need to call somebody to get them taken care of.

4   So I'm happy --

5           THE COURT:  That assumes that we stay.

6           MS. BLAIN:  I thought that's why you were asking me

7   the question.

8           THE COURT:  No, I was asking you the question to

9   determine what time tomorrow to come in.

10          MS. BLAIN:  Okay.

11          THE COURT:  I'm very sympathetic with dogs.

12          MS. BLAIN:  Thank you.  Most people are.  Judge, the

13  issues that I have for discussion tomorrow are sovereign

14  immunity as it relates to the palliative care issue and the

15  issues with the blood test.  So sovereign immunity on that and

16  then qualified immunity as it relates to the palliative care

17  issue.

18          THE COURT:  How long are you going to take?

19          MS. BLAIN:  I would probably take about 45 minutes.

20  I suspect the Court might have some questions about the facts

21  of the case, and so that might prolong things.

22          THE COURT:  I'll see you at 10:00.  I have a hearing

23  all afternoon, evidentiary hearing, and I need to get this

24  thing finished.

25          MS. BLAIN:  If we start at 10:00, is the plan that we

1    would be done by --

2              THE COURT:  It is my fond hope that we will done by

3    lunch.  We might not, in which event who knows what will

4    happen.

5              MS. BLAIN:  May I approach?

6              THE COURT:  What?

7              MS. BLAIN:  I need to talk to you about something,

8    and I don't want it on the record.

9              THE COURT:  I just didn't hear you.  Yes.  If it's

10   something personal and it keeps you from being here, just say I

11   have a personal -- you're an officer of the court.  I don't

12   need to know the details.

13             MS. BLAIN:  I have something I have to do.

14             THE COURT:  When?

15             MS. BLAIN:  I think it's at 11:30, but I don't have

16   my calendar because I don't have my phone.  It just needs to be

17   taken care of.

18             THE COURT:  If it does, it does.  I will see you

19   Thursday at 1:00 p.m.

20             MS. BLAIN:  Yes, sir.

21             MR. LePIERRE:  I'll clear my schedule of anything,

22   Your Honor.

23             MR. ROSEN:  Judge, do you require Dr. Amonette's

24   counsel here for that hearing?

25             THE COURT:  I don't know whether we're going to have

1   more for you or not.  You're never off duty.

2        MR. ROSEN:  Okay, Judge.  We will arrange to have

3   someone here Thursday at 1:30.

4        THE COURT:  Since Ms. Maughan has carried the ball,

5   she's the one who needs to be here.

6        MS. MAUGHAN:  Unfortunately, Your Honor, I cannot be

7   here Thursday.  I have an appointment with my baby from 12:00

8   to 2:00, and I can't be here Thursday.

9        MS. BLAIN:  Judge, I will change my appointment.

10   Let's just get it done tomorrow.  Let's get the hearing done

11   tomorrow, and I'll take care of my appointment.

12        THE COURT:  All right, 10:00.

13        MR. ROSEN:  Judge, do you require both counsel for

14   Dr. Amonette be present --

15        THE COURT:  If you don't want to be here, it's all

16   right with me.

17        MR. ROSEN:  I'll check my schedule.  I'd like to be

18   here if I could.  I'll check my schedule.  Thank you.

19        THE COURT:  All right.  Thank you all very much.  I

20   think trying to go late tonight probably is an utter madness,

21   and would I lose the services of Ms. Peterson permanently.

22   We'll be in adjournment.

23

24                     (End of proceedings.)

25

```
 1

 2

 3          I certify that the foregoing is a correct transcript

 4    from the record of proceedings in the above-entitled matter.

 5

 6

 7    _____/s/_____          _____
      P. E. Peterson, RPR             Date
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```