```
 1            IN THE UNITED STATES DISTRICT COURT

 2          FOR THE EASTERN DISTRICT OF VIRGINIA

 3                   RICHMOND DIVISION

 4

 5   --------------------------------------
                                        :
 6    JACOB PFALLER                     :   Civil Action No.
                                        :   3:19cv728
 7    vs.                               :
                                        :
 8    DR. MARK AMONETTE, et al.         :   April 7, 2021
                                        :
 9   --------------------------------------

10

11        COMPLETE TRANSCRIPT OF THE MOTIONS HEARING

12         BEFORE THE HONORABLE ROBERT E. PAYNE

13              UNITED STATES DISTRICT JUDGE

14

15   APPEARANCES:

16   Dallas LePierre, Esquire
     John Shoreman, Esquire
17   NDH, LLC
     44 Broad Street Northwest
18   Suite 200
     Atlanta, Georgia  30303
19   Counsel for the plaintiff
                                      VOLUME 2 OF 2
20   Laura Maughan, Esquire
     Office of the Attorney General
21   202 North Ninth Street
     Richmond, Virginia  23219
22   Counsel for Dr. Mark Amonette

23

24              Peppy Peterson, RPR
              Official Court Reporter
25           United States District Court
```

```
 1    APPEARANCES:  (cont'g)

 2    Lynne Jones Blain, Esquire
      M. Scott Fisher, Jr., Esquire
 3    Harman, Claytor, Corrigan & Wellman
      4951 Lake Brook Drive
 4    Suite 100
      Glen Allen, Virginia  23060
 5    Counsel for Dr. Laurence Shu-Chung Wang

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2

 3            THE CLERK:  Case number 3:19CV728, Jacob Pfaller

 4   versus Dr. Mark Amonette, et al.  The plaintiff is represented

 5   by Dallas LePierre and John Shoreman.  The defendant Dr. Mark

 6   Amonette is represented by Laura Maughan.  The defendant Dr.

 7   Laurence Shu-Chung Wang is represented by M. Scott Fisher, Jr.,

 8   and Lynne Blain.  Are counsel ready to proceed?

 9            MS. BLAIN:  Yes.

10            THE COURT:  I want to revisit a couple things from

11   yesterday that I believe I need to understand a little better.

12   Mr. LePierre, can you come up to the lectern, let me ask you

13   some questions, please.  On count one, the Eighth Amendment

14   claim, I want to make sure I understand what your theory is as

15   to the liability for Dr. Amonette, count one.  Can you help me

16   again with that?

17            MR. LePIERRE:  Yes, Your Honor.  Our theory of

18   liability in count one, Your Honor, is that Dr. Amonette

19   knowingly instituted a policy where, first, for one year, he

20   categorically excluded all patients with hepatitis C --

21            THE COURT:  He instituted a policy.  All right.

22            MR. LePIERRE:  That is the year 2014.

23            THE COURT:  In 2014.

24            MR. LePIERRE:  That stopped all treatment beyond

25   monitoring of individuals with hep C in the VDOC.
```

1             THE COURT:  Except monitoring.

2             MR. LePIERRE:  Correct, Your Honor.

3             THE COURT:  All right.  And then the next one?

4             MR. LePIERRE:  Then in 2015 --

5             THE COURT:  Is that in your complaint?

6             MR. LePIERRE:  No, Your Honor.

7             THE COURT:  That number 14 -- I mean that 2014

8      stoppage?

9             MR. LePIERRE:  No, Your Honor.  That came out in

10     discovery.

11            THE COURT:  Okay.  But if it's not in the complaint,

12     how does it go forward?

13            MR. LePIERRE:  Your Honor, it's not directly in the

14     complaint, but it is part of the promulgation of the 2015

15     policy that is directly referred to in the complaint.

16            THE COURT:  They have to be on notice of what the

17     claims are as well as the evidence.  Now, the way -- if you

18     wanted to include that as a theory for count one, the proper

19     thing to do is to move to amend the complaint to include that

20     as a theory, and you haven't done that.

21            MR. LePIERRE:  Your Honor is correct.  I apologize.

22            THE COURT:  Okay.  So then we have the 2015.

23            MR. LePIERRE:  Yes, Your Honor.  And our claim is

24     that Dr. Amonette promulgated a policy that categorically

25     excluded Mr. Pfaller from receiving treatment with a readily

1   available cure, DAAs, until he got to the sickest level from

2   hepatitis C and that that policy has no connection to

3   prioritization --

4            THE COURT:  Wait a minute.  And the policy -- go

5   ahead.

6            MR. LePIERRE:  Has no connection to any

7   prioritization of treatment or any scarcity of resources.  It

8   simply excludes Mr. Pfaller from receiving treatment without

9   any medical basis.

10            THE COURT:  All right, now, help me with this:  What

11   does the record show about what, during the same time period,

12   once the DAAs became available, the policy was in all of the

13   other 50 states or any of the other states and what was the

14   policy in the Bureau of Prisons run by the federal government?

15   Let's take the BOP first.  What does the evidence show about

16   what the policy was as to the BOP which is the federal

17   institution?

18            MR. LePIERRE:  Your Honor, the federal Bureau of

19   Prisons did have a prioritization system.  I do not know where

20   on the record or if on the record the BOP policies have been

21   placed.

22            THE COURT:  I have to tell you, I'm kind of surprised

23   that neither side didn't give me a list that said here are 50

24   states, and here's what they do.  I would think if this policy

25   were different than the 50 states, you'd want to put it in.  I

1   would think if this policy were basically the same as the other

2   50 states, the state, Amonette would want to put it in.  Same

3   thing with BOP, because that helps determine a number of things

4   in the case, but there is nothing -- have I missed the

5   references or proofs -- not the references but the proofs in

6   the record about what the BOP policy is and about the policy in

7   the other states?  Is it there and I've not found it?

8              MR. LePIERRE:  I know, Your Honor, there is no

9   reference to the way other states have done it in the record.

10  I am fairly sure there is no filing of the Federal Bureau of

11  Prisons policy unless I myself am neglecting to remember where

12  it was.

13             THE COURT:  All right.

14             MR. LePIERRE:  The only thing in the record related

15  to how treatment is typically done is the AASLD guidelines, and

16  the Federal Bureau of Prisons does follow that policy.

17             THE COURT:  Is that in the record?

18             MR. LePIERRE:  The AASLD guidelines are, Your Honor.

19             THE COURT:  No, is it in the record that the BOP

20  follows those guidelines?

21             MR. LePIERRE:  I cannot think of where it is, Your

22  Honor.  I'm sure it was mentioned at some point, but I cannot

23  think of a specific location.

24             THE COURT:  All right.  So what was wrong with the

25  DOC policy?  You make a big point about what was wrong was

1   that -- you talk about the ASSL -- AALSD policy says that you

2   can prioritize if there are constraints on resources, but it

3   seems to me that the thrust of your argument is that there is

4   no -- there's nothing in the record to show a constraint on the

5   VDOC's resources when they implemented the policy.

6           MR. LePIERRE:  Yes, Your Honor --

7           THE COURT:  Or is it that they have said that the

8   constraint is the limit imposed by the size of the VCU program

9   and that's just not right, they never went to VCU to say

10   increase it so there wasn't any -- and so there wasn't any real

11   constraint on resources, that argument is just not true.  Is

12   that part of what you're saying?

13           MR. LePIERRE:  Yes, Your Honor.  We have actually two

14   major arguments.  The first is that there is no evidence of

15   scarcity and that the only evidence of scarcity is artificially

16   created.

17           THE COURT:  Artificially created.

18           MR. LePIERRE:  Meaning they didn't go and attempt to

19   expand the scarcity that existed at VCU.

20           THE COURT:  So those are the two.

21           MR. LePIERRE:  The second one, Your Honor, is that

22   even if there was some scarcity, the policy that Dr. Amonette

23   promulgated had no connection to that scarcity.  There's no

24   evidence he had any knowledge of how many people needed to be

25   treated, how many were sickest, and that the policy that was

1    put in place would have treated the sickest and not left space.

2         Under the policy there's no connection, so if there's

3    30 empty spaces in the VCU for treatment and there's no inmates

4    that met the policy of being the sickest, those 30 spaces went

5    unused.  There was no real prioritization where lower illnesses

6    could have gotten treated as resources permitted.

7         THE COURT:  What does the record show about how many

8    times there were spaces at VCU but people who were lower down

9    the list, sick but not the sickest, didn't get in?

10        MR. LePIERRE:  Your Honor, we have no information on

11   the record that shows when there was spaces available other

12   than Dr. Amonette's testimony at his deposition, which is in

13   the record, that he tried to make sure that they were always

14   full and that no spaces went empty, but there's no indication

15   on the record of the exact numbers.  We were simply unable to

16   get that, Your Honor.

17        THE COURT:  Did you ask for it?

18        MR. LePIERRE:  Yes, Your Honor.  In the deposition of

19   Dr. Sterling, it was just the information wasn't quite

20   available to us.  We were asking how many were treated and how

21   many were available, and we were made to understand it was

22   usually nearly full.

23        THE COURT:  The doctor who was running the program

24   says it was usually nearly full.  Is that what his testimony

25   was?

1          MR. LePIERRE:  I know, Your Honor, his testimony was

2     that they tried to keep it full, not to waste space.  I don't

3     believe -- I'm sorry.  I can't say on the record he said

4     specifically it was usually full.

5          THE COURT:  You didn't say that.  You said it was

6     usually nearly full which, to me, says there were times when it

7     wasn't full at all.

8          MR. LePIERRE:  Yes, Your Honor.  I apologize.

9          THE COURT:  Did he say that?  Did he admit that?

10         MR. LePIERRE:  No, Your Honor.  That was my

11    understanding of what they were saying.  I apologize.  That's

12    not the exact testimony on record.  The exact testimony on

13    record, Your Honor, was they tried not to leave any empty

14    spaces.

15         THE COURT:  What is the evidence in the record about

16    what resources were actually considered by Dr. Amonette in

17    formulating the policy?

18         MR. LePIERRE:  Your Honor, there's no evidence in the

19    record that he -- of what he considered, if anything.  My

20    understanding is there's been testimony that he generally knew

21    of some scientific studies out there that indicated there would

22    be a high number of people --

23         THE COURT:  No, but that and a nickel will get you a

24    Coke, in the words of Bear Bryant, because what's generally out

25    there is not the issue.  It's what he knew and what was going

1    on at the time this policy was provided.  So you say there's no

2    evidence of what Amonette knew the resources were or what he

3    thought were constraints on the resources.

4              MR. LePIERRE:  Correct, Your Honor.  The only

5    information we have is that at the time of promulgating the

6    policy, Dr. Amonette worked with VCU to create the VCU

7    telemedicine clinic.  At the time he created the policy,

8    there's no evidence in the record that he attempted to work

9    with any other hospitals, doctors, anything of that nature.

10             THE COURT:  Yes, I understand that, but I'm actually

11   trying to think differently than that.  To me, the word

12   resources encompasses a number of things.  It encompasses -- in

13   the context of this case.  It encompasses what facilities you

14   have available, what people you have available, and what money

15   you have available to buy resources on the market if you don't

16   have the resources internally.

17             Now, I understand Amonette's position to be that he

18   thought you had to have a specialist to treat these people and

19   that there's evidence from Dr. Sterling that says that you

20   should be a specialist to treat these people.  And you have

21   evidence that says that's nonsense, that any doctor can treat

22   it, and that includes diagnosing it, prescribing the medicine

23   and following the results, and, in fact, if we're to consider

24   what happened in 2019, Amonette hired a nondoctor, a pharm

25   doctor.  That's a doctor of pharmacy, and that's not a medical

1  doctor as I understand it.  That's a doctor of pharmacy, and

2  that person prescribes and follows at the clinic, at the prison

3  now; is that right?

4           MR. LePIERRE:  Yes, Your Honor.

5           THE COURT:  So if you define resources in those

6  terms, what evidence is there in the record about what

7  resources Dr. Amonette took into account at the time that he

8  promulgated the policy or any changes to the policy?

9           MR. LePIERRE:  Your Honor, the only evidence in the

10  record relating to what resources Dr. Amonette considered at

11  the time he promulgated the first policy was the resources

12  available from VCU where he said he created the VCU

13  telemedicine clinic, and then at some point while he was

14  promulgating the additional iterations of the policy that

15  materially change it, he did attempt, he says, to go to UVa.

16  Those are the only resources --

17           THE COURT:  You say that did not materially change

18  it.

19           MR. LePIERRE:  Yes, Your Honor.

20           THE COURT:  You are eliding a lot of your words, and

21  I'm having trouble determining particularly between whether

22  you're asserting something did happen or did not happen.

23           MR. LePIERRE:  I apologize, Your Honor.

24           THE COURT:  Did you intend to say that the changes

25  that he was making over time is shown in that footnote three on

1   110, ECF 110 were not material changes?

2         MR. LePIERRE:  Yes, Your Honor.  Once the policy was

3   changed in June of 2015, the inclusion in the exclusion

4   criteria for treatment did not change.  You had to have the

5   same APRI and FIB-4 scores.  How you make -- if you fell into

6   the middle range where those scores no longer predicted what

7   your liver condition was, they were making changes to how and

8   what tests you might receive to confirm what your actual

9   fibrosis was, what your FIB score was.  But that didn't alter

10   whether or not you were treated.  It was still essentially the

11   same.

12         THE COURT:  Is it your understanding of the record

13   that what Amonette did was go talk to the people -- he decided

14   to get some help from VCU, he talked to the people at VCU, and

15   he determined what his resources were to be whatever VCU could

16   offer, and that's the extent of his assessment of resources?

17         MR. LePIERRE:  Initially, yes, Your Honor.

18         THE COURT:  Is there any document in the record that

19   shows that at the time Dr. Amonette was promulgating the

20   regulations in 2015, that the word resources or resource or

21   limitation or constraint was mentioned in any way?

22         MR. LePIERRE:  Not to my knowledge, Your Honor.

23         THE COURT:  Throughout the process of changing the

24   regulations, the guidelines one way or the other, is there any

25   mention of the word resources, limited resources, or

1    constraints on resources mentioned in any document that has

2    been produced in this litigation so far?

3              MR. LePIERRE:  Not to my knowledge, Your Honor.

4              THE COURT:  All right.  So where does this argument

5    about resource limitation come from?

