**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

JACOB PFALLER, Administrator
of the Estate of
Danny Harold Pfaller

     Plaintiff,

v.                                    Civil Action No. 3:19cv728

HAROLD CLARKE,
et al.,

     Defendants.

**MEMORANDUM OPINION**

This matter is before the Court on DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT (ECF No. 108) (the "MOTION") filed by Dr. Mark
Amonette ("Amonette"). For the reasons set forth below the MOTION
will be denied as to Count I and granted as to Count II.

**BACKGROUND**

**I. Procedural Background**

This case arises from the death of Danny Harold Pfaller
("Pfaller") of liver cancer while in the custody of the Virginia
Department of Corrections ("VDOC"). Plaintiff Jacob Pfaller
("Plaintiff"), the Administrator of Pfaller's estate, alleges
federal constitutional claims and state law tort claims against
various defendants in their individual capacities, including Dr.
Mark Amonette, VDOC's Medical Director and Chief Physician.
Plaintiff brings two claims against Amonette. In Count I, Plaintiff

claims that Amonette violated Pfaller's Eighth Amendment right to adequate medical care "by the deliberate enforcement of a policy not consistent with medical standards, which, in effect, denied [Pfaller] screening for liver cancer, treatment for liver cancer, and treatment for Hepatitis C."[1] Compl. ¶¶ 161, 163, ECF No. 1. Specifically, Plaintiff alleges that the policy (crafted and enforced by Amonette), instructed physicians not to: (1) "treat patients with direct acting antiviral drugs," id. ¶ 170; (2) "refer patients to another physician who could prescribe direct acting antiviral drugs," id. ¶ 171; and (3) "order abdominal imaging for patients with abnormal liver tests to screen for liver cancer," id. ¶ 172. Plaintiff also alleges that, "[t]o the extent that the direct-acting antiviral treatment was not provided because of financial considerations, such concerns are in violation of the U.S. Constitution." Id. ¶ 164. In Count II, Plaintiff claims that Amonette failed "to provide adequate medical care in a supervisory capacity," repeating the allegations that Amonette deliberately enforced a policy not consistent with medical standards and that denial of treatment with direct-acting antiviral drugs for financial reasons violates the constitution. Id. ¶¶ 182-84.

---

[1] Under 42 U.S.C. § 1983, a plaintiff is given the right to sue in federal court for a violation of a federal constitutional or statutory right committed by a person acting under color of state law. However, § 1983 is merely a procedural vehicle for suing in federal courts. It confers no substantive rights.

Amonette now moves for summary judgment on three bases: (1) Plaintiff cannot establish deliberate indifference, (2) Plaintiff cannot establish supervisory liability, and (3) Amonette is entitled to qualified immunity.

## II.  Facts

In late 2014, the FDA approved the use of direct-acting antiviral drugs ("DAAs") to treat Hepatitis C, a "viral infection that can lead to liver inflammation and scarring." Amonette Aff. ¶¶ 4, 7, ECF No. 110-1. DAAs have a much higher cure rate than earlier treatments. Id. Before 2015, the American Academy for the Study of Liver Disease ("AASLD") recommended a "prioritization of patients [for treatment] based on fibrosis staging and the existence of certain co-morbidities."[2] Id. ¶ 8.

In 2015, the AASLD removed the prioritization criteria and recommended "treatment for all HCV-infected persons, except those with limited life expectancy (less than 12 months) due to non-liver-related comorbid conditions." Def.'s Mem. Supp. Ex. 2, at 2, ECF No. 110-2. Nevertheless, the AASLD's guidance acknowledged the need for prioritization where resources limit the ability to treat all patients immediately:

---

[2] Fibrosis (i.e., scarring) is measured on a scale from F0 (no scarring) to Stage F4 (cirrhosis). Amonette Aff. ¶ 5, ECF No. 110-1. In between, "Stage F1 is considered early scarring, Stage F2 is considered scarring of particular part of the liver, and Stage 3 is advanced scarring." Id.

> Although treatment is best administered early in the course of the disease before fibrosis progression and the development of complications, the most immediate benefits of treatment will be realized by populations at highest risk for liver-related complications. Thus, where resources limit the ability to treat all infected patients immediately as recommended, it is most appropriate to treat first those at greatest risk of disease complications and those at risk for transmitting [Hepatitis C] or in whom treatment may reduce transmission risk. Where such limitations exist, prioritization of immediate treatment for those listed in Tables 3 and 4 is recommended, including patients with progressive liver disease (Metavir stage F3 or F4), transplant recipients, or those with severe extrahepatic manifestations.

Id. The federal Bureau of Prisons also adopted a prioritization strategy in 2016. See generally Def.'s Mem. Supp. Ex. 5, at 30-32, ECF No. 110-5. Both Dr. Travis Schamber, Plaintiff's medical expert witness, and Dr. Chad Zawitz, Amonette's medical expert witness, agree that prioritization is appropriate when resources are limited. See Schamber Dep. 50:17-19, 51:9-15, ECF No. 110-3; Zawitz Dep. 32:2-19, ECF No. 110-13.

After DAAs were approved, VDOC developed interim Hepatitis C treatment guidelines.[3] Amonette Aff. ¶ 9, ECF No. 110-1. At this time, and at all relevant times, Dr. Mark Amonette was the VDOC's Medical Director and Chief Physician. Id. ¶ 2. These interim

---

[3] Collectively, the relevant VDOC hepatitis C treatment guidelines will be referred to as the "VDOC Guidelines."

guidelines were in effect from February 9, 2015 to June 8, 2015. See generally Def.'s Mem. Supp. Ex. 6, at 1-16, ECF No. 110-6 ("VDOC Guidelines"). Under these guidelines, inmates with an APRI score of 1.0 or higher would be approved for treatment.[4] Id. at 2. Inmates with an APRI score between 0.7 and 1.0 would be approved for treatment "if there are other findings to suggest advanced liver disease such as low albumin or platelets, or elevated bilirubin or INR." Id.

These interim guidelines were revised by Amonette in collaboration with Dr. Richard Sterling, Chief of Hepatology at Virginia Commonwealth University ("VCU") Health System. Amonette Aff. ¶ 9, ECF No. 110-1. "Dr. Sterling is a nationally recognized expert in Hepatitis C" and a member of the AASLD since 1991 or 1992. Id.; Sterling Dep. 42:8-18, Feb. 8, 2019, ECF No. 110-7. VDOC issued revised guidelines in June 2015. See generally VDOC Guidelines at 32-48, ECF No. 110-6. The following month, the hepatology group at VCU Medical Center began to provide treatment to VDOC inmates through the VCU Hepatitis C Telemedicine Clinic ("VCU Telemedicine Clinic"). Amonette Aff. ¶¶ 10, 12, ECF No. 110-1.

