**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

JACOB PFALLER, Administrator
of the Estate of
Danny Harold Pfaller

     Plaintiff,

v.                             Civil Action No. 3:19cv728

HAROLD CLARKE,
et al.,

     Defendants.

### MEMORANDUM OPINION

This matter is before the Court on DEFENDANT DR. LAURENCE SHU-CHUNG WANG'S MOTION FOR SUMMARY JUDGMENT (ECF No. 107) (the "MOTION"). For the reasons set forth below, the MOTION will be granted in part and denied in part. The MOTION will be granted on the claim in Count I that Wang's provision of palliative care to Pfaller violated the Eighth Amendment and on Wang's defense of qualified immunity on that claim. The MOTION will be denied on the claim in Count I that Wang's treatment of Pfaller's Hepatitis C violated the Eighth Amendment and on Wang's defense of qualified immunity on that claim. The MOTION will be denied as to Count III.

### BACKGROUND

**I. Procedural Background**

This case arises from the death of Danny Harold Pfaller ("Pfaller") of liver cancer while in the custody of the Virginia

Department of Corrections ("VDOC"). Jacob Pfaller ("Plaintiff"), the Administrator of Pfaller's estate, asserts federal constitutional claims and state law tort claims against various defendants in their individual capacities, including Dr. Laurence Shu-Chung Wang, a physician at Green Rock Correctional Center ("Green Rock").

In Count I, Plaintiff claims that Wang violated Pfaller's Eighth Amendment right to adequate medical care "by the deliberate enforcement of a policy not consistent with medical standards, which, in effect, denied [Pfaller] screening for liver cancer, treatment for liver cancer, and treatment for Hepatitis C." Compl. ¶ 162, ECF No. 1. Specifically, Plaintiff alleges that Wang failed to: (1) "prescribe direct acting antiviral drugs" ("DAAs"), id. ¶ 165; (2) "refer Pfaller to another physician who could prescribe [DAAs]," id. ¶ 166; (3) "order abdominal imaging for [Pfaller] to screen for liver cancer," id. ¶ 167; and (4) treat Pfaller's terminal liver cancer with pain medications such as Fentanyl, id. ¶ 168. Also, in Count I, Plaintiff alleges that Wang violated Pfaller's Eighth Amendment right to adequate medical care by denying palliative care at the end of Pfaller's life.

In Count III, Plaintiff brings a medical malpractice claim against Wang. There it is alleged that Wang acted inconsistently with the standard of care by denying "treatment for Hepatitis C,

2

screening for liver cancer, treatment for liver cancer, and treatment for his pain as he died." Id. ¶ 190.

## II. Facts

In 2015, direct-acting antivirals ("DAAs") became readily available for treating Hepatitis C. Schamber Dep. 13:9-13, ECF No. 130-2. In February 2015, VDOC distributed Hepatitis C treatment guidelines (the "VDOC Guidelines") to all medical clinics in the VDOC system. Wang Decl. ¶¶ 15, 16, ECF No. 111-1. The first set of these guidelines was in effect from February 9, 2015 to June 8, 2015. See generally Wang Decl. Ex. 2., at 18-33, ECF No. 111-1.[1] Under the February 9, 2015 – June 8, 2015 VDOC Guidelines, inmates with an APRI score of 1.0 or higher would be approved for treatment.[2] Id. at 19. Inmates with an APRI score between 0.7 and 1.0 would be approved for treatment "if there are other findings to suggest advanced liver disease such as low albumin or platelets, or elevated bilirubin or INR." Id.

The VDOC Guidelines were subsequently revised five times between June 2015 and May 2018, resulting in versions effective from: (1) June 8, 2015 – September 23, 2015, (2) September 23,

---

[1] The page numbers referenced for ECF No. 111-1 refer to the ECF pagination.

[2] APRI stands for "AST to Platelet Ratio Index." Wang Decl. ¶ 25, ECF No. 111-1. It is calculated based on the results of blood tests and helps identify the progression of liver disease in a patient. Wang Dep. 62:21-63:6, ECF No. 111-4.

2015 - October 13, 2015, (3) October 13, 2015 - June 2016, (4) June 2016 - June 2017, and (5) June 2017 - May 2018. Wang Decl. ¶¶ 17-21, ECF No. 111-1. Under these guidelines, inmates who met certain "inclusion criteria" could be referred either to the VCU Telemedicine Clinic for treatment or for further testing with a test called a Fibroscan.[3] Id. ¶ 22. Under each of these guidelines, the inclusion criteria for referral to the VCU Telemedicine Clinic was an APRI score greater than 1.5 and a FIB-4 greater than 3.25. Wang Decl. Ex. 3, at 35, ECF No. 111-1; Wang Decl. Ex. 4, at 52, ECF No. 111-1; Wang. Decl. Ex. 5, at 70-71, ECF No. 111-1; Wang Decl. Ex. 6, at 88-89, ECF No. 111-1; Wang Decl. Ex. 7, at 107-108, ECF No. 111-1. The inclusion criteria for a Fibroscan was an APRI score between 0.5 and 1.5 or a FIB-4 between 1.45 and 3.25. Id. In addition, inmates who did not meet the inclusion criteria could nevertheless be referred to the VCU Telemedicine Clinic "if there are other findings suggestive of advanced liver disease such as low albumin or Platelets, or elevated bilirubin or INR, or if there are extra-hepatic conditions that warrant treatment, such as symptomatic cryoglobulins, debilitating fatigue." Id. Although other aspects of the VDOC Guidelines were revised between June

---

[3] A Fibroscan provides information about the level of fibrosis (which is caused by Hepatitis C) in a patient's liver. Wang Decl. ¶ 26, ECF No. 111-1.

2015 and May 2018, these inclusion criteria did not change during this time period.

Dr. Laurence Shu-Chung Wang has been employed by the VDOC as a physician at Green Rock since 2007. Wang Decl. ¶ 2, ECF No. 111-1. As part of his duties, Wang sees inmates in the Chronic Disease Clinic for chronic illnesses, such as Hepatitis C. Id. ¶ 14. Hepatitis C patients have blood tests every six to twelve months. Id. ¶ 27. Wang reviews the blood test results and calculates APRI and FIB-4 scores. Wang Dep. 62:21-63:6, ECF No. 111-4. Wang does not choose inmates he sees, and the Commonwealth of Virginia provides the equipment he uses. Wang Decl. ¶¶ 9-10, ECF No. 111-1.

Wang became Pfaller's physician in 2012, when Pfaller came to Green Rock. Wang Dep. 16:13-18, ECF No. 111-4. Wang saw Pfaller through both Green Rock's General Medical Clinic and its Chronic Disease Clinic, and at all times Wang was aware that Pfaller had Hepatitis C. Id. at 24:7-10; Wang. Decl. ¶ 12, ECF No. 111-1.

On April 10, 2015, Pfaller had his blood drawn for Hepatitis C-related testing. Wang Decl. ¶ 48, ECF No. 111-1. At that time, the February 9, 2015 - June 8, 2015 VDOC Guidelines were in effect, which only considered an inmate's APRI score. Id. ¶ 24. Under these guidelines, an APRI score higher than 1.0 would result in a referral request. See id. On April 13, 2015, Wang calculated

5

Pfaller's APRI score as .69, below the 1.0 threshold for a referral request.[4] Id. ¶ 49.