6              MR. LePIERRE:  That, Your Honor, is the position Dr.

7    Amonette has taken in litigation in his depositions, is that he

8    was creating the policy to address such limitation of

9    resources.

10             THE COURT:  And you all have cited all of his

11   testimony or testimony from other cases.  Where, in any record

12   of any proceeding, is there any proof of what he took into

13   account?  In other words, did he write a memo even if it's a

14   covering memo that says I was -- I reflected upon this, I took

15   into account that we have limited resources, the limited

16   resources are -- we're not considering cash, we're not

17   considering what the cost would be, but we are considering this

18   clinic, and so this is where -- this is the resource constraint

19   I am applying in applying the AALSD guidelines?

20             MR. LePIERRE:  Your Honor, I'm unaware of any such

21   document.

22             THE COURT:  And the concept of resource limitation

23   comes from, as I understand it, the AALSD guidelines because it

24   is the AALSD guidelines that say if you have con -- you should

25   give everybody treatment, but if you have -- resources are

1   limited, then you should treat the sickest people first.

2                MR. LePIERRE:  Yes, Your Honor.

3                THE COURT:  And that's where that whole concept comes

4   from.

5                MR. LePIERRE:  Yes, Your Honor.

6                THE COURT:  All right.  Thank you.

7                MR. LePIERRE:  Thank you, Your Honor.

8                THE COURT:  Ms. Maughan, I'll give you an opportunity

9   since I gave him an opportunity.  Is there anything in the

10  record about what the BOP, the federal, or any or all of the

11  other states have done by way of guidelines?

12               MS. MAUGHAN:  The BOP guidelines, Your Honor, are in

13  the record at docket number 110-5, and I believe that's the

14  guidelines that were in effect in the BOP starting in 2014 and

15  then again in 2016.

16               THE COURT:  And that's the ones -- what do they say?

17               MS. MAUGHAN:  So I will go to the 2016 guidelines,

18  Your Honor, because I think those are the ones that deal with

19  the DAAs.  I'm not sure the prior guidelines dealt with that.

20               THE COURT:  DAA did not come in until 2014, wasn't

21  available --

22               MS. MAUGHAN:  That's my understanding, Your Honor.

23  That's why I don't think the 2014 guidelines are relevant.  I

24  could be wrong.

25               THE COURT:  What exhibit is it?

1     MS. MAUGHAN:  It's 110-5.  And the guidelines contain

2     a lot of information about testing and what you should do for

3     preventative measures and things like that, but the substance

4     of who gets referred for treatment in the BOP's prioritization

5     strategy starts at page 31 of docket number 110-5.

6          THE COURT:  Have you all overlaid the guidelines of

7     the VDOC onto the BOP and seen exactly how they match up or are

8     different?

9          MS. MAUGHAN:  There's no demonstrative exhibit in the

10    record that does that, no, Your Honor.

11         THE COURT:  Well, I want one, please.  I don't think

12    it will take long for you all to agree upon one, and I would

13    like something that shows me, in a way that I can understand

14    it, how they differ.  And you can include all of the text of

15    110-5 in your analysis if that's important, or you can agree on

16    the parts that are important and submit a smaller segment which

17    is fine with me.

18         But I want to see how they differ.  Do you know -- I

19    just hit you with this, but do you know how they differ or if

20    they differ, either one?

21         MS. MAUGHAN:  They do differ to an extent, Your

22    Honor, and I can run the Court briefly through how they do

23    that.  Let me get back to the footnote here.  So in

24    comparing -- I'll try to compare apples to apples for the

25    Court.  When I say that, I mean starting with the dates.

1          So the BOP policy that I'm looking at right now at

2    docket 110-5 starting at page 31 is dated October 2016.  So I

3    will start with the most correlating policy, guideline from the

4    Department of Corrections which starts in October of 2016.

5          And for priority level one, the BOP's first priority

6    level, they categorize people as a high priority for treatment

7    if they had an APRI of greater than or equal to two or a

8    Metavir Batts/Ludwig stage three or four on liver biopsy,

9    effectively F3 or F4 fibrosis, or known or suspected cirrhosis.

10   They also included liver transplant recipients, if you had

11   hepatocellular carcinoma or liver cancer and other comorbid

12   medical conditions.

13         So the numbers that are listed at the bottom of page

14   six at docket number 110 are slightly different in that the

15   Department of Corrections at that time said that if you had an

16   APRI of greater than 1.5 and a FIB-4 of greater than 3.25, you

17   were prioritized for referral.

18         THE COURT:  Is that higher or lower eligibility than

19   the BOP?

20         MS. MAUGHAN:  That's hard for me to say as a

21   nonmedical professional, Your Honor.  The number at which the

22   Department of Corrections was looking to start treatment is

23   lower.  It starts at an APRI of 1.5, but it also requires a

24   FIB-4 score of 3.25.  I don't know enough to translate what

25   those two factors mean in relation to the single factor that

1    the BOP uses.

2              The BOP at that same document, docket number 110-5,

3    page 31, categorizes people into a priority level two which is

4    an intermediate priority for treatment, and that's based on an

5    APRI score of greater than or equal to one or --

6              THE COURT:  Greater than what?

7              MS. MAUGHAN:  An APRI score of greater than or equal

8    to one and stage two fibrosis or F-2 fibrosis along with some

9    other comorbid conditions.

10             THE COURT:  What is the VDOC guideline?

11             MS. MAUGHAN:  The DOC guideline at the time that put

12   people into the intermediate category for additional testing

13   indicated an APRI score of greater than .5 and less than 1.5 or

14   a FIB-4 score of greater than 1.45 and less than 3.25, and that

15   triggered the follow-up testing for people in the Department of

16   Corrections.

17             THE COURT:  Okay.  And there's nothing from the other

18   states?

19             MS. MAUGHAN:  No, Your Honor, not in the record.

20             THE COURT:  What evidence in the record is there

21   about the actual resources or constraints on resources that Dr.

22   Amonette took into account in deciding upon the 2015 policy and

23   the various policies thereafter?

24             MS. MAUGHAN:  Other than what we discussed yesterday,

25   Your Honor -- I have double-checked.  I don't see anything else

 1    in the record that was not covered yesterday.

 2              THE COURT:  All right.  As I understand it, what was

 3    covered yesterday was essentially that it was the size and

 4    capacity of the VCU program, that Virginia had turned them

 5    down, that they didn't -- that he thought that a specialist had

 6    to diagnose, prescribe, and monitor the test results; is that

 7    right?  Are those the three things we consider?

 8              MS. MAUGHAN:  That's correct, Your Honor.

 9              THE COURT:  Okay.

10              MS. MAUGHAN:  I will note for the Court one thing

11    that is in the record regarding resources in --

12              THE COURT:  Sorry, I'm having trouble hearing.  I

13    don't know whether it's me or you.

14              MS. MAUGHAN:  I'm sorry, Your Honor.  I'll try to

15    stay --

16              THE COURT:  That's better.

17              MS. MAUGHAN:  One of the things that Dr. Sterling

18    from VCU testified about, and that is in the record at docket

19    number 225-5, page one, is that clinic slots never went

20    unfilled if they could help it.

21              THE COURT:  That's at the VCU clinic.

22              MS. MAUGHAN:  At the VCU clinic, correct.

23              THE COURT:  Was he talking about his clinic

24    generally, or is he talking about the clinic component of --

25    the component of the clinic that was used for the prisoners

1    when he testified in that capacity?

2          MS. MAUGHAN:  I believe he is discussing in general

3    the VCU clinic, not specifically to DOC inmates but in general

4    he says -- the question is, "And when did the VCU Health

5    Systems standards and protocols stop prioritizing patients?"

6    There is an objection to the form.  The witness answers, "Our

7    prioritization was also based on our capacity to treat

8    patients.  So we never had an unfilled clinic spot if we could

9    help it based on the patient list that we had."

10          THE COURT:  Is there anything in the record of what,

11   at the various times, was the capacity available at the VCU

12   clinic generally at large and what part of that capacity was

13   devoted to treatment -- to the treatment of the inmates?  Is

14   there anything in the record that shows that at given times?

15   Or at any time.  If you'd like to -- that's the last question I

16   have.  If you'd like to, you can study that while Ms. Blain is

17   talking --

18          MS. MAUGHAN:  That would be a better use of the

19   Court's time, and I will do that.  I appreciate that, Your

20   Honor.  Thank you.

21          THE COURT:  All right, Ms. Blain.

22          MS. BLAIN:  Yes, sir.  I'm generally not very

23   soft-spoken, so I don't -- I hope there won't be an issue.

24          THE COURT:  Okay.  We'll be duly warned.

25          MS. BLAIN:  Good morning.  I represent Dr. Wang.  Dr.

1    Wang has two counts in this complaint against him, count one

2    and count three.  With the Court's permission -- and within

3    each count, there are two time frames that the complaint

4    revolves around.  The first timeframe is from February of '15

5    until May of '18.  The second timeframe is May of '18 to

6    September of '18.

7              THE COURT:  So what happened in September is that he

8    moved to another facility.

9              MS. BLAIN:  Correct.  September 25th.

10             THE COURT:  What facility was he in originally?

11             MS. BLAIN:  He was at Green Rock beginning in October

12   of 2012.

13             THE COURT:  Right.

14             MS. BLAIN:  And then they moved him to, I want to say

15   Powhatan, but I may be incorrect about that, September 25th,

16   because they had a more sophisticated medical unit.

17             THE COURT:  That's where he died.

18             MS. BLAIN:  Yes, sir.  So what I want to talk about

19   first, subject to the Court's permission on that, is the period

20   of time from May of '18 to September of '18, because I think

21   that's the easier issue to deal with.

22             THE COURT:  Count one, your basis for summary

23   judgment is what?

24             MS. BLAIN:  Well, again, there are two different

25   issues.  Within count one, the two areas of complaint are

1   February of '15 to May of '18, and then that second timeframe,

2   May of '18 to September of '18.

3          THE COURT:  So your basis for summary judgment in the

4   period May of '18 to September of '18 is what?

5          MS. BLAIN:  Is that he -- that Dr. Wang provided Mr.

6   Pfaller with appropriate care, including pain medication,

7   during that entire time.  The plaintiff's complaint with regard

8   to the palliative care period, which is that time frame we're

9   talking about, is that Dr. Wang should have provided palliative

10  care in the form of basal pain control.

11         THE COURT:  There isn't any question from the record

12  that during the period May '18 through September '18, Mr.

13  Pfaller was provided pain medication of sorts; is that correct?

14         MS. BLAIN:  Yes.

15         THE COURT:  What was he given?

16         MS. BLAIN:  He was given Mobic, and he was given

17  Tylenol.

18         THE COURT:  Just regular strength?

19         MS. BLAIN:  No, sir.  It was --

20         THE COURT:  Was it Tylenol with codeine or Tylenol

21  arthritis?  You go to the grocery store, drugstore, you have

22  about 18 different kinds of Tylenol.  So what kind is it you're

23  talking about?

24         MS. BLAIN:  He was given a high volume dose.  So it

25  started at 400 and then was increased to 600, and then at the

1    same time --

2         THE COURT:  That's not big.  600 -- you can take 600

3    and function completely.  It doesn't -- you don't hurt too bad

4    with 600, but that's not a huge does.  You can take 4,000 a

5    day.  You can take a dose of Tylenol, you can take 4,000 a day

6    according to the label.  So all they gave him was 400 a day?

7         MS. BLAIN:  No, sir.  What they did was, initially he

8    was on 600 a day.  That was starting on June 8.  That was the

9    first time that he came in complaining of abdominal pain.

10        THE COURT:  So from May '18 to June -- what? -- 8, he

11   didn't get any pain medication; is that right?

12        MS. BLAIN:  He was on -- at some point in May, he was

13   on ibuprofen, 600 milligrams as needed.

14        THE COURT:  Wait a minute.  You all know exactly what

15   he took.

16        MS. BLAIN:  We don't, and here's why.  In order to

17   avoid him having to come to pain call, the pill call every day,

18   on the chart, the medication chart, which is in the record,

19   next to both the Mobic and the ibuprofen is a three letter KOP,

20   keep on person.

21        So these medications were given to Mr. Pfaller so

22   that he could take them as needed for his pain.  And so he

23   didn't have to say I need to go up to the pill window.

24        THE COURT:  Okay.  So from May '18 through what

25   period are you saying he didn't get medication?

1              MS. BLAIN:  Not May 18th.

2              THE COURT:  May of '18.

3              MS. BLAIN:  June 8th is the first time he came into

4    the clinic and said I'm having abdominal pain, and Dr. Wang

5    prescribed the ibuprofen, 600 milligrams every six to eight

6    hours as needed, and then ordered labs.  And those were -- 60

7    of those tabs were dispensed to him for self-administration on

8    June 8th.

9              THE COURT:  600 milligrams every six to eight hours

10   as needed; right?

11             MS. BLAIN:  Yes, sir.

12             THE COURT:  And on his person.

13             MS. BLAIN:  On his person.  He was given 60 tabs.

14             THE COURT:  Was it every refilled?

15             MS. BLAIN:  On June 15th, he was given 60 more tabs

16   for self-administration.

17             THE COURT:  So in a week, he took 60.

18             MS. BLAIN:  Presumably, yes, sir.

19             THE COURT:  You don't have any indication he was

20   hoarding them or selling them, do you?

21             MS. BLAIN:  None.  No evidence in the record of that.

22             THE COURT:  So that's a week; right?

23             MS. BLAIN:  Yes, sir.

24             THE COURT:  So he's taking roughly eight a day.

25             MS. BLAIN:  Yes, sir.

1          THE COURT:  Right?

2          MS. BLAIN:  I think that math works out.

3          THE COURT:  Okay.  If he is to take one 600-milligram

4   every six to eight hours, he's to be taking three a day.  A

5   doctor, knowing that he needed a refill, would know that he was

6   taking three times what the prescribed dose was.

7          MS. BLAIN:  Except that --

8          THE COURT:  Or he was giving it away.

9          MS. BLAIN:  Except when he comes in and renews or

10  asks for a refill, that information doesn't -- Dr. Wang doesn't

11  get that information.

12         THE COURT:  Well, that's his fault.  Any doctor who

13  is following a patient and doesn't look at what the patient is

14  consuming when he gives him another dose --

15         MS. BLAIN:  He doesn't give him another dose.  I

16  understand the Court's point.

17         THE COURT:  Who prescribes the next 600, somebody

18  else, another doctor?