---

[4] APRI stands for AST to Platelet Ratio Index and is a biochemical test. Sterling Dep. 19:14-16, Feb. 8, 2019, ECF No. 110-7.

The revised guidelines provided criteria, based on inmates' APRI and FIB-4 scores,[5] that sorted inmates with Hepatitis C into three groups. Id. ¶ 11. This sorting based on APRI and FIB-4 scores was "designed to immediately refer for evaluation those with F3 and F4 scarring." Id.

Under the revised guidelines: (1) an inmate with an APRI score greater than 1.5 and a FIB-4 score greater than 3.25 would be "automatically referred to VCU for evaluation without any additional testing"; (2) an inmate with an APRI score between 0.5 and 1.5 or a FIB-4 score between 1.45 and 3.25 would receive "additional testing to determine whether [he or she] should be referred for evaluation"; and (3) an inmate with an APRI score of less than .5 and a FIB-4 score of less than 1.45 would be monitored, i.e., "receive periodic laboratory blood testing and chronic care appointments with a medical provider." Id. The APRI and FIB-4 thresholds for referral for treatment or testing are listed under the heading "Inclusion Criteria for consideration of treatment." VDOC Guidelines at 19, ECF No. 110-6. The APRI and FIB-4 thresholds for monitoring are listed under the heading "Exclusion criteria." Id. at 21-22.

---

[5] "FIB-4 . . . is a non-invasive assessment of liver disease based on routine laboratory studies." Sterling Dep. 19:18-20, Feb. 8, 2019, ECF No. 110-7.

In addition, inmates who did not meet the inclusion criteria could nevertheless be referred to the VCU Telemedicine Clinic "if there are other findings suggestive of advanced liver disease such as low albumin or Platelets, or elevated bilirubin or INR, or if there are extra-hepatic conditions that warrant treatment, such as symptomatic cryoglobulins, debilitating fatigue." Id. at 20. Although other aspects of the VDOC Guidelines were revised between June 2015 and May 2018,[6] these inclusion and exclusion criteria did not change during this time period. See Def.'s Mem. Supp. ¶ 14 n.3, ECF No. 110; VDOC Guidelines at 19-22, 33-34, 50-52, 69-72, 96-97, 114-116, ECF No 110-6. And those criteria are the relevant provisions of the VDOC Guidelines for the purpose of this case.

If a VDOC physician believed an inmate should be referred to VCU, the physician "would forward their medical information, including the results of the recent laboratory resting, to [Amonette]." Amonette Aff. ¶ 12, ECF No. 110-1. If Amonette determined that the inmate's lab results met the criteria in the VDOC Guidelines for referral, he would approve the referral. Id.

---

[6] VDOC issued revised versions of the guidelines effective: (1) September 23, 2015 – October 13, 2015, (2) October 13, 2015 – June 2016, (3) June 2016 – June 2017, and (4) June 2017 – May 2018. See generally VDOC Guidelines, ECF No. 110-6. These inclusion criteria are also the same in the July 2018 – January 2019 guidelines, to the extent those are material (Pfaller was referred for further testing based on his APRI and FIB-4 scores in May 2018), although the "inclusion" and "exclusion" language was removed. See id. at 84-85.

Amonette testified that he did not generally expect a VDOC physician to refer for treatment inmates who did not meet the VDOC Guidelines criteria nor would he have approved such a referral. Amonette Dep. 55:12-56:12, 57:5-8, ECF No. 128-5. If Amonette approved a referral, the inmate would be seen through VCU's Telemedicine Clinic. Amonette Aff. ¶ 12, ECF No. 110-1. VCU independently determined whether there was a medical reason not to treat the inmate. Id. ¶¶ 12-13. If no such reason existed, VCU would provide the DAA medication through its pharmacy. Id. ¶ 12.

Amonette's expert, Dr. Angel Alsina, interprets the VDOC Guidelines as prioritizing VDOC inmates for DAA treatment. Alsina Rep. at 18, ECF No. 128-3. Schamber, after reviewing one of the VDOC guidelines in place in 2015, interprets those guidelines as excluding some inmates from DAA treatment. Schamber Dep. 144:19-22, 254:4-15, ECF No. 128-1.

Amonette asserts that "VDOC has placed no restraints on the provision of healthcare required for the offender population. Cost is not a factor in determining how many inmates will be treated for Hepatitis C in a fiscal year. VDOC does not make decisions not to treat offenders based on finances." Amonette Aff. ¶ 20, ECF No. 110-1. It is undisputed that VDOC has never had a budget for spending on any type of medication, id. ¶ 19; if the General Assembly does not allocate VDOC sufficient funds for healthcare

costs, VDOC will pull money for healthcare costs from elsewhere in its budget, Fuller Dep. 23:10-14, 24:7-9, ECF No. 110-8.

In other words, neither Amonette nor the General Assembly has set limits on the <u>financial resources</u> available to treat inmates with Hepatitis C. Thus, in this case, the asserted resource limitation constraining VDOC's ability to treat all infected inmates with DAAs is the <u>provider resource</u>.

Between 2015 and 2018, the timeframe at issue here, the VCU Telemedicine Clinic was the only provider resource on which VDOC relied for treating inmates with Hepatitis C.[7] Amonette Dep. 42:18-22, ECF No. 110-9. VDOC used the VCU Telemedicine Clinic because, in Amonette's view, it is not "clinically appropriate to have VDOC medical providers 'in the field' prescribe direct-acting antivirals without specialty input." <u>Id.</u> ¶ 15; <u>see also</u> Sterling Dep. 44:2-7, Feb. 8, 2019, ECF No. 110-7 (opining that primary care physicians refer patients to specialists for DAA treatment). In contrast, Schamber, a medical expert for Plaintiff, testified that some primary physicians are comfortable treating patients with DAAs. Schamber Dep. 85:2-21, ECF No. 138-1. And, neither Amonette nor Sterling testified that VDOC medical providers were

---

[7] Amonette's deposition testimony is that the VCU Telemedicine Clinic was VDOC's only resource between 2016 and 2018. Amonette does not assert, nor does the record reveal, that VDOC relied on any other resource in 2015.

incapable of prescribing or monitoring the effects of the DAA medication.

However, because of the VCU Telemedicine Clinic's limited capacity, VDOC could not refer every inmate with Hepatitis C for treatment. Amonette Aff. ¶ 17, ECF No. 110-1. "Based on initial staffing levels in 2015, VCU only had the capacity to see 250 patients during that first year of the agreement."[8] Id. There has always been a waiting list for the clinic. Amonette Dep. 43:1-2, ECF No. 128-5. Amonette never asked the VCU Telemedicine Clinic to expand its capacity. Id. at 57:25-58:7. Amonette has testified that "VDOC tried, unsuccessfully, to enter into arrangements with other specialty groups, including at the University of Virginia, so that VDOC could refer more inmates for treatment." Amonette Aff. ¶ 17, ECF No. 110-1. VDOC did not directly hire any medical providers to provide DAA treatment to inmates until after 2018. Amonette Dep. 42:1-22, ECF No. 128-5. Since 2018, after Pfaller's death, VDOC hired a pharmacist and a nurse practitioner to facilitate treatment within VDOC. Id.