Pfaller's blood was next drawn on October 16, 2015. Id. ¶ 55. At that time, the October 13, 2015 – June 2016 VDOC Guidelines were in effect. Under these guidelines, the inclusion criteria for referral was an APRI score greater than 1.5 and a FIB-4 score greater than 3.25, and the inclusion criteria for a Fibroscan was an APRI score between 0.5 and 1.5 or a FIB-4 score between 1.45 and 3.25. Id. ¶ 24. On October 20, 2015 Wang calculated Pfaller's APRI score as .38 and FIB-4 score as 1.48. Id. ¶ 56. Under the VDOC Guidelines, Wang should have referred Pfaller for a Fibroscan based on his FIB-4 score, but Wang did not. Wang asserts that he mistakenly believed that the inclusion criteria for referral for a Fibroscan was a FIB-4 score of 1.5 rather than 1.45.[5] Id.

On July 12, 2017, Pfaller had his blood drawn, and Wang calculated an APRI score of .46 and a FIB-4 score of 1.46. Id.

---

[4] Plaintiff points out that the Guidelines also directed medical providers to refer for treatment patients with "other findings to suggest advanced liver disease" and APRI of greater than 0.7. Pl.'s Mem. Opp. ¶ 20, ECF No. 129. This is immaterial: Pfaller's APRI score was also below this threshold.

[5] Pfaller received additional blood draws on August 4, 2016 and January 5, 2017. Wang Decl. ¶¶ 63, 69, ECF No. 111-1. In August, Wang calculated an APRI score of 0.38 and a FIB-4 score of 1.24; in January, an APRI score of 0.33 and a FIB-4 score of 1.21. Id. Neither met the VDOC Guidelines' inclusion criteria for referral for a Fibroscan or treatment.

¶ 76. Like in October 2015, Wang should have referred Pfaller for a Fibroscan based on his FIB-4 score but did not. Wang again asserts that he mistakenly believed that the FIB-4 inclusion criteria was 1.5. Id.

Pfaller's blood was next drawn on May 7, 2018. Id. ¶ 86. Wang calculated an APRI score of 0.55 and a FIB-4 score of 2.18. Id. Under the VDOC Guidelines, these scores met the inclusion criteria for referral for a Fibroscan. In this instance, Wang met with Pfaller on May 14, 2018, explained the results, and ordered a Fibroscan. Id. ¶ 87.

Wang saw Pfaller twice in June 2018. On June 8, 2018 Wang saw Pfaller for complaints of abdominal pain and swelling. Id. ¶ 89. Wang ordered a Hepatitis C genotype test and prescribed Pfaller various medications, including renewing his prescription for ibuprofen. Id.; ECF No. 111-1 at 174. Wang saw Pfaller again on June 27, 2018, about "concerns about weight gain and a bowel obstruction." Wang Decl. ¶ 90, ECF No. 111-1. At that time, Wang knew that Pfaller "was on the list to be scheduled for a Fibroscan at VCU." Id. However, Wang did nothing to arrange for the now-delayed test to be performed promptly.

Wang next saw Pfaller on July 11, 2018 for "complaints of fullness in his abdomen." Id. ¶ 95. Wang believed that this was

"ascites and cirrhosis from Hepatitis C."[6] Id. At this point, VCU still had not scheduled the Fibroscan that Wang had ordered on May 14, so Wang "ordered labs and a Fibroscan asap." Id. Pfaller received a Fibroscan on July 17, 2018.[7] Id. ¶ 96.

Pfaller underwent other diagnostic tests in July and August 2018. On July 20, 2018, Pfaller had an abdominal CT scan that "revealed a mass on his liver raising concern for liver cancer." Id. ¶ 97. Pfaller also received a liver ultrasound on August 16, 2018 and an MRI on August 22, 2018. Id. ¶¶ 102-03. "The MRI results were sent to VCU and as a result, [Wang] referred Mr. Pfaller to VCU Oncology." Id. ¶ 104. "Pfaller was scheduled to be seen at VCU by Dr. Scott Matherly, hepato-oncologist[,] on September 4, 2018." Id. ¶ 107.

On August 27, Wang saw Pfaller and ordered that he remain in the medical unit "to take his meals." Id. ¶ 106. Pfaller remained in the medical unit from August 27 to September 5. Id. ¶ 108; ECF No. 111-1 at 159. While in the medical unit, Pfaller was monitored by nurses "including for complaints of pain." Wang Decl. ¶ 108, ECF No. 111-1. At the time, Pfaller had a keep-on-person prescription for Mobic, a pain medication. ECF No. 111-3 at 79.

---

[6] Ascites is fluid retention, which can be caused by liver disease. See Wang Decl. ¶¶ 90-91, ECF No. 111-1.

[7] The results of this Fibroscan are not in the record.

Pfaller complained of pain on August 28. ECF No. 111-1 at 155. He again complained of pain on August 29, and the nurse noted that he had Mobic for pain. Id. at 156. At 5:00 a.m. on September 1, Pfaller complained of pain again and said that the Mobic "isn't helping much." Id. at 157. Wang then prescribed Pfaller ibuprofen, which he received at 6:00 a.m. ECF No. 111-2 at 81. Pfaller did not again complain of pain during this stay in the medical unit, but he received ibuprofen at 6:00 a.m. and 4:00 p.m. until his release to general population on September 5. Id. at 81-82; ECF No. 111-1 at 159.

On September 4, 2018, Pfaller saw Matherly at VCU, who diagnosed Pfaller with liver cancer. Wang Decl. ¶ 108, ECF No. 111-1; ECF No. 111-3 at 31. After Pfaller's visit, VDOC received a handwritten Health Services Consultation Report from Matherly. Wang Decl. ¶ 109, ECF No. 111-1; ECF No. 111-3 at 31. The report recommended discontinuing HCZT, changing Pfaller's dose of furosemide and spironolactone, and recommended a chest CT and medical oncology referral but did not recommend palliative care. Id. On September 5, Wang met with Pfaller to discuss his visit with Matherly, and Pfaller was released from the medical unit back to the general population. ECF No. 111-1 at 159. Wang ordered all of Matherly's recommendations. Wang Decl. ¶ 109, ECF No. 111-1. On September 6, Wang received Matherly's typewritten Final Report, which recommended medical oncology or palliative care, and

9

"reviewed and signed off on the note on the same date." Id. ¶ 110; ECF No. 111-3 at 28.