19         MS. BLAIN:  The nurse fills the prescription that Dr.

20  Wang wrote on 6/8 that had refills on it.  So they get the

21  refill.

22         THE COURT:  But we're agreeing that he's taking three

23  times -- he's taking approximately three times the prescribed

24  dose during the period June 8 through June 15th.

25         MS. BLAIN:  Assuming, and it's not in the record,

1   assuming he's taking all 60 of those in a week, yes, sir.  I

2   think that would be the indication, but, again --

3           THE COURT:  From the fact that he got 60 more, you

4   can infer that he was out and he needed more, or you can infer

5   he was selling them or squirreling them away somewhere, but a

6   reasonable inference for somebody who is in pain is that

7   they're using them.  That's for a jury to decide.  Okay.  He

8   gets 60 tabs of ibuprofen on June 15th.  What else happens?

9           MS. BLAIN:  So then he's back to see Dr. Wang on

10  June 27th, and Dr. Wang observes that his abdomen is distended

11  and diagnoses ascites which is a fluid retention, and so he

12  puts him on three medications at that time designed to reduce

13  the fluid retention and reduce abdominal distention.

14          THE COURT:  What's that?

15          MS. BLAIN:  Lasix, spironolactone, and lactulose.

16          THE COURT:  That doesn't have anything to do with

17  pain except that it reduces the fluids, so it reduces the pain.

18          MS. BLAIN:  Correct.  That's exactly why he did it,

19  and he said I want to see you again in two weeks.

20          THE COURT:  What did he do about his pain medication?

21          MS. BLAIN:  He continued on the same pain medication,

22  and interestingly --

23          THE COURT:  What happened then?  The pain medication

24  was ibuprofen, 600 milligrams, six to eight hours.

25          MS. BLAIN:  Yes.  And Mr. Pfaller never -- did not

1   request a refill of the Tylenol --

2         THE COURT:  We haven't gotten him on Tylenol yet.

3         MS. BLAIN:  Sorry.

4         THE COURT:  I'm going from the time he got there on,

5   what happened?

6         MS. BLAIN:  Okay.

7         THE COURT:  So on 6/26, did Dr. Wang order a refill

8   of the ibuprofen?

9         MS. BLAIN:  6/27 there was still a refill in place

10   because the refills were for three months.  So from June 8th,

11   that would go to September 8th.

12         THE COURT:  But did he order any other pain

13   medication?

14         MS. BLAIN:  At that time, he did not.

15         THE COURT:  Next?  What pain medication did he get?

16         MS. BLAIN:  So Mr. Pfaller did not come back to

17   refill the ibuprofen ever.  So the next time that he saw Dr.

18   Wang was June 11th --

19         THE COURT:  Wait a minute.  June 11th?

20         MS. BLAIN:  Sorry, you're right.  July 11th.

21         THE COURT:  What did he do then?

22         MS. BLAIN:  At that time, I'm not sure why the

23   FibroScan had not been completed as Dr. Wang had ordered in

24   May, so he ordered that that be scheduled and completed as soon

25   as possible.

1          THE COURT:  In May, a FibroScan was ordered.

2          MS. BLAIN:  Yes, sir.

3          THE COURT:  And in July, it hadn't been accomplished.

4          MS. BLAIN:  Correct.

5          THE COURT:  What had Dr. Wang done between May and

6     July to find out why that hadn't happened?

7          MS. BLAIN:  So he ordered the FibroScan on May 14th

8     during a visit with Mr. Pfaller talking about the APRI and the

9     FIB-4 score.  On that same day, a VCU preregistration request

10    form was submitted to VCU asking that -- the appointment

11    request was for the hepatology clinic, and the boxes checked

12    were emergent and urgent, not next available.  And that was

13    submitted to VCU May 14th.

14         THE COURT:  VCU went to sleep on it?

15         MS. BLAIN:  Yes.

16         THE COURT:  When did Dr. Wang next check to see if

17    the FibroScan had been implemented given he had sent it over

18    there as emergent and urgent?

19         MS. BLAIN:  The next time there's any mention about

20    the FibroScan was July 11th.

21         THE COURT:  Two months later.

22         MS. BLAIN:  Yes, sir.

23         THE COURT:  By this time, they knew that he was quite

24    sick.

25         MS. BLAIN:  Yes, sir.  The FibroScan was completed on

1    July 17th, and he then had a very long series of treatment

2    thereafter.

3             THE COURT:  Any pain medication ordered at this point

4    in time?  He still has a refill left on the -- or two -- one I

5    guess it is, on the ibuprofen.  Any pain medication ordered as

6    of July 17th other than the ibuprofen, 600 milligrams every six

7    to eight hours as needed?

8             MS. BLAIN:  Not specifically pain medication although

9    he's continuing to take the medication to reduce the fluid

10   which will reduce the abdominal issue, yes, sir.

11            THE COURT:  I know that happens, but it takes time to

12   reduce the fluid.  In the meantime, pain continues.  What do we

13   know about that?

14            MS. BLAIN:  So he came in on July 24th, and he

15   indicated that he has abdominal pain mostly in the morning.

16   So, at that time, Dr. Wang made several orders.  One was

17   oncology.  Two was hepatology for a biopsy.  Three was Mobic.

18   That's a pain medication.  7.5 milligrams twice a day on top of

19   the Tylenol -- I mean the ibuprofen, and Phenergan for the

20   nausea.

21            THE COURT:  All right.

22            MS. BLAIN:  He also scheduled an appointment for Mr.

23   Pfaller with Danville Gastroenterology, and on July 27th, Mr.

24   Pfaller received 60 doses of the Mobic.

25            THE COURT:  When did he see him again; the 21st?

1           MS. BLAIN:  24th.  He saw him on the 11th and then

2   again on the 24th.

3           THE COURT:  So the prescription he gave on the 24th

4   was filled on the 27th.

5           MS. BLAIN:  Yes, sir.

6           THE COURT:  All right.  Any other pain medications?

7           MS. BLAIN:  Yes.  He was then admitted, so he was

8   admitted to the medical unit for observation on August 28th and

9   remained there until September the 5th, and the medical

10  administration records indicate that they supplemented the

11  keep-on-person medication with additional doses of Mobic and

12  ibuprofen as needed for pain.  So when he would complain of

13  pain, which he did on two occasions, additional doses of either

14  Mobic or ibuprofen were given.

15          THE COURT:  How many were given?  Additional doses

16  you say.

17          MS. BLAIN:  Sure.  On August 28th at 6:00 a.m., he

18  received a dose of Mobic, 7.5 milligrams.  On September 1st,

19  Dr. Wang added ibuprofen, 400 milligrams twice a day while he

20  was in the medical unit.

21          THE COURT:  So he wasn't taking his on-person

22  ibuprofen while he was in the medical unit.

23          MS. BLAIN:  There's no indication one way or the

24  other.  I can't answer that question.  So September 1st, he

25  received both Mobic and ibuprofen in the morning, and then

1  until -- do you want me to list everything?

2          THE COURT:  Is it daily?  Can you say daily from

3  September -- August 29th to September 5th, was he receiving his

4  doses daily?

5          MS. BLAIN:  From September 1st through September 5th,

6  he was receiving Mobic and two doses of the ibuprofen every

7  day.

8          THE COURT:  So daily he got that.

9          MS. BLAIN:  He was then -- according to the records,

10  wanted to go back to his bunk, did not want to remain in

11  medical.  So they allowed him to go back to his bunk again with

12  the keep-on-person medication, and then on September 12 --

13          THE COURT:  Keep-on-person medication, was that just

14  the ibuprofen, or was that the ibuprofen and the Mobic?

15          MS. BLAIN:  Let me look.  He -- so he was given 60

16  doses of Mobic on July 27th.

17          THE COURT:  Yeah.

18          MS. BLAIN:  Did not ask for a refill on that and then

19  was given 60 doses of Mobic on September 21st.

20          THE COURT:  Went back to his unit the 6th of

21  September or the 5th?

22          MS. BLAIN:  The 5th at the end of the day, and

23  there's no indication -- there's nothing in the record to

24  indicate that he came into medical -- and let me just

25  double-check that before I utter these words out loud.

1          So between September 5th and September 21st, he was

2     in medical for one day preparing for a CT scan, but other than

3     that, there is no indication that he requested additional pain

4     medication, came to the pill window, asked to see Dr. Wang, and

5     when he came back, they would do an assessment on him when he

6     came back from getting his CT scan and assessed him, and

7     there's no indication that he was asking for pain medication at

8     that time.

9          Then, on September 21st, he was not eating, so they

10    admitted him to medical.  He did not want to stay in medical,

11    but they told him he had to.  And he was -- that's when he was

12    provided the Mobic, and some Boost was added because he was

13    having trouble eating.  It was also at that time that they were

14    arranging the transfer.

15              THE COURT:  And he transferred what day?

16              MS. BLAIN:  September 25th.

17              THE COURT:  Is there anything in the record that

18    indicates at any time Dr. Wang considered basal pain medication

19    for Mr. Pfaller?

20              MS. BLAIN:  No.  He did not because --

21              THE COURT:  Is there anything in the record about

22    whether the medical unit or the doctors at the Green Rock

23    facility were authorized to prescribe basal pain medication?

24              MS. BLAIN:  I should know the answer to that, and, as

25    I stand here, I do not.

1          THE COURT:  Is there anything in the record about

2    whether there was basal pain medication on hand at Green Rock

3    at any time from May 18 through September 28?

4          MS. BLAIN:  It is my understanding, and I want to go

5    back and check this, that morphine was not in their formulary,

6    and that's the basal pain control, but I want to double-check

7    that.

8          THE COURT:  Fentanyl is not morphine.

9          MS. BLAIN:  It's still the controlled substance.

10   That's the issue.

11         THE COURT:  So they didn't have it available at all?

12         MS. BLAIN:  I do not believe they had -- but, again,

13   I want to check that.  I would be speaking out of turn.

14         THE COURT:  I want to know that, two reasons.  I have

15   on my desk an order dismissing Armor, and it was, in part,

16   based on representation they had it but didn't use it.  Now you

17   tell me they couldn't do it.

18         No, that's at the other facility.  Sorry.  That's at

19   the other facility.  Forget it.  But I do need to know, did

20   they even have it.  If it's not in the formulary --

21         MS. BLAIN:  I'll find that out today, sir.

22         THE COURT:  Then what's the effect of having a man

23   who is having that kind of pain in a facility that does not

24   offer basal pain medication?  What's the meaning of that

25   according to the record in this case?

1        MS. BLAIN:  With all due respect, Judge, I don't
2    believe that the record in this case, including the medical
3    records, substantiate a finding that he was in that level of
4    pain.  I think when he was in pain --
5        THE COURT:  Excuse me.  It does, certainly.  That
6    level of pain is that level which prompted the medication that
7    he got.
8        MS. BLAIN:  Sure, but the point I'm making is that
9    the medication was controlling the pain, and the way we know
10   that is when he was in the medical unit from August 28th until
11   September 5th, he was assessed regularly, and on all but two of
12   the entries, no distress, talking on the phone, doesn't want
13   his vital signs taken, etcetera.  There was no indication that
14   the pain medication that he was prescribed was not controlling
15   the pain he was experiencing.
16       THE COURT:  During this period of time, as I
17   understand your position, from the period May 1, 2018 to
18   September 28, 2018, he made no request for additional pain
19   medication other than that which he had been prescribed by Dr.
20   Wang.
21       MS. BLAIN:  Correct.  And, again -- can I --
22       THE COURT:  And there's no indication in the record
23   that he complained of pain except that which you have told me
24   when he said he was complaining of abdominal pain on June 8th
25   and he got the ibuprofen, July 24th when he got the Mobic.

1           MS. BLAIN:  Yes, sir, and then two of the assessments

2    by the nurses, he told them he was having abdominal pain, and

3    at least one of them, Nurse Betterton says you have the Mobic,

4    you need to take the Mobic.  And from that point forward, there

5    were no other indications in the record that there was a

6    complaint until September 24th, and, at that point, they were

7    making arrangements for him to be transferred.

8           THE COURT:  What did they do on September 24th?

9           MS. BLAIN:  At that point, his abdomen was distended,

10   and he said he was having trouble breathing, so they put him --

11   he was on oxygen, and they counseled him about using the oxygen

12   and that would make him more comfortable.

13          THE COURT:  They didn't give him any pain medication?

14   He complained of pain, and they didn't do anything about it,

15   or -- except breathe deeply?

16          MS. BLAIN:  And to take the Mobic which he had on his

17   person.

18          THE COURT:  That's what it says.  They told him to

19   take Mobic.

20          MS. BLAIN:  And then they gave him -- the next day, I

21   think they gave him Mobic as he left, but let me check.  Let me

22   check one more spot, Judge.  So at 7:30 on September 24th,

23   shift assessment, no complaint, offender is on four liters of

24   oxygen.  September 24th, 2100, offender is asleep, did not wake

25   for vitals.  September 4th at 2335, they did the vitals.

1          THE COURT:  You are talking about September 25th, I

2     thought.

3          MS. BLAIN:  So that's the 24th.  Then the 25th, he

4     said I'm unable to get comfortable, O2 sats are -- they give --

5     they needed to get his O2 up to be able to transfer him, and

6     that's what they were concerned with.  Two hours later, no

7     distress at this time.

8          THE COURT:  So they didn't give him any pain even

9     though he was complaining of pain on September 24th.

10          MS. BLAIN:  So he had the pain medication on him, and

11     that's all I can tell you.  He was -- he kept the

12     keep-on-person medication.

13          THE COURT:  While he's in the medical unit?

14          MS. BLAIN:  Yes, sir.  He also didn't want to stay in

15     medical, but they said you have to.

16          THE COURT:  Okay.

17          MS. BLAIN:  That was so they could monitor him.

18          THE COURT:  So then they transferred him.

19          MS. BLAIN:  So then they transferred him.

20          THE COURT:  Now, what's the theory, what's the legal

21     argument here?

22          MS. BLAIN:  So the plaintiff's only complaint with

23     regard to that period of time is the failure to provide basal

24     pain control.