---

[8] The VCU Telemedicine Clinic's capacity expanded to approximately 624 in September 2018, after Sterling asked Amonette if he wanted to increase the clinic's capacity. Amonette Aff. ¶ 22, ECF No. 110-1; Sterling Dep. 170:23-24, 171:13-22, Apr. 11, 2018, ECF No. 128-7. In September 2018, Pfaller was diagnosed with terminal liver cancer, and he died on October 3, 2018. Therefore, that expansion, which was initiated by Sterling, not Amonette, made no difference to Pfaller's treatment.

Pfaller, who had been incarcerated by VDOC since 1999 and had been diagnosed with Hepatitis C since some time before 2012, never met the VDOC Guidelines criteria for referral to the VCU Telemedicine Clinic for treatment. Compl. ¶ 6, ECF No. 1; Mayes Aff. ¶¶ 5, 7, ECF No. 110-12. In May 2018, Dr. Laurence Shu-Chung Wang, Pfaller's treating physician at VDOC, referred Pfaller for a Fibroscan at the VCU Telemedicine Clinic because Pfaller's APRI and FIB-4 scores met the VDOC Guidelines criteria for referral for additional testing. Amonette Aff. ¶¶ 9-11, ECF No. 110-1. Amonette "first learned of Mr. Pfaller's medical condition when he was found to have abnormalities and was referred directly to the VCU Hepatology Clinic, leading to a hepatocellular cancer diagnosis." Id. ¶ 30. Amonette "was never asked to refer Mr. Pfaller to the VCU Telemedicine Clinic for evaluation for treatment with DAAs." Id.

## III. **Summary Judgment Standard**

A district court should grant a party's motion for summary judgment where the moving party demonstrates that there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). An issue is "genuine" if a reasonable jury could return a verdict for the non-moving party. Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 568 (4th Cir. 2015). A fact is "material" if, based on the governing law, it could affect the outcome of the suit. Id. "[A]

11

complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

To successfully oppose a motion for summary judgment, the nonmoving party must show that there are specific facts that create a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). And, "'[c]onclusory or speculative allegations do not suffice' to oppose a properly supported motion for summary judgment, 'nor does a mere scintilla of evidence.'" Matherly v. Andrews, 859 F.3d 264, 280 (4th Cir. 2017) (quoting Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002)). Consequently, summary judgment is appropriate where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." United States v. Lee, 943 F.2d 366, 368 (4th Cir. 1991).

When evaluating a motion for summary judgment, the district court must view the evidence in the light most favorable to the non-moving party. Jacobs, 780 F.3d at 568. That includes drawing all reasonable inferences in favor of the non-moving party. Ballinger v. N.C. Agric. Extension Serv., 815 F.2d 1001, 1004 (4th Cir. 1987). The court must also refrain from weighing the evidence or making credibility determinations. Jacobs, 780 F.3d at 569. "Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on

the merits." <u>Jacobs</u>, 780 F.3d at 568 (quoting 10A Charles Alan Wright & Arthur R. Miller et al., <u>Federal Practice and Procedure</u> § 2728 (3d ed. 1998)).

**DISCUSSION**

Amonette moves for summary judgment on the two counts remaining against him: Count I (direct liability for violating Pfaller's Eighth Amendment rights) and Count II (supervisory liability for violations of Pfaller's Eighth Amendment rights).

## I. Count II

The Complaint frames the claim in Count II as Amonette's failure "to provide adequate medical care in a supervisory capacity" and repeats the allegations from Count I that Amonette deliberately enforced a policy not consistent with medical standards and that denial of treatment with direct-acting antiviral for financial reasons violates the Constitution. Plaintiff subsequently clarified that the supervisory liability claim "stems from ordering, ratifying, and condoning Dr. Wang's failure to refer Mr. Pfaller to treatment by creating, implementing, and enforcing the Hepatitis C Guidelines which denied Mr. Pfaller treatment." Pl.'s Answer Ct.'s Questions at 3, ECF No. 231. Plaintiff does not allege supervisory liability in connection with Wang's other alleged misconduct, i.e., failing to refer Pfaller for a Fibroscan in October 2015 and July 2017, failing to follow up on the May 2018 order for a Fibroscan for two

13

months, or failing to provide palliative care.[9] Thus, Count II merely duplicates Count I's claim that Amonette created and enforced guidelines that denied Pfaller treatment for Hepatitis C.[10]

Nor does Count II allege the requisites of supervisory liability claims. In Shaw v. Stroud, 13 F.3d 791 (4th Cir. 1994), the Fourth Circuit "set forth three elements necessary to establish supervisory liability under § 1983":

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit

---

[9] Plaintiff's counsel also represented that "there is no paragraph in the complaint that would state that Dr. Wang and Dr. Amonette ever interacted with relation to Mr. Pfaller's care or any individual's care other than through the referral process which would just be enforcement of the policy under direct liability." Apr. 6, 2021 Mot. H'rg Tr. 88:3-7, ECF No. 258.

[10] At the hearing on the MOTION, Plaintiff's counsel distinguished Count II as an "alternative argument" to Count I if the jury were to find that Amonette was not responsible for the content of the VDOC Guidelines. See Apr. 6, 2021 Mot. H'rg Tr. 85:24-86:20, ECF No. 258. However, the Fourth Circuit has rejected the contention that officials who enforce the VDOC's Hepatitis C guidelines are not sufficiently personally involved in inmates' medical care to be held directly liable for deliberate indifference. See Gordon v. Schilling, 937 F.3d 348, 358-59, 362 (4th Cir. 2019) (holding that both Fred Schilling, VDOC's Health Services Director, and Amonette were personally involved in treatment decisions related to the plaintiff's Hepatitis C by virtue of their positions and enforcement of VDOC's Hepatitis C treatment policy). Hence, at least in this case, there is no viable supervisory liability claim.

> authorization of the alleged offensive practices," and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

Id. at 799. Count II contains no such allegations.

For these reasons, Amonette's motion for summary judgment on Count II will be granted.

## II. Count I

As to Count I, for the reasons set forth below, a reasonable jury could find that Amonette was deliberately indifferent to Pfaller's serious medical needs. Further, Amonette is not entitled to qualified immunity because Pfaller's right to adequate medical care was clearly established at the time of the alleged constitutional violation and a reasonable jury could find that Amonette violated the right. Thus, Amonette's motion for summary judgment on Count I will be denied.