According to the record on summary judgment, Pfaller did not visit the medical unit again until September 10, 2018, when he received a chest and abdomen CT. Wang Decl. ¶ 111, ECF No. 111-1. Pfaller did not visit the medical unit between September 10, 2018 and September 21, 2018, and "there is no indication that he requested to see a physician during that time." Id. ¶ 113. On September 21, Pfaller refilled his keep-on-person Mobic prescription. Id. ¶ 112; ECF No. 111-3 at 2. On September 24, 2018, Pfaller was readmitted to the medical unit. Wang Decl. ¶ 114, ECF No. 111-1. At 11:35 p.m. that night, Pfaller complained of pain to a nurse. ECF No. 111-1 at 162-63. At 1:30 a.m. on September 25, Pfaller told a nurse he was unable to get comfortable but did not specifically complain of pain. Id. at 163. At 3:30 a.m., a nurse noted that Pfaller was resting with his eyes closed and was not in distress. Id. Pfaller received Mobic at 6:00 a.m. ECF No. 111-3 at 1. Pfaller was transferred to Deep Meadow Correctional Center later that day. Wang Decl. ¶ 114, ECF No. 111-1.

## III. Summary Judgment Standard

A district court should grant a party's motion for summary judgment where the moving party demonstrates that there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). An issue is

"genuine" if a reasonable jury could return a verdict for the non-moving party. Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 568 (4th Cir. 2015). A fact is "material" if, based on the governing law, it could affect the outcome of the suit. Id. "[A] complete failure of proof concerning an essential element of the nonmoving party's case renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

To successfully oppose a motion for summary judgment, the nonmoving party must show that there are specific facts that create a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). And, "'[c]onclusory or speculative allegations do not suffice' to oppose a properly supported motion for summary judgment, 'nor does a mere scintilla of evidence.'" Matherly v. Andrews, 859 F.3d 264, 280 (4th Cir. 2017) (quoting Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002)). Consequently, summary judgment is appropriate where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." United States v. Lee, 943 F.2d 366, 368 (4th Cir. 1991).

When evaluating a motion for summary judgment, the district court must view the evidence in the light most favorable to the non-moving party. Jacobs, 780 F.3d at 568. That includes drawing all reasonable inferences in favor of the non-moving party. Ballinger v. N.C. Agric. Extension Serv., 815 F.2d 1001, 1004 (4th

Cir. 1987). The court must also refrain from weighing the evidence or making credibility determinations. Jacobs, 780 F.3d at 569. "Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." Jacobs, 780 F.3d at 568 (quoting 10A Charles Alan Wright & Arthur R. Miller et al., Federal Practice and Procedure § 2728 (3d ed. 1998)).

## DISCUSSION

### I. Count I: Eighth Amendment Violation

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. This prohibition "encompasses 'the treatment a prisoner receives in prison and the conditions under which he is confined.'" Scinto v. Stansberry, 841 F.3d 219, 225 (4th Cir. 2016) (quoting Helling v. McKinney, 509 U.S. 25, 31 (1993)). The Fourth Circuit explained in Scinto v. Stansberry, 841 F.3d 219 (4th Cir. 2016):

> In particular, the Eighth Amendment imposes a duty on prison officials to "provide humane conditions of confinement . . . [and] ensure that inmates receive adequate food, clothing, shelter, and medical care." To that end, a prison official's "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." Prisoners alleging that they have been subjected to unconstitutional conditions of confinement must satisfy the Supreme Court's two-pronged test set forth in Farmer v. Brennan, 511 U.S. 825 (1994).

12

Id. at 225 (citations omitted) (alterations in original) (quoting Farmer v. Brennan, 511 U.S. 825, 832 (1994); Estelle v. Gamble, 429 U.S. 97, 104 (1976)).

The first prong of the Farmer test is an objective one. Id. It requires a plaintiff to prove that the alleged deprivation was sufficiently serious, i.e., "the deprivation must be 'extreme' – meaning that it poses 'a serious or significant physical or emotional injury resulting from the challenged conditions,' or 'a substantial risk of such serious harm resulting from . . . exposure to the challenged conditions.'" Id. (quoting De'Lonta v. Angelone, 330 F.3d 630, 634 (4th Cir. 2003)). In a case involving medical care, "the Farmer test requires plaintiffs to demonstrate officials' deliberate indifference to a 'serious' medical need that has either 'been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" Id. (quoting Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008)).

The second prong of the Farmer test is a subjective one. It requires a plaintiff to show that a prison official acted with deliberate indifference. Id. "To prove deliberate indifference, plaintiffs must show that 'the official kn[ew] of and disregard[ed] an excessive risk to inmate health or safety.'" Id. (quoting Farmer, 511 U.S. at 837). This involves "two slightly different aspects of an official's state of mind": (1) "actual knowledge of

the risk of harm to the inmate" and (2) recognition "'that his actions were insufficient' to mitigate the risk of harm to the inmate arising from his medical needs." Iko, 535 F.3d at 241 (quoting Young v. City of Mt. Ranier, 238 F.3d 567, 575-76 (4th Cir. 2001); Parrish ex rel. Lee v. Cleveland, 372 F.3d 294, 303 (4th Cir. 2004)); see also Scinto, 841 F.3d at 226. Ultimately, deliberate indifference is akin to criminal recklessness: "'more than mere negligence,' but 'less than acts or omissions [done] for the very purpose of causing harm or with knowledge that harm will result.'" Scinto, 841 F.3d at 224 (alteration in original) (quoting Farmer, 511 U.S. at 835). Mere disagreement between an inmate and a physician "over the inmate's proper medical care" is not deliberate indifference. Id. at 225 (quoting Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985)).

Plaintiff's claim in Count I that Wang was deliberately indifferent to Pfaller's serious medical needs consists of two courses of conduct. One occurred from 2015 or 2016 to September 2018.[8] The other occurred in September 2018, near the end of Pfaller's life.

---

[8] In Plaintiff's response to Wang's motion for summary judgment, Plaintiff asserted that Wang evinced deliberate indifference between 2012 and 2014 by failing to treat Pfaller's Hepatitis C and failing to refer him to someone who would. Pl.'s Mem. Opp. at 16, ECF No. 129. However, when Plaintiff's counsel stated his theory of deliberate indifference at the hearing on Wang's motion, he said, "The Eighth Amendment claim against Dr. Wang, Your Honor, is that Dr. Wang, knowing of Mr. Pfaller's serious medical need

First, Plaintiff claims that Wang's treatment of Pfaller's Hepatitis C evinced deliberate indifference. As evidence, Plaintiff points to the fact that Wang woodenly adhered to the VDOC Guidelines rather than referring Pfaller for treatment as required by AASLD guidance. As additional evidence, Plaintiff relies on instances in October 2015 and July 2017 when Pfaller's FIB-4 score met the threshold for referral for a Fibroscan and Wang failed to refer him and on Wang's failure to follow up for two months on his May 2018 order for a Fibroscan. For ease of reference, this will be referred to as the "Hepatitis C Treatment Claim." Second, Plaintiff argues that Wang's failure to provide Pfaller with adequate palliative care (i.e., basal pain medication) after his diagnosis with stage 4B liver cancer on September 4, 2018 and before he left Wang's care on September 25, 2018 evinces deliberate indifference. For ease of reference, this will be referred to as the "Palliative Treatment Claim."