25          THE COURT:  The Eighth Amendment claim.

```
 1              MS. BLAIN:  Yes, sir.  It's actually both, the Eighth
 2    and the negligence claim.  That's what they're claiming.
 3              THE COURT:  Are you arguing both at the same time or
 4    different?  I need to know what I'm thinking about.  I thought
 5    you were just arguing count one, the period May 2018 to
 6    September 2018.
 7              MS. BLAIN:  Yes, sir.
 8              THE COURT:  Or are you arguing both?  I don't care.
 9    I just need to know.
10              MS. BLAIN:  I'm going to argue the sovereign immunity
11    eventually.
12              THE COURT:  The only arguments you've got on count
13    three is the sovereign immunity; right?
14              MS. BLAIN:  Not for these set of facts, no, sir, but
15    we'll get --
16              THE COURT:  All right.
17              MS. BLAIN:  I don't want to be short-circuited.
18    Here's the issue with regard to this claim for deliberate
19    indifference.  Did he provide -- did Dr. Wang provide grossly
20    inadequate treatment with regard to pain control during that
21    time frame, and the answer is no, he did not.  He provided pain
22    medication, he assessed his pain, he responded to the pain,
23    and, furthermore, there's nothing in Dr. Matherly's note --
24    that's the note, remember, that came in on September 5th from
25    MCV that had the list of things that Dr. Wang needed to
```

1   accomplish for Mr. Pfaller.  Nothing on there about pain

2   management, nothing about put him on basal pain control,

3   nothing about palliative care.

4           THE COURT:  What's that doctor's name?

5           MS. BLAIN:  Matherly, M-a-t-h-e-r-l-y.  So from Dr.

6   Wang's perspective with regard to deliberate indifference, he

7   provided abundant care during that time frame.  He followed the

8   recommendations of the consultants.  There wasn't a specific

9   order for basal pain control.

10          So I don't see how he would not be entitled to

11  summary judgment because his treatment was not so grossly

12  incompetent, inadequate so as to shock the conscience.  He

13  provided pain medication, and when the pain -- when he

14  complained of additional pain, he provided additional treatment

15  to address that pain.

16          THE COURT:  All right.  That takes care of the Eighth

17  Amendment claim.

18          MS. BLAIN:  I think on the Eighth Amendment claim

19  there is no deliberate indifference, so we really shouldn't

20  even get to the qualified immunity issue, but even if you get

21  to that, I do believe that there is an established right to be

22  provided care for pain.

23          THE COURT:  Yes.

24          MS. BLAIN:  I think that's right.  No question about

25  it.

1              THE COURT:  We have entire facilities that do nothing
2     but that.  They're called what?
3              MS. BLAIN:  Pain doctors.
4              THE COURT:  Hospice.  That's what we do for people at
5     the end of their lives.  We keep them comfortable so their
6     passing can be eased.  It's undeniable that everybody is
7     entitled to that nowadays.
8              MS. BLAIN:  I'm not arguing that point.  I would be
9     silly to argue that point, but the question is while he was
10    under Dr. Wang's care, did he take appropriate and lawful
11    conduct for that pain, and the evidence in the record is that
12    he did.
13             THE COURT:  All right.  Same argument applies --
14    since it's clearly established, the same argument applies to
15    both the deliberate indifference Eighth Amendment claim and to
16    the qualified immunity component, the objective component;
17    right?
18             MS. BLAIN:  I think that's right, yes, sir.
19             THE COURT:  All right.  So that takes care of the
20    Eighth Amendment period for the -- time period May 18th through
21    September 18th; right?
22             MS. BLAIN:  Yes, sir.
23             THE COURT:  Let me hear from Mr. LePierre on that.
24    That way we'll keep it all together.
25             You don't quarrel with the notion that what she said

1    was given, as she recited it, was given; is that right?

2    There's no dispute over that.

3            MR. LePIERRE:  No, Your Honor.  Your Honor, I do

4    have -- I don't entirely disagree with her idea of the

5    timeline, Your Honor, except I believe there's one significant

6    event that she did not address.

7            Mr. Pfaller was known to be sick from early May of

8    2018.  They were aware of that.  They did begin with Tylenol

9    and eventually, on July 27th, Mobic.  On August --

10           THE COURT:  Wait a minute.

11           MS. BLAIN:  Can you speak up a little bit?

12           MR. LePIERRE:  Of course.

13           THE COURT:  She never mentioned that he got Tylenol

14   on a particular date, at least according to my notes.  She did

15   say that he got Mobic and Tylenol, but I didn't see in the

16   specific recitations, I didn't hear any date that the Tylenol

17   actually showed up.

18           MR. LePIERRE:  I apologize, Your Honor.  We're -- we

19   both did the same thing.  It's ibuprofen, not Tylenol.  I

20   apologize, Your Honor.

21           THE COURT:  There's a big difference because

22   ibuprofen is an anti-inflammatory and reduces pain by that

23   mechanism.  Tylenol is a direct pain medication.

24           MR. LePIERRE:  Yes, Your Honor.

25           THE COURT:  Are you in agreement that it was

1    ibuprofen, not Tylenol, Ms. Blain?  Yes, okay, she is.  All

2    right, go right ahead.  There was a date when that she didn't

3    mention?  I missed your statement.

4              MR. LePIERRE:  Yes, Your Honor.  On August 23rd, Dr.

5    Matherly diagnosed Mr. Pfaller with stage 4B liver cancer.

6    Prior to that point, that diagnosis had not been made.  And in

7    the medical notes, the electronic medical notes from that

8    diagnosis which was transferred to the VDOC, there was a

9    recommendation of palliative care and the note that Mr. Pfaller

10   had less than six months to live.

11             THE COURT:  Is there agreement in the record as to

12   what is palliative care?

13             MR. LePIERRE:  That, Your Honor, is where the dispute

14   lies.

15             THE COURT:  What's your position, what's her

16   position?

17             MR. LePIERRE:  Dr. Schamber is of the opinion that

18   with palliative care, you are required to provide basal pain

19   control that provides a baseline of pain relief to make the

20   individual comfortable.  It addresses pain, shortness of

21   breath, and a few other issues.

22             THE COURT:  Wait a minute.  Must give basal pain

23   medication that does what?

24             MR. LePIERRE:  That, Your Honor, provides a baseline

25   of pain control.  It is longer-term pain control.  That's

1  something like the fentanyl patch or a morphine drip.

2  Something along the lines of that that would provide just a

3  constant and steady level of pain control.

4           THE COURT:  It's either morphine or fentanyl; is that

5  what it is?

6           MR. LePIERRE:  Yes.  The choice of what kind of basal

7  pain control, that would obviously be up to the discretion of

8  the doctor but some kind of basal pain control.

9           THE COURT:  I'm trying to ask you something different

10  right now.  What is the universe of basal pain control

11  medication?  You mentioned morphine and fentanyl.  Is there

12  different -- are there different kinds in addition to that?

13           MR. LePIERRE:  Your Honor, there is --

14           THE COURT:  According to the record.

15           MR. LePIERRE:  Yes, Your Honor.  I believe at one

16  point a third kind of a pump is mentioned that I just don't

17  recall, and nobody was really thinking that was something that

18  was going to be used.

19           THE COURT:  Basically, then, what we're looking at is

20  that doctor, according to what you are saying, recommended as

21  to palliative care and as defined by Dr. Schamber, the

22  palliative care is pain medication that provides a baseline of

23  long-term pain control, and that is either morphine or

24  fentanyl.

25           MR. LePIERRE:  Yes, Your Honor.  And then PRN pain

1    medication.  That's pain medication as needed such as Mobic or

2    ibuprofen is given on top of basal pain control to address

3    spikes of pain or times when the pain increases above the basal

4    pain control level.

5              THE COURT:  All right.  Now, that's Mobic and what?

6              MR. LePIERRE:  For the as-needed, you can use Mobic,

7    the Norco that was eventually given, Tylenol, ibuprofen.  Any

8    as-needed pain medication could be supplementing the basal pain

9    control.

10             THE COURT:  All right.  And do they have a doctor

11   that says that's not the definition of palliative care?

12             MR. LePIERRE:  Yes, Your Honor.  Their medical expert

13   opines that basal pain control is not necessarily a part.

14             THE COURT:  Who is that?

15             MR. LePIERRE:  Your Honor --

16             THE COURT:  Who is that?

17             MR. LePIERRE:  I believe it's Dr. Joshua.

18             THE COURT:  Is that your man?  I need to know, what

19   is this doctor X, what does doctor X say?

20             MR. LePIERRE:  I'm sorry, Your Honor, it's Dr.

21   Alsina.

22             THE COURT:  How do you spell that?

23             MR. LePIERRE:  A-l-s-i-n-a.

24             THE COURT:  A-l-s-i-n-a, and what does he say about

25   palliative care?

1          MR. LePIERRE:  He says, Your Honor, that basal pain

2    control is not necessary and that Dr. Wang's treatment was

3    appropriate.

4          THE COURT:  Is he saying it's not necessary because

5    of the particular situation of Mr. Pfaller, or was he saying

6    that palliative care does not include basal pain medication

7    ever?

8          MR. LePIERRE:  Your Honor, he was saying there's no

9    universal requirement for it, and, in his opinion, Danny

10   Pfaller did not require basal pain control.

11         THE COURT:  All right.  So there's a dispute among

12   the experts as to whether or not palliative care included pain

13   control.

14         MR. LePIERRE:  Yes, Your Honor.

15         THE COURT:  I mean basal pain control.

16         MR. LePIERRE:  Yes, Your Honor.

17         THE COURT:  And is there a dispute among the experts

18   as to whether Mr. Pfaller should have been given basal pain

19   control given what was in his medical records?

20         MR. LePIERRE:  Yes, Your Honor.

21         THE COURT:  Dr. Alsina says Pfaller should not have

22   been -- did not need to be given basal, and Schamber says yes.

23         MR. LePIERRE:  Correct, Your Honor.

24         THE COURT:  In his particular case.

25         MR. LePIERRE:  Correct, Your Honor.

1          THE COURT:  All right.  Go ahead.

2          MR. LePIERRE:  I believe, Your Honor, as we just

3    discussed, there is ample evidence from which a reasonable jury

4    could infer that Mr. Pfaller was in pain from May 1st until he

5    was transferred out of Green Rock into Deep Meadow

6    Correctional, the Powhatan facility.

7          Your Honor, he was prescribed, as you noted,

8    ibuprofen and was taking it 1.3 times the recommended dose.  He

9    continued on Mobic and ibuprofen, and when he asked for more

10   and complained of pain, he was told to take his Mobic.

11         A reasonable jury could infer that he's not going to

12   ask for a different medication or anything else when he's told,

13   when he complains of pain, to just take the medication he's

14   given.

15         There is a recommendation from the oncologist at VCU,

16   Dr. Matherly, that Mr. Pfaller be placed on palliative care.

17   That recommendation came after he was already on Mobic and on

18   ibuprofen that he was aware of, so there's an inference from

19   that that there was an understanding that Mr. Pfaller needed

20   more or additional basal pain control Dr. Schamber indicates is

21   appropriate.

22         Based on that, Your Honor, I believe there is a

23   dispute, a genuine dispute as to material fact as to whether

24   Dr. Wang actually provided palliative care to Mr. Pfaller after

25   his diagnosis with stage 4B liver cancer.

```
 1                THE COURT:  All right.

 2                MR. LePIERRE:  I believe, Your Honor, obviously there

 3   is a clearly established right to pain control.

 4                THE COURT:  I don't think anybody contests that.

 5   We'll take a 20-minute recess.

 6                (Recess taken.)

 7                THE COURT:  All right.

 8                MS. BLAIN:  Judge, I just have one -- more than one,

 9   but initially I talked with Mr. LePierre during the break, and

10   he and I agreed that with regard to one or two dates that he

11   provided the Court, he was incorrect, and he agreed that I

12   could correct those with the Court.

13                THE COURT:  All right.

14                MS. BLAIN:  Specifically, Mr. Pfaller did not see Dr.

15   Matherly until September 4th.

16                THE COURT:  Instead of August 23rd.

17                MS. BLAIN:  Yes, sir.  And what happened is when a

18   patient -- and this is in the record --

19                THE COURT:  Is that when he was diagnosed with stage

20   four liver cancer and there was a recommendation of palliative

21   care and said he had less than six months to live?  Is that

22   what we're talking about?

23                MS. BLAIN:  Yes, and what's interesting, the

24   recommendation was medical oncology or palliative care.  So in

25   the -- I'll tell you what has caused an issue in this case.
```

1            THE COURT:  What does that mean?

2            MS. BLAIN:  That's what I want to talk about.

3            THE COURT:  What does medical oncology mean?

4            MS. BLAIN:  Refer him to a medical oncologist at MCV

5    which was done.  But the issue is, when a patient from the

6    Department of Corrections goes out, they take with them this

7    handwritten form, and the doctor writes in that, and that's the

8    form that comes back with the patient.  And that's the form you

9    asked the question about, did Dr. Wang do everything that's

10   listed on that handwritten form, and the answer is that he did.

11           There's nothing about palliative care on that form.

12   That form says get him a CT scan, get these additional tests --

13           THE COURT:  Where did Matherly recommend palliative

14   care or medical oncology?

15           MS. BLAIN:  So then the next day, MCV prepares a

16   typewritten note, and that is then submitted, and it's the

17   typewritten note that said medical oncology or palliative care.

18           THE COURT:  That comes to the Bureau of Prisons, too.

19           MS. BLAIN:  It does, but, at that point, Dr. Wang had

20   already ordered all of the medical oncology recommendations

21   that had been made, number one.  Number two, it's now

22   September 5th.  He's been in the medical unit for about seven

23   days with only two complaints of pain that we find.  He says I

24   want to go back to the general population, which he does, and

25   from September 5th until September 21st, he never comes to

1    medical, never contacts medical, never indicates that he's in

2    pain.

3             So at that point, why would -- let's say -- Dr.

4    Schamber says palliative care is a buzz word for basal pain

5    control, although it doesn't say that anywhere in the records,

6    nor does Dr. Matherly recommend basal pain control.  Dr. Wang

7    has a patient who is not coming to him saying my pain

8    medication isn't covering the pain.  So why would it be

9    deliberately indifferent to a serious medical need not to give

10   the additional pain medication if there are no complaints of

11   pain?

12            The dispute that's created between Dr. Alsina and Dr.

13   Schamber is a negligence dispute.  That's a standard of care

14   issue.  That's not a deliberate indifference analysis.

15            THE COURT:  It's relevant to the deliberate

16   indifference analysis because I was asking about what the

17   definition is, what the definition of palliative care is.