## a. Deliberate Indifference

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. This prohibition "encompasses 'the treatment a prisoner receives in prison and the conditions under which he is confined.'" Scinto v. Stansberry, 841 F.3d 219, 225 (4th Cir. 2016) (quoting Helling v. McKinney, 509 U.S. 25, 31 (1993)). The Fourth Circuit explained in Scinto v. Stansberry, 841 F.3d 219 (4th Cir. 2016):

> In particular, the Eighth Amendment imposes a duty on prison officials to "provide humane conditions of confinement . . . [and] ensure that inmates receive adequate food, clothing, shelter, and medical care." To that end, a prison official's "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." Prisoners alleging that they have been subjected to unconstitutional conditions of confinement must satisfy the Supreme Court's two-pronged test set forth in Farmer v. Brennan, 511 U.S. 825 (1994).

Id. at 225 (citations omitted) (alterations in original) (quoting Farmer v. Brennan, 511 U.S. 825, 832 (1994); Estelle v. Gamble, 429 U.S. 97, 104 (1976)).

The first prong of the Farmer test is an objective one. Id. It requires a plaintiff to prove that the alleged deprivation was sufficiently serious, i.e., "the deprivation must be 'extreme' - meaning that it poses 'a serious or significant physical or emotional injury resulting from the challenged conditions,' or 'a substantial risk of such serious harm resulting from . . . exposure to the challenged conditions.'" Id. (quoting De'Lonta v. Angelone, 330 F.3d 630, 634 (4th Cir. 2003)). In a case involving medical care, "the Farmer test requires plaintiffs to demonstrate officials' deliberate indifference to a 'serious' medical need that has either 'been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person

.

would easily recognize the necessity for a doctor's attention.'" Id. (quoting Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008)).

The second prong of the Farmer test is a subjective one. It requires a plaintiff to show that a prison official acted with deliberate indifference. Id. "To prove deliberate indifference, plaintiffs must show that 'the official kn[ew] of and disregard[ed] an excessive risk to inmate health or safety.'" Id. (quoting Farmer, 511 U.S. at 837). This involves "two slightly different aspects of an official's state of mind": (1) "actual knowledge of the risk of harm to the inmate" and (2) recognition "'that his actions were insufficient' to mitigate the risk of harm to the inmate arising from his medical needs." Iko, 535 F.3d at 241 (quoting Young v. City of Mt. Ranier, 238 F.3d 567, 575-76 (4th Cir. 2001); Parrish ex rel. Lee v. Cleveland, 372 F.3d 294, 303 (4th Cir. 2004)); see also Scinto, 841 F.3d at 226. Ultimately, deliberate indifference is akin to criminal recklessness: "'more than mere negligence,' but 'less than acts or omissions [done] for the very purpose of causing harm or with knowledge that harm will result.'" Scinto, 841 F.3d at 224 (alteration in original) (quoting Farmer, 511 U.S. at 835). Mere disagreement between an inmate and a physician "over the inmate's proper medical care" is not deliberate indifference. Id. at 225 (quoting Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985)).

Amonette does not contest that Hepatitis C is an objectively serious medical condition, satisfying the objective prong of the Farmer test. Nor does Amonette contest that he had actual knowledge of the substantial risks to inmates, including Pfaller, of untreated Hepatitis C. The issue then is whether Amonette's promulgation and enforcement of the VDOC Guidelines for the treatment of Hepatitis C deliberately disregarded this substantial risk.[11]

Amonette argues that no reasonable jury could conclude that Amonette disregarded this substantial risk by "prioritizing treatment referrals for inmates most in need in accordance with recognized treatment guidelines." Def.'s Mem. Supp. at 14, ECF No. 110. Plaintiff does not contend that prioritization is per se unreasonable. Indeed, the record reflects general agreement that prioritization can be reasonable. Most importantly, the 2015 AASLD guidance states:

> Evidence clearly supports treatment for all HCV-infected persons, except those with limited life expectancy (less than 12 months) due to non-liver-related comorbid conditions.

---

[11] At issue are the VDOC Guidelines issued from February 2015 through May 2018. See generally ECF No. 110-6. At one point during the hearing, Plaintiff indicated that he was also pursuing the argument that Amonette's 2014 repeal of the 2004 VDOC Guidelines was deliberately indifferent. Apr. 7, 2021 Mot. H'rg 162:17-25, ECF No. 259. However, Plaintiff admits this was not alleged in the Complaint, and Amonette does not address this argument in his motion. Id. at 163:5-21. Thus, that theory is not a part of the Plaintiff's claim.

> Although treatment is best administered early in the course of the disease before fibrosis progression and the development of complications, the most immediate benefits of treatment will be realized by populations at highest risk for liver-related complications. Thus, <u>where resources limit the ability to treat all infected patients immediately as recommended, it is most appropriate to treat first those at greatest risk of disease complications</u> and those at risk for transmitting HCV or in whom treatment may reduce transmission risk. <u>Where such limitations exist, prioritization of immediate treatment for those listed in Tables 3 and 4 is recommended,</u> including patients with progressive liver disease (Metavir stage F3 or F4), transplant recipients, or those with severe extrahepatic manifestations.

Def.'s Mem. Supp. Ex. 2, at 2, ECF No. 110-2 (emphasis added).

Both Schamber and Zawitz, medical experts for the Plaintiff and Amonette respectively, agree that prioritization is appropriate when resources are limited. See Schamber Dep. 50:17-19, 51:9-15, ECF No. 110-3; Zawitz Dep. 32:2-19, ECF No. 110-13. And the federal Bureau of Prisons' Hepatitis C treatment guidelines also reflect a prioritization strategy. See Def.'s Mem. Supp. Ex. 5, at 30-32, ECF No. 110-5. Thus, no reasonable jury could find that Amonette was deliberately indifferent if the record established, beyond dispute, that the VDOC Guidelines reflected a strategy of prioritization to deal with limited resources to treat inmates with Hepatitis C.

But the record reflects that is not the case, for two reasons. First, a reasonable jury could find, on this record, that the VDOC

Guidelines did not reflect a strategy to deal with limited resources. Second, a reasonable jury could also find that the VDOC Guidelines did not prioritize the inmates for treatment but rather excluded some inmates from treatment.