---

for treatment, knowing he has hepatitis C, a disease that he knew could cause cirrhosis and death, failed to provide any treatment for Mr. Pfaller as required by the AASLD guidelines. . . . He failed to do that for over two years." Apr. 6, 2021 Mot. H'rg Tr. 5:9-22, ECF No. 258. Plaintiff's counsel specified that this period started in either 2015 or 2016 and ended with Pfaller's liver cancer diagnosis in 2018. Id. at 5:23-6:4. Plaintiff will be held to the representation made at the hearing.

**a. The Objective Component of <u>Farmer</u>**

Wang first contends that, without the testimony of experts Dr. Travis Schamber and Dr. Paul Gaglio, Plaintiff cannot prove that Hepatitis C or liver cancer is an objectively serious medical need. Because Wang's motion in limine to exclude the testimony of those witnesses has been denied, Order, Nov. 4, 2020, ECF No. 170, that argument does not provide a basis for granting Wang's motion for summary judgment. Thus, for purposes of analyzing Wang's motion for summary judgment, the objective prong of the <u>Farmer</u> test is satisfied. The remaining issue then, on the Eighth Amendment claim in Count I, is whether a reasonable jury could find that Wang's treatment of Pfaller meets the subjective prong of the <u>Farmer</u> test.

**b. The Subjective Component of <u>Farmer</u>: Deliberate Indifference**

**i. The Hepatitis C Treatment Claim**

Wang argues that he was not deliberately indifferent in his treatment of Pfaller's Hepatitis C because he followed the VDOC Guidelines, under which Pfaller never qualified for referral for treatment, and that, in October 2015 and July 2017, he merely made a mistake about the FIB-4 inclusion criteria. <u>See</u> Def.'s Mem. Supp. at 14-16, ECF No. 111. A mistake, Wang argues, does not rise to the level of deliberate indifference, particularly because Pfaller did not show any symptoms of liver decompensation before May 2018 that would have alerted Wang to his mistake. <u>See</u> Def.'s Reply at 6, ECF No. 142.

16

Even if a jury accepted that it was appropriate for Wang to treat Pfaller according to the VDOC Guidelines (and there is not much in the record to support Plaintiff's notion that Wang was obligated professionally to refer Pfaller for treatment when the VDOC Guidelines specified otherwise such that if this were the only predicate for Count I's subjective prong, it might fail), a jury could nevertheless reasonably find that Wang's treatment of Pfaller's Hepatitis C was deliberately indifferent. On three occasions, Pfaller's bloodwork indicated, according to the VDOC Guidelines, that he needed further testing. And on each of those occasions, a reasonable jury could conclude that Wang turned a blind eye to the substantial risk to Pfaller of not receiving this testing - the very risk that the VDOC Guidelines acknowledged in requiring further testing.

First, on October 20, 2015, Pfaller's FIB-4 score met the VDOC Guidelines criteria for referral for further testing. See Wang Decl. ¶ 56, ECF No. 111-1. Wang did not refer Pfaller for further testing. Id. Again, on July 12, 2017, Pfaller's FIB-4 score met the VDOC Guidelines criteria for referral for further testing, but Wang did not refer him for further testing. Id. ¶ 76.

Wang argues that his failure to refer Pfaller for further testing was a mere mistake.[9] Of course, if Wang merely made a

---

[9] Wang asserts that he thought that the VDOC Guidelines FIB-4 inclusion criteria for referral for a Fibroscan was 1.5 rather

mistake, that would not rise to the level of deliberate indifference. See Estelle, 429 U.S. at 105-106 ("[I]n the medical context, an inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.' Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.").

However, Plaintiff has introduced evidence that raises a genuine dispute of material fact as to whether Wang made a mistake. First, Wang testified that "the VDOC guidelines on the treatment of hepatitis C between early 2015 and 2018 in [his] understanding set a standard of care [he was] to meet for the treatment of patients with chronic hepatitis C in [his] care." Wang Dep. 68:20-69:3, ECF No. 130-1. Second, it is undisputed that the VDOC Guidelines inclusion criteria for referral for a Fibroscan based on an inmate's FIB-4 score was set at 1.45 in June 2015 and did not change between June 2015 and May 2018. See Wang Decl. ¶ 24,

---

than 1.45 and therefore that Pfaller's FIB-4 scores of 1.48 and 1.46, respectively, did not meet the threshold for referral. Def.'s Mem. Supp. at 15-16, ECF No. 111. The fact that this was a mistake is underscored, Wang argues, by the fact that he did refer Pfaller for a Fibroscan in May 2018 based on his FIB-4 score – the first time it was higher than 1.5. Id. at 16. This argument is undercut by the fact that Pfaller's APRI score also met the threshold for referral for a Fibroscan in May 2018. See Wang Decl. ¶ 86, ECF No. 111-1.

ECF No. 111-1 (summarizing the VDOC Guidelines inclusion criteria between June 2015 and May 2018). If the VDOC Guidelines set the standard of care and the VDOC Guidelines inclusion criteria had not changed in either the four months preceding Pfaller's October 2015 bloodwork or the two years preceding Pfaller's July 2017 bloodwork, a jury could reasonably infer that Wang knew the criteria and deliberately ignored them.[10] Ultimately, Wang's defense of mistake hinges on his credibility, which is not appropriate to consider on a motion for summary judgment.

Finally, Wang ordered a Fibroscan on May 14, 2018 but did not follow up on that order until July 11, 2018. Id. ¶¶ 87, 95. In the interim, Wang saw Pfaller twice – once on June 8 and once on June 27. Id. ¶¶ 89-90. As a result of these visits, Wang knew that Pfaller was suffering abdominal pain and ascites (fluid retention), which can be caused by liver disease. Id. ¶¶ 89-91. At the June 27 visit, Wang admittedly knew that Pfaller was "on the list to be scheduled for a Fibroscan." Id. ¶ 90. But, Wang did not press to have the previously ordered test performed. Pfaller did not receive a Fibroscan until July 17, 2018. Id. ¶ 96.

---

[10] Wang also concedes that the evidence in the record is that he did not consult the VDOC Guidelines when deciding whether to refer Pfaller for a Fibroscan on October 20, 2015 and July 12, 2017. Apr. 7, 2021 Mot. H'rg Tr. 219:9-15, ECF No. 259.

The record thus reflects that Pfaller should have received a Fibroscan after his October 2015 bloodwork but did not receive one until July 2018 – almost three years later. A reasonable jury could find that this delay was the result of Wang's inaction (i.e., the failure to refer and the failure to follow up) in spite of his knowledge that the VDOC Guidelines required a Fibroscan for an inmate with Pfaller's FIB-4 score. Therefore, viewing the undisputed facts in the light most favorable to Plaintiff and drawing all inferences in his favor, a jury could reasonably find, on this record and by a preponderance of the evidence, that Wang's treatment of Pfaller's Hepatitis C was deliberately indifferent. See Estelle, 429 U.S. at 104-05 (holding that "intentionally denying or delaying access to medical care" can evince deliberate indifference); see also Miltier v. Beorn, 896 F.2d 848, 853 (4th Cir. 1990) (holding that failing to follow up on medical orders is a "[f]ailure to provide the level of care that a treating physician himself believes is necessary" that can evince deliberate indifference).