18            MS. BLAIN:  What's interesting about that is I

19   discussed that with Dr. Schamber at some length in his

20   deposition, and this is in the record.  I asked Dr. Schamber

21   specifically, what do you mean by palliative care.  What is it

22   that Dr. Wang was supposed to do that he didn't do, and

23   eventually he said --

24            THE COURT:  Did anybody object to the form of that

25   question?  You asked two different questions in the same

1   question.  Which one was he answering?

2           MS. BLAIN:  I don't remember whether anybody

3   objected, but I got an answer to the question, and it was he

4   needed to have a palliative care mindset.  I said what does

5   that mean, like discussing with the patient where he is, what

6   he needs, and he said basically, yes, a palliative care

7   mindset.

8           THE COURT:  That's one of the things he said.  He

9   also said other things, though, didn't he?  Your reply to all

10  this is that the circumstances of Pfaller's condition with no

11  reported pain did not call for basal pain.

12          MS. BLAIN:  And also establishes that Dr. Wang was

13  not deliberately indifferent to his serious medical need.  The

14  only area that the plaintiff complains of is the pain

15  management, not any of the other management done by Dr. Wang,

16  and the medical records establish without contradiction that he

17  was not complaining of pain from September 5th until the

18  time -- except on two occasions, and that's when they put him

19  in the medical unit to manage him.

20          THE COURT:  All right.  Do you want to get on to the

21  other time period?

22          MS. BLAIN:  Yes, sir.  Would you like to go right --

23  do you want to talk about sovereign immunity for that same time

24  period since we're on that set of facts?  Would that make more

25  sense, or not?

```
 1              THE COURT:  Count three, the only basis for summary
 2     judgment on count three is sovereign immunity.
 3              MS. BLAIN:  Correct.
 4              THE COURT:  All right.  And the bottom line, I think
 5     he said the only issue is the factor of control.
 6              MS. BLAIN:  Here's what's interesting.
 7              THE COURT:  Discretion; is that right, Mr. LePierre?
 8              MR. LePIERRE:  Your Honor, we did note that we
 9     disagree with the state interest part of it, but we know that
10     Your Honor did, in the motion to dismiss, say the issue of
11     discretion is the only one that's actually still open.
12              THE COURT:  So there isn't any question, it seems to
13     me, from the record that he had discretion as to this kind of
14     treatment.
15              MS. BLAIN:  Yes, sir.
16              THE COURT:  That's what it seems to me.  It's up to
17     him to show me why he didn't.  You agree that if there's no
18     discretion, then you don't get sovereign immunity?
19              MS. BLAIN:  I don't agree with that.
20              THE COURT:  Why am I doing it then?  That analysis is
21     the most idiotic analysis.  It's not the most but one of the
22     most difficult, convoluted analyses to apply in the law, and
23     it's virtually unrelated to what goes on in the real world.
24     But that's the test we have to apply.
25              MS. BLAIN:  I can't help it what the Virginia --
```

1    that's what they say the test is.  The problem is, as they

2    apply it, there's this sliding scale between control and

3    discretion.  There are some cases --

4             THE COURT:  But if, on the sliding scale, there is

5    total control by the state, then there is no immunity.  If

6    there is total discretion, there is immunity; is that basically

7    right?

8             MS. BLAIN:  Those are the two ends of the pole, but

9    in some cases they have said -- there's an interesting case,

10   *Gargiulo v. Ohar,* where a fellow was doing directed research

11   based on protocols provided to the fellow, and, as they say,

12   she was required to obey state-established rules, employ

13   state-prescribed methods, follow state standardized procedures.

14   There was a mere measure of discretion, and they granted

15   sovereign immunity in that case.

16            THE COURT:  Well, my view, if there's a discretion,

17   unless it's clear one way or the other -- I mean if there's an

18   issue as to whether it's control or discretion, it's a fact

19   question.  How else can you make that decision?  I'm making

20   decisions about it.  I decide that as a matter of fact or law?

21            MS. BLAIN:  According to the Supreme Court, it's a

22   matter of law, the Supreme Court of Virginia, that that issue

23   of sovereign immunity is a question of law.

24            THE COURT:  How about the facts in between?

25   Qualified immunity is a matter of law, but we often submit the

1    underlying issues to the jury for trial.

2              MS. BLAIN:  I agree, but in the context of the facts

3    of this case --

4              THE COURT:  No.  To decide sovereign immunity, to

5    decide whether -- the issue that we're facing here for this

6    period, and maybe for the other period as I understand it, is

7    that the -- whether there was control by the state or he had

8    discretion.

9              Now, who decides whether or not there is control or

10   not?  How does that -- who decides that under Virginia law?

11   Control or discretion, who decides that?

12             MS. BLAIN:  According to these various cases, those

13   questions are decided by the Court, but there isn't any

14   dispute, it doesn't seem to me, in this case that Dr. Wang had

15   the discretion to order various types of pain medication

16   depending on what he thought his patient needed.

17             THE COURT:  What case holds that the Court decides

18   the underlying question of whether there's control or

19   discretion?  Can you help me with that?

20             MS. BLAIN:  Well, *James v. Jane*, the Court decided,

21   *Gargiulo v. Ohar*.  There's another one.  In *Coppage v. Mann* the

22   Court decided it, and in *Lohr* --

23             THE COURT:  Did they discuss -- is there a case that

24   discusses who decides it?

25             MS. BLAIN:  I read each of those cases, and in each

1    of them, the Court decided it.  I don't remember focusing on --

2    because I didn't think it was an issue in this case, I don't

3    remember focusing on whether there was a factual dispute in

4    those cases and it was submitted to a jury.  It did not appear

5    that that's what happened, that it was a court decided.  And,

6    again, it didn't appear to me either that the facts were in

7    dispute.  It was here are the facts --

8              THE COURT:  And you just say here he had discretion,

9    and you win.

10             MS. BLAIN:  Correct.

11             THE COURT:  All right.

12             MS. BLAIN:  The next time period that we are looking

13   to --

14             THE COURT:  Wait a minute.  Mr. LePierre, if you'll

15   stand up and say it from where you are, what is your

16   argument -- see if we can hear you -- on whether he had

17   discretion or did not for the time period in the pain

18   management?

19             MR. LePIERRE:  Our position, Your Honor, is that he

20   had no discretion whether or not to provide palliative care.

21   He had discretion if he had started to do so.  And there's a

22   factual dispute as to whether or not the pain medication he did

23   provide was palliative care.  However, we don't dispute that

24   there's no policy from the VDOC that directly dictates what his

25   actions have to be.

```
1              THE COURT:  So you say he had no discretion whether
2    to provide palliative care or not.
3              MR. LePIERRE:  Correct, Your Honor.
4              THE COURT:  That's what the issue is.
5              MR. LePIERRE:  Correct, Your Honor.
6              THE COURT:  All right, thank you.  That's it.  Let's
7    go on.
8              MS. BLAIN:  Do you want to talk any more about that?
9              THE COURT:  No.
10             MS. BLAIN:  I had a great argument lined up.  The
11   next timeframe --
12             THE COURT:  I hate to cut off a great argument.
13             MS. BLAIN:  You probably would have disagreed it was
14   great anyway.  That's okay.
15             The next time we're talking about is from February of
16   2015 to April of 2018.
17             THE COURT:  That's count one.
18             MS. BLAIN:  On count one.  And the question there is
19   whether Dr. Wang was deliberately indifferent to Mr. Pfaller's
20   hepatitis C by virtue of improper screening and monitoring and
21   grossly inadequate treatment.  That's the plaintiff's claim.
22             THE COURT:  And what?  Grossly what?
23             MS. BLAIN:  Grossly inadequate treatment.
24             THE COURT:  So the improper screening and monitoring,
25   is that the two instances when he made the wrong call on
```

1    whether Mr. Pfaller was eligible for further examination?

2              MS. BLAIN:  Correct.

3              THE COURT:  What's the dates of those?

4              MS. BLAIN:  You would think I would have that

5    memorized by now.

6              MR. FISHER:  October 2015 --

7              MS. BLAIN:  I got it.  October 20, 2015 -- that's

8    when the FIB-4 was 1.48 -- and then July 12th, 2017, when the

9    FIB-4 was 1.46.

10             THE COURT:  And then the grossly inadequate treatment

11   argument, what is that?

12             MS. BLAIN:  That means that despite the VDOC policy,

13   Dr. Wang should have referred Mr. Pfaller for a course of DAAs

14   simply by virtue of his diagnosis.  So it was improper to put

15   him in the monitoring category because he had chronic hepatitis

16   C.  And, Your Honor, for purposes of Dr. Wang on that point, I

17   understood when we talked earlier, the Court referred to that

18   as the Nazi defense, that is I was just following orders.

19             THE COURT:  Probably better if we wouldn't use that

20   term.

21             MS. BLAIN:  I know, but --

22             THE COURT:  But that's what he's doing.  He's saying

23   I'm following orders.  I'm doing what I'm told under the

24   policy.

25             MS. BLAIN:  And I think it's important to understand

1    that within the Virginia Department of Corrections, when

2    someone is going to need additional treatment, referral,

3    whatever, all of that has to go to the central office for

4    approval and then ordering.  So Dr. Wang doesn't have the

5    ability to say I don't care what your policy is, I want this

6    guy to be seen to have -- to get DAA.

7            THE COURT:  What's the evidence in the record on

8    that?

9            MS. BLAIN:  It's in both Dr. Wang's deposition

10   transcript and Dr. Amonette.  Dr. Amonette said if he received

11   a referral for DAAs that didn't meet the requirements, he would

12   not have approved it.  So Dr. Wang was doing exactly what he

13   was instructed to do which is see him in the chronic disease

14   clinic every six months and do his blood test every six to

15   12 months, and there's no dispute that he did that.

16           So what we're left with is there are two occasions

17   when Dr. Wang had reports of a FIB-4 in excess of 1.45 but less

18   than 1.5, and Dr. Wang's testimony is that he believed that the

19   cutoff was 1.5.  And I know the Court has indicated that the

20   jury could infer that he didn't refer him because he didn't

21   care.

22           THE COURT:  That's his argument.

23           MS. BLAIN:  Correct, but what's interesting is that

24   in May of 2018 -- that's when it was then over 1.5 -- Dr. Wang

25   referred him immediately.  So I don't think a cynical argument

1    can be made or a cynical motive implied to Dr. Wang when he

2    referred him the minute it reached the level that he believed

3    was appropriate.

4            And what else is interesting is that until June 8th

5    of 2018, and there is no dispute on this, Mr. Pfaller had no

6    symptoms of liver decompensation or synthetic liver dysfunction

7    meaning no indication that he had cirrhosis.  And Dr. Schamber

8    agrees with that, the plaintiff's expert.

9            THE COURT:  Until when?

10           MS. BLAIN:  June 8th, 2018.

11           THE COURT:  No indication in the blood work.

12           MS. BLAIN:  No indication at any visit, because Dr.

13   Wang --

14           THE COURT:  He didn't have any scans by then.  In

15   other words, what does it mean to say there's no indication?

16           MS. BLAIN:  You can have physical symptoms.  You

17   might have pain, you might have bloating, you might have some

18   voiding issues, and --

19           THE COURT:  How about the blood work?  Does that

20   include blood work?

21           MS. BLAIN:  Yes, sir.  So that's why Dr. Wang was

22   seeing him every six months, because, again, under the policy,

23   if the patient has normal blood work but has other signs or

24   symptoms of issues with his liver, then Dr. Wang had the

25   authority to refer him --

```
1              THE COURT:  Tell me something.  FIB-4 score was high
2    on October 20th, 2015.  What significance is it that it wasn't
3    until June 8th, 2018, that he had physical symptoms?  Because
4    the issue is had he been referred to get the scan, he would
5    have gotten the treatment.  That's what his doctor says.  Had
6    he been referred to get the scan when he should have, in 2015,
7    October 20th, as I understand, his doctor says he would have
8    gotten the treatment, the DAA treatment.
9              MS. BLAIN:  I went back and looked at that issue last
10   night.  That is not the testimony because I asked the question
11   what would a FibroScan have shown in October of 2015, would it
12   have put him at an F3 or F4 such that he would be in line for
13   treatment, and the doctors were unable to answer that question.
14   And --
15             THE COURT:  The report answers it, doesn't it?  I
16   think the report answers it.  He's not bound by what he said in
17   his testimony.  He can say whatever is in his report at trial,
18   and that's a fact issue.
19             MS. BLAIN:  Yes, sir.
20             THE COURT:  And it depends on whether or not you ask
21   the precise question that would impeach his report as to
22   whether or not the report is actually impeached and he's at
23   odds with it.
24             MS. BLAIN:  True.
25             THE COURT:  I'm not at the point where I can do that
```

1    at this time.

2              MS. BLAIN:  Yes, sir.

3              THE COURT:  If, again, he had a problem, a mistake,

4    Dr. Wang had a mistake on July 12th, 2017, and as I understand

5    the doctor's report, is that if he had gotten his scan, he

6    would have been able to get the medications because he was

7    sick.

8              So if that's the testimony, what significance is it

9    that until -- it wasn't until June 8th that he had physical

10   symptoms or the blood work didn't indicate liver decomposition?

11   What do I make of all that in this analysis is what I'm asking.

12             MS. BLAIN:  I'm not sure there's any anything in the

13   record to allow the Court -- Dr. Alsina comments on where he

14   thinks his disease was along the way, but he said, you know, it

15   varies from person to person whether they have symptoms based

16   on an F3 or F4 or F1.  So there's nothing to be -- you can't

17   conclude anything about Mr. Pfaller's specific condition based

18   on a lack of symptoms I think is what they were saying.

19             THE COURT:  That's kind of what I understood the

20   plaintiff's position was, is that the -- it doesn't make any

21   difference that he didn't have the symptoms in 2015 and 2017

22   insofar as assessing the testimony of the doctors who say that

23   he would have gotten the treatment.

24             MS. BLAIN:  He would have been referred for

25   treatment.  The next issue is --

1          THE COURT:  That means he would have gotten the DAA,

2     doesn't it?

3          MS. BLAIN:  So if he has liver cancer and they

4     diagnose it, he doesn't get the DAAs.

5          THE COURT:  If it was precancerous, they would

6     have -- he would have gotten the drug, wouldn't he?

7          MS. BLAIN:  That's true, but both Dr. Gaglio -- Dr.

8     Gaglio puts the onset of cancer somewhere in 2016, and Dr.

9     Alsina puts it in 2015.  It's a complicated causation issue

10    which is not ripe for summary judgment, obviously, but it's

11    pretty complicated in terms of the medicine.

12         THE COURT:  My point is, I can't resolve that on

13    summary judgment.