### i. A jury could find that the VDOC Guidelines did not reflect a strategy to deal with VDOC's limited resources.

Amonette asserts that VDOC puts "no restraints on the provision of healthcare required for the offender population" but that its limited human resources (i.e., physicians) to prescribe and monitor treatment with DAAs required prioritization.[12] Amonette Aff. ¶ 20, ECF No. 110-1; Def.'s Mem. Supp. at 15, ECF No. 110. However, on this record, Amonette has not shown that, at the relevant times, he even knew what resources were required or that VDOC did not have access to the resources required. Rather, the record reflects that, for reasons not entirely clear, VDOC entered into a single relationship with an outside provider, the VCU Telemedicine Clinic, to treat inmates with DAAs and then accepted that provider's asserted limited capacity to treat VDOC inmates as the limiting factor of VDOC's ability to treat inmates.

---

[12] Plaintiff argues that the VDOC Guidelines were motivated predominantly by cost. Pl.'s Mem. Opp. at 20, ECF No. 128. Even assuming, as Amonette argues, that they were not, Amonette is not entitled to summary judgment on Plaintiff's deliberate indifference claim.

First, there is no evidence in the record that, when the challenged policy was adopted, or at any relevant time, Amonette knew how many VDOC inmates had Hepatitis C and thus needed treatment with DAAs. Instead, Amonette points to an article that Sterling presented in 2016 and published in 2018 about his experience treating VDOC inmates, in which Sterling estimated the number of inmates with Hepatitis C to be 5,000. Alsina Rep. at 20, ECF No. 128-3. However, this record does not prove what year the estimate was for, where the estimate came from, or that Amonette was aware of the estimate. Thus, the record fails to establish that VDOC had determined the number of inmates with Hepatitis C at the time Amonette promulgated the VDOC Guidelines or at the time relevant in this case. Nor does the record reflect that Amonette knew how many inmates would fall into each of the three categories that the VDOC Guidelines created (i.e., monitoring, referral for testing, and referral for treatment) at that time.

Second, Amonette has failed to establish, on this record, that VDOC's resources were limited. There is a genuine dispute of material fact as to whether VDOC could have used the resources it already had, including primary care physicians, to treat inmates with DAAs. On one hand, Amonette asserts that it is not "clinically appropriate to have VDOC medical providers 'in the field' prescribe direct-acting antivirals without specialty input." See Amonette Aff. ¶ 15, ECF No. 110-1. That appears to be Amonette's view

21

because he thinks that primary care physicians "commonly refer" Hepatitis C patients to specialists for treatment "because non-specialist physicians are not completely knowledgeable about the applicable standards of care relating to management of those patients." Id. ¶ 16. Amonette also relies on Sterling's testimony that, in his experience, primary care physicians are not knowledgeable about the types of DAAs appropriate for different genotypes of Hepatitis C and how comorbid conditions affect which DAAs are appropriate. Sterling Dep. 43:11-25, Feb. 8, 2019, ECF No. 110-7. Sterling also testified that, in his experience, primary care physicians refer patients with Hepatitis C to specialists for treatment with DAAs. Id. at 44:2-7.

Plaintiff's medical expert, Schamber, testified that, in his experience, "there are primary care physicians who feel comfortable providing direct-acting antiviral care." Schamber Dep. 85:2-4, ECF No. 138-1; see also id. at 85:13-21 (testifying that primary care physicians need to be knowledgeable and comfortable with prescribing DAAs but that it does not require any specific special training). And in the event that a jury were to credit Schamber's testimony, Amonette points to no evidence that VDOC had evaluated how many of its primary care physicians were able to, or felt comfortable in, prescribing DAAs.

Nor does the record provide contemporaneous proof as to why VDOC decided to outsource the treatment of Hepatitis C to the VCU

22

Telemedicine Clinic.[13] But, it is undisputed that, when VDOC decided to limit treatment of inmates to the VCU Telemedicine Clinic, Amonette knew that the VCU Telemedicine Clinic had a limited capacity to treat VDOC patients. See Amonette Aff. ¶ 17, ECF No. 110-1 (noting that the VCU Telemedicine Clinic only had the capacity to see 250 VDOC inmates in 2015). And the record reflects that the number of VDOC inmates referred for treatment outstripped the clinic's capacity: to Amonette's knowledge, "there's always been some waiting list to get into the clinic." Amonette Dep. 43:1-2, ECF No. 128-5; see also Sterling Dep. 17:23-25, Aug. 19, 2020, ECF No. 225-5 (testifying that "we never had an unfilled clinic spot if we could help it").

VDOC therefore had three options to increase the number of inmates who could be treated with DAAs: (1) hire its own medical providers to treat inmates with DAAs, (2) find institutions in addition to VCU to provide treatment to VDOC inmates, or (3) ask VCU to increase its capacity. As to the first option, the record is devoid of evidence about whether VDOC tried to directly hire providers to prescribe and monitor treatment with DAAs between 2015 and 2018.[14] As to the second option – hiring outside providers

---

[13] Amonette's evidence is all "after the fact" explanation.

[14] Plaintiff introduced evidence that since 2018, VDOC has hired a pharmacist and a nurse practitioner to facilitate treatment within VDOC. Amonette Dep. 42:1-22, ECF No. 128-5. Amonette's statement of material facts touts hiring the pharmacist, Def.'s Mem. Supp.

other than VCU – Amonette asserts that "VDOC tried, unsuccessfully, to enter into arrangements with other specialty groups, including at the University of Virginia, so that VDOC could refer more inmates for treatment." Amonette Aff. ¶ 17, ECF No. 110-1. However, the record does not show why UVA and VDOC did not reach an agreement or what other specialty groups VDOC reached out to and why no agreement was reached with those groups. Finally, the record does not reflect that Amonette asked VCU to increase its capacity before Pfaller's death in 2018, although Amonette knew that VDOC could have made such a request. See Amonette Dep. 57:25-58:7, 61:12-21, ECF No. 128-5 (testifying that he never "personally made efforts" to ask VCU to expand its clinic capacity but that VDOC "ha[d] the ability to" do so).

In sum, viewed in the light most favorable to Plaintiff, the record shows that, in 2014, DAAs became available to treat a well-known, serious medical condition, which could result in death if not treated. Amonette knew that, in 2015, the AASLD promulgated guidance prescribing the use of DAAs for all Hepatitis C sufferers.

Amonette also knew that there were VDOC inmates who had Hepatitis C. However, he did not determine how many inmates had

_____

¶ 35, ECF No. 110, and that evidence is probative to address the notion that specialists are necessary to prescribe and monitor the effects of DAAs.

Hepatitis C and thus needed DAA treatment, much less how advanced their disease was.

With this abundant lack of pertinent information, Amonette determined that it was appropriate to provide VDOC's inmates, however many there were, however advanced their disease, with DAA treatment by using the limited facilities at the VCU Telemedicine Clinic. Although Amonette claims that VDOC puts "no restraints" on the provision of healthcare to inmates, a reasonable jury could conclude that he constructed an artificially limited resource to provide DAA treatment that had been recommended for all Hepatitis C-infected persons unless limited resources precluded doing so.