### ii. The Palliative Treatment Claim

Plaintiff argues that Wang's failure to provide Pfaller with adequate palliative care (specifically, basal pain medication) after his diagnosis with stage 4B liver cancer on September 4, 2018 and before Pfaller left Wang's care on September 25, 2018

evinces deliberate indifference; Wang argues that it does not.[11] At the hearing on Wang's motion for summary judgment, counsel for Plaintiff represented that Plaintiff's expert Dr. Travis Schamber and Wang's expert Dr. Angel Alsina disagree over whether palliative care universally requires basal pain medication and whether basal pain medication was required in this case. Apr. 7, 2021 Mot. H'rg Tr. 199:17-20, 201:10-202:25, ECF No. 259. This disagreement between the experts does not come out in the parties' briefing on the MOTION. Although the Court is familiar with Schamber's testimony on this subject from the record on defendants Dr. Jalal Taslimi and Armor Correctional Health Services, Inc.'s motion for summary judgment and found this testimony in this record, see Schamber Dep. 191:18-20, 195:14-18, ECF No. 130-2, the Court could not find in Alsina's report any opinion on whether palliative care requires basal medication in general or in this case, see generally Alsina Rep., ECF No. 130-6.[12]

---

[11] Wang provided evidence of his provision of pain medication dating back to May 2018. However, the evidence before September 4, 2018 is immaterial to the theory that Plaintiff's counsel stated that he was advancing at the hearing on April 6, 2021. Plaintiff stated this theory as "after Mr. Pfaller was diagnosed with stage 4B liver cancer, the failure to provide adequate palliative care until he left Dr. Wang's care on September 25th, 2018." Apr. 6, 2021 Mot. H'rg Tr. 6:12-14, ECF No. 258. Plaintiff will be held to the representation made at the hearing.

[12] Alsina's deposition is not in the record on the MOTION, and the single page included in the record of Dr. Mark Amonette's motion

Nonetheless, the record about deviation from that alleged standard of care would not permit a finding that Wang was deliberately indifferent to Pfaller's pain during the timeframe at issue. In Jackson v. Lightsey, 775 F.3d 170 (4th Cir. 2014), the Fourth Circuit held that a deviation from the standard of care does not, standing alone, clear the "high bar" for deliberate indifference. Id. at 178-79 (citing Iko, 535 F.3d at 241). Deliberate indifference requires recklessness – knowing disregard of an excessive risk – not mere negligence. See Scinto, 841 F.3d at 225. Thus, a deviation from the standard of care that did not knowingly expose Pfaller to an excessive risk of untreated pain does not evince deliberate indifference.

The record, viewed most favorably to Pfaller, does not permit a finding that Wang was aware of an excessive risk that Pfaller was in untreated pain from September 4 until September 25. As of September 4, Pfaller was in Green Rock's medical unit. Wang Decl. ¶ 108, ECF No. 111-1. At that time, he had a keep-on-person prescription for 7.5 mg of Mobic twice a day as needed that he had most recently refilled on July 27. ECF No. 111-3 at 79; Apr. 7 Mot. H'rg Tr. 181:18-22 (explaining that "KOP" means "keep on person" and that Pfaller was given KOP pain medications so he could

---

for summary judgment does not address palliative care or basal pain medication. See Alsina Dep. 36, ECF No. 110-11.

take them as needed). Pfaller also was given two tabs of ibuprofen and one tab of Meloxicam at 6:00 a.m. and two tabs of ibuprofen at 4:00 p.m. on September 4 and 5. ECF No. 111-2 at 81-82. On September 4, Pfaller saw Matherly at VCU, who diagnosed Pfaller with liver cancer. ECF No. 111-3 at 31. After Pfaller's visit, VDOC received a handwritten Health Services Consultation Report from Matherly. Id.; Wang Decl. ¶ 109, ECF No. 111-1. The report recommended discontinuing HCZT, changing Pfaller's dose of furosemide and spironolactone, and recommended a chest CT and medical oncology referral but did not recommend palliative care. Id. On September 5, Wang met with Pfaller to discuss his visit with Matherly, and Pfaller was released from the medical unit back to the general population. ECF No. 111-1 at 159. Wang ordered all of Matherly's recommendations. Wang Decl. ¶ 109, ECF No. 111-1.

On September 6, Wang received Matherly's typewritten Final Report, which recommended medical oncology or palliative care.[13] ECF No. 111-3 at 28. Between September 5 and September 21, the record does not reflect that Pfaller complained of pain, requested additional pain medication, or asked to see Wang. On September 21, Pfaller refilled his Mobic prescription. ECF No. 111-3 at 2. On

---

[13] Plaintiff argues that a recommendation of basal pain medication can be inferred from Matherly's recommendation of palliative care since Pfaller had a prescription for Mobic at the time. Apr. 7, 2021 Mot. H'rg Tr. 203:15-21, ECF No. 259.

September 24, Pfaller was readmitted to the medical unit. ECF No. 111-1 at 162. That day, at 11:35 p.m., for the first and only time during the period from September 4 to September 25, Pfaller complained of pain to a nurse. Id. at 162-63. At 1:30 a.m., Pfaller told a nurse that he was unable to get comfortable but did not specifically complain of pain, and by 3:30 a.m. on September 25, a nurse noted that Pfaller was resting with his eyes closed and was not in distress. Id. at 163-64. Pfaller did not complain of pain again before being transferred to Deep Meadow later that day. Id. at 164-65. Pfaller did receive one 7.5 mg tab of Mobic on September 25 at 6:00 a.m. ECF No. 111-3 at 1.

In sum, the record reflects that, during this period, Pfaller had access to pain medication, never complained that this medication was insufficient, and complained of pain only once and for a limited duration.[14] On this record, there is no evidence from

---

[14] To the extent that evidence from the period when Pfaller was in the medical unit before his liver cancer diagnosis, i.e., August 27 through September 3, is material to Wang's state of mind in Pfaller's last two days in the medical unit (September 4 and September 5), the record reflects that, although Pfaller had complained of pain and complained that the Mobic "isn't helping much," ECF No. 111-1 at 155-57, Wang prescribed ibuprofen the same day Pfaller complained about the Mobic, ECF No. 111-2 at 81, that Pfaller received ibuprofen an hour after his complaint, id., and that Pfaller did not again complain of pain while in the medical unit.

which a rational jury could conclude that Wang knew of an excessive risk that Pfaller was in untreated pain.[15]

## c. Qualified Immunity

As the Fourth Circuit explained in Booker v. South Carolina Department of Corrections, 855 F.3d 533 (4th Cir. 2017), the qualified immunity analysis involves "a two-step inquiry, asking 'whether a constitutional violation occurred' and 'whether the right violated was clearly established at the time of the official's conduct.'" Id. at 538 (quoting Melgar ex rel. Melgar v. Green, 593 F.3d 348, 353 (4th Cir. 2010)); see also District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018) ("[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" (quoting Reichle v. Howards, 566 U.S. 657, 665 (2012))). Either step can be addressed first. Booker, 855 F.3d at 538 (citing Pearson v. Callahan, 555 U.S. 223, 236 (2009)).