14         MS. BLAIN:  The causation issue, no.  So the question

15    then is, Judge, if, and we agree, that on two occasions Dr.

16    Wang should have referred him for further analysis, a

17    FibroScan, and he did not, does that amount to grossly

18    inadequate treatment, treatment which is repugnant, which

19    shocks the conscience of the Court, and I would argue it does

20    not rise to that level.

21         There is nothing to indicate ill intent.  There is

22    abundant evidence of Dr. Wang seeing him on a regular basis,

23    not just at the chronic care clinic.  The only way it gets to

24    deliberate indifference is if there is that evidence Dr. Wang

25    said I know this is at the level that he should be referred and

1    I don't care, I'm not going to do it.  And there's absolutely

2    no evidence of that and no way for an inference to be made on

3    that.

4              THE COURT:  Who, in their right mind, is going to

5    confess to that?

6              MS. BLAIN:  Whether you confess to it, the question

7    is does the circumstantial evidence support it, and it does not

8    because the minute he hit that level, he was referred.

9              THE COURT:  Let me ask you something.  What evidence

10   is there that when he was -- when Wang was reading the scans,

11   the results, excuse me, of the blood work on September 20th

12   and -- of '15 -- excuse me, on October 20th, 2015, and July 12,

13   2017, that he went back and looked at what the standards were

14   for referral?

15             MS. BLAIN:  He did not.  The evidence is he did not.

16             THE COURT:  Why isn't that deliberate indifference?

17   That's the functional equivalent of practicing law in the

18   Supreme Court of Virginia and not going back and reading

19   whether something is filed with the clerk or is filed.  You

20   don't go -- you know, you don't rely on your memory to

21   determine whether to give somebody a potentially life-saving

22   treatment.  You have it taped to your desk.

23             MS. BLAIN:  Judge, I believe -- I understand that

24   argument, and I think --

25             THE COURT:  That's his point, isn't it, is deliberate

1   indifference.

2          MS. BLAIN:  I think he can argue to the jury that

3   that's deliberate indifference, but I don't think the evidence

4   supports that argument.

5          THE COURT:  That's not my call, though; right?  Can I

6   make that call now?  Is there sufficient evidence in the record

7   for me to say that's not deliberate indifference?  Because it

8   has to be so strong that as a matter of law it's not.

9   Otherwise, I'm trenching on the role of the jury and his right

10  to a jury decision on the point.

11         MS. BLAIN:  Judge, the issue for me is, there's no

12  dispute about the facts of that.  The fact is that he didn't

13  refer him when he should have.  I would love for the facts to

14  be different, but they aren't.  And under those facts, can the

15  Court say that Dr. Wang thought about the fact that he should

16  get treatment and chose to ignore it, that his treatment was so

17  excessive or inexcessive as to shock the conscience, that it

18  was wanton behavior, and I just don't -- I don't believe that

19  this conduct, which is undisputed, rises to the level of that

20  sort of behavior.  And that's why I think summary judgment --

21         THE COURT:  What's the evidence on the other side?

22         MS. BLAIN:  The evidence on the other side --

23         THE COURT:  I have to look at the evidence on the

24  other side, too.

25         MS. BLAIN:  The evidence on the other side is exactly

1    what the Court has pointed out, that the number is 1.45, that

2    he didn't go back and check it, and he didn't refer him.

3              THE COURT:   Is there evidence that it was

4    inappropriate for him to rely on his memory, that it's the

5    obligation -- it seems to me it is permissible to infer that a

6    doctor has the responsibility to know, when making a decision

7    about whether to refer somebody or not, to do something or --

8    in a situation where the person's life ultimately could be at

9    stake, it's deliberately indifferent not to make sure what the

10   trigger is, and then you make the decision, no, I'm not going

11   to send you, yes, I am going to send you, but I am going to do

12   that because I know what the trigger point is.

13             MS. BLAIN:   Dr. Schamber, as I recall, and

14   Mr. LePierre can correct me, said he should have been referred.

15   Nothing more than -- not any analysis of how do you correct

16   your misapprehension about what the fact is.  It was just you

17   were wrong, and you should have referred him.

18             THE COURT:   It's undisputed he should have been --

19             MS. BLAIN:   That's exactly right.  It's a bad fact

20   for me in the case.

21             THE COURT:   Anything else?

22             MS. BLAIN:   Not on that point, no, sir.

23             THE COURT:   Anything else on that, the Eighth

24   Amendment issue for that period of time?

25             MS. BLAIN:   Can I look at one more thing?  Okay.

1          THE COURT:  Okay.

2          MS. BLAIN:  Yes, sir.

3          THE COURT:  Let me hear from you, Mr. LePierre.  Do

4     you agree that she has characterized things correctly by saying

5     that your deliberate indifference claim is based on the

6     improper screening and monitoring on the 20th of October, 2015,

7     and July 12th, 2017, and what was done or not done then, and on

8     the assertion of grossly inadequate treatment in which the

9     theory is that Dr. Wang should have referred him for DAA

10    treatment notwithstanding VDOC policy is the second part of it.

11         MR. LePIERRE:  Your Honor, I believe that analysis

12    misses one point that we believe should be included in there,

13    and that is we don't believe the timeframe ends at that point,

14    Your Honor.  We believe that there's also a further inference

15    that Dr. Wang was closing his eyes to Mr. Pfaller's condition

16    and his treatment, and that is that when Mr. Pfaller's FIB-4

17    scores came back at the 2.12 that ended up getting his

18    referring to the FibroScan in May as was discussed earlier, Dr.

19    Wang did no follow-up for more than two months before he

20    finally came back in and ordered again what he had originally

21    ordered as an emergent FibroScan to be done.

22         We think that position, Your Honor, with the fact

23    that Dr. Wang is making an assertion that he made a mistake in

24    October 20th of 2015 -- I'm sorry, July 12th of 2017 --

25         THE COURT:  Wait a minute.  So to the first part of

1   it, that is the improper screening and monitoring, and I

2   mentioned two dates, you would add another date, and that is

3   May of what, 2018?

4           MR. LePIERRE:  May of 2018, Your Honor, when he

5   issued the first emergent order for FibroScan.

6           THE COURT:  And then did nothing until July what,

7   22nd?

8           MR. LePIERRE:  I believe it was July 22nd, Your

9   Honor, when he reissued the order.

10           THE COURT:  All right.  And with that addition, then

11   that correctly describes what we're referring to as the

12   improper screening and monitoring component of your deliberate

13   indifference claim.

14           MR. LePIERRE:  Correct, Your Honor.

15           THE COURT:  And then the other part of your

16   deliberate indifference claim is grossly inadequate treatment

17   in that Dr. Wang should have referred Mr. Pfaller for DAA

18   treatment notwithstanding the VDOC policy because medical

19   standards required it.

20           MR. LePIERRE:  Correct, Your Honor.

21           THE COURT:  All right.  What do you have to say in

22   response to what she said?

23           MR. LePIERRE:  Your Honor, I do believe that a

24   reasonable jury could find that Dr. Wang, who admits -- takes

25   the position that the only thing that guides his treatment of a

1    patient with a disease he knows can be fatal is the policy of

2    the VDOC.   I think a reasonable jury can infer that a doctor

3    who, in October of 2015, four months after the policy had been

4    established at 1.45, didn't refer Mr. Pfaller when he met that

5    standard for a FibroScan, and then two years after the policy

6    had changed to 1.45, again failed to refer Mr. Pfaller when he

7    met the standards.   And then when he finally does refer Mr.

8    Pfaller for a FibroScan does nothing for an additional two

9    months to ensure that that FibroScan occurred.

10          I think any reasonable jury can infer Dr. Wang simply

11   closed his eyes to Mr. Pfaller's condition and was not going to

12   give him the treatment.   That was deliberately indifferent.

13          THE COURT:   Does that amount to an argument that says

14   the cumulative conduct of Dr. Wang from October 2015 through

15   July of 2018 amounts to deliberate indifference -- is proof of

16   deliberate indifference and that viewed as a whole, it shows

17   deliberate indifference at each stage -- at each time that that

18   occurred throughout the course of treatment?

19          MR. LePIERRE:   Yes, Your Honor.

20          THE COURT:   And that is the argument on that

21   component.

22          MR. LePIERRE:   Yes, Your Honor.

23          THE COURT:   All right.

24          MR. LePIERRE:   And, Your Honor, as to the causation

25   issue, there was one question that had come up yesterday, and I

1    neglected to answer when I came up on the lectern.  You had

2    asked what treatment would have been available for Mr.

3    Pfaller's liver cancer.  Dr. Gaglio, in his report, identified

4    three treatments that would have been available to Mr. Pfaller

5    had his liver cancer been discovered earlier.  That is ablative

6    therapy, surgical rescission to remove the tumor, and

7    chemotherapy.

8              THE COURT:  That would have been -- he said that

9    would have been available as of what date?

10             MR. LePIERRE:  I believe Dr. Gaglio listed as early

11   as 2016 as the time that the liver cancer could have been

12   present --

13             THE COURT:  Gaglio is their doctor.

14             MR. LePIERRE:  Dr. Gaglio is our causation expert.

15             THE COURT:  Gaglio is your causation expert.

16             MR. LePIERRE:  Correct, Your Honor.

17             THE COURT:  And he says the cancer was discovered

18   when?

19             MR. LePIERRE:  Was discoverable as early as 2016,

20   that that would be the earliest time, and that those treatments

21   would have been available to him at that time.

22             THE COURT:  Well, then, what difference does it make

23   that the doctor was deliberately indifferent on October 20th,

24   2015, except to show his general -- as evidence of his general

25   state of mind as being deliberately indifferent?

1          MR. LePIERRE:  Yes, Your Honor, that's actually the

2    first date where, under the policy, if Dr. Wang had not been

3    deliberately indifferent, he would have referred Mr. Pfaller

4    for a FibroScan, and there would have been, according to Dr.

5    Gaglio, no liver cancer to prevent his treatment with DAAs.

6          Dr. Gaglio says it may have been present at the

7    July 12th, 2017, FibroScan, but it would have been treatable

8    with one of those three therapies, and then he could have

9    received the DAAs at that time, Your Honor.

10          I believe nobody --

11          THE COURT:  So, first, the issue is that you can get

12    DAA before cancer, and if cancer is treated, you can get DAA

13    afterwards.

14          MR. LePIERRE:  Correct, Your Honor.

15          THE COURT:  What does treated mean?

16          MR. LePIERRE:  Treated with the liver cancer or

17    treated with the hepatitis C, Your Honor?

18          THE COURT:  Treated with the liver cancer.  You're

19    saying that Gaglio says that he could have gotten the DAAs

20    after October 20th, 2015.

21          MR. LePIERRE:  Correct.

22          THE COURT:  Because he didn't have any liver cancer

23    at that time according to the doctor.

24          MR. LePIERRE:  Correct, Your Honor.

25          THE COURT:  The liver cancer manifested itself in

1    2016.

2              MR. LePIERRE:  Possibly as early as 2016.

3              THE COURT:  Possibly as early.  And does he say to a

4    reasonable degree of medical certainty when he thinks it did

5    manifest itself?

6              MR. LePIERRE:  I believe he said to a reasonable

7    degree of medical certainty 2016 would have been the earliest.

8              THE COURT:  Would have been the earliest.

9              MR. LePIERRE:  Correct, Your Honor.

10             THE COURT:  So the rules say you don't get DAA while

11   you have liver cancer; is that right?

12             MR. LePIERRE:  Correct, Your Honor.

13             THE COURT:  And so Dr. Gaglio says you can get

14   ablative treatment, you can get surgical rescission, and you

15   can get chemotherapy, and let's suppose that you get one or all

16   of those and the cancer is in remission.  Are you with me?

17             MR. LePIERRE:  Yes, Your Honor.

18             THE COURT:  Can you get DAAs then?

19             MR. LePIERRE:  Yes, Your Honor.  In fact, you are a

20   higher priority at that point.

21             THE COURT:  All right.  So if, on the other hand, you

22   get one or all of those treatments that Dr. Gaglio says and you

23   are -- there's still cancer in your system, you do not get DAA.

24             MR. LePIERRE:  If the treatment is unsuccessful, Your

25   Honor, the cancer is terminal, and, no, you would not get DAAs.

1   And, in fact, Your Honor, with regards to the final time in

2   which Dr. Wang was deliberately indifferent, May of 2018 to

3   July of 2018, at that time, Your Honor, he did have terminal

4   cancer, and Dr. Gaglio does concede that he would not have been

5   a candidate for the DAAs at that time.

6           THE COURT:  All right, go ahead.

7           MR. LePIERRE:  Your Honor, that is our argument, that

8   those failures, combined with the failure to do anything at all

9   to try to get treatment, get the ball rolling on treatment for

10  Mr. Pfaller for a known potentially fatal illness throughout

11  the course of 2015 until 2018 creates a dispute, a genuine

12  dispute as to material fact as to whether or not Dr. Wang

13  simply closed his eyes to the medical signs of an individual

14  with F-2, which is the midpoint on the liver damage, throughout

15  a course of three years and refused to do anything to try to

16  help Mr. Pfaller's medical condition, and I believe that

17  creates a genuine issue as to whether or not he was

18  deliberately indifferent, Your Honor.

19          THE COURT:  All right.  Anything else, Ms. Blain?

20  I'm trying to say your name, and I'm sneezing all over.

21          MS. BLAIN:  Judge Hughes, when he was on the bench,

22  because I used all three names, called me Ms. Jones.  Just

23  could never get it right.  And my husband is a lawyer and also

24  an administrator of estates, and he had to appear before Judge

25  Hughes one time, and he walks in and he said, Mr. Jones, it's

1  so good to see you again.  And Stu said later I had no idea

2  whether you correct a judge on your name, whether that would

3  have offended him.  So forever when we'd see Judge Hughes, he

4  calls us both Mr. and Mrs. Jones.  I love that story.

5          Okay, so in response to what he's saying, Judge, I

6  think the issue that the Court has to address is whether this

7  is a claim of simple negligence based on the evidence or

8  whether the evidence, and, again, not direct evidence but

9  inferences from the evidence, can rise to the level of

10  deliberate indifference, and our argument is simply that the

11  inferences don't exist for deliberate indifference to be found,

12  and that's why we think we're entitled to summary judgment.

13          THE COURT:  All right.  Let's take count three for

14  the period of time that you are talking about.