As noted above, in 2017, VCU, not VDOC, asked if Amonette wanted the VCU Telemedicine Clinic resources expanded.[15] Almost seven months later, Amonette agreed. But the record shows no other consideration by Amonette of expanding the one limited resource on which he fashions his defense of acting as he did because of limited resources.

Amonette claims to have contacted UVA and other providers to augment the limited resource that VDOC created. But the record

---

[15] In September 2017, Sterling asked Amonette if he wanted to increase the capacity of the VCU Telemedicine Clinic, and, on April 10, 2018, Amonette told Sterling that he did. Sterling Dep. 170:23-24, 171:13-22, Apr. 11, 2018, ECF No. 128-7. In September 2018, the clinic's capacity was expanded to approximately 624 inmates per year. Amonette Aff. ¶ 22, ECF No. 110-1.

supplies no proof why the efforts to add those providers to that resource did not succeed. Amonette takes the view that the treatment resource was limited to specialists. Plaintiff offers evidence to the contrary.

On this record, a reasonable jury could conclude that limited resources did not foreclose the adequate treatment necessitated by the medical world and hence the Constitution.

### ii. A jury could find that the VDOC Guidelines did not prioritize inmates for treatment but rather excluded some inmates from treatment until they got sicker.

A jury could also find that the VDOC Guidelines did not prioritize the inmates for treatment, as Amonette argues they do, and as is recommended by the AASLD, but rather that they excluded some inmates from treatment until they got sicker, as Plaintiff argues. As the Court held in Reid v. Clarke, No. 7:16cv547, 2018 WL 3626122 (W.D. Va. July 30, 2018), in commenting upon the same policy at issue here:

> There is a difference between "everyone gets treatment but the worst get it first" and what VDOC's policy effectively says: "Only the sickest get treatment, and the rest must get sicker before we treat them." As Amonette rightly acknowledged at oral argument, if Plaintiff's Hep C does not get worse (as measured by VDOC's testing criteria), then he will never get treatment. Plaintiff is not on a list of inmates needing treatment, with worse-off inmates ahead of him. Rather, VDOC's policy currently puts him completely off the (hypothetical) waitlist. This is not a semantic difference. Plaintiff is

26

categorically excluded from treatment by VDOC's policy.

Id. at *4. In addition, in Gordon v. Schilling, 937 F.3d 348 (4th Cir. 2019), our Court of Appeals held that "it is inconsistent with the Eighth Amendment for a prison official to withhold treatment from an inmate who suffers from a serious chronic disease until the inmate's condition significantly deteriorates." Id. at 359. This case presents the issue of whether the VDOC Guidelines offend the fundamental precepts set out in Reid and Gordon.

Key to the resolution of that issue are the VDOC Guidelines. From June 2015 to May 2018, the VDOC Guidelines contained "inclusion criteria" and "exclusion criteria" based on an inmate's APRI and FIB-4 scores, which are intended to indicate the progression of liver fibrosis.[16] See, e.g., VDOC Guidelines at 33-34, ECF No. 110-6. Inmates with an APRI score between 0.5 and 1.5 or a FIB-4 score between 1.45 and 3.25 would be referred for further testing; inmates with an APRI score above 1.5 and a FIB-4 score above 3.25 would be referred to the VCU Telemedicine Clinic for treatment. Id. at 33. The VDOC Guidelines' inclusion criteria also provided that inmates who did not meet the APRI and FIB-4

---

[16] The February 9, 2015 - June 8, 2015 VDOC Guidelines' inclusion criteria was based on an inmate's APRI score or the presence of "other findings to suggest advanced liver disease." VDOC Guidelines at 2, ECF No. 110-6. They did not include an exclusion criterion based on APRI score. Id. at 3.

score thresholds could nevertheless be referred for treatment "if there are other findings suggestive of advanced liver disease such as low albumin or Platelets, or elevated bilirubin or INR, or if there are extra-hepatic conditions that warrant treatment, such as symptomatic cryoglobulins, debilitating fatigue." Id. Likewise, the exclusion criteria applied only "without significant extra-hepatic conditions associated with [Hepatitis C]." Id. at 34. Thus, Amonette argues, the VDOC Guidelines prioritized those inmates with "the most serious illness." Def.'s Mem. Supp at 15, ECF No. 110.

There is a genuine dispute of material fact created by the text of the VDOC Guidelines and the testimony of expert witnesses as to whether the VDOC Guidelines excluded some inmates with Hepatitis C from receiving treatment with DAAs until they got sicker rather than simply "prioritizing treatment for referrals from inmates most in need," as Amonette puts it. Id. at 14. In Alsina's expert report, he interprets the 2015 AASLD Guidelines to recommend "the stratification of patients" with Hepatitis C, i.e., "a system of which patients could be treated when these drugs became available, based on the resources that were available, liver disease severity, comorbid conditions (other conditions such as diabetes, obesity), and other manifestations outside of the liver." Alsina Rep. at 18, ECF No. 128-3. Then, Alsina concludes that, "[b]ased on review of the Guidelines from VDOC, one can see

28

how patients were stratified according to severity, just like any other center at the onset of the DAA's era and subsequently would have done." Id. at 19 (emphasis added). On the other hand, Dr. Schamber testified that he "had concerns that [the version of the VDOC Guidelines he reviewed] was truly exclusionary in nature." Schamber Dep. 254:4-15, ECF No. 128-1; see also id. at 144:19-22 ("My concern is that it wasn't a prioritization based on the information I have but, instead, was exclusionary, that if you didn't hit a certain bar, you weren't considered for treatment.").

Further, the Court cannot conclude on this record that the difference between prioritizing inmates and excluding some inmates from treatment until they get sicker is merely semantic. Plaintiff has put forward evidence demonstrating that the VDOC Guidelines excluded certain inmates from treatment with DAAs.

For example, Amonette testified that, in general, he would not have expected Wang (Pfaller's VDOC treating physician) to refer an inmate for treatment who did not meet the VDOC Guidelines' inclusion criteria. Amonette Dep. 55:12-56:21, ECF No. 128-5. Amonette further testified that, "if I received a request for an offender who did not qualify for treatment based on our guideline, I would not have approved it." Id. at 57:5-8. And, when Amonette was asked why he decided not to remove the "exclusion criteria" from the VDOC Guidelines in 2016 in light of the AASLD recommendation that all patients with Hepatitis C be treated with

29

DAAs, Amonette testified that he "could have changed the wording, but it wouldn't have changed how – how the process was working" because VDOC still needed to prioritize treatment because of the VCU Telemedicine Clinic's limited capacity. Id. at 48:14-49:19.