In District of Columbia v. Wesby, 138 S. Ct. 577 (2018), the Supreme Court of the United States summarized the basic precepts that govern an analysis of whether a right was clearly established

---

[15] Wang's reply raises the issue of causation, arguing that Schamber testified that Wang's alleged lack of palliative care mindset did not harm Pfaller. Def.'s Reply at 7, ECF No. 142. Because the issue of causation was not raised in Wang's opening brief, it will not be considered.

at the time it was alleged to have been violated. In particular, the Court said:

> "Clearly established" means that, at the time of the officer's conduct, the law was "'sufficiently clear' that every 'reasonable official would understand that what he is doing'" is unlawful.  In other words, existing law must have placed the constitutionality of the officer's conduct "beyond debate."  This demanding standard protects "all but the plainly incompetent or those who knowingly violate the law."

Id. at 589 (citations omitted) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011); Malley v. Briggs, 475 U.S. 335, 341 (1986)).

In Wesby, the Supreme Court went on to explain that:

> To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent.  The rule must be "settled law," which means it is dictated by "controlling authority" or "a robust 'consensus of cases of persuasive authority.'"

Id. at 589-90 (citations omitted) (quoting Hunter v. Bryant, 502 U.S. 224, 228 (1991) (per curiam); al-Kidd, 563 U.S. at 741-42).

And although the Supreme Court has never directly addressed what precedent qualifies as controlling authority, see id. at 591 n.8, the Fourth Circuit has advised:

> [T]o determine whether a right was clearly established we first look to cases from the Supreme Court, [the Fourth Circuit], or the highest court of the state in which the action arose.  In the absence of "directly on-point, binding authority," courts may also consider whether "the right was clearly established based on general constitutional principles or a consensus of persuasive authority."

Ray v. Roane, 948 F.3d 222, 229 (4th Cir. 2020) (quoting Booker, 855 F.3d at 543).

### i. The Palliative Treatment Claim

Wang seeks summary judgment on the Palliative Treatment claim in Count I on the basis of qualified immunity. Ordinarily, it is preferable to articulate a single basis for decision and, conversely, to refrain from making alternative holdings. Karsten v. Kaiser Foundation Health Plan of Mid-Atlantic States, Inc., 36 F.3d 8, 11 (4th Cir. 1994). However, considering the rather unique aspect of the Palliative Treatment Claim and the potential for appeal, this case presents one of those unusual circumstances in which it is appropriate to set out an alternative ground for decision. Therefore, it is appropriate to note that Wang would be entitled to qualified immunity as to his provision of palliative care to Pfaller because, on this record, a reasonable jury could not find that Wang violated Pfaller's Eighth Amendment rights.

### ii. The Hepatitis C Treatment Claim

As to the Hepatitis C Treatment Claim, having found that there is a genuine dispute of material fact as to whether Wang's treatment of Pfaller's Hepatitis C violated Pfaller's Eighth Amendment rights, Wang is only entitled to qualified immunity at the summary judgment stage if the constitutional right at issue was not clearly established at the time of the alleged violation. See Willingham v. Crooke, 412 F.3d 553, 559 (4th Cir. 2005) ("Thus,

while the purely legal question of whether the constitutional right at issue was clearly established 'is always capable of decision at the summary judgment stage,' a genuine question of material fact regarding '[w]hether the conduct allegedly violative of the right actually occurred . . . must be reserved for trial.'" (alteration in original) (quoting Pritchett v. Alford, 973 F.2d 307, 313 (4th Cir. 1992))). To determine whether the constitutional right at issue was clearly established at the time of the alleged violation, the constitutional right at issue must first be defined. Scinto, 841 F.3d at 235. The application of the qualified immunity doctrine "depends substantially upon the level of generality" at which the constitutional right at issue is defined. Anderson v. Creighton, 483 U.S. 635, 639 (1987). The Supreme Court has discouraged courts from defining rights "at a high level of generality" but has also held that the right need not be defined by "a case directly on point." al-Kidd, 563 U.S. at 741-42.

Wang argues that the right at issue is the right of inmates with Hepatitis C to receive treatment with DAAs. However, in Scinto, which also involved a claim of deliberate indifference to an inmate's serious medical needs, the Fourth Circuit rejected a similar attempt by the defendant to "define the rights at issue in accordance with the 'very action[s] in question.'" 841 F.3d at 236 (alteration in original) (quoting Hope v. Pelzer, 536 U.S. 730, 739 (2002)). Instead, the Fourth Circuit held that the right at

28

issue was "right of prisoners to receive adequate medical care and to be free from officials' deliberate indifference to their known medical needs." Id.; see also Iko, 535 F.3d at 243 & n.12 (holding that an inmate's "Eighth Amendment right to adequate medical care" had been violated and that it was clearly established). Indeed, if the right had to be defined in reference to the particular medical condition and treatment at issue, as Plaintiff suggests, "prison officials would be free to decline any medical care until controlling precedent addressed the precise infirmity." Lovelace v. Clarke, 2:19cv75, 2019 WL 3728265, at *5 (E.D. Va. Aug. 7, 2019).

Thus, applying the Fourth Circuit's decision in Scinto, the constitutional right at issue in this case is Pfaller's Eighth Amendment right to receive adequate medical care and to be free from officials' deliberate indifference to his known medical needs. And, as the Fourth Circuit also held in Scinto, "[a] prisoner's right to adequate medical care and freedom from deliberate indifference to medical needs has been clearly established by the Supreme Court and this Circuit since at least 1976 and, thus, was clearly established at the time of the events in question." 841 F.3d at 236 (citing Estelle, 429 U.S. at 104-05; Farmer, 511 U.S. at 832; Bowring v. Godwin, 551 F.2d 44, 47 (4th Cir. 1977)). Because Pfaller's right to adequate medical care was clearly established at all relevant times and there is a

29

genuine dispute of material fact as to whether Wang's treatment of Pfaller's Hepatitis C evinced deliberate indifference, Wang is not entitled to qualified immunity as to the Hepatitis C Treatment Claim at the summary judgment stage.

## II. Count III: Medical Malpractice

Plaintiff's medical malpractice claim in Count III rests on the same evidence as Plaintiff's deliberate indifference claim in Count I – with one exception. Wang's failure to follow up on the Fibroscan that he ordered in May 2018 is not admissible as to Count III because Plaintiff's standard-of-care expert did not address that theory in his report as a predicate for his opinion on Wang's violation of the standard of care.

Wang moves for summary judgment on Plaintiff's medical malpractice claim on two bases. First, Wang argues that Pfaller cannot establish medical malpractice without the testimony of Drs. Schamber and Gaglio, whose testimony should be excluded. Def.'s Mem. Supp. at 19, ECF No. 111. The Court denied Wang's motions in limine to exclude Schamber and Gaglio's testimony, Order, Nov. 4, 2020, ECF No. 170, and thus summary judgment on that basis cannot be granted.