15          MS. BLAIN:  So here's what's interesting --

16          THE COURT:  There is an issue.

17          MS. BLAIN:  The issue on the sovereign immunity, and

18  I need to get -- in the record at --

19          THE COURT:  Whoa, whoa, whoa.

20          MS. BLAIN:  Yes, sir.

21          THE COURT:  Are you now letting go of the claim that

22  he should have referred the man, Pfaller, for treatment

23  notwithstanding the VDOC policy?

24          MR. LePIERRE:  No, Your Honor.

25          THE COURT:  What evidence is there in the record that

1   he should have?  In other words, what's the fact dispute or

2   what's the lack of fact dispute in that area?  I think I cut

3   you off.  Go ahead.

4           MR. LePIERRE:  Yes, Your Honor.  Do you want me to

5   speak from the lectern?  Your Honor, as to the failure to

6   refer, it is the testimony of our experts, Dr. Schamber and I

7   believe the majority of the defendant's experts, that a doctor

8   has a duty to meet the standard of care of their patient

9   irrespective of what the VDOC policy is.

10          THE COURT:  All experts agree?

11          MR. LePIERRE:  I believe there is one expert that

12  does disagree.  I do know Dr. Wang disagrees.  Dr. Wang takes

13  the position that he is to follow the VDOC policy and nothing

14  else.  But it is our position and Dr. Schamber's position that

15  a doctor has an independent duty to his patients and should

16  have made efforts to advocate, to refer Mr. Pfaller, and if he

17  can't get it done, that's different than just simply saying no

18  matter what the records show, I'm not going to get Mr. Pfaller

19  treatment.

20          THE COURT:  Is there any case that holds that?

21          MR. LePIERRE:  No, Your Honor.  That's based solely

22  upon the expert opinion what the standard of care calls for.

23          THE COURT:  So he should have referred, and if it

24  didn't work, then so be it, but failure to refer equals

25  deliberate indifference because you have a duty to recommend it

1   even if the policy is otherwise.

2        MR. LePIERRE:  Yes, Your Honor, combined with the

3   other facts we covered related to the monitoring.

4        THE COURT:  What?  You are mixing it together.

5        MR. LePIERRE:  We believe, Your Honor, that both of

6   those combined do show his deliberate indifference as to both

7   aspects.

8        THE COURT:  All right.

9        MR. LePIERRE:  Thank you, Your Honor.

10       THE COURT:  He says that all the experts but one

11  agree -- as I understand it, a doctor has a duty to meet the

12  standard of care regardless of the VDOC standard, so that

13  required Dr. Wang to have made a referral.  If it didn't work,

14  so be it, and he's not either violated the standard of care or

15  he has not been deliberately indifferent on that score, but the

16  failure to refer at all, knowing what he knew about the

17  condition and about the -- generally and what he knew about the

18  man's, Pfaller's, condition is deliberate indifference, and

19  that in considering the deliberate indifference, you can

20  consider his general deliberate indifference evinced by the

21  three times that he fouled up in making the diagnoses and in

22  not following up on the referral.  What do you say?

23       MS. BLAIN:  Judge, it strikes me that the plaintiff

24  is now, for lack of a better term, smooshing together these

25  separate claims that he's made over time.  The issue with the

1   referral is, you have a doctor who is working within a system,
2   and the system says to him, here are the rules under which you
3   treat patients with chronic hepatitis C, do not refer patients
4   to me simply because they have chronic hepatitis C, period.
5           THE COURT:  All right.
6           MS. BLAIN:  And if you do, I'm not going to do
7   anything --
8           THE COURT:  That's right.  But he says there is
9   evidence from other doctors who say that you cannot just
10  obey -- go by the rules, that there's expert testimony that
11  says -- you correct me if I'm wrong, Mr. LePierre.  As I
12  understand it, he's saying there's expert testimony that says
13  you have a duty under the standard of care to refer that
14  patient if that's what is called for by the standard of care
15  without regard to what is in the VDOC standard.
16          If your superior then says no, you have lived up to
17  what you -- you are required to do, and the fact that you did
18  not do that is not only deliberate indifference, it is
19  negligence.  Am I right?
20          MR. LePIERRE:  Yes, Your Honor.
21          THE COURT:  First thing is, do all the doctors but
22  one in the case agree with that?  That's what I understood him
23  to say.
24          MS. BLAIN:  What does Dr. Zawitz say?  I don't think
25  he agrees with that, does he?

1          MS. MAUGHAN:  I do not believe --

2          THE COURT:  What's that now?

3          MS. BLAIN:  Dr. Zawitz is the expert for Dr.

4    Amonette, and I don't --

5          THE COURT:  What's he got to do with --

6          MS. BLAIN:  Well, there are only two experts.  It's

7    the two of us, Dr. Schamber and Dr. Alsina, so I don't think

8    all experts in the case agree on it.

9          THE COURT:  He said all but one.  Who -- excuse me.

10   Let's start again.  Which experts' testimony are you talking

11   about here when you say that the experts agree?  Yours is

12   doctor who?

13         MR. LePIERRE:  Dr. Schamber, Your Honor.

14         THE COURT:  And he says, as I understand it, the

15   doctor had a study to meet the standard of care regardless of

16   the VDOC standard and to make the referral; right?

17         MR. LePIERRE:  Correct, Your Honor.

18         THE COURT:  And then so Dr. Schamber says that;

19   right?

20         MR. LePIERRE:  Yes, Your Honor.

21         THE COURT:  And you said another doctor agreed with

22   it.  Who else agreed with it?

23         MR. LePIERRE:  Your Honor, I apologize for doing

24   this.  I did refer to testimony from depositions that was not

25   in the record.  So on the record, it's just Dr. Schamber versus

1    Ms. Blain's expert, Dr. --

2              MS. BLAIN:  Alsina.

3              MR. LePIERRE:  I apologize for that.  Off the record

4    there is conversation that I understand I can't rely on.

5              THE COURT:  Is it in a deposition in the case?

6              MR. LePIERRE:  It is, Your Honor.

7              THE COURT:  It's not conversation, it's questions and

8    answers?

9              MR. LePIERRE:  Correct, Your Honor.  Those are just

10   not in the record before you.

11             THE COURT:  Is it in a deposition taken of a doctor

12   in this case?

13             MR. LePIERRE:  I believe it was, Your Honor, of Dr.

14   Zawitz is, I believe, the one.  There's also Dr. Joshua.  I'm

15   just trying to recall which ones it was that agreed with me,

16   Your Honor.

17             THE COURT:  But they're not in the record.

18             MR. LePIERRE:  No, Your Honor, and I apologize.  I

19   spoke out of turn, and I do apologize for that.

20             THE COURT:  All right.  So it's not in the record.

21   I'm not going to consider that.  He says Schamber says that.

22   What does your man say in response to that, your expert say?

23             MS. BLAIN:  He says you follow the regulations of the

24   VDOC.  That's where you work, and that's what you follow.

25             THE COURT:  Who says it?

1          MS. BLAIN:  Dr. Alsina.

2          THE COURT:  How is that a medical standard as opposed

3    to an employment standard?  I'm lost to what you are saying.

4    Is he opining that the standard of care is different than Dr.

5    Schamber is saying?

6          MS. BLAIN:  Yes, sir.

7          THE COURT:  Or is he saying that just because you

8    work for somebody, you have to do what they say?

9          MS. BLAIN:  He's saying it is a different standard of

10   care for Dr. Wang under the circumstances of this case than Dr.

11   Schamber says.  There is a dispute about the standard of care.

12   There's no question about that, but that's negligence.  That's

13   not deliberate indifference.

14         THE COURT:  No, it is according to his argument.  I'm

15   not saying whether it is or isn't, but his argument -- he's got

16   a guy, an expert named Schamber who says a doctor in this case,

17   Dr. Wang, had the duty to meet the standard of care.

18         MS. BLAIN:  Right.  I agree.

19         THE COURT:  Regardless of the VDOC standard, and, in

20   this instance, that standard of care required him to make a

21   referral.

22         MS. BLAIN:  Knowing it's not going to be approved, he

23   still had to go through the motions --

24         THE COURT:  I gather.

25         MS. BLAIN:  -- of referring him.

1          THE COURT:  I do not believe that he made that

2    statement, but I gather from evidence in the record, there's

3    evidence that Dr. Amonette has said that if he got a referral

4    that did not meet the guidelines, he would reject it.  So I

5    think implied in his argument is that knowing that the

6    reference -- recommendation for a referral that he would

7    forward to meet what Dr. Schamber says is his obligation would

8    be denied, he was, nonetheless, obligated to make it; am I

9    right about that?

10          MR. LePIERRE:  Yes, Your Honor.

11          THE COURT:  And that his failure to do that, his

12   failure to comply with the standard of care and stand up and do

13   what was right for his patient amounts to deliberate

14   indifference under the law.

15          MS. BLAIN:  The argument is it amounts to it.  The

16   evidence is it's a negligence, but think about this for a

17   minute.  So the idea is that a doctor, simply because he says

18   to himself I know DAAs aren't available for my patient, but if

19   I were out in the community I would refer them and hope they

20   got in line even though we know at MCV they were prioritizing,

21   so I'm going to refer him anyway just so Amonette can turn me

22   down, and then he doesn't get the treatment, where's the

23   causation in that?  It's like this straw man.

24          THE COURT:  That's not the argument that you are

25   making.  What you're making is there's no deliberate

1    indifference, and that's a different question than causation,

2    so I can't -- causation wasn't even addressed in the papers.

3            MS. BLAIN:  My point is this is a negligence claim.

4    That's what we're arguing about.

5            THE COURT:  No, he is arguing about your argument --

6    the argument is about count one, the Eighth Amendment claim,

7    viewed from the period of February of 2015 to April of 2018.

8    That's what we're talking about now.

9            MS. BLAIN:  Right.

10           THE COURT:  He's saying that that shows the failure

11   to recommend under those circumstances is deliberate

12   indifference.

13           MS. BLAIN:  But there are cases that we have cited in

14   our brief that say a mere dispute about what would be

15   appropriate is not deliberate indifference.

16           THE COURT:  That's not the line of cases -- that

17   doesn't apply here.  That's a dispute between the patient and

18   the doctor about what is an appropriate treatment.  That's a

19   different legal principle than what he's talking about here.

20           MS. BLAIN:  Okay.  I thought it also dealt with when

21   you have two doctors on each side of the case, one says you

22   need to do X and this one says, no, you need to do Y, that's

23   just a simple negligence argument.  That's not saying --

24   obviously this doctor is not permitted to say what he did rose

25   to the level of deliberate indifference.  The question is for

1    the Court.  We know what the facts are --

2           THE COURT:  What case says what you are saying?  You

3    have an unusual twist in deliberate indifference here, and that

4    is that there is involved in the predicate evidence offered by

5    the plaintiff the issue of the standard of care.  So the first

6    question is, what's the standard of care.  Then the question

7    is, the failure to meet the standard of care, wholly apart from

8    the VDOC policy, is deliberate indifference because you are

9    turning your back on, blinding yourself to, proceeding with

10   conduct that forecloses what otherwise would be available to

11   the inmate.

12          You are saying, no -- what you're really saying is

13   that if that's your argument on this part of count one, then

14   that collapses and conflates the negligence claim, and

15   that's -- and it boils down to an assessment of whether the

16   difference of the standard of care is sufficient -- whether a

17   difference of the standard of care is sufficient to create a

18   factual dispute going to deliberate indifference.  I'd like to

19   know your case on that.

20          MS. BLAIN:  That's what I'm looking for, Judge.  It's

21   going to take me a minute.  Can I come back to you on that?

22          THE COURT:  Yeah, but we're going to have to have a

23   termination point here in a little while.  But you can come

24   back on another day if you want to.

25          MS. BLAIN:  The last point I want to make on this,

1   and then I want to move on, if we can, to sovereign immunity,

2   is the case law says that in order to find deliberate

3   indifference, it has to be so grossly incompetent, inadequate,

4   or excessive to shock the conscience.

5            THE COURT:  What are you reading from?

6            MS. BLAIN:  This is from *Harden v. Green*, a Fourth

7   Circuit case from 2001.  It was in our brief.

8            THE COURT:  All right.

9            MS. BLAIN:  And then *Clinkscales v. Pamlico*

10  *Correctional*, Fourth Circuit, 2000.  And that's where I get

11  to --

12           THE COURT:  Since that time, they've talked a little

13  bit differently, in different terms about what deliberate

14  indifference is.  It isn't always shocking the conscience, so

15  get off of that theory.  There are things -- it has to be

16  serious, and the Court in *Scinto* and others have refined it a

17  little bit, but, anyway, so what is it that you want me to --

18           MS. BLAIN:  I think it requires more than negligence,

19  and I do think that they make out a case for negligence.  I

20  think what is required for deliberate indifference under any of

21  these cases is something much more than that, and I don't think

22  the evidence before the Court, which I believe is not in

23  dispute, supports deliberate indifference on that count.

24           THE COURT:  Well, he says that you can consider not

25  only his failure to refer notwithstanding that but the other

1    evidence of deliberate indifference that he cited, the events

2    of October 2015, July 2017, and May 2018.  You can consider

3    those in deciding his state of mind as well.

4              MS. BLAIN:  That's where I think he's conflating his

5    two theories.

6              THE COURT:  Your basic argument in response to what

7    he's been arguing about how -- the duty to make the referral in

8    the face of the VDOC standard is that it's really just a

9    negligence argument.

10             MS. BLAIN:  Correct.

11             THE COURT:  Do you want to make the negligence

12   argument now?

13             MS. BLAIN:  Yes, sir.

14             THE COURT:  You don't contest that it's negligence?

15   You just said -- you said it's negligence.

16             MS. BLAIN:  Yeah, I did.

17             THE COURT:  So now the issue is sovereign immunity;

18   right?

19             MS. BLAIN:  Yes, sir.

20             THE COURT:  Now, the -- I'm trying to figure out how

21   you deal with the sovereign immunity test, and I need to get

22   hold of it and read it here.  Give me a minute.

23             MS. BLAIN:  Yes, sir.

24             THE COURT:  In *James against Jane*, there are four

25   factors:  The function the employee was performing.  Here

1    that's medical care.  Two, the state's interest and involvement

2    in that function.  I think I've previously held that there's a

3    significant state interest in providing medical care to the

4    prisoners.  They have argued that the issue here is really one

5    of running penal institutions, and I've said that I don't agree

6    with that.