As explained above, the record shows that the VCU Telemedicine Clinic has always had a "waiting list" for treating VDOC inmates. However, Amonette has presented no evidence of how the waiting list operates, i.e., whether the waiting list further prioritizes inmates by disease severity or whether it is first-come, first-served. In the absence of that evidence and drawing all inferences in favor of Plaintiff, a reasonable jury could reject Amonette's contention that inmates with less severe liver disease would not have received treatment even if they had been referred and placed on a waiting list. Based on expert testimony that the VDOC Guidelines were exclusionary and Amonette's testimony that he would only refer inmates who met the VDOC Guidelines' criteria, a reasonable jury could conclude that the VDOC Guidelines excluded certain inmates until they got sicker.

In perspective of all of the evidence in this record and the actual text of the 2015 AASLD guidance and the VDOC Guidelines, a reasonable jury readily could reject Alsina's spin presenting the notion that VDOC's policy is one of stratification and prioritization and accept Schamber's view that the VDOC policy actually excludes treatment until an inmate gets sicker. Whether

Amonette is deliberately indifferent to a known serious condition depends upon which view of the evidence the jury accepts. And, where, as here, Schamber's (and Plaintiff's) interpretation of the policy has secured the approval of a court (even at the Rule 12(b)(6) stage), it certainly is necessary to allow the jury to make that call.

### iii. A jury could find that implementing an exclusionary policy not related to limited resources evinces deliberate indifference.

Therefore, a reasonable jury could find on this record that the VDOC Guidelines were not related to VDOC's limited resources and excluded certain inmates from treatment with DAAs until their condition worsened. And promulgating such a policy, a jury could conclude, is deliberately indifferent to the serious medical needs of inmates with Hepatitis C, including Pfaller.

In arguing to the contrary, Plaintiff cites the Sixth Circuit's decision in Atkins v. Parker, 972 F.3d 734 (6th Cir. 2020), and the Eleventh Circuit's decision in Hoffer v. Secretary, Florida Department of Corrections, 973 F.3d 1263 (11th Cir. 2020). Both held that state department of corrections policies that prioritized inmates for treatment with DAAs did not evince deliberate indifference. Neither is persuasive.

As to the two issues around which this motion turns – whether the VDOC Guidelines were exclusionary and whether VDOC's resources were limited – Atkins is distinguishable. Like the VDOC Guidelines,

the Tennessee Department of Corrections policy at issue in <u>Atkins</u> established criteria to determine which inmates to treat with DAAs. 972 F.3d at 737. However, the policy also recognized that those criteria could not reflect all circumstances and established "an advisory committee of medical professionals . . . to make individualized decisions regarding treatment for every infected inmate, and to revise those decisions when the inmate's condition so warranted." <u>Id.</u> at 737, 740. Further, the Sixth Circuit found that the medical director of the Tennessee Department of Corrections "repeatedly sought more money to buy direct-acting antivirals for inmates with hepatitis C." <u>Id.</u> Because these facts suggest that the policy at issue was related to the Tennessee Department of Correction's limited resources and was not exclusionary, <u>Atkins</u> is not persuasive here.

In comparison, <u>Hoffer</u> involved a policy more like the VDOC Guidelines. However, the Eleventh Circuit's reasoning in <u>Hoffer</u> runs contrary to the Fourth Circuit's decision in <u>Gordon</u>. In <u>Hoffer</u>, the Florida Department of Corrections policy provided for treatment of all inmates with stage F2 or higher fibrosis and provided for monitoring of inmates with stage F0 or F1 fibrosis. 973 F.3d at 1267. Inmates with stage F0 or F1 fibrosis could only receive treatment with DAAs "if they (a) have or develop an exacerbating condition like HIV, (b) exhibit signs of rapid fibrosis progression, or (c) advance to F2." <u>Id.</u> at 1268. The

Eleventh Circuit held that this policy did not evince deliberate indifference for two reasons. Id. at 1272. First, in Hoffer, the court found F0 and F1 inmates received "some medical attention," i.e., monitoring of their condition, so the policy did not rise to the level of deliberate indifference. Id. Second, the court, in Hoffer, found that the F0 and F1 inmates' demand for treatment amounted to a "difference in medical opinion between the prison's medical staff and the inmate," which also fails to rise to the level of deliberate indifference. Id. at 1273 (quoting Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991)).

In Gordon, the Fourth Circuit explicitly rejected the argument that a demand for treatment with DAAs amounts to a difference of medical opinion between VDOC staff and inmates and in doing so, necessarily rejected the argument that, as long as an inmates receives some medical attention (in the context of Hepatitis C - monitoring), an official is not deliberately indifferent. In Gordon, the plaintiff claimed that VDOC officials (namely Amonette and VDOC Health Services Director Fred Schilling) acted with deliberate indifference by excluding him from treatment for Hepatitis C under VDOC's 2004 Hepatitis C treatment guidelines because of his parole eligibility and under Amonette's 2014 suspension of the 2004 guidelines. 937 F.3d at 352, 355. The plaintiff "was placed in the chronic care clinic and received biannual liver function testing to monitor (rather than treat) his

disease." Id. at 352; id. 352-54 (noting that the monitoring became less frequent over the years).

The Fourth Circuit rejected the defendants' argument that the plaintiff's deliberate indifference claim was merely a disagreement between medical personnel and an inmate over the proper diagnosis and treatment: "[The plaintiff] does not merely disagree with the course of treatment for his [Hepatitis C]; rather, he complains that he received no treatment at all." Id. at 359 n.14. The Court of Appeals concluded that, even though VDOC monitored the defendant's Hepatitis C, a jury could find that both defendants "disregarded the substantial risk of harm presented to [the plaintiff] by his untreated [Hepatitis C]" by enforcing policies that "prevented [the plaintiff] from receiving [Hepatitis C] treatment."[17] Id. at 358-59, 361.

In this case, Amonette does not dispute that he knew that untreated Hepatitis C posed a substantial risk of harm to inmates, including Pfaller. Nevertheless, he instituted guidelines that a jury could find excluded some inmates with Hepatitis C, including

---

[17] For this reason, Amonette's reliance on Hinton v. Amonette, No. 3:18cv59, 2021 WL 279238 (E.D. Va. Jan. 27, 2021), in which the court concluded based on Hoffer that Amonette was not deliberately indifferent because an inmate "received ongoing chronic care monitoring and routine testing," is also misplaced. Id. at *7. And, importantly, Hinton involved a pro se plaintiff and a one-sided record, one that is not at all like the substantial one produced in this case by the adversarial process.