Second, Wang argues that he is entitled to sovereign immunity. Id. at 20-25. Virginia remains committed to the doctrine of sovereign immunity. See Pike v. Hagaman, 787 S.E.2d 89, 92 (Va. 2016) (repeating the chestnut that the doctrine of sovereign

immunity is "alive and well in Virginia"). The doctrine of sovereign immunity "protects the state from burdensome interference with the performance of its governmental functions and preserves its control over state funds, property, and instrumentalities." Id. at 92 (quoting City of Virginia Beach v. Carmichael Dev. Co., 527 S.E.2d 778, 781 (Va. 2000)) ; see also James v. Jane, 282 S.E.2d 864, 869 (Va. 1980) (noting that sovereign immunity protects the state from being paralyzed by the threat of litigation).

Under Virginia law, "[s]overeign immunity determinations must be made on a case by case basis, balancing factors identified in a test established in James . . . and further enunciated in Messina." Benjamin v. Univ. Internal Med. Found., 492 S.E.2d 651, 652 (Va. 1997) (citing James, 282 S.E.2d at 869; Messina v. Burden, 321 S.E.2d 657, 663 (Va. 1984)). These factors are:

> 1. The function the employee was performing;
>
> 2. The state's interest and involvement in that function;
>
> 3. Whether the act performed by the employee involved the use of judgment and discretion; and
>
> 4. The degree of control and direction exercised by the state over the employee.

Pike, 787 S.E.2d at 92 (citing James, 282 S.E.2d at 869). The defendant bears the burden of proving facts entitling him or her to sovereign immunity. Id. at 92.

Applying the James factors to the facts of this case presents a challenging task, but balancing the factors ultimately results in the conclusion that Wang is not entitled to sovereign immunity.[16]

## a. The Function the Employee Was Performing and the State's Interest and Involvement in That Function

The first and second factors call for assessing Wang's function and the governmental objective. When a government employee performs a function that is "essential to a governmental objective and the government had a great interest and involvement that function," these factors weigh in favor of sovereign immunity. Lohr v. Larsen, 431 S.E.2d 642, 644 (Va. 1993). But when a government employee performs a function that "has only a marginal influence upon a governmental objective, and the government's interest and involvement in that function are 'slight,'" these factors weigh against sovereign immunity. Id.

In James, the Supreme Court of Virginia held that the government had only a slight interest in providing adequate medical care to patients at the University of Virginia Hospital. 282 S.E.2d at 870. The Court provided two rationales for this holding. First,

---

[16] Plaintiff has abandoned the theory that Wang was grossly negligent and therefore not entitled to sovereign immunity. See Pl.'s Answers Ct.'s Questions at 4, ECF No. 230. In addition, although the James factor are non-exclusive, Plaintiff and Wang confine their analysis to these four factors and thus so does the Court. See Pike, 787 S.E.2d at 92 n.2 (limiting the analysis to the four James factors where neither party urged consideration of any other factor).

the Court found that the state's "paramount interest" in the hospital was medical education. See id. ("[T]he paramount interest of the Commonwealth of Virginia is that the University of Virginia operate a good medical school and that it be staffed with efficient and competent administrators and professors."). Second, although the state also had an interest in ensuring that patients at the hospital received proper medical care, that interest was not unique from the state's interest in ensuring that all patients in Virginia - including those at private hospitals - receive proper medical care. Id.

There is no dispute that, at all relevant times, Wang provided medical care to inmates, including Pfaller, at Green Rock. Wang Decl. ¶ 1, ECF No. 111-1; Wang Dep. 16:13-18, ECF No. 111-4. The state undoubtedly has an important interest the provision of medical care to inmates, see Coppage v. Mann, 906 Fed. Supp. 1025, 1048 (E.D. Va. 1995); however, the state's "paramount" interest at Green Rock is incarceration, see Deavers v. Rappahannock Reg. Jail Auth., No. 3:13cv821, 2014 WL 3045445, at *11 (E.D. Va. July 3, 2014) ("Virginia's primary interest in the Jail is the incarceration of convicted criminals, rather than the provision of medical care."). Like in James, the state's interest in providing medical care flows from this primary interest. In James, the Supreme Court of Virginia found that the state interest in having a good medical school required having a hospital as well. See 282

33

S.E.2d at 867 ("A medical school could not operate without a hospital as an adjunct thereto.").

Here, the United States Constitution obligates the state to provide the people it incarcerates with adequate medical care. Farmer, 511 U.S. at 832 (holding that the Eighth Amendment requires prison officials to provide inmates with adequate medical care). However, the weight of this constitutional obligation does not allow the Court to conclude that the state's interest in providing medical care to inmates is "slight," as the Supreme Court of Virginia concluded with respect to patients at the University of Virginia Hospital in James. Neither can the Court conclude that the state's interest is "great," given that the state's primary interest is in incarceration. The Supreme Court of Virginia has not provided a clear indication of how these factors should be weighed when the state's interest is neither great nor slight.[17]

The Supreme Court of Virginia's decision in McCloskey v. Kane, 604 S.E.2d 59 (Va. 2004), teaches that, in this case, these factors weigh against sovereign immunity. McCloskey involved a doctor at a state psychiatric hospital. Id. at 60. The Court did not directly address these factors. However, it distinguished its previous

---

[17] The Supreme Court of Virginia considered sovereign immunity for VDOC medical staff in Whitley v. Commonwealth of Virginia, 538 S.E.2d 296 (Va. 2000). However, these factors were not at issue on appeal, so the Court did not consider them. Id. at 302.

decision in Lohr v. Larsen, 431 S.E.2d 642 (Va. 1993) on the basis, in part, that the state's "paramount interest" in Lohr "was the provision of quality medical care to economically disadvantaged citizens." Id. at 62 n.1. Together with James then, McCloskey tells us that, if the state's paramount interest is not the provision of medical care, these factors weigh against sovereign immunity – even in the absence of a holding that the state's interest in the provision of medical care is only slight. Therefore, because the state's paramount interest at Green Rock was incarceration, these factors weigh against a finding of sovereign immunity.

## b. Whether the Act Performed by the Employee Involved the Use of Judgment and Discretion

The third James factor calls for assessment of discretion in the act or acts complained of in the plaintiff's claim. See Adams v. Naphcare, Inc., 243 F. Supp. 3d 707, 719 (E.D. Va. 2017) ("Under Virginia law, a court considers 'whether the act complained of involved the use of judgment and discretion.'" (quoting Messina, 321 S.E.2d at 657)). In general, when a state employee exercises discretion, this factor weighs in favor of sovereign immunity. See Lohr, 431 S.E.2d at 645 ("To facilitate the efficient and effective operation of government, the exercise of discretion vested in government employees should not be affected by threats of personal liability arising from the use of such discretion."). However, this factor "is not always determinative." James, 282 S.E.2d at

35

869. Analyzing a state employee's claim of sovereign immunity requires determining "the level of discretion required of a government employee in performing his job and whether the employee is exercising that discretion in the discharge of his duties <u>when the allegedly negligent act occurred</u>." <u>Lohr</u>, 431 S.E.2d at 645 (emphasis added). Because Plaintiff alleges that Wang acted negligently in two courses of conduct, his treatment of Pfaller's Hepatitis C and his provision of palliative care to Pfaller, the analysis of this factor will address these two courses of conduct separately.