7             Three, whether the act performed involved the use of

8    judgment and discretion.  Now, the failure to refer here

9    doesn't involve the use of any discretion.

10            MS. BLAIN:  I knew that that's how you thought about

11   it.

12            THE COURT:  Well, it doesn't.  I mean, that's your

13   argument.  It's all over your papers, and it's all over -- even

14   Amonette's papers say essentially the same thing.  And you just

15   told me that if he referred it, it would be turned down, and

16   Amonette says that.  There's no question he says that.

17            MS. BLAIN:  Right.

18            THE COURT:  He knew that it would be turned down,

19   and, therefore, he didn't do it.  So why does he have any

20   discretion on those facts?

21            MS. BLAIN:  The reason that he has discretion, and in

22   looking at these cases, the issue is what is he doing at the

23   time, and, in this case, Dr. Wang is obligated and did see this

24   patient at least every six months to assess him for his

25   hepatitis C, among other conditions, and determine whether,

1   separate and apart from test results, he had signs or symptoms

2   which would suggest that he had an issue with his liver

3   function and then refer.

4         So he was given under the policy the discretion to

5   refer the patient if he thought that the symptoms justified it.

6   And so the case -- it isn't so much about -- when you read

7   these cases, the Court is looking at is there discretion in the

8   relationship between the doctor and the patient as to how to

9   treat that patient.  And, in this case, there was discretion as

10  to that, because that's why he had to see him every six months.

11        If he didn't have discretion, then there really would

12  be no need to see the doctor.  All you do is run the blood

13  test, and it's either up or down.  But the policy said, no, we

14  want you to see him because sometimes the tests don't tell us

15  what we need to know.  That's why he was in the chronic disease

16  clinic, and that's why I have marked pages in every one of

17  these policies that says regardless of categories in Section 3B

18  above, you refer the offender for consideration of treatment if

19  there are other findings suggestive of advanced liver disease,

20  and that's where the discretion comes in for Dr. Wang in this

21  circumstance.

22        But I would also urge the Court to read that *Gargiulo*

23  case because it's a really interesting analysis in light of

24  this case because it seems -- in that case, there was very

25  little discretion

1           THE COURT:  Which case?

2           MS. BLAIN:  It's *Gargiulo* -- I think I'm pronouncing

3    that -- *v. Ohar*.  See if I can get the cite.  239 Va. 209.

4           THE COURT:  The fourth factor is the degree of

5    control and direction exercised by the state over the employee.

6    Now, that's just not out in the ether.  Control exercise in

7    respect of the particular function being assessed; is that

8    right?

9           MS. BLAIN:  Correct.

10           THE COURT:  Here they have a hundred percent control.

11    They have a hundred percent control.  They say -- according to

12    you, it gets you out of deliberate indifference, but it looks

13    to me like it sinks on you sovereign immunity.  They say -- you

14    know -- you care what the standard of care says.  If it doesn't

15    meet the VDOC policy, you don't refer.

16           MS. BLAIN:  Again, I would -- having read all these

17    cases, it's a really interesting analysis that the Supreme

18    Court goes through as it relates to control.  The one case

19    where they found there was not control, sufficient to meet the

20    control, number four is that particular doctor had no

21    supervisor whatsoever.

22           But in the other cases, for example this *Gargiulo*

23    case that I'm talking about, that doctor was under a great deal

24    of control because of all of the state-mandated regulations in

25    place, similar to this case.  But they also found that she had

1   a measure of discretion in the way she performed her job, and

2   so they found sovereign immunity.

3           So that case, to me, really deals with the competing

4   interests in this case, and I think following that case, he's

5   entitled to sovereign immunity.

6           THE COURT:  All right.  Any argument?

7           MR. LePIERRE:  Your Honor, it is our position that

8   Dr. Wang had zero discretion in the application of the VDOC

9   policy related to the treatment of hepatitis C.  The policy --

10          THE COURT:  Doesn't it have discretion in it?

11  Doesn't it say refer -- you can refer if other findings of

12  advanced disease, so his non-discretion is the inability -- he

13  cannot refer at all unless there are other findings; is that

14  your point?

15          MR. LePIERRE:  Yes, Your Honor, and, in this case,

16  it's agreed that there was no indications or other signs,

17  physical signs of Mr. Pfaller's liver damage until May of 2018.

18  So he had no discretion to refer at any point between

19  February 2nd, 2015, and at least May of 2018.

20          I do not believe personally that that particular

21  provision is discretionary because it does say that when there

22  are other signs, you may refer.  That indicates you are going

23  to refer.  No doctor is going to have symptoms of liver

24  function and liver decompensation and not refer for further

25  treatment.

1            But at least between February of 2015 and May of

2    2018, there is no discretion.  Mr. Pfaller would either meet

3    the numbers required for referral for treatment or not, and he

4    would either be referred or not.  And Mr. Pfaller would either

5    have signs and symptoms of liver cancer or not, and he did not.

6            THE COURT:  All right.

7            MR. LePIERRE:  Under that standard, Your Honor, we

8    believe under *James v. Jane*, there is no discretion, and

9    sovereign immunity fails.  We also do believe, Your Honor, that

10   the state function is not met here, but we recognize Your

11   Honor's decision on that one.

12           THE COURT:  You're saying that the act in this

13   instance does not involve the use of judgment and discretion

14   and the degree of control is complete.

15           MR. LePIERRE:  Correct, Your Honor.

16           THE COURT:  So you're saying three and four auger in

17   your favor, and you think two even though I said otherwise.

18           MR. LePIERRE:  Yes, Your Honor.

19           THE COURT:  That's all right.  I just want to get

20   straight what you are saying.

21           MR. LePIERRE:  Yes, Your Honor.  We respect your

22   position, but those are the three that we do believe favor our

23   position.

24           THE COURT:  Okay.  Anything else?

25           MS. BLAIN:  I won't touch.  I'll just talk from here.

1    I think that Mr. Pfaller is turning the question of discretion

2    on its head because it isn't a question of whether the facts of

3    this case gave him the opportunity to make that referral.  The

4    question is did he have to exercise judgment and discretion in

5    deciding whether to make the referral.

6              He may have looked at all the circumstances and said,

7    okay, I've checked your symptoms, I've palpated your stomach,

8    I've done all these things, and under my discretion and

9    judgment you do not need to be referred.  So I think he's

10   flipping the analysis there.

11             And for that reason I do think that there was

12   discretion involved.  I don't think that the degree of control

13   was complete.  So I do think we are -- it favors us on three

14   and four.

15             THE COURT:  All right.  Ms. Maughan, yesterday, Mr.

16   Rosen said, and I think it's the correct case, when I was

17   asking what had happened to the other cases involving Dr.

18   Amonette, that *Lovelace* had settled, and then he stood up a few

19   minutes later and said it had -- it was -- I think he said it

20   was resolved.  And then he stood up and said it is pending.

21             And I know that if a case is settled, it still has to

22   go through the attorney general's office and it remains pending

23   before it gets approval, and at certain levels it has to get

24   other approvals.

25             Did he mean to tell me that the case basically is

1    resolved and awaiting final approval by the attorney general's

2    office or somebody or that it's still pending in the sense that

3    it is actually awaiting trial, or do you know?

4             MS. MAUGHAN:  Your Honor, to the best of my

5    understanding, and Mr. LePierre represents -- or Mr. LePierre's

6    firm represents the plaintiff in that case as well, that case

7    is still pending with the court.  It is awaiting trial, I

8    believe in 2020, and it's still in discovery.  To the best of

9    my knowledge, there has been no settlement proposal made to the

10   attorney general's office.

11            THE COURT:  And it has not been otherwise resolved.

12            MS. MAUGHAN:  To the best of my knowledge, yes, Your

13   Honor.

14            THE COURT:  Is my recollection correct that it is

15   *Lovelace* that we're talking about?

16            MS. MAUGHAN:  Lovelace v. Clarke, but Mr. Clarke has

17   been dismissed from the case.

18            THE COURT:  Did she just recite it correctly?

19            MR. LePIERRE:  To my knowledge, yes, Your Honor.  I'm

20   not on that case, but that is my basic knowledge of what's

21   going on in the case.

22            THE COURT:  All right.  I just wanted to get it

23   straight.  I learned another way to express agreement in that

24   situation, Mr. LePierre.

25            MR. LePIERRE:  I'm sorry, Your Honor?

1          THE COURT:  I learned another way to express
2    agreement from one of my grandchildren.  You turn and you say,
3    what she said.
4          MR. LePIERRE:  I think, Your Honor, that would save a
5    lot of time.
6          THE COURT:  All right.  I have your arguments.  I
7    appreciate it very much.  I will get you a decision, and I need
8    to sort through some of the things that you've said because a
9    lot of them are forecast accurately in the papers, and a lot of
10   them have sort of shifted ground from what the papers were.  I
11   have a better understanding after having heard your arguments.
12         MS. MAUGHAN:  Your Honor, before I left the podium
13   last, the Court had asked me to review the record for any
14   information about the capacity at the VCU clinic, and I have
15   done that, and I can briefly point the Court where that is in
16   the record if you would like to do that.
17         THE COURT:  Yes.  If you would come to the lectern, I
18   think it would be helpful.
19         MS. MAUGHAN:  At docket number 110-1, page four,
20   paragraph 17, Dr. Amonette represents that in 2015, the
21   capacity at the VCU clinic was approximately 250 people per
22   year.
23         At docket number 110-1, page five, paragraph 22, in
24   September of 2018, Dr. Amonette says that they expanded the VCU
25   clinic to 624 people per year per VCU's estimate at that time.

1          THE COURT:  This is the total capacity for the whole

2     clinic at VCU.  We already have separate numbers for what your

3     allocation was.

4          MS. MAUGHAN:  This is the capacity for the VCU

5     portion of the clinic that treated DOC inmates.

6          THE COURT:  This is just DOC?

7          MS. MAUGHAN:  Correct.  This is capacity.  There is

8     not information about the general capacity of the entire VCU

9     system.  I do not have that information.

10          THE COURT:  All right.  Go ahead.

11          MS. MAUGHAN:  There was testimony from Dr. Sterling

12     who operates the VCU clinic at docket 116-9, page eight, and

13     Dr. Sterling's units of how he measures capacity are slightly

14     different, so I will summarize them for the Court.

15          He says that in 2015, there were two to three half

16     days of clinic space per week and that each clinic had six to

17     eight treatment slots available.  He said that some clinics

18     were overbooked, and he could not tell you exactly the number

19     of slots per week because that varied somewhat.

20          And at page 14 of the same document, he states that

21     in 2018, the capacity of the clinic to treat DOC inmates

22     increased from three clinics to six.

23          THE COURT:  Okay.  Per week?

24          MS. MAUGHAN:  Yes, Your Honor, per week.

25          THE COURT:  Three clinic days or three clinics?  It's

1    three clinic days, is it?  You were talking about two to three

2    one-half days.

3              MS. MAUGHAN:  Let me double-check.  Those clinics are

4    six half-day clinics.

5              THE COURT:  Okay.  So it went from three half-day

6    clinics to six half-day clinics.

7              MS. MAUGHAN:  It went from two to three half-day

8    clinics to six half-day clinics.

9              THE COURT:  In a case like this -- are you through?

10             MS. MAUGHAN:  If the Court wants to hear it, I know

11   this came up again this morning, attempts to find other

12   providers that were made by the Department of Corrections back

13   in 2015 and the number of people in each stage, whether they

14   were being treated or monitored or referred for additional

15   testing.  I have a little bit more information on that that's

16   in the record if the Court would like to hear it.

17             THE COURT:  Is it different than what you gave me

18   before?

19             MS. MAUGHAN:  It is not substantively different, but

20   it is additional information upon which the Department of

21   Corrections was relying when it made their decisions in 2015.

22             THE COURT:  Is there proof that they were relying on

23   it?  How does -- what proof is there that anybody relied on any

24   of what you are talking about when making a decision?

25             MS. MAUGHAN:  It's sworn testimony in depositions

1    from the person who was the Department of Corrections, I think,

2    health services administrator in 2015 when this policy was

3    first being set up.

4              THE COURT:  Okay.

5              MS. MAUGHAN:  That's at docket number 116-1, page

6    three, and the person testifying is Fred Schilling.  He

7    indicated that he called community physicians in an attempt to

8    find people who would treat hepatitis C and was not able to

9    find one.

10             He noted at page five of that same exhibit a shortage

11   of hepatologists all over America and at VCU and that there

12   were a small number at VCU.  He indicated that it was his

13   understanding there were five to seven specialists in

14   hepatology in all of central Virginia.  He did state also at

15   page five when asked about the number of hepatitis C positive

16   inmates in the Virginia Department of Corrections that there

17   was no definitive scientific answer, but they were aware of

18   information indicating that some states had estimated 15, 30,

19   to 40 percent of their inmate population was positive for

20   hepatitis C.

21             And then on the question of whether or not the

22   Department of Corrections knew how many people were in each

23   slot, each priority category from the guidelines, there's not

24   specific numbering information, but there is information to

25   indicate that the Department of Corrections was monitoring

1    that, and that appears at docket number 116-7, page 11, and

2    it's Dr. Fuller testifying on behalf of the Department of

3    Corrections as a 30(b)(6) witness, and he states that prior to

4    January of 2019, they were moving on from treating F3 and F4s

5    to the F2s because they were starting to have space open up to

6    be able to do that.

7                    THE COURT:  All right.  Thank you.

8                    MS. MAUGHAN:  Thank you, Your Honor.

9                    THE COURT:  In a case like this, knowledge of the

10   record is a very important thing, and I am especially grateful

11   to lawyers who know the record and who are able to answer

12   questions, and it's of great help to me in making decisions and

13   in asking questions, and I express my appreciation to all of

14   you for having a command of the record, but I especially

15   commend Ms. Maughan.

16                    MS. MAUGHAN:  Thank you, Your Honor.

17                    THE COURT:  Maybe Ms. Blain can get a handle on a

18   level of performance at that level if you quit using notebooks

19   and use a computer like she did because that's what's slowing

20   you down.  But you are very helpful.  In your case you had

21   great knowledge, too, and I appreciate it very much.  Thank you

22   all.

23                    MS. MAUGHAN:  I appreciate that, Your Honor.

24

25                            (End of proceedings.)

1

2

3           I certify that the foregoing is a correct transcript

4    from the record of proceedings in the above-entitled matter.

5

6

7    _____/s/_____              _____
     P. E. Peterson, RPR                Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25