Pfaller, from treatment with DAAs until they showed signs of more advanced liver disease without consideration of all the resources available to VDOC. Although the VDOC Guidelines provided for monitoring these inmates, as the Fourth Circuit taught in Gordon, monitoring is not treatment. The treatment – the cure – for Hepatitis C is DAAs. See Amonette Aff. ¶ 7, ECF No. 110-7 (noting that DAAs, unlike earlier drugs, "have a much higher cure rate for Hepatitis C"). This is underscored by the 2015 AASLD guidance, of which Amonette concedes that he was aware, which clearly states that all patients with Hepatitis C should receive treatment with DAAs and that "treatment is best administered early in the course of the disease before fibrosis progression and the development of complications." Def.'s Mem. Supp. Ex. 2, at 2, ECF No. 110-2. Therefore, a reasonable jury could find that excluding inmates from receiving DAAs until they got sicker evinced a disregard for the substantial risk of harm that these inmates faced. See Gordon, 937 F.3d at 359 ("[I]t is inconsistent with the Eighth Amendment for a prison official to withhold treatment from an inmate who suffers from a serious, chronic disease until the inmate's condition significantly deteriorates.").

**b. Qualified Immunity**

As the Fourth Circuit explained in Booker v. South Carolina Department of Corrections, 855 F.3d 533 (4th Cir. 2017), the qualified immunity analysis involves "a two-step inquiry, asking

'whether a constitutional violation occurred' and 'whether the right violated was clearly established at the time of the official's conduct.'" Id. at 538 (quoting Melgar ex rel. Melgar v. Green, 593 F.3d 348, 353 (4th Cir. 2010)); see also District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018) ("[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" (quoting Reichle v. Howards, 566 U.S. 657, 665 (2012))). Either step can be addressed first. Booker, 855 F.3d at 538 (citing Pearson v. Callahan, 555 U.S. 223, 236 (2009)).

In District of Columbia v. Wesby, 138 S. Ct. 577 (2018), the Supreme Court of the United States summarized the basic precepts that govern an analysis of whether a right was clearly established at the time it was alleged to have been violated. In particular, the Court said:

> "Clearly established" means that, at the time of the officer's conduct, the law was "'sufficiently clear' that every 'reasonable official would understand that what he is doing'" is unlawful. In other words, existing law must have placed the constitutionality of the officer's conduct "beyond debate." This demanding standard protects "all but the plainly incompetent or those who knowingly violate the law."

36

Id. at 589 (citations omitted) (quoting Ashcroft v. al-Kidd, 563

U.S. 731, 741 (2011); Malley v. Briggs, 475 U.S. 335, 341 (1986)).

In Wesby, the Supreme Court went on to explain that:

> To be clearly established, a legal principle
> must have a sufficiently clear foundation in
> then-existing precedent. The rule must be
> "settled law," which means it is dictated by
> "controlling authority" or "a robust
> 'consensus of cases of persuasive authority.'"

Id. at 589-90 (citations omitted) (quoting Hunter v. Bryant, 502

U.S. 224, 228 (1991) (per curiam); al-Kidd, 563 U.S. at 741-42).

And although the Supreme Court has never directly addressed what

precedent qualifies as controlling authority, see id. at 591 n.8,

the Fourth Circuit has advised:

> [T]o determine whether a right was clearly
> established we first look to cases from the
> Supreme Court, [the Fourth Circuit], or the
> highest court of the state in which the action
> arose. In the absence of "directly on-point,
> binding authority," courts may also consider
> whether "the right was clearly established
> based on general constitutional principles or
> a consensus of persuasive authority."

Ray v. Roane, 948 F.3d 222, 229 (4th Cir. 2020) (quoting Booker,

855 F.3d at 543).

Having found that there is a genuine dispute of material fact

as to whether Amonette was deliberately indifferent, Amonette is

entitled to qualified immunity at the summary judgment stage only

if the constitutional right at issue was not clearly established

at the time of the alleged violation. See Willingham v. Crooke,

412 F.3d 553, 559 (4th Cir. 2005) ("Thus, while the purely legal question of whether the constitutional right at issue was clearly established 'is always capable of decision at the summary judgment stage,' a genuine question of material fact regarding '[w]hether the conduct allegedly violative of the right actually occurred . . . must be reserved for trial." (alteration in original) (quoting Pritchett v. Alford, 973 F.2d 307, 313 (4th Cir. 1992))). To determine whether the constitutional right at issue was clearly established at the time of the alleged violation, the constitutional right at issue must first be defined. Scinto, 841 F.3d at 235. The application of the qualified immunity doctrine "depends substantially upon the level of generality" at which the constitutional right at issue is defined. Anderson v. Creighton, 483 U.S. 635, 639 (1987). The Supreme Court has discouraged courts from defining rights "at a high level of generality" but has also held that the right need not be defined by "a case directly on point." al-Kidd, 563 U.S. at 741-42.

In this case, Amonette argues that the right at issue is the right of inmates with Hepatitis C to receive treatment with DAAs. However, in Scinto, which also involved a claim of deliberate indifference to an inmate's serious medical needs, the Fourth Circuit rejected a similar attempt by the defendant to "define the rights at issue in accordance with the 'very action[s] in question.'" 841 F.3d at 236 (alteration in original) (quoting Hope

v. Pelzer, 536 U.S. 730, 739 (2002)). Instead, the Fourth Circuit held that the right at issue was "right of prisoners to receive adequate medical care and to be free from officials' deliberate indifference to their known medical needs." Id.; see also Iko, 535 F.3d at 243 & n.12 (holding that an inmate's "Eight Amendment right to adequate medical care" had been violated and that it was clearly established). Indeed, if the right had to be defined in reference to the particular medical condition and treatment at issue, as Plaintiff suggests, "prison officials would be free to decline any medical care until controlling precedent addressed the precise infirmity." Lovelace v. Clarke, 2:19cv75, 2019 WL 3728265, at *5 (E.D. Va. Aug. 7, 2019).

Thus, applying the Fourth Circuit's decision in Scinto, the constitutional right at issue in this case is Pfaller's Eighth Amendment right to receive adequate medical care and to be free from officials' deliberate indifference to his known medical needs. And, as the Fourth Circuit also held in Scinto, "[a] prisoner's right to adequate medical care and freedom from deliberate indifference to medical needs has been clearly established by the Supreme Court and this Circuit since at least 1976 and, thus, was clearly established at the time of the events in question." 841 F.3d at 236 (citing Estelle, 429 U.S. at 104-05; Farmer, 511 U.S. at 832; Bowring v. Godwin, 551 F.2d 44, 47 (4th Cir. 1977)). Because Pfaller's right to adequate medical care

39

is clearly established and there is a genuine dispute of material fact as to whether Amonette was deliberately indifferent, Amonette is not entitled to qualified immunity at the summary judgment stage.

**CONCLUSION**

For the foregoing reasons, DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 108) will be denied as to Count I and granted as to Count II.

It is so ORDERED.

/s/

Robert E. Payne
Senior United States District Judge


Richmond, Virginia
Date:  April  30 , 2021