### i. The Hepatitis C Treatment Claim

As to Wang's treatment of Pfaller's Hepatitis C, Plaintiff specifically claims that Wang was negligent in deciding whether to refer Pfaller for further testing or treatment by failing to refer Pfaller for a Fibroscan in October 2015 and in July 2017 when he met the VDOC Guidelines' FIB-4 threshold and by failing to refer Pfaller for treatment at any point, as the AASLD guidance recommends. In deciding whether to refer Pfaller for treatment or testing, Wang appears to have had significantly less discretion than the physicians in <u>James</u>. In <u>James</u>, the Court found, "While all attending physicians are required and encouraged to follow certain guidelines to the end that their professional services constitute 'good medical practice,' the attending physicians of

patients exercised broad discretion in selecting the methods by which they care for them." 282 S.E.2d at 866.

In contrast, the VDOC Guidelines go beyond general guidelines to ensure "good medical practice": they instruct that inmates can only be referred for further testing and/or treatment with DAAs under certain conditions. Specifically, the VDOC Guidelines requires inmates to meet certain APRI and/or FIB-4 thresholds before they can be referred for a Fibroscan or treatment with DAAs at the VCU Telemedicine Clinic. See, e.g., Wang Decl. Ex. 3, at 35, ECF No. 111-1. Further, the VDOC Guidelines specify how to calculate the APRI and FIB-4 scores. See id. at 36. Inmates that do not meet the APRI and/or FIB-4 thresholds can be referred for treatment "if there are other findings suggestive of advanced liver disease such as low albumin or Platelets, or elevated bilirubin or INR, or if there are extra-hepatic conditions that warrant treatment, such as symptomatic cryoglobulins, debilitating fatigue." Id. at 35. In other words, VDOC prescribed the course of monitoring and treatment for inmates with Hepatitis C, and Wang's role was to follow that prescription. Only in emergency circumstances could Wang order a Fibroscan without an inmate meeting the VDOC Guidelines' criteria. See Wang. Dep. 40:2-16, ECF No. 111-4. Thus, Wang's discretion was severely curtailed by the VDOC Guidelines, and this factor weighs against sovereign immunity as to Plaintiff's claim related to Hepatitis C treatment.

37

### ii. The Palliative Treatment Claim

As to Plaintiff's claim that Wang's provision of palliative care to Pfaller was negligent, Plaintiff points to no similar VDOC guidelines or policy that constrain Wang's discretion.[18] On this record, Wang appears to have had substantial discretion in providing palliative care, much like the physicians in James. However, discretion, when not aimed at the state's primary purpose, does not weigh in favor of sovereign immunity. See Lohr, 431 S.E.2d at 645 ("Thus, because the broad discretion vested in the physicians in James was not attendant to actions that were integral to the Commonwealth's interest or function, there was no immunity."). As discussed above, providing palliative care (or any medical care) was not the state's primary interest at Green Rock. Thus, even though Wang exercised substantial discretion in this regard, this factor also does not weigh in favor of sovereign immunity as to Plaintiff's claim related to palliative care.

### c. The Degree of Control and Direction Exercised by the State over the Employee

The fourth James factor necessitates a look at the state's control over Wang. "A high level of control weighs in favor of immunity; a low level of such control weighs against immunity."

---

[18] Plaintiff's argument that the standard of care limited Wang's discretion misapprehends the discretion factor of the sovereign immunity analysis. This factor is concerned with whether the state afforded its employee discretion, not whether the employee wielded that discretion appropriately.

Id. at 646. In its line of cases dealing with sovereign immunity for medical malpractice, the Supreme Court of Virginia has examined various bases for finding that a state controls an employee by distinguishing the facts of James. For example, in Gargiulo v. Ohar, 387 S.E.2d 787 (Va. 1990), the Supreme Court of Virginia musters the following facts in support of its conclusion that "[t]he state had virtually no control over the professional conduct of the physicians in James": the physicians in James could refuse patients, they could choose the "means and methods" of caring for their patients, and they received some compensation from patients' fees. Id. at 790-91. In contrast, the doctor in Gargiulo was a state employee earning a state salary who was not permitted to choose her patients and was "required to obey state-established rules, to employ state-prescribed methods, and to follow state-standardized procedures." Id. at 791. Similarly in Lohr, the Court concluded that the state had control over the doctor relative to James because the state controlled "the equipment [the doctor] used, the procedures he could perform and 'even the brand names of the medication he [could] prescribe" and which patients he saw. 431 S.E.2d at 646 (second alteration in original).

Here, the state exercises a high level of control over Wang's provision of medical care to inmates at Green Rock, including Pfaller. Wang is a VDOC employee, and his salary is paid by the Commonwealth of Virginia. Wang Decl. ¶ 4, ECF No. 111-1. He cannot

39

choose his own patients or refuse to see certain patients: he sees "any patient placed on [his] schedule." Id. ¶ 9. All the equipment he uses is provided by the VDOC. Id. ¶ 10. And, in the treatment of Hepatitis C at least, he must follow the VDOC Guidelines, which prescribe specific methods and procedures for assessing liver damage.[19] These facts augur in favor of a finding that the state exerted control over Wang's provision of both palliative care and – to an even greater degree – Hepatitis C treatment to Pfaller. Therefore, this factor weighs in favor of sovereign immunity.

The remaining task is to assess whether the four James factors, as established by the record, call for application of the sovereign immunity doctrine to bar the medical malpractice claim made in Count III. The Supreme Court of Virginia has instructed that "[s]overeign immunity determinations must be made on a case by case basis, balancing factors identified in a test established in James . . . and further enunciated in Messina." Benjamin, 492 S.E.2d at 652 (citing James, 282 S.E.2d at 869; Messina, 321 S.E.2d at 663).

---

[19] The Supreme Court of Virginia clarified in Lohr that finding that the state imposed rules, methods, and procedures on an employee is not necessary to find that an employee was subject to state control. 431 S.E.2d at 646 n.2. Thus, the lack of information in the record about any VDOC policies about palliative care does not undermine the conclusion that the state exerted significant control over Wang.

In sum, the only factor weighing in favor of granting sovereign immunity is the state's control over Wang's provision of medical care to inmates, including Pfaller, at Green Rock. Except for this factor, this case is similar to James: the state has two interests in Green Rock, carceral and medical, but Wang only serves (and any discretion he has is only related to) the state's secondary interest in providing medical care to inmates. On balance, therefore, Wang is not entitled to sovereign immunity.

## CONCLUSION

For the foregoing reasons, DEFENDANT DR. LAURENCE SHU-CHUNG WANG'S MOTION FOR SUMMARY JUDGMENT (ECF No. 107) will be granted in part and denied in part. The MOTION will be granted on the claim in Count I that Wang's provision of palliative care to Pfaller violated the Eighth Amendment and on Wang's defense of qualified immunity on that claim. The MOTION will be denied on the claim in Count I that Wang's treatment of Pfaller's Hepatitis C violated the Eighth Amendment and on Wang's defense of qualified immunity on that claim. The MOTION will be denied as to Count III.

It is so ORDERED.

/s/

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: May ___, 